## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

The Roman Catholic Archbishop of Boston, a Corporation Sole,

    Plaintiff,

v.

Lumbermens Mutual Casualty Company,

    Defendant.

**04 10461 DPW**

MAGISTRATE JUDGE Alexander

Civil Action No.

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED Yes
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. T.O.M
DATE 3/5/04

## COMPLAINT

The Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB"), asserts the following claims against the defendant Lumbermens Mutual Casualty Company ("LMC").

## NATURE OF CLAIMS

1.    This is an action for declaratory and monetary relief arising out of the wrongful failure by LMC to acknowledge and fulfill its obligations under various insurance policies issued to the RCAB between at least 1964 and 1983. The RCAB seeks a declaration of its rights with respect to claims that have been asserted against the RCAB and its insured personnel by individuals alleging injury as a result of sexual molestation by clergy while they were associated with the RCAB and also alleging negligent supervision of such clergy by RCAB personnel. The RCAB seeks a determination that LMC's conduct constitutes multiple breaches of contract, breaches of the implied covenant of good faith and fair dealing, misrepresentation, fraud, and bad faith insurance practices in violation of G.L. chs. 93A, §2(A) and 176D. The RCAB also seeks an award of damages and fees.

## PARTIES

2.    The Roman Catholic Archbishop of Boston is a corporation sole organized and existing under the laws of the Commonwealth of Massachusetts with a usual place of business at 2121 Commonwealth Avenue, Brighton, Massachusetts 02135.

3.    Lumbermens Mutual Casualty Company is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business at 1 Kemper Drive, Long Grove, Illinois 60049.  LMC is a member of the Kemper Insurance Companies group ("Kemper").

## JURISDICTION

4.    The jurisdiction of this Court arises under 28 U.S.C. §1332 because there exists diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

5.    Venue is proper pursuant to 28 U.S.C. §1391(a), because a substantial part of the acts or omissions giving rise to the Complaint occurred in this District.

6.    The defendant is subject to personal jurisdiction in this forum pursuant to G.L. c.223A, §3(a), (b), (c), (d), and (f).

## THE APPLICABLE INSURANCE COVERAGES

7.    For many years, beginning no later than March 31, 1964, LMC sold insurance coverage to the RCAB through the James S. Kemper Insurance Agency in Boston, Massachusetts.

8.      On March 31, 1964 (if not earlier), LMC issued a standard form comprehensive general liability insurance policy to the RCAB which provided primary coverage on a "per occurrence" basis for bodily injury claims. Substantially identical renewal policies were issued thereafter until the coverage was terminated effective March 31, 1983 (the "March Primary Policies"). In addition, on September 23, 1971, LMC issued a supplementary primary insurance policy to the RCAB. This policy was renewed routinely until coverage was terminated effective March 31, 1983 (the "September Primary Policies"). Under each of these policies, LMC undertook to indemnify the RCAB to a limit of $300,000 per occurrence for bodily injury claims. There is no aggregate limit applicable to bodily injury claims outside of the completed operations and product liability hazards in any of the policies. The policies also required LMC to defend the RCAB against claims for bodily injury without any erosion of the limits of coverage. Among others, the following primary policies were issued to the RCAB by LMC: 4LL 64263A; 5LL 64263A; 6LL 64263A; 7LL 64263A; 8LL 64263A; 9LL 64263A; 0LL 64263A; 1YL757500; 2YL757500; 3YL757500; 4YL757500; 5YL757500; 6YL757500; 7YL757500; 8YL757500; 9YL757500; 0YL757500; 2YL757500-00; 0YL757500-01; 1YL 64706; 2YL 64706; 3YL 64706; 4YL 64706; 5YL 64706; 6YL 64706; 7YL 64706; 8YL 64706; 9YL 64706; and 0YL 64706.

9.      In 1973 (if not earlier), the RCAB purchased from LMC standard form excess liability coverage with a $5 million per occurrence limit for bodily injury claims. This coverage remained in effect until September 23, 1980, when the RCAB purchased such excess insurance from LMC with a per occurrence limit of $10 million. This coverage then remained in effect until 1982 when the RCAB purchased new excess insurance from LMC with a per occurrence limit of $2 million, which took effect on September 23, 1982, and remained in effect until March

31, 1983. Among others, the following excess policies were issued to the RCAB by LMC: 7SX 002269; 8SX 002269; 9SX 002269; 0SX 002269-00; 0SX 002269-01; and 0SX 002269-02.

10.    At all times between at least 1964 and 1983, the RCAB was covered by primary and (for some periods) by excess liability insurance policies issued by LMC (the "LMC Coverage Period").  On information and belief, LMC also provided liability insurance coverage to the RCAB from 1954 until 1964.

11.    The policies issued by LMC are comprehensive general liability insurance policies pursuant to which LMC agrees to pay on behalf of the insureds all loss they are obligated to pay because of bodily injury.  The policies further provide that LMC has a duty to defend any suit seeking damages on account of bodily injury. The policies insure the RCAB as well as its employees, officers, directors, and volunteers and all subsidiary, affiliated, associated, and allied companies, corporations, firms, or organizations.

## FACTS

12.    The RCAB operates numerous parishes and other facilities dedicated principally to the worship of God and to pastoral care and other services.  The RCAB has been assisted at all relevant times by various priests, nuns, church  members, and others in the pursuit of various pastoral and other activities.

13.    In or around 1993, the RCAB notified LMC that it had received notice of several claims by individuals alleging that they had been sexually molested by priests.  Abuse allegedly occurred, in whole or in part, between 1954 and 1983, and the claimants asserted that RCAB

supervisors were liable to them for negligent supervision of the priests. The RCAB requested that LMC defend and indemnify it with respect to these claims (the "Initial Claims").

14.    Despite a diligent search starting in 1993, the RCAB was unable to locate any of the actual policies issued by LMC, the most recent of which was for a period that had ended ten years previously. The RCAB's search included inquiries through the successor to the James S. Kemper Insurance Agency, as well as exhaustive searches of the RCAB's offices and archives.

15.    LMC responded to the notices concerning the Initial Claims by a series of letters denying coverage on various grounds. While it acknowledged that coverage existed starting in 1971, LMC claimed that it was unable to locate any of the actual policies. These denial letters assumed two distinct forms: (a) for claims with an initial date of loss prior to September 1971, LMC wrongly denied coverage (including costs of defense) by simply asserting that it was unable to locate any evidence of coverage; and (b) for claims with an initial date of loss after September 1971, LMC wrongly denied coverage (including costs of defense) by asserting that the alleged sexual abuse did not constitute an occurrence, bodily injury or property damage within the meaning of the policies. The RCAB challenged both types of denials by LMC, and ultimately was forced to resolve the Initial Claims without contribution from LMC. The RCAB paid approximately $2 million of its own funds, between 1993 and 1996, to settle these claims.

16.    In June 1995, representatives of LMC came to Boston to inform the RCAB that, upon further review, LMC now acknowledged that the policies it had issued to the RCAB did in fact provide coverage for claims arising out of sexual molestation. Although they continued to assert that they were unable to locate copies of the actual policies, LMC through its representatives

represented that the primary policies carried not only per occurrence limits of $300,000, but also annual aggregate limits of $300,000 applicable to the type of claims at issue. They further represented that the aggregate limit of liability for certain policy years had been eroded (or even exhausted) by prior indemnity payments that LMC had made on unidentified, but not sexual molestation, claims. They said that the basis for these representations was historical data, including accounting records. LMC agreed to reimburse the RCAB for those Initial Claims with dates of loss between September 23, 1971 and March 31, 1983, but only insofar as the claims alleged initial contact in a year for which LMC concluded that the available aggregate had not been exhausted by prior indemnity payments.

17.     The RCAB thereupon sent LMC a list of all of the settled claims that had arisen either within or before the acknowledged coverage period, as well as a list of all the pending claims. The RCAB also continued to challenge LMC's position that no coverage existed prior to 1971. In July 1995, it sent LMC three affidavits signed by former employees of LMC and the insurance brokerage agency that handled the RCAB's account, stating that coverage existed as early as 1955.

18.     LMC communicated with counsel for the RCAB several times during the next twelve months by telephone and written correspondence. In December 1995, Christine Zinoman, a representative of LMC, informed counsel for the RCAB that LMC now was also prepared to acknowledge coverage back to 1968, and, in January 1996, she informed counsel for the RCAB that it had tentatively verified coverage back to 1964. Shortly thereafter, the RCAB received correspondence from LMC setting forth "beginning aggregates" for the March and September Primary Policies, most of which were lower than $300,000. LMC claimed that the aggregates

had been eroded by prior indemnity payments, but was unable to provide any details of the claims that had supposedly eroded the asserted aggregates. In or around April 1996, LMC confirmed in writing that it had verified the existence of primary coverage back to 1964.

19.     In April 1996, LMC finally began indemnifying the RCAB for the Initial Claims. It continued to represent that the policies contained annual aggregates of $300,000. Each payment was accompanied by a cover letter indicating LMC's position as to which policy year's aggregate was impacted by the payment. At that time, LMC insisted that the "first encounter" rule applied, and applied each indemnity payment to the asserted aggregate for the policy year in which the first act of abuse allegedly occurred.

20.     As claims continued coming in to the RCAB, the RCAB continued promptly to put LMC on notice. Although given every opportunity to do so, LMC consistently declined to participate in settlement negotiations. As a result, the RCAB took responsibility for settlement negotiations, while keeping LMC informed of the progress through correspondence and telephone calls. When an agreement was reached to settle a particular claim, the RCAB forwarded the terms of that agreement to LMC. If LMC agreed that there was a policy in effect for the year[s] the alleged conduct occurred, LMC, upon receipt of the settlement agreement, applied each claim to the applicable policy year and made indemnity payments from its calculation of the "available aggregate" for that year. LMC acknowledged its obligation to indemnify the RCAB for all of these claims.

21.     Although LMC originally insisted that the "first encounter" rule applied, and further insisted on applying indemnity payments only to the "aggregate balance" for the first year in which the alleged abuse occurred, the RCAB repeatedly challenged this position. As LMC

continued to make payments to the RCAB, and as the asserted aggregates for certain policy years purportedly became "exhausted," LMC began applying indemnity payments to policy years with available aggregates, so long as some of the alleged abuse occurred within that policy year. The applicable insurance law so required.

22.     In or around 1997, the RCAB began to receive claims from individuals alleging that they had been sexually molested by a Rev. John Geoghan (the "Geoghan Claims"). Many of the Geoghan Claims alleged conduct that occurred in the LMC Coverage Period.   Consistent with the practice that had evolved, the RCAB promptly notified LMC of the Geoghan Claims and responded to all requests from LMC for further information. LMC again declined to participate in the settlement negotiations, and paid only a share of the defense costs.

23.     By 1998, LMC had acknowledged that it had issued excess liability policies to the RCAB from September 23, 1977 through March 31, 1983, with per occurrence limits of liability ranging from $2 million to $10 million. LMC had misrepresented, however, that these policies also were subject to applicable aggregate limits equal to the policies' per occurrence limits. The RCAB insisted that it had excess coverage in place with LMC prior to 1977, and, in June 1998, submitted an "extension binder" along with other supporting documentation that it had found, as evidence of excess coverage from 1973-1977. In July 1998, LMC responded by wrongly denying that there was such coverage, and stating that, although it had engaged in multiple searches, it was unable to find any evidence of excess coverage prior to 1977. Incomprehensibly, it denied that the extension binder and supporting documents were sufficient secondary evidence of coverage.

24.    In or around this time, a representative of LMC also wrongly informed the RCAB that all of the primary policies prior to September 1977 had been exhausted by payments of claims and asked that the RCAB refrain from sending any new claims to LMC with dates of loss prior to September 1977.  LMC also refused to pay defense costs under these pre-September 1977 policies.  LMC further stated that the primary policies from 1977-1983 were almost exhausted and that most indemnity payments for those years were now being paid out of the excess policy coverage.

25.    While the Geoghan Claims were pending, LMC stated that, between 1967 and 1983, there were primary policies in effect which each had an "annual aggregate limit of $300,000," and LMC further asserted that "with respect to each of the aforementioned primary policies, all these policies have been exhausted."  LMC also represented that (a) excess policies were in place from 1977 through 1980 with "annual aggregate[s]" of $5 million dollars, (b) excess policies were in place from 1980 through 1982 with an "annual aggregate" of $10 million, and (c) an excess policy was in place from 1982 through March 31, 1983 with an "annual aggregate" of $2 million.

26.    On July 13, 2000, Paul D. Meany, an "Executive Liability Specialist" of LMC who was responsible for the RCAB coverage, was deposed by counsel for the Geoghan claimants in connection with the Geoghan Claims.  At the deposition, Mr. Meany produced (for the first time) portions of certain of the RCAB policies. He reiterated that the policies issued to the RCAB each had "annual aggregates" and that the primary policies each had been "exhaust[ed]" by payment of the aggregate limits. Both assertions were false and misleading, as the policies had no applicable aggregates and, therefore, could not have been exhausted.

27.    As the RCAB continued to settle claims, LMC indemnified the RCAB only for claims that involved injury in an excess policy year that LMC considered not to be exhausted by prior payments. In or around 2001, LMC informed the RCAB that it would thereafter only pay defense costs for claims that fell within unexhausted policy years. In accordance with that instruction, the RCAB stopped sending defense bills to LMC and paid the bills itself. The RCAB was compelled to defend and settle claims during this time period without the participation of LMC.

28.    By late 2001, settlement negotiations with the 86 Geoghan claimants represented by Mitchell Garabedian had stalled. In order to fund a possible settlement, the RCAB focused on the excess policies it believed it had in place from 1973-1977. LMC offered to "buy-back" the excess coverage for $2.5 million, although in fact these policies provided coverage with annual per occurrence limits of $5 million without aggregate limits. On the basis of LMC's representations of the terms of the primary and excess coverage offered by it during the period in question, including the alleged annual aggregate limits, the RCAB agreed to the buy-out. In fact, the excess policies – like the primary policies – contained no applicable aggregate limits. The RCAB reasonably relied to its detriment on the deception of LMC.

29.    In or around 2002, partly as a result of the public disclosures concerning the Geoghan cases, the RCAB began receiving a rapidly escalating number of claims from individuals alleging that they had been sexually molested by priests while those priests were associated with the RCAB (the "Recent Claims"). Consistent with the practice that had been established, the

RCAB promptly informed LMC of these additional claims and offered to cooperate fully with LMC. LMC continued to assert (wrongly) that the primary policies were "exhausted."

30.    The RCAB entered into a settlement in 2002 for $10 million with the 86 Geoghan claimants represented by Mitchell Garabedian. LMC contributed $2,160,000 to that settlement. The extent of LMC's participation was premised on the RCAB's good faith reliance on the misrepresentations made by LMC as to the existence and applicability of aggregate limits in the policies issued to the RCAB.

31.    The number of Recent Claims increased to more than 500 by late 2002. While settlement efforts, including intensive mediation efforts, had continued, the parties had been unable to reach any agreement on the Recent Claims. The RCAB kept LMC informed of the status of negotiations as they progressed, and cooperated fully with any requests for information from LMC. LMC, however, continued to refuse to participate in the negotiations and continued to assert falsely that the primary policies had been exhausted, thus seeking to limit drastically the available coverage. LMC's refusal to make a reasonable offer of settlement to the RCAB seriously impeded the RCAB's ability to settle the claims in a timely and effective manner. Instead, LMC's intransigence and deception caused the costs and exposure of the RCAB to increase substantially.

32.    In or around January 2003, the RCAB conducted a review of the LMC coverage, particularly the representations by LMC regarding aggregate limits of liability in the policies. The review led the RCAB to question LMC's unflagging position on the existence of aggregate limits.

33.    In January 2003, representatives of the RCAB went to Chicago to meet with representatives of LMC. At this meeting, the representatives of the RCAB asked the LMC representatives to explain the basis for LMC's assertion that the policies contained aggregate limits. Although the representatives of LMC continued to insist that the policies themselves contained such applicable aggregates, when asked to identify the specific provisions of the policies containing the aggregate limits, they were unable to do so.

34.    In February 2003, representatives of LMC came to Boston to discuss coverage issues. LMC at long last confessed that there were no applicable aggregate limits and that the language of the policies does not support an argument that there are applicable aggregate limits. Moreover, they conceded that there was "nothing in the file" that would impose aggregate limits on the policies. Instead of offering an explanation for its ten years of coverage denials and misrepresentations, counsel for LMC incredibly suggested that the RCAB and LMC simply "agree" that there were applicable aggregate limits. Such an agreement, he explained, would help limit the RCAB's payments to the victims as well as avoid opening a "can of worms". Counsel for the RCAB obviously declined to agree that there were aggregate limits where none existed. LMC's ploy of attempting to insert aggregates where none existed would have limited fraudulently its coverage by tens of millions of dollars.

35.    Counsel for the RCAB promptly sent a letter to the mediators and to counsel for the claimants stating that, although the RCAB had been led to believe that the policies from 1964-1977 had been exhausted, the RCAB now believed that those policies were not exhausted. Counsel for LMC then sent a letter to the recipients of the RCAB's letter stating that it was "grossly deceptive" of the RCAB to make those statements concerning the exhaustion of the

policies, and that "it is [LMC]'s position that any and all coverage that may have existed from 1964 to 1977 is exhausted." LMC offered no explanation or evidence to support its wrongful position.

36.    In May 2003, when representatives of LMC met again with representatives of the RCAB, counsel for LMC stated, for the first time, that "agreements were reached" regarding coverage and that the RCAB was obligated to accept the existence of aggregate limits on all of the policies issued by LMC. LMC's assertion that such an agreement exists is false. Tellingly, LMC has not asserted that there was any written agreement modifying the policies, nor has it identified any oral communication that constitutes such an agreement. Indeed, the policies provide that they cannot be modified except in writing.

37.    As of the Spring and Summer of 2003, there were approximately 550 Recent Claims pending against the RCAB, including over 200 civil suits pending in the Massachusetts Superior Court. Approximately 400 of these claims alleged injury that occurred, in whole or in part, during the LMC Coverage Period. Despite repeated attempts by the RCAB to ascertain LMC's position, however, LMC continued to refuse to acknowledge its obligation to provide coverage, continued to assert the existence of aggregates, and declined to make any settlement proposal that would provide continuing coverage to the RCAB with respect to any of the Recent Claims.

38.    In July 2003, Bishop Sean O'Malley was appointed as Archbishop of the Boston Archdiocese. Immediately upon his appointment, Archbishop O'Malley initiated an evaluation of the Recent Claims. He concluded that an early settlement was necessary to provide reasonable and appropriate compensation for the claimants and to minimize the financial risk to the Archdiocese.

39.     As the evaluation of the Recent Claims was concluding, mediation sessions commenced between the RCAB and a Steering Committee of counsel representing claimants.   The RCAB apprised LMC of each and every proposal and counterproposal that was made to the Steering Committee. LMC acknowledged receipt of the reports on the status of the discussions, and raised no objection and offered no suggestions regarding the process or the merits of the negotiations.

40.     On September 9, 2003, the RCAB announced that a settlement in principle, in the form of a memorandum of understanding, had been executed with the Steering Committee, in which the RCAB agreed to pay up to $84,250,000 to 552 claimants. The form of the Settlement Agreement and Arbitration Agreement (the "Agreement") to be signed by each of the claimants opting into the settlement was finalized on September 23, 2003.

41.     The Agreement provides that the amount received by each claimant will be determined through individual arbitration, and that, absent a finding of substantial injustice, each claimant alleging sexual abuse will receive an award between $80,000 and $300,000. The Agreement provides that individuals with claims for loss of consortium will receive $20,000. The Agreement also provides that the total of all the awards paid to the claimants shall be $84,250,000, although a pro rata share will be deducted for each claimant that does not opt in. The Agreement provides that it would become final once 80% of the 552 claimants opted in. The Agreement also provides that the awards shall be to compensate each claimant who has presented a sexual abuse claim for physical injury or sickness arising from the claimed abuse and related alleged negligent supervision.   The Agreement also provides for the payment of up to a

total of $750,000 to reimburse attorneys for the claimants for out-of-pocket expenses incurred in pending litigation.

42.     On September 15, 2003, the RCAB received a letter from a representative of LMC, stating for the first time its position that the settlement offer constitutes a voluntary payment and assumption of liability on the part of the RCAB, and that LMC is thereby relieved of any obligation it may have had to contribute to the settlement.

43.     The Agreement became final on October 21, 2003, when the 80% criterion was reached, and by October 30, 2003, the final day for claimants to opt into the Agreement, over 98% of the 552 claimants had opted into the Agreement.

44.     The individual arbitrations were completed in December, and approximately $84 million was paid out by the RCAB on December 22, 2003. Largely as a result of LMC's denial of coverage, the RCAB was forced to borrow money to fund the settlement, and to offer certain valuable property for sale. Of the total amount paid, approximately $59.3 million relate to policy periods when LMC was the sole insurer, and an additional $7.7 million arise out of policy periods where LMC coverage overlapped with coverage purchased from another insurer. Moreover, approximately $6 million relate to the pre-1964 period when the RCAB believes it was insured by LMC.

45.     LMC has refused to make a reasonable offer of settlement, and still even refuses to acknowledge that there are no aggregate limits applicable to the claims at issue.

-15-

46.    The Agreement was a fair and reasonable resolution of the claims. Among other things, the Agreement disposed of the vast majority of the Recent Claims in a single settlement, and thereby drastically reduced the time and expense that otherwise would be necessary to achieve resolution. In addition, the Agreement eliminated the risk of verdicts that could have far exceeded the total provided by the Agreement. Such verdicts could have made it financially impossible for the RCAB to provide any reasonable compensation to other claimants, and would have threatened the financial viability of the Archdiocese.

## COUNT I
### Declaratory Judgment

47.    The RCAB repeats and realleges each and every allegation contained in paragraphs 1 through 46, as if fully set forth herein. It seeks a Declaratory Judgment as follows.

48.    LMC issued to the RCAB various insurance policies, beginning no later than 1964 and continuing until March 31, 1983, containing a duty to defend and indemnify the RCAB against claims arising from occurrences during those years. These policies do not contain aggregate limits applicable to bodily injury claims, except such claims resulting from products liability or completed operations hazards, neither of which is applicable to the sexual molestation claims at issue. Pursuant to the terms of the policies, LMC in the adjustment of claims or the defense of suits, cannot rely upon any limitation of liability by statute or the immunity of the RCAB from tort liability.

49.    LMC also issued primary policies to the RCAB from 1954 through 1964. These policies provide coverage for bodily injury claims on a per occurrence basis, likewise without any