UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, a Corporation Sole,<br>    Plaintiff, | ) ) ) | |
| | ) | Civil Action No. 04-10461-DPW |
| vs. | ) ) | |
| LUMBERMENS MUTUAL CASUALTY COMPANY,<br>    Defendant. | ) ) ) | |

## ANSWER, COUNTERCLAIM AND JURY CLAIM

Defendant, Lumbermens Mutual Casualty Company ("LMC") responds as follows to the separately numbered paragraphs in the complaint of the Roman Catholic Archbishop of Boston, a Corporation Sole ("RCAB"):

1.    LMC states that paragraph 1 of the Complaint is a summary characterization of the contents of the complaint and does not contain allegations of fact to which LMC has an obligation to respond.  To the extent that paragraph 1 is deemed to contain factual allegations to which LMC is obligated to respond, LMC denies such allegations.  Further answering, LMC denies that it has wrongfully failed to acknowledge and fulfill its obligations under any insurance policies issued to the RCAB, and further alleges that there is a dispute between LMC and RCAB as to what policies were issued to the RCAB and for what years.  LMC denies that it has engaged in any breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, fraud, or bad faith insurance practices and denies that the RCAB is entitled to any award of damages and fees for any such alleged conduct.

2.    Admits the allegations of paragraph 2.

3.    Admits the allegations of paragraph 3.

4.      LMC neither admits nor denies the allegations of paragraph 4 same are bare legal conclusions to which no response is made or required.  To the extent that paragraph 4 is deemed to contain factual allegations to which LMC is obligated to respond, LMC denies such allegations.

5.      LMC neither admits nor denies the allegations of paragraph 5 as same are bare legal conclusions to which no response is made or required.  To the extent that paragraph 5 is deemed to contain factual allegations to which LMC is obligated to respond, LMC denies such allegations.

6.      LMC neither admits nor denies the allegations of paragraph 6 as same are bare legal conclusions to which no response is made or required.  To the extent that paragraph 6 is deemed to contain factual allegations to which LMC is obligated to respond, LMC denies such allegations.

7.      LMC admits only that there is some evidence that it issued one or more primary insurance policies to the RCAB beginning March 31, 1964 and affirmatively alleges that there are no policies in existence for any policy period prior to 1974.  LMC admits that the James S. Kemper Insurance Agency was an insurance broker through which the RCAB purchased insurance and denies the balance of the allegations contained in paragraph 7 of the complaint and demands strict proof thereof.

8.      LMC denies the allegations of paragraph 8 of the complaint insofar as same characterize the contents of any contract(s) of insurance between it and the RCAB, and states that each such policy speaks for itself.  LMC admits only that it issued general liability insurance policies to the RCAB for periods between March 31, 1974 and March 31, 1983, which included a limit of $300,000 per occurrence for bodily injury claims.  LMC also admits that the primary

coverage for the years 1974 to 1983 included a duty to defend against claims for bodily injury resulting from an occurrence to the extent such claims fell within the scope of coverage afforded under the policies under applicable law, and subject to any limitations or exceptions provided under the policies or applicable law.  The remaining allegations of paragraph 8 are denied and LMC demands strict proof thereof.  LMC affirmatively alleges that there was a dispute between LMC and RCAB as to the existence, terms and conditions of comprehensive general liability insurance policies issued to the RCAB.  In addition, LMC affirmatively alleges that LMC and the RCAB have been unable to locate any actual policies issued prior to 1974; that the parties agreed that primary policies had existed during the period from 1964 through 1974 with per occurrence and aggregate limits of $300,000; and that the parties believed and agreed that the primary insurance policies from 1974 through 1983 included aggregate limits of $300,000.

9.    LMC admits only that it issued excess liability coverage to the RCAB and denies the remaining allegations of paragraph 9 and demands strict proof thereof.  LMC affirmatively alleges that there is a dispute between the RCAB and LMC as to the existence, terms and conditions of any standard form excess liability coverage issued to the RCAB.  LMC specifically denies having issued any excess liability coverage to the RCAB at any time prior to September 23, 1977 and affirmatively alleges that the RCAB and LMC have entered into a settlement of disputed coverage between 1973 and 1977 pursuant to a buy back agreement, a copy of which is attached hereto as *Exhibit 1*.

10.    LMC admits only that it issued insurance policies to the RCAB as outlined in its responses to the allegations of paragraphs 7, 8 and 9 of the complaint as set forth above, and denies the remaining allegations of paragraph 10 and demands strict proof thereof.  LMC objects

to the RCAB's use and definition of the phrase "LMC Coverage Period" and states that such is a disputed matter.

11.    LMC denies that the allegations of paragraph 11 accurately describe the terms and conditions of the insurance policies issued by LMC and affirmatively alleges that each such policy speaks for itself.  LMC denies the remainder of the allegations contained in paragraph 11 of the complaint and demand strict proof thereof.

12.    Admits that the RCAB operates the facilities described with the personnel described.  LMC is without sufficient knowledge or information to admit or deny as to the purpose for which such facilities are dedicated and therefore denies same and demands strict proof thereof.

13.    Admits only that LMC received notice of several claims from the RCAB in 1993 and without information as to the specific claims being referenced, LMC denies the remaining allegations of paragraph 13 and demands strict proof thereof.  LMC objects to the RCAB's use and definition of the phrase "Initial Claims" and states that such is a disputed matter.

14.    LMC is without sufficient information to admit or deny the allegations of paragraph 14 and therefore denies said allegations and demands strict proof thereof.

15.    LMC admits that it denied certain claims as presented to it by RCAB during the period alleged.  However, without information as to the specific claims or letters being referenced, LMC is without sufficient information to admit or deny the remainder of the allegations of paragraph 15 and therefore denies the same and demands strict proof thereof. LMC objects to the RCAB's use and definition of the phrase "Initial Claims" and states that such is a disputed matter.

16.    Without information as to the specific dates, specific claims, or specific representatives of LMC being referenced, LMC is without sufficient information to admit or deny the allegations of paragraph 16 and therefore denies the same and demands strict proof thereof.

17.    Without information as to the specific claims being referenced and without information as to the affidavits being referenced, LMC is without sufficient information to admit or deny the allegations of paragraph 17 and therefore denies the same and demands strict proof thereof.

18.    LMC admits that based on the information presented to it by the RCAB and the information otherwise available to it, LMC understood and believed that each policy was subject to an aggregate policy period liability limit of $300,000.  Without specific information as to the specific telephone calls or correspondence being referenced, LMC is without sufficient information to admit or deny the remainder of the allegations of paragraph 18 and therefore denies the same and demands strict proof thereof.

19.    Denies that LMC's response to or claims handling in connection with any claim presented to it by RCAB was unreasonable in the circumstances.  Admits that based on the information presented to it by the RCAB and the information otherwise available to it, LMC understood and believed  that each policy was subject to an aggregate policy period liability limit of $300,000.  Without information as to the specific dates and types of communications being referenced, LMC is without sufficient information to admit or deny the remainder of the allegations of paragraph 19 and therefore denies the same and demands strict proof thereof.

20.    Denies the allegations of paragraph 20 and affirmatively alleges that LMC on numerous occasions requested that the RCAB not settle cases without LMC's prior approval and

that RCAB repeatedly, and in direct violation of its contractual obligations to LMC, disregarded such requests.  Further responding, LMC states that some of the allegations of paragraph 20 are vague and ambiguous and without reference to specific claims, specific dates or specific letters, and LMC is therefore without sufficient knowledge to admit or deny such allegations and therefore denies same and demands strict proof thereof.

21.    LMC denies that the RCAB challenged any position LMC was taking regarding the aggregate balance of any policies, and affirmatively alleges that the RCAB agreed to the application of aggregates for each policy year for which LMC acknowledged coverage.  LMC denies the allegations regarding applicable insurance law.

22.    LMC is without sufficient knowledge to admit or deny the allegations of paragraph 22 as to when the RCAB began to receive claims or complaints concerning alleged conduct of Rev. John A. Geoghan ("Geoghan") and demands strict proof thereof.  LMC admits only that claims were made against Geoghan for sexually molesting individuals, and denies the remaining allegations of paragraph 22 and specifically objects to the use of the expression LMC "Coverage Period," which is a disputed issue in this matter.  LMC admits that it requested that the RCAB not settle claims without its prior approval, but that the RCAB settled such claims nonetheless.

23.    LMC admits only that it has issued excess liability insurance coverage to the RCAB and denies the present existence of any policies providing such coverage; denies that the periods for which such coverage was placed is known; and denies that the terms and conditions of such coverage are known by the RCAB or LMC.  LMC denies that it made any misrepresentations whatsoever to the RCAB regarding any insurance coverage.  LMC admits only that the RCAB submitted materials to LMC which RCAB contended comprised evidence of

excess policies in existence from 1973 to 1977. LMC states that after review, it denied that the materials submitted constituted sufficient evidence of excess coverage prior to 1977 to establish the existence of such coverage and that it so advised the RCAB. LMC admits that it engaged in multiples searches of its records for evidence of excess coverage for the period 1973 through 1977 without success and otherwise denies the remaining allegations of paragraph 23 of the complaint, and demand strict proof thereof. LMC affirmatively alleges that the parties entered into negotiations and a settlement agreement regarding the alleged existence of any excess policies from 1973 to 1977, a copy of which is attached hereto as *Exhibit 1*. Said agreement makes it clear that the parties have settled any and all possible disputes regarding alleged excess policies from 1973 to 1977 and that there has been an accord and satisfaction and a release with respect to such excess coverage.

24.    Without information as to the date of the communication described, the individual being referred to and content of the communications being referred to, LMC is without sufficient knowledge or information to admit or deny the allegations of paragraph 24 and therefore denies same and demands strict proof thereof.

25.    LMC admits that based on the information presented to it by the RCAB and the information otherwise available to it, LMC understood and believed that each policy was subject to an aggregate policy period liability limit of $300,000. Without information as to the representatives involved or the communications being referred to, LMC is without sufficient information to admit or deny the remainder of the allegations of paragraph 25 and therefore denies the same and demands strict proof thereof.

26.    Admits only that Paul D. Meany was an employee of LMC and that his deposition was taken on or about July 13, 2000 by counsel to plaintiffs in litigation then pending in the

Massachusetts Superior Court, and further states that the deposition speaks for itself.  LMC denies that any testimony provided at the deposition of Mr. Meany was false, misleading, or constituted misrepresentations of material fact to the RCAB, and further denies the remaining allegations contained in paragraph 26 of the complaint and demands strict proof thereof.

27.     Without information as to the dates or claims being referred to and without information as to the communications being referred to, LMC is without sufficient information to admit or deny the allegations of paragraph 27 and therefore denies the same and demands strict proof thereof.  Admitted that based on its discussions and agreement with RCAB and its counsel, LMC informed the RCAB that the agreed on aggregate limits for certain policy years had been exhausted, and the RCAB did not contend otherwise.

28.     LMC is without sufficient knowledge or information to admit or deny the first sentence of paragraph 28 of the complaint and therefore demands strict proof of same.  LMC denies the remaining allegations of paragraph 28 and LMC affirmatively alleges that a bona fide dispute existed between the RCAB and LMC regarding the existence of any excess coverage for the period 1973 to 1977 and as a result the parties entered into a binding agreement regarding such coverage, a copy of which agreement is attached as *Exhibit 1*.

29.     Admits only that the RCAB told LMC that it began receiving a large number of claims in 2002 and denies the remaining allegations of paragraph 29 and demands strict proof thereof.  LMC objects to the use and definition of the phrase "Recent Claims" as such is a disputed matter.  Further answering, LMC states that it is without sufficient knowledge or information to admit or deny when the RCAB first began to have knowledge of the events on which such claims were based, but is informed and believes the RCAB had such knowledge many years prior to 2002.  Denied that the RCAB notified LMC of such claims as it became

aware of same.  LMC affirmatively alleges that LMC and the RCAB have been unable to locate any actual insurance policies issued prior to 1974 by LMC to the RCAB and that the parties agreed to the existence of primary policies from 1964 through 1974 with per occurrence and aggregate limits of $300,000, and that the parties believed and demonstrated through their conduct that the primary insurance policies from 1974 through 1983 included aggregate limits of $300,000.

30.    LMC denies that it made any misrepresentations to the RCAB regarding any Geoghan settlements or regarding the applicability of aggregate limits and policies to the RCAB and denies that the RCAB relied on any such misrepresentations.  The remaining allegations of paragraph 30 are admitted.

31.    LMC is without sufficient knowledge or information to admit or deny the allegations of the first two sentences of paragraph 31 of the complaint.  LMC denies that the RCAB kept LMC fully informed of its settlement discussions with the various plaintiffs, and denies the remainder of the allegations of paragraph 31 of the complaint.  Further answering LMC asserts that the allegations of paragraph 31, insofar as they reference discussions concerning the possible settlement of the dispute between the RCAB and LMC concerning the coverage available to the RCAB under policies issued by LMC for the claims against the RCAB arising from the alleged criminal conduct of RCAB personnel comprise redundant, immaterial, impertinent or scandalous matter which should be stricken from the complaint and to which no response is made or required.  Further answering, LMC denies the remainder of the allegations contained in paragraph 31 of the complaint and demands strict proof thereof.

32.     LMC is without sufficient knowledge or information to admit or deny the allegations of paragraph 32 of the complaint and therefore denies same and demands strict proof thereof.

33.     LMC asserts that the allegations of paragraph 33, which are allegations concerning discussions concerning the possible settlement of the dispute between the RCAB and LMC concerning the coverage available to the RCAB under policies issued by LMC for the claims against the RCAB arising from the alleged criminal conduct of RCAB personnel comprise redundant, immaterial, impertinent or scandalous matter which should be stricken from the complaint and to which no response is made or required.  Insofar as a response is deemed required, LMC denies the allegations contained in paragraph 33 of the complaint and demands strict proof thereof.

34.     LMC asserts that the allegations of paragraph 34, which are allegations concerning discussions concerning the possible settlement of the dispute between the RCAB and LMC concerning the coverage available to the RCAB under policies issued by LMC for the claims against the RCAB arising from the alleged criminal conduct of RCAB personnel comprise redundant, immaterial, impertinent or scandalous matter which should be stricken from the complaint and to which no response is made or required.  Insofar as a response is deemed required, LMC denies the allegations contained in paragraph 34 of the complaint and demands strict proof thereof.

35.     LMC is without sufficient knowledge or information to admit or deny the allegations of paragraph 35 of the complaint insofar as they described the conduct of the RCAB or its agents in relation to third parties.  LMC admits that on receipt of a letter purporting to describe coverages available under alleged LMC policies to third parties, LMC responded to

such persons contesting the description of such coverages as was contained in the communications. Further answering, LMC denies the characterizations of any statements it made in such communications, and denies the remainder of the allegations contained in paragraph 35 of the complaint and demands strict proof thereof.

36.    LMC asserts that the allegations of paragraph 36, which are allegations concerning discussions concerning the possible settlement of the dispute between the RCAB and LMC concerning the coverage available to the RCAB under policies issued by LMC for the claims against the RCAB arising from the alleged criminal conduct of RCAB personnel comprise redundant, immaterial, impertinent or scandalous matter which should be stricken from the complaint and to which no response is made or required. Insofar as a response is deemed required, LMC denies the allegations contained in paragraph 36 of the complaint and demands strict proof thereof.

37.    LMC is without sufficient knowledge or information to admit or deny the allegations contained in the first and second sentences of paragraph 37 of the complaint, and therefore denies same. Further answering, LMC objects to the phrase "LMC Coverage Period" and asserts that the period for which any coverage was in place for the RCAB under policies issued by LMC is a disputed matter. LMC further asserts that the allegations of paragraph 37, which are allegations concerning discussions concerning the possible settlement of the dispute between the RCAB and LMC concerning the coverage available to the RCAB under policies issued by LMC for the claims against the RCAB arising from the alleged criminal conduct of RCAB personnel comprise redundant, immaterial, impertinent or scandalous matter which should be stricken from the complaint and to which no response is made or required. Insofar as a

response is deemed required, LMC denies the allegations contained in paragraph 37 of the complaint and demands strict proof thereof.

38.    LMC is without sufficient information to admit or deny the allegations of paragraph 38 and therefore denies the same and demands strict proof thereof.  LMC affirmatively alleges that Archbishop O'Malley was not authorized under any of the policies of insurance issued by LMC to unilaterally enter into settlements of claims for which the RCAB sought indemnity from LMC without approval of LMC, and any payments made without said approval constitute voluntary payments for which LMC has no liability.

39.    LMC is without sufficient information to admit or deny the allegations of the first two sentences of paragraph 39 and therefore denies the same and demands strict proof thereof. LMC admits that it received some reports concerning the mediation from counsel to the RCAB; that it had made a general reservation of rights concerning all the claims which were the subject of the mediation, which the RCAB had acknowledged and agreed to; and that LMC had specifically requested that the RCAB not settle any claims without LMC's prior consent.  LMC affirmatively alleges that Archbishop O'Malley was not authorized under any of the policies of insurance issued by LMC to unilaterally agree to a settlement without the prior consent of LMC and contends that any payments made without said approval constitute voluntary payments.

40.    Admits the allegations of paragraph 40 and affirmatively alleges that the settlement agreement was entered into over the objection of LMC and without the approval of LMC as required under the terms and conditions of the policies of insurance under which RCAB contends it was covered.

41.    Neither admits nor denies the allegations of paragraph 41 as the documents referred to speak for themselves, but denies that the characterization of such documents is

complete or materially accurate. Further answering, LMC affirmatively alleges that the settlement agreement was entered into over the objection of LMC and without any approval of LMC as required.

42.     LMC is without sufficient knowledge or information to admit or deny the allegations of paragraph 42 of the complaint with respect to when the RCAB received the correspondence referenced and states that the document referred to speaks for itself. Further responding, LMC denies the remainder of the allegations of paragraph 42 of the complaint and therefore demands strict proof thereof.

43.     LMC is without sufficient knowledge or information to admit or deny the allegations of paragraph 43 of the complaint and therefore denies same and demands strict proof thereof.

44.     Admits only that the individual arbitrations were completed in December and approximately $84,000,000 was paid out by the RCAB. LMC denies each and every other allegation of paragraph 44 and demands strict proof thereof.

45.     LMC asserts that the allegations of paragraph 45, which are allegations concerning the possible settlement of the dispute between the RCAB and LMC concerning the coverage available to the RCAB from LMC for the claims against the RCAB arising from the alleged criminal conduct of RCAB personnel comprise redundant, immaterial, impertinent or scandalous matter which should be stricken from the complaint and to which no response is made or required. Insofar as a response is deemed required, LMC denies the allegations contained in paragraph 45 of the complaint and demands strict proof thereof.

46.     Denies the allegations of paragraph 46 and demands strict proof thereof.

47.     LMC repeats and realleges each and every allegation contained in paragraphs 1 through 46 as is fully set forth herein.

48.     Denies the allegations of paragraph 48.

49.     Denies the allegations of paragraph 49.

50.     Denies the allegations of paragraph 50.

51.     Denies the allegations of paragraph 50 and denies that LMC has the burden of proof on the issues alleged.

52.     Denies the allegations of paragraph 52.

53.     Admits only that there is an actual controversy between RCAB and LMC and denies the remaining allegations of paragraph 53.

54.     Denies that the RCAB is entitled to any of the declarations sought in paragraph 54.

55.     LMC repeats and realleges each and every response contained in paragraph 1 through 54 as though fully set forth herein.

56.     Denies the allegations of paragraph 56.

57.     Denies the allegations of paragraph 57.

58.     Denies the allegations of paragraph 58.

59.     Denies the allegations of paragraph 59.

60.     LMC repeats and realleges its responses in paragraphs 1 through 59 as though fully set forth herein.

61.     Denies the allegations of paragraph 61.

62.     Denies the allegations of paragraph 62.

63.     Denies the allegations of paragraph 63.

64.     LMC repeats and realleges its responses to paragraphs 1 through 63 as though fully set forth herein.

65.     Denies the allegations of paragraph 65.

66.     Denies the allegations of paragraph 66.

67.     Denies the allegations of paragraph 67.

68.     LMC repeats and realleges its responses to paragraphs 1 through 67 as though fully set forth herein.

69.     Denies the allegations of paragraph 69.

70.     Denies the allegations of paragraph 70.

71.     Denies the allegations of paragraph 71.

72.     LMC repeats and realleges its responses to paragraphs 1 through 71 as though fully set forth herein.

73.     The allegations of paragraph 73 are bare legal conclusions to which no response is made or required.

74.     Denies the allegations of paragraph 74.

75.     Denies the allegations of paragraph 75.

76.     Denies the allegations of paragraph 76.

77.     LMC repeats and realleges its responses to paragraphs 1 through 76 as though fully set forth herein.

78.     Denies that it refused to participate in settlement negotiations and asserts that the remaining allegations of paragraph 78 are vague and ambiguous such that LMC cannot intelligently respond and for that reason demands strict proof thereof.

79.     Denies the allegations of paragraph 79.

80.     Admits only that LMC has provided insurance coverage to the RCAB for certain claims alleging negligent supervision by the RCAB, and affirmatively alleges that the defense and handling of cases by LMC was provided pursuant to a full reservation of rights agreed to by the RCAB.

81.     Denies the allegations of paragraph 81.

WHEREFORE, LMC denies that the RCAB is entitled to any of the relief sought in the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The RCAB's allegations fail to state claims upon which relief can be granted.

### Second Affirmative Defense

The RCAB's claims are or may be barred, in whole or part, by the doctrine of unclean hands.

### Third Affirmative Defense

The RCAB's claims are or may be barred, in whole or part, by the related doctrines of laches, waiver, and estoppel.

### Fourth Affirmative Defense

The RCAB's claims are or may be barred, in whole or part, by the doctrine of accord and satisfaction.

### Fifth Affirmative Defense

The RCAB's claims against LMC are barred in whole or in part by the applicable statute(s) of limitation.

**Sixth Affirmative Defense**

LMC has no obligation to defend or indemnify the RCAB for any claim or claims for which it seeks excess coverage made against RCAB for breach of its professional duty by reason of any negligent act, error or omission.

**Seventh Affirmative Defense**

LMC has no obligation to defend or indemnify the RCAB in connection with the claims for which it seeks coverage from LMC because of its failure to meet its obligations to assist and cooperate with LMC in connection with such claims.

**Eighth Affirmative Defense**

The RCAB's claims are or may be barred in whole or in part to the extent that its alleged liability does not arise out of, result from or constitute an "occurrence" as defined by any policy issued to the RCAB by LMC.

**Ninth Affirmative Defense**

To the extent it is determined that the RCAB's alleged liability does arise from "an occurrence", which LMC denies, such liability arises from a single "occurrence."

**Tenth Affirmative Defense**

There is no coverage available to the RCAB for any voluntary payment or voluntary assumption of liability by the RCAB.

**Eleventh Affirmative Defense**

The RCAB's claims are or may be barred in whole or in part to the extent that its alleged liability does not arise out of "bodily injury" or "personal injury" which occurred during the applicable coverage period(s).

### Twelfth Affirmative Defense

LMC has no obligation to defend or indemnify the RCAB in connection with any claim for or award of equitable, injunctive or declaratory relief sought by the underlying claimants.

### Thirteenth Affirmative Defense

The RCAB's claims are or may be barred in whole or in part to the extent that its alleged liability to the underlying claimants arose out of or arises out of intentional conduct on the part of RCAB.

### Fourteenth Affirmative Defense

There is no coverage available under any LMC insurance agreement for any of the alleged conduct or liability of Cardinal Law.

### Fifteenth Affirmative Defense

The RCAB's claims for a violation of M.G.L. c. 93A fail because the conduct complained of did not occur primarily and substantially within the Commonwealth of Massachusetts.

### Sixteenth Affirmative Defense

The RCAB's claims for coverage fail because the RCAB failed to provide LMC with notice of the underlying claims or occurrences in a timely fashion and LMC has been prejudiced thereby.

### Seventeenth Affirmative Defense

The RCAB is barred from any relief in the form of rescission as the result of its failure to meet a condition precedent to such relief.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT
## AND MONETARY DAMAGES

Defendant/Plaintiff-in-Counterclaim, Lumbermens Mutual Casualty Company ("LMC"),

asserts this Counterclaim for Declaratory Judgment and Monetary Damages pursuant to Title 28,

U.S.C., § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Upon personal knowledge,

and information and belief, LMC states the following:

### Background

> [T]he Attorney General has concluded that the widespread abuse of
> children was due to *an institutional acceptance of abuse* and a massive
> pervasive failure of the leadership.  For at least six decades, three
> successive Archbishops, their Bishops and others in positions of
> authority within the Archdiocese operated with tragically misguided
> priorities.  They *chose* to protect the image and reputation of their
> institution rather than the safety and well-being of the children entrusted
> in their care.
>
> > --*The Sexual Abuse of Children in the Roman Catholic Archdiocese of Boston, A
> > Report by the Attorney General* (July 23, 2003) (emphasis supplied). [1]

So concluded Thomas F. Reilly, Attorney General for the Commonwealth of

Massachusetts, in his landmark report to the Commonwealth following his office's 18-month

investigation of child sexual abuse by priests assigned to the Roman Catholic Archdiocese of

Boston ("RCAB").  With this as the relevant backdrop, in September 2003 the RCAB reached a

tentative settlement agreement with more than 550 people who claimed sexual abuse at the hands

of RCAB priests.  In commenting upon its agreement to pay approximately $85 million to settle

these claims, an RCAB spokesman declared:  "Our actions say we admit our mistakes, we've

learned from our mistakes, and we're doing everything we can to make sure that they never

happen again."  Unfortunately, despite *finally* mouthing accountability, it is clear from this

---

[1] This report and its unequivocal findings provide bedrock support for the allegations of this Counterclaim, and this
pleading borrows from it, liberally.

lawsuit that the RCAB nevertheless persists in its attempts to evade true accountability—namely, enduring the consequences of its actions.

### Nature of Dispute

1.      This is an insurance coverage action.  At issue is whether LMC owes any duty to defend or indemnify RCAB for some portion of the aforementioned clergy sexual abuse settlement, or for any other pending, or as yet unasserted, clergy sexual abuse claims against the RCAB.  Not only does LMC not owe any such duty, but the RCAB's knowledge, and its policies and practices regarding clergy sexual abuse, mandate that the RCAB reimburse LMC for the sums already paid by LMC on behalf of the RCAB for the settlement of clergy sexual abuse claims.

### The Parties

2.      Defendant/Plaintiff-in-Counterclaim, LMC, is incorporated under the laws of the State of Illinois, and has its principal place of business in Long Grove, Illinois.  LMC is a member of The Kemper Insurance Companies.

3.      Plaintiff/Defendant-in-Counterclaim, the RCAB, is a corporation sole, organized and existing under the laws of the Commonwealth of Massachusetts with a usual place of business at 2121 Commonwealth Avenue, Brighton, Massachusetts.

### FACTS

### The LMC/RCAB Insurance Relationship

4.      LMC and the RCAB have had a long-standing relationship as insurer and insured. Indeed, at times relevant hereto, the RCAB employed its own insurance manager who was responsible to assessing the insurance needs of the RCAB and who directly placed coverages with LMC and other insurance carriers.

5.      In 1993, when the RCAB first began to make claims for defense and indemnity to LMC in connection with clergy sexual abuse claims, the RCAB was unable to satisfy its affirmative obligation to produce any and all insurance policies under which coverage was requested.

6.      While baldly asserting that LMC had issued policies continuously from 1954 to 1983, to date, the RCAB has produced none of the actual policies of insurance under which it seeks coverage from LMC.

7.      In light of RCAB's inability to produce copies of the insurance policies under which it was seeking coverage from LCM, LCM and the RCAB undertook to examine secondary evidence of insurance available to them in a joint effort to determine the parties' respective rights and obligations under whatever policies had been issued.

8.      One such source of secondary evidence of coverage was copies of Declaration Pages for certain policy years for which no policy was located.  Such Declaration Pages indicated that underlying policies included a $300,000 aggregate bodily injury limit per policy period.

9.      In the face of growing numbers of claims arising from the alleged criminal conduct of priests and others under its supervision, and faced with uncertainty regarding the extent of insurance available to it in light of (i) the nature of the claims presented by the victims of such conduct; (ii) the RCAB's inability to satisfy its policy production obligations; and (iii) concerned about the growing public scandal the claims were generating, the RCAB entered into discussions with LMC concerning the nature and extent of the insurance coverage available to the RCAB from LMC in connection with such claims.  The product of these discussions was an insurance program, which the parties fashioned by agreement.

10.     Specifically, despite the RCAB's failure to produce any insurance policies issued to it by LMC, LMC agreed to treat the RCAB as an insured under a primary commercial general liability policy for the years 1964 to 1983.  Moreover, LMC and the RCAB agreed: (i) to treat each annual period during that time-span as subject to liability limits of $300,000 per occurrence, and $300,000 in the aggregate; and (ii) that upon exhaustion of limits for any particular annual period, clergy sexual abuse claims would be deemed as occurring within an annual period with remaining limits, so long as some portion of the alleged abuse occurred within the latter period.

11.     The conduct and communications of LMC and the RCAB over time readily confirm the existence of their mutual agreement to such an insurance program, and also that each made concessions and compromises in the course of doing so.

12.     One example of such conduct and communications is as follows:  During the course of the underlying clergy sexual abuse litigation, the RCAB, by its authorized agents, requested that LMC execute a letter prepared by the RCAB's counsel and directed to counsel to certain of the plaintiffs in the underlying clergy sexual abuse litigation then pending against the RCAB, specifically stating and asserting that all of the primary policies had been exhausted by LMC's payment of aggregate limits.

13.     Because the letter prepared by RCAB's counsel was consistent with LMC's understanding and belief and its discussions with the RCAB regarding the status of the insurance coverage available to RCAB in connection with the clergy sexual abuse claims previously presented to it, LMC executed the letter at the RCAB's request.

14.     During the course of the discussions between the RCAB and LMC, and in the course of the parties' dealings under the arrangement they reached, LMC did not know, and did not have reason to know that the RCAB was engaged in the type of conduct described in the

Attorney General's report, and in particular was not aware that the RCAB had engaged for many years in activities intended to conceal from third parties, including law enforcement authorities, the scope and magnitude of the problem of clergy sexual abuse in the diocese.

15.    In addition to the aggregate limits, the coverage contemplated by the parties is limited to injury relating to an "occurrence."  As contemplated by the parties, the term "occurrence" means an accident.

16.    Therefore, to the extent that any liability ascribable to the RCAB is the result of intentional conduct, constitutes expected harm, rather than an accident, or was not fortuitous, there is no defense or indemnity coverage available to the RCAB.

17.    Additionally, under the parties' arrangement, there is no coverage for injuries known to the RCAB prior to the inception date of each annual period for which coverage was afforded to the RCAB.

18.    Finally, under the parties' arrangement, there is no coverage for damages which were the proximate result of the intentional criminal conduct of priests who committed acts of sexual abuse against minors.

### The RCAB's Institutional Acceptance of Clergy Sexual Abuse As Evidenced by Its Knowledge, and Policies and Practices

19.    The Attorney General's investigation has revealed that for more than 50 years the RCAB has cultivated a "culture of secrecy" with regard to clergy sexual abuse claims.  In doing so, the RCAB consciously has chosen to protect its own interests and authority at the expense of children's safety.  These ominous conclusions, indicative of the RCAB's institutional acceptance of clergy sexual abuse, are supported by the following allegations, which are asserted upon information and belief:

**The Magnitude of Clergy Sexual Abuse of Children in the RCAB**

20.    The RCAB's own records reveal that no fewer than 789 victims (or 3rd parties acting on the behalf of victims) have complained directly to the RCAB of clergy sexual abuse.

21.    The abuse of those 789 victims took place in the following time-frames:

|           |            |
|-----------|------------|
| 1940-1959 | 24 Victims  |
| 1960-1969 | 163 Victims |
| 1970-1979 | 282 Victims |
| 1980-1984 | 107 Victims |
| 1984-1992 | 86 Victims  |
| 1993-2000 | 33 Victims  |
| No Date   | 94 Victims  |

22.    The number of incidents of individual acts of abuse inflicted on the victims of such conduct is in the thousands.

**RCAB Supervisory Officials Knew, or Should Have Known,
of the Extent of the Clergy Sexual Abuse Problem**

23.    Although the public did not discover the staggering magnitude of this epidemic until 2002, at all times the RCAB knew, or should have known, its full extent.

24.    The RCAB's own records contain extensive information concerning the breadth and scope of the problem.  Such records were at all times available to the RCAB's supervisory personnel.

25.    In fact, it is evident that RCAB supervisory personnel regularly created contemporaneous records documenting allegations by victims of clergy sexual abuse, as well as the RCAB's responses to same.

**The RCAB's Response to Reports of Sexual Abuse of Children,
Including Maintaining Secrecy of Reports, Placed Children at Risk**

26.     The RCAB consciously and continuously determined to and did conceal its knowledge of clergy sexual abuse of children from the parishes, laity, law enforcement, the public and its insurers.

27.     As a matter of practice, information concerning complaints of abuse was shared with only a small number of senior RCAB officials, and these officials, alone, were responsible for fashioning responses to the abuse.

28.     The error of the RCAB's clandestine ways is compounded by the tragic results produced. Indeed, it is clear that the select RCAB officials who responded to reports of clergy sexual abuse, regularly addressed and supported the needs of offending priests over the needs of children who had been, or were at risk of being, abused.

**The RCAB Chose Not to Notify Law Enforcement
Authorities of Clergy Sexual Abuse Allegations**

29.     The RCAB has scrupulously followed a practice of withholding allegations of sexual abuse of children from law enforcement and child protection authorities, notwithstanding the RCAB's awareness that such conduct was a serious violation of criminal law.

30.     This practice has prevailed even in instances involving priests who continued to abuse children after unsuccessful intervention by the RCAB.

**The RCAB Chose Not to Provide All Relevant
Information to Law Enforcement Authorities During Criminal Investigations**

31.     In the very few cases where allegations of sexual abuse of children were communicated to law enforcement, senior RCAB managers nevertheless remained committed to

their primary objectives: (i) safeguarding the well being of priests and the institution at the expense of children; and (ii) and preventing scandal by any means possible.

32.    As a result, the RCAB often consciously chose to withhold critical information from law enforcement authorities, including the full extent of perpetrator priests' histories of abusing children.

33.    The RCAB's practice of providing incomplete information and support to law enforcement authorities resulted in investigative and prosecutorial decisions being made on less than complete information, and the otherwise avoidable victimization of children.

**The RCAB Chose Not to Conduct Thorough
Investigations of Clergy Sexual Abuse Allegations**

34.    As a matter of practice, the RCAB has <u>never</u> thoroughly investigated allegations of sexual abuse of children—neither the allegations of the abuse itself, nor the histories of the clergy involved.

35.    In fact, prior to 1993, the RCAB's response essentially entailed a perfunctory review of an alleged victim's complaint and his abuser's response, followed by whatever action was necessary to pacify the victim and the abuser, while maintaining secrecy.

36.    In 1993, notwithstanding that senior managers had been aware that sexual abuse of children by clergy had been a problem in the archdiocese for decades, the RCAB issued its first ever written clergy sexual abuse policy. However, the issuance of this policy did little to improve the quality or thoroughness of the RCAB's investigations of allegations of sexual abuse of children. Despite a staff assigned to handle clergy sexual abuse allegations, the RCAB continued to:

- Fail to train staff in conducting interviews or investigations;
- Conduct only perfunctory interviews of accused priests;

- Make little or no effort to determine the credibility of allegations through interviews or other corroborative evidence when an accused priest denies abuse;

- Make little or no effort to obtain anything more than a minimal level of information from the victim, or to corroborate the victim's allegation;

- Make no effort to determine if there were other victims, even when the initial victim has stated the existence of other victims;

- Take little or no action to investigate anonymous complaints or complaints from third parties; and

- Fail to inquire of other priests, Archdiocese workers, or parishioners in the parish where the alleged abuse has taken place.

### The RCAB Placed Children at Risk
### by Transferring Abusive Priests to Other Parishes

37.     A favorite RCAB tactic in response to allegations of clergy sexual abuse claims was the hushed transfer of the alleged abuser to a different parish in the RCAB, often without disclosing the circumstance of the transfer to the new parish, or restricting the abusive priest's ministry functions, or his future exposure to children within the new parish.

38.     Sounding a familiar theme, such transfers were designed to appease victims, while avoiding scandal.

39.     This practice of reassigning abusive priests directly placed children in harm's way, and demonstrated the RCAB's failure to deem the protection of children as a greater priority than the protection of abusive priests and the RCAB's reputational standing.

### The RCAB Placed Children at Risk by
### Accepting Abusive Priests from Other Dioceses

40.     Not only did the RCAB surreptitiously transfer abusive priests to other parishes within the RCAB, it also placed children at risk by accepting abusive priests from other dioceses despite full knowledge of these priests' histories of abuse.

**The RCAB Placed Children at Risk by Transferring**
**Abusive Priests to Other Dioceses in the United States and Abroad**

41.     The RCAB also arranged for, or assented to, the transfer of sexually abusive priests to other dioceses in the country.

42.     Yet again, these transfers were motivated by the RCAB's desire to avoid scandal at all costs.

**The RCAB Chose Not to Adequately Supervise**
**Priests Known to Have Sexually Abused Children in the Past**

43.     As a matter of practice, the RCAB very often did not restrict accused priests' ministerial functions upon transfer to new parish assignments.

44.     As information about the abusive priests' histories was not shared with the new parishes or their parishioners, it is evident that these transfers neither were intended to, nor were able to, protect children.

45.     Furthermore, even when the RCAB attempted to limit abusive priests' exposure to children by restricting their residential or ministerial assignments, children nevertheless remained at risk because the RCAB withheld any meaningful supervision of such clergy.

46.     As a result of the RCAB's intentional practice of disregarding known risks posed to a known class of victims, by failing to supervise abusive priests, additional children were needlessly victimized.

**COUNT I**
**(Known Loss)**

47.     LMC hereby incorporates by reference, as if set forth fully herein, Paragraphs 1 through 47 of this Counterclaim.

48.     Due to its institutional acceptance of clergy sexual abuse, prior to inception of the periods for which LMC provided coverage to the RCAB, the RCAB knew, or had reason to

know, that there was a substantial probability that loss or liability from clergy sexual abuse would occur during each annual period.

49.     LMC provided no coverage to the RCAB for known losses.

50.     Accordingly, LMC has no obligation to defend or indemnify the RCAB for RCAB liability relating to clergy sexual abuse claims.

51.     LMC is therefore entitled to reimbursement from the RCAB of all amounts paid by LMC in connection with clergy sexual abuse claims.

**COUNT II**
**(Intended or Expected Harm)**

52.     LMC hereby incorporates by reference, as if set forth fully herein, Paragraphs 1 through 52 of this Counterclaim.

53.     LMC provided no coverage to the RCAB for injury relating to intended or expected harm.

54.     Due to its institutional acceptance of clergy sexual abuse, injuries relating to clergy sexual abuse were intended or expected by the RCAB, and not accidental.

55.     Accordingly, LMC has no obligation to defend or indemnify the RCAB for RCAB liability relating to clergy sexual abuse claims..

56.     LMC is therefore entitled to reimbursement from the RCAB of all amounts paid by LMC in connection with clergy sexual abuse claims.

**COUNT III**
**(Exhaustion)**

57.     LMC hereby incorporates by reference, as if set forth fully herein, Paragraphs 1 through 57 of this Counterclaim.

58.    Pursuant to the agreement between the RCAB and LMC, coverage for the RCAB is subject to a $300,000 per occurrence and annual aggregate limit of liability for clergy sexual abuse claims under the primary coverage afforded to the RCAB.

59.    To the extent that the express terms and conditions of any LMC policy failed to provide such an aggregate limit of liability, LMC and the RCAB subsequently agreed to treat each annual period as subject to the aggregate limit in consideration for LMC's agreement not to contest the existence of coverage for the 1964 – 1983 period, notwithstanding the RCAB's failure to produce policies for the periods in question.

60.    Accordingly, based upon LMC's prior payments in settlement of clergy sexual abuse claims, the limits of the LMC policies have been exhausted, in whole or part.

### COUNT IV
### (Estoppel)

61.    LMC hereby incorporates by reference, as if set forth fully herein, Paragraphs 1 through 61 of this Counterclaim.

62.    With the RCAB's knowledge and for the RCAB's benefit, LMC has acted to its detriment based upon a good faith belief that the LMC policies were each subject to a $300,000 aggregate limit of liability for clergy sexual abuse claims.

63.    Therefore, the RCAB is estopped from asserting that any LMC policy is not subject to such an aggregate limit of liability.

64.     Accordingly, based upon LMC's prior payments in settlement of clergy sexual abuse claims, the limits of the LMC policies have been exhausted, in whole or part.

### RELIEF SOUGHT

65.    By reason of all of the foregoing, a true and actual controversy exists between the parties.  This Court is vested, pursuant to Title 28, U.S.C., § 2201 and Rule 57 of the Federal

Rules of Civil Procedure, with power to declare the rights and obligations of the parties hereto, and to provide such other relief as may be necessary. Accordingly, Defendant/Plaintiff-in-Counterclaim, Lumbermens Mutual Casualty Company, prays that this Court find and declare as follows:

### DECLARATORY RELIEF SOUGHT

### FIRST RELIEF SOUGHT

It is the RCAB's burden to prove all the terms and conditions of each policy allegedly issued by LMC, and the RCAB's failure to prove same precludes coverage for the periods for which it seeks defense or indemnity coverage by this action.

### SECOND RELIEF SOUGHT

Any insurance coverage issued by LMC is not required to respond for any vicarious liability of the RCAB arising out of any alleged acts of clergy sexual abuse by any perpetrator/priest because such injuries were not caused by "an occurrence" as required under the coverage afforded by LMC to the RCAB.

### THIRD RELIEF SOUGHT

The maximum liability of LMC for RCAB's liability to any individual claimant is the statutory immunity amount applicable to such claim as alleged and asserted by the RCAB in the underlying clergy sexual abuse claims.

### FOURTH RELIEF SOUGHT

LMC has no liability to the RCAB for its failure to supervise any priest/perpetrator before the RCAB first became aware of allegations of sexual abuse by a particular priest/perpetrator due to a lack of notice as to the need for any such supervision.

### FIFTH RELIEF SOUGHT

LMC has no liability to the RCAB for its failure to supervise any priest/perpetrator <u>after</u> the RCAB first became aware of allegations of sexual abuse by a particular priest/perpetrator because failure to adequately supervise with such knowledge constitutes reckless or intentional conduct, rather than merely negligent conduct.

## SIXTH RELIEF SOUGHT

The RCAB has the burden of proof on allocating the amount of damages among defendants in the underlying clergy sexual abuse claims before seeking indemnification from LMC.

## SEVENTH RELIEF SOUGHT

The RCAB has the burden of proof of allocating damages in the underlying clergy sexual abuse claims among covered and non-covered allegations in the underlying suits.

## EIGHTH RELIEF SOUGHT

The RCAB has the burden of proving that the damages alleged in the underlying clergy sexual abuse claims were proximately caused by negligent conduct of the RCAB.

## NINTH RELIEF SOUGHT

The RCAB has the burden of proving that the amount of damages paid for each individual underlying clergy sexual abuse claim was fair and reasonable.

## TENTH RELIEF SOUGHT

LMC has no liability to the RCAB because damages in the underlying clergy sexual abuse claims constituted known loss preceding the annual inception dates of coverage provided by LMC.

## ELEVENTH RELIEF SOUGHT

Because there is no coverage available to the RCAB for its liability stemming from claims of clergy sexual abuse, and because damages arising from the underlying claims constituted known loss, the RCAB must reimburse LMC for all amounts previously paid in connection with clergy sexual abuse claims.

## TWELFTH RELIEF SOUGHT

LMC has no liability to the RCAB because damages in the underlying clergy sexual abuse claims were intended or expected due to the RCAB's institutional acceptance of same.

## THIRTEENTH RELIEF SOUGHT

As there is no liability under any LMC policy because damages in the underlying clergy sexual abuse claim must be deemed intended or expected, the RCAB must reimburse LMC for all amounts previously paid in connection with clergy sexual abuse claims.

## FOURTEENTH RELIEF SOUGHT

Pursuant to the agreement between the RCAB and LMC, coverage for the RCAB is subject to a $300,000 per occurrence and annual aggregate limit of liability for clergy sexual abuse claims under the primary coverage afforded to the RCAB.

## FIFTEENTH RELIEF SOUGHT

To the extent that the original terms and conditions of any LMC policy did not include a $300,000 aggregate limit of liability for clergy sexual abuse claims, the parties subsequently agreed to modify the terms and conditions so as to include same.

## SIXTEENTH RELIEF SOUGHT

There is no liability to the RCAB under any LMC insurance coverage because LMC's prior payments in settlements of clergy sexual abuse claims have exhausted the available coverage limits.

## <u>SEVENTEENTH RELIEF SOUGHT</u>

To the extent that any LMC insurance agreement provided defense or indemnity coverage to the RCAB for claims arising from clergy sexual abuse, at most a single "occurrence" took place in all policy periods combined.

In addition to the foregoing declarations, Lumbermens Mutual Casualty Company respectfully prays that this Court:

1.  Award LMC damages under Counts I and II of its Counterclaim, as well as its costs and reasonable attorneys' fees; and

2.  Award LMC such other and further relief as the Court deems just and proper.

**LUMBERMENS MUTUAL CASUALTY COMPANY HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**LUMBERMENS MUTUAL CASUALTY COMPANY**
By its attorneys,
ROBINSON & COLE LLP

John E. Tener, BBO No. 563791
Michael D. Lurie, BBO No. 553024
Brian P. McDonough, BBO No. 637999
Robinson & Cole LLP
One Boston Place
Boston, Massachusetts 02108
(617) 557-5900

April 28, 2004