# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE, )<br><br>Plaintiff, )<br><br>v. )<br><br>LUMBERMENS MUTUAL CASUALTY COMPANY, )<br><br>Defendant. ) | Civil Action No. 04-10461-DPW |

## THE PARTIES' JOINT STATEMENT PURSUANT TO RULE 26(f)

The parties, by their counsel, submit this statement pursuant to the provisions of Fed. R. Civ. P. 26(f), Local Rules 16 and 26, and the Order of the Court of April 28, 2004.

## I.    DISCOVERY EVENTS

### A.    Plaintiff's Position

This is an action brought by the Roman Catholic Archbishop of Boston, a Corporation Sole ("RCAB") to require the Lumbermens Mutual Casualty Company ("LMC") to honor its obligations under general liability insurance policies issued during the period commencing no later than 1955 and extending to 1983. At issue are claims of sexual molestation and negligent supervision and hiring brought against the RCAB. Because of LMC's rapidly deteriorating financial condition, the RCAB proposes a scheduling order requiring an expedited, but phased discovery process that would see all discovery and other pre-trial matters (including dispositive motions) completed shortly after year-end 2004, with trial to follow as early as possible in 2005, consistent with the Court's schedule.

1.    <u>Discovery Should Proceed on an Expedited Schedule</u>

The RCAB predicates its scheduling proposal on two fundamental grounds: *first*, LMC's refusal to pay the RCAB's valid claims under the policies issued by LMC, leaving the RCAB without the tens of millions it is currently due, and *second*, LMC's deteriorating financial condition.

LMC's dilatory tactics are set forth in detail in the RCAB's Complaint. Those facts demonstrate that LMC has been—and continues to be—engaged in a pattern of deception, obfuscation, and delay, aimed at defeating the RCAB's legitimate claims for coverage. LMC's conduct violates MGL ch. 176D and ch. 93A, subjecting it to multiple damages. It is against this backdrop that RCAB seeks a rapid pre-trial and trial schedule in order to hold LMC to account, while it is still possible.

Perhaps the most egregious conduct of LMC and its representatives lies in its false repetitive assertions that the policies it issued to RCAB throughout the sixties, seventies, and early eighties contained annual aggregates of $300,000—that is, provisions limiting all coverage (regardless of the number of claims) for any given year to that amount. In fact, no such aggregates ever existed, and LMC's ruse caused the RCAB to be denied tens of millions of dollars in coverage.

Of equal importance is the poor financial condition of LMC. LMC has told the world in public filings with the Illinois Department of Insurance that it is in financial distress. Unless brought to judgment promptly, there is real concern that LMC's assets will be dissipated to the point that the RCAB will be unable to collect what it is owed. The facts that follow concerning LMC's financial condition are taken from the website of the Kemper Insurance Companies ("Kemper"), of which LMC is part. (www.kemperinsurance.com).

On March 1, 2004, Kemper submitted its year-end financials for 2003.  Those financials and related disclosures paint a dismal picture.  LMC is in runoff and operating under Corrective Orders issued by the Illinois Insurance Commissioner.  It has ceased writing new business. Kemper has engaged Kenning Financial Advisers, LLC ("Kenning") to provide run-off expertise and services to LMC.  As Kemper explained in its press release of November 10, 2003, "Run off is the professional management of an insurance company's discontinued, distressed or non-renewed lines of insurance and associated liabilities outside of a judicial proceeding."  More ominous is the disclosure in its recent filing that Kenning will be paid an average of $1,285,714 per year for each Kenning professional plus performance based compensation yet to be determined.  "Performance" most assuredly is a euphemism for "claims-avoidance".  Kemper's and LMC's conduct as set forth in the Complaint reveals the importance of this arrangement. Performance worthy of a bonus would not appear to include the prompt recognition and payment of legitimate claims.  Indeed, the Kenning relationship cries out for a thorough exposition in discovery, and may warrant still further claims of bad faith insurance practices.  If Kenning is being rewarded for delaying the RCAB, increasing its costs, and thus seeking to coerce it to settle or drop its claims, such conduct should be addressed promptly.  Any delay will exacerbate the problem and play into the hands of Kemper and Kenning.  The surest way to secure the plaintiff's rights and to put a stop to the defendant's tactics is swift discovery and trial.

There is more.  We also know from LMC's filings that it has suffered a decrease in surplus of at least $494 million in each of the past four years with net cash out-flow from operations of $479 million in 2003.  It expects to have a negative cash flow each year until its run-off is complete.  In fact, LMC says it would have reported a deficit of close to a billion dollars, were it not for "accounting allowances" granted by the Illinois Department of Insurance.

LMC is a sinking ship being kept afloat by accounting allowances.[1] As of December 31, 2003, LMC had about $1.7 billion, or nearly half, of its invested assets encumbered by being on deposit or held in trust or escrow arrangements ($10 million is in trust for Kenning, but none for the RCAB).

The interests of justice require that this case be moved rapidly through pretrial discovery and trial. LMC is an insurer in runoff and its reserves are dwindling. While LMC's current runoff plan is designed to stave off receivership, it is unclear whether those efforts will succeed. *See* Douglas McLeod, *Regulators Aid Kemper Runoff Plans*, BUSINESS INSURANCE (Mar. 15, 2004). As noted, LMC obtained special approval for various accounting allowances in order to maintain solvency in the short term. *Id.* There is a very real potential that LMC will be put into receivership, curtailing the RCAB's ability to recover the funds to which it is entitled.[2]

Consequently, the RCAB proposes a six-month discovery schedule, with trial to commence at the beginning of 2005. Such a discovery schedule is not unusual. *See, e.g.*, *Beneficial Std. Life Ins. Co. v. Madariaga*, 851 F.2d 271, 277 (9th Cir. 1988) (six-month discovery period appropriate); *Northern Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 268–69 (7th Cir. 1986) (approving five month discovery schedule). A rapid schedule is justified in light of Lumbermen's rapidly deteriorating financial situation. *Cf. In re Joint E. &*

---

[1] Reports persist that LMC is trying to buy-back policies, cut deals with reinsurers, and is paying claims (when it pays) on a first come, first served basis.

[2] Counsel for RCAB has explored with counsel for LMC whether LMC will secure any potential judgment against it by posting a bond or depositing funds with the Court, thus allowing a more leisurely litigation schedule. LMC has refused to provide such security. Consequently, should LMC's proposed schedule be entertained, it should be conditioned on LMC's having to post security in the amount of RCAB's proposed damages. *See Alpha Capital Aktiengellschaft v. Group Mgmt. Corp.*, No. 02 Civ. 2219 (LBS), 2002 WL 31681798 at *11–13 (S.D.N.Y. Nov. 25, 2002).

*S. Dists. Asbestos Litig.*, 132 F.R.D. 332, 333–34 (E.D.N.Y. 1990) (expediting appointment of lead class counsel in light of potential insolvency of liability insurer).

2.    LMC Should Not Be Permitted to Delay the Litigation By Taking "Hundreds" of Depositions.

In light of LMC's documented financial hardship and habitual dilatory behavior, its claimed need to take extensive discovery of claimants, clergy, and the Church hierarchy regarding the settled underlying claims is transparent. At no time during the past ten years has LMC ever sought or demanded such details in order to assess its coverage obligation. It has paid claims on its terms (*i.e.*, limited by the ersatz annual aggregates) with nothing more than a victim's demand.

LMC has understood full-well the nature of the claims and the importance of settling them equitably and promptly. The obligation to investigate, in any event, lies with LMC, not with the RCAB. *See* MGL ch. 176D, § (9)(c). Its strategy of now seeking not only to delay the proceedings but to cause individuals embarrassment in the hope of forcing a cheap buyout is also reflected in its dog-in-the-manger attitude concerning the completed settlement negotiations of the individual claims. Although the RCAB kept LMC fully apprised of all developments during the negotiations, as soon as the settlement was announced in late 2003, LMC's counsel, without any warning, wrote to the RCAB invoking for the first time the "cooperation" clause in the policy, and alleging that coverage had been forfeited by settling without LMC's approval. Such high-handed tactics must fail.

The RCAB's burden (leaving aside its bad faith claims) is limited to proving simply that the settlements it reached were reasonable and that LMC was, therefore, not prejudiced. Even when an insurance policy contains a voluntary settlement provision, an insurer is obligated to pay for a reasonable settlement obtained by the insured if it either disclaimed coverage altogether

and left its insured to fend for itself or defended its insured subject to a reservation of rights.  *See Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 823 F. Supp. 975, 980 (D. Mass. 1993); *Waddell v. Titan Ins. Co.*, ___ P.3d ___, 2004 WL 906182, at * 2 (Ariz. Ct. App. Apr. 29, 2004); *United Servs. Auto. Ass'n v. Morris*, 741 P.2d 246, 252 (Ariz. 1987); *see also Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 639 (1ˢᵗ Cir. 1989) (citing *Morris*).[3]

When considering the reasonableness of a voluntary global settlement, LMC is not entitled essentially to try each of the underlying claims, as it now contends.  Rather, the RCAB's settlement should be viewed as a whole and not as a host of hundreds of individual cases.  The insured is obligated only to demonstrate that it had the potential for liability and that it reached a settlement that was reasonable in view of the prospect of an actual finding of liability and the extent of related damages.  *See Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1091 (2d Cir. 1986); *see also Colonial Gas*, 823 F. Supp. at 982 (holding settlement reasonable that settled 100 *actual* and 300 *potential* demands for repurchase of hazardous insulation material).  The opposite rule cannot obtain.  Were it the case that the insurer were permitted to re-litigate the individual claims underlying a global settlement, there would be no incentive to settle at all.  On the contrary, there would be a disincentive to settle.  If an insured that settled were forced then to spend its own funds in trying to prove the plaintiff's case that it just settled against its carrier, it would be better off defending the case-in-chief through trial, with the carrier providing the defense.  Such a scenario would violate the strong public policy in favor of settlements.  *See, e.g., Conservation Law Found. of N. Engl., Inc. v. Franklin*, 989 F.2d 54, 59

---

[3] The RCAB does not concede that LMC properly has reserved its rights with regard to policy defenses. By providing defense costs without a proper reservation of rights, LMC waived its ability to assert the many purported policy defenses it now seeks to advance. *See Shapiro v. State Farm Mut. Ins. Co.*, 355 Mass. 54, 57 (1968).

(1st Cir. 1993). Moreover, insureds might be left in the untenable position of claiming no liability in the underlying action and settling the case, only to be met with an estoppel argument in an action against the carrier predicated on the initial denial of liability. *See Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1379 (E.D.N.Y. 1988). Not only would such an approach undermine sound public policy, it would reward insurers like LMC.

      3.      <u>LMC's Position in the Litigation Lends Itself to a Phased Discovery Approach.</u>

In addition to maintaining an expeditious discovery schedule, further efficiency can be achieved by phasing discovery to maximize the potential for quick resolution of the claims at issue. LMC has taken the contradictory positions that (a) there are no insurance policies for the period prior to 1974 (*see* Answer, Countercl. & Jury Claim ¶¶ 7–8); (b) the terms of the disputed policies—some of which it claims do not exist—"speak[] for [them]selves" (*id.* ¶ 11); (c) the RCAB's global settlement of claims violated the terms of policies—again, some of which it claims do not exist (*see id.* ¶¶ 38–41); and (d) the policies do not provide coverage for certain losses (*see id.* ¶¶ 49, 53). Furthermore, LMC has contended that there was an agreement between RCAB and LMC whereby the two parties agreed that the primary policies issued from 1964 to 1983 were deemed to have annual aggregate limits of $300,000 (*see, e.g.*, *Id.* ¶ 8) and that coverage under excess policies was also limited by annual aggregates. The RCAB denies the allegations. Similar controversy exists concerning such basic coverage issues as the meaning of "occurrence", the trigger of coverage, the relevance of charitable immunity, the duty to investigate, the relevance of the cooperation clause, and such. (*See, e.g.*, *id.* at 17, 31, 34.)

The Court is empowered with broad discretion to shape the discovery schedule in order to encourage efficient (and potentially early) resolution of disputes. *See* Fed. R. Civ. P. 16(c)(1), (5), (15), (16); L.R. 16.1(f)(11); *see also O'Connel v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st

Cir. 2004) (noting that scheduling orders are an important tool for case management and reviewing only for abuse of discretion decision whether to extend scheduling order). The local rules specifically extend that discretion to the power to phase discovery "[i]n order to facilitate settlement and efficient completion of discovery." L.R. 26.3. When considered in light of the substantive law that will govern at trial, phasing discovery makes eminent sense. Interpretation of an insurance policy is, in general, "no different from an interpretation of any other contract." *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998). It follows, therefore, that one must first decide what policies were issued and for what years and what terms are incorporated in them. *Cf., e.g.*, *John Hancock Mut. Life Ins. Co. v. Banerji*, No. CIV. A. 95-3163, at *8 (Mass. Super. Mar. 14, 2000) ("[h]aving determined the documents that form the insurance policy," the next question is what the terms in those documents require of the insured.) For example, the question whether there are applicable annual aggregates either in the policies or by agreement is fundamental. Its answer will allow the parties "to develop[] information needed for a realistic assessment of the case." L.R. 26.3.

At the same time that discovery and resolution of these primary issues is occurring, the parties can brief and argue the question what must be proven at trial. Will the trial consist, as the RCAB contends, of a consideration of the reasonableness of the global settlement, or will it be hundreds of separate trials where the facts of each claim must be tried one by one, as LMC contends? The answer to this question will govern the scope of discovery in the second phase. Will hundreds of depositions be necessary as LMC posits, or will only a few be germane, as the RCAB contends? This second round of discovery should be held in abeyance until the more fundamental issues are resolved. The second round also will raise serious privacy issues and should be deferred until the Court rules whether it is necessary.

Given this situation, the RCAB contends that the most efficient pre-trial procedure would be to begin by taking discovery on such topics as:

(1) The existence and location of insurance policies, and the search for such policies;

(2) The terms and limits of those insurance policies, and the knowledge of the parties of such terms and limits;

(3) Communications and negotiations between the RCAB and LMC regarding claims;

(4) The circumstances and content of alleged "agreements" concerning a $300,000 annual aggregate;

(5) The validity of the buy-back of an excess policy;

(6) The dates and nature of any denials of coverage or purported reservations of rights;

(7) The dates and amounts of payments to RCAB by LMC for defense costs and/or settlement costs;

(8) Investigation of claims and cooperation of the insured and the insurer;

(9) The financial condition of LMC;

(10) LMC's bad faith.

Discovery into these primary issues would involve a relatively discrete number of individuals.[4] Subsequent to this limited discovery, the parties would be in a position either to stipulate as to certain relevant facts or to file partially dispositive motions. To the extent necessary, discovery would then turn to additional issues.

Depending on the facts discovered in the RCAB's proposed first phase of discovery and the Court's ruling on basic issues, a second phase of discovery could be significantly narrowed in scope and length. The discovery schedule should reject LMC's suggestion that it is entitled to

---

[4] Counsel for LMC has expressed concern that certain witnesses potentially relevant to the second phase of discovery may be enfeebled, creating a need to depose these witnesses sooner rather than later. The RCAB agrees that where LMC can identify such a case, the deposition could go forward in the first phase.

the limits of Local Rule 26.2(C)(1) discovery (*i.e.*, ten depositions, twenty-five interrogatories, twenty-five requests for admission and two sets of requests for production) *for each and every claim* at issue.  The settlements in question comprised well in excess of 600 (six hundred) claims.  (*See* Compl. ¶¶ 30, 40.)  That LMC suggests that it is entitled to take in excess of 6000 depositions in this case is the best evidence yet that it seeks to use the discovery process as a means of delaying the resolution of these issues, while Kenning uses LMC's diminishing resources to earn a bonus.  Phasing and expediting discovery in the manner suggested by RCAB will deprive LMC of this strategy of delay as a means of defeating the RCAB's ability to recover what it is owed.

4.    Plaintiff's Comments Upon Defendant's Position

On May 12, 2004, at the mandated conference of the parties, counsel for LMC gave counsel for the RCAB its draft of its position for inclusion in this Joint Statement.  Counsel for the RCAB then prepared the foregoing statement, which it provided to counsel for LMC on Monday, May 24.  Counsel for LMC thereupon rewrote its draft position statement as set forth below, which has constrained the RCAB to make the following supplemental comments to aid the Court's understanding of the parties' positions.  The RCAB has not revised its initial statement of position but, rather, offers observations on several salient points that demonstrate substantial flaws in LMC's newly-adopted position.

- LMC's proposed "content neutral" phasing of discovery is a meaningless exercise.  In essence, LMC proposes that some discovery (without regard to issue) be taken now and that some be taken later.  It is difficult to understand what this form of phasing would accomplish; it has no apparent relationship to Local Rule 26.3's suggestion that phasing be entertained "[i]n order to facilitate settlement and the efficient completion of discovery."  L.R. 26.3.  LMC's proposed phasing

of discovery without a concurrent delineation of subject matter is ephemeral. It is clear that there exists a fundamental disagreement between the parties as to what needs to be proven at trial. The parties can simultaneously brief for the Court's consideration their positions as to what evidence need be presented at trial. Until that issue is resolved by the Court, discovery should not proceed on anything but basic coverage issues that all agree are relevant. The Court can determine the appropriate scope of Phase II discovery.

- LMC contends that an agreement was reached to treat the policies as having a $300,000 annual aggregate, and that this purported agreement was based upon the reference to aggregate limits on certain declaration pages. LMC did not produce those pages until 2000 and, in any event, they demonstrate on their face that the aggregate limits are governed by the language of the *policies*, which in fact provide no annual aggregate for the claims at issue in this case. The RCAB will provide the Court with copies of the relevant declaration and policy pages.

- LMC accuses the RCAB of "hyperbole" for its suggestion that LMC seeks as many as 6000 depositions in this case. In its initial statement of position given to the RCAB by LMC on May 12, LMC in fact stated that it was entitled to all of the discovery contemplated by Local Rule 26.1(C) (*i.e.*, 10 depositions) for *each* underlying claim (which it calculated to be in excess of 600). That means 6000 depositions. In its revised position, LMC no longer includes in *haec verba* its assertion that it be permitted to take as many of 6000 depositions; instead, it now states that it is entitled to take an *unspecified* number of depositions, but at least more than 100. LMC's revised position is no different from its prior position—it

does, indeed, contemplate dragging this case out for years, taking an untold number of depositions in the process.

- LMC contends that the RCAB has put forward no factual support for its claims regarding LMC's financial condition. The RCAB can and will provide the Court with a copy of LMC's publicly-disclosed financial statements. Those reports substantiate LMC's dire description of its situation and underscore the need for a speedy resolution to this case.

- Despite LMC's precarious financial situation, the RCAB is not, as LMC seems to believe, affirmatively seeking entry of a bond to secure a judgment against LMC. What the RCAB is suggesting is that, given LMC's financial condition, the Court should exercise its discretion to establish an expedited discovery and trial schedule. If, however, LMC insists on its drawn-out discovery schedule—leading to a trial in 2007, when it may be unable to satisfy a judgment—the Court ought to require security for the RCAB as a *condition* to granting LMC's longer discovery schedule. LMC's suggestion that the RCAB must make a showing of likelihood of success and irreparable harm similar to a preliminary injunction is off point.

- LMC suggests that the RCAB is not entitled to an expedited discovery schedule because it somehow has "slept on its rights" with regard to LMC's insurance coverage. This position puts the cart before the horse. The RCAB contends that LMC repeatedly misled it regarding the nature and status of its insurance coverage. The doctrine that equity protects the vigilant has no application where, as here, the vigilant are deceived. *Cf. Jamesbury Corp. v. Worcester Valve Co.,*

443 F.2d 205, 208 (1st Cir. 1971) (equitable laches do not begin to run where plaintiff was not aware of underlying facts giving rise to the action).

- LMC also misconstrues the RCAB's claims regarding the "buy-back" agreement. RCAB is not seeking rescission of that agreement. Instead, the circumstances of the execution of that particular agreement (1) are evidence of LMC's pattern and practice of bad faith with regard to the RCAB's claims and (2) entitle the RCAB to a declaration that it may access the excess insurance that it agreed to surrender on the basis of LMC's bad faith misrepresentations as to its scope of coverage.

- Throughout its statement of position, LMC repeatedly misstates the RCAB's position regarding which tort claims are covered, asserting that the RCAB's position is that intentional sexual abuse is covered under the insurance policies. The RCAB's position is not, nor has it ever been, that intentional torts are covered by LMC's policies, but rather that the negligent supervision and hiring claims related to those intentional torts are. Those are the claims that LMC paid for a decade, but limited to its imaginary annual aggregates.

Despite LMC's changed position, the interests of justice and efficient use of judicial resources are best advanced by a speedy, phased discovery as proposed by the RCAB.

**B.    Defendant's Position**

      1.    <u>The Scope of the Claims Asserted in the Action</u>

This action involves issues concerning insurance coverage obligations reaching back in time some 40 years.[5]  The defendant, Lumbermens Mutual Casualty Company ("LMC")

---

[5] LMC notes that the RCAB appears to contend that for the purpose of considering its proposals concerning scheduling, the bare allegations of its complaint should be treated as something more than unproven assertions.  LMC is aware of no basis on which it would be appropriate to make such an

understands that based on his investigation, the Attorney General of the Commonwealth of

Massachusetts concluded that as of July 2003, some 789 persons had complained of sexual abuse

by priests or other employees of the plaintiff The Roman Catholic Archbishop of Boston, a

Corporation Sole (the "RCAB") since 1940.[6] The Attorney General further concluded that some

250 priests or other employees of the RCAB committed such acts. By this action, the RCAB

seeks (among other relief) indemnity coverage in an unnamed amount for an unstated number of

such events which took place between 1955 (at the latest) and 1983.[7] The RCAB seeks

indemnity not only in connection with the alleged negligence of supervisory personnel, but also

*seeks indemnity for and a declaration that the acts of sexual abuse of minors committed by*

*priests and others in its employ are covered under the LMC policies.* *See* Complaint, ¶ 54.

The RCAB also apparently seeks rescission of a buy-back agreement under which LMC

previously paid the RCAB $2,500,000.00 in exchange for a release of claimed excess coverage

for the period September 14, 1973 through September 23, 1977. Notably, the RCAB has not

tendered any amount of the benefit it received from that agreement to LMC. *See Jurewicz v.*

*Jurewicz*, 317 Mass. 512, 517 (1945) (party seeking rescission must first give up all she

received); *Fitch v. Ingalls*, 271 Mass. 121, 129 (1930) (tender of benefit received under contract

necessary to obtain remedy of rescission). By its counterclaim, LMC seeks repayment to it of

---

assumption, and notes further that it has denied many of those allegations which the RCAB unilaterally
treats in its proposals as established in this action.

[6] The Attorney General concluded that the majority of the alleged abuse took place between 1960 and
1992.

[7] The RCAB alleges that it had insurance coverage with LMC from "at least 1955." LMC is not aware at
the present juncture for how many years prior to 1955 the RCAB contends it had such coverage.

the amounts it has paid to the RCAB for indemnity and defense of claims of supervisory

negligence to date -- $17,238,882.[8]

2. The Elements of Proof on Which Discovery Will be Necessary

In LMC's view, in order for the RCAB to prevail on each such claim for indemnity

coverage, the RCAB must, at a minimum, demonstrate an "occurrence" during an LMC policy

period, which falls within the scope and the terms and conditions of the coverage afforded under

the policies of insurance issued by LMC to the RCAB over this period, and that it made

payments in reasonable amounts to compensate claimants for covered, and not uncovered harms

as to each such loss.[9] *Amtrol, Inc. v. Tudor Ins. Co.*, 2002 U.S. Dist. LEXIS 18691 (D.Mass.

2002) (noting that "The initial burden lies with the insured to prove that the underlying facts state

a claim for which the insurance policy provides coverage." citing *Highlands Ins. Co. v. Aerovox*

*Inc.*, 424 Mass. 226, 230 (1997)).

In essence, the RCAB's complaint includes distinct claims for declaratory relief as to

each separate event for which the RCAB seeks indemnity or defense coverage in this action;

each of which could have been brought as a separate action.  In order to defend each claim of

---

[8] LMC does not anticipate that the discovery on its counterclaims will be substantially separate or distinct from discovery concerning the RCAB's claims.

[9] It is LMC's position that its insurance policies provide no coverage to the RCAB for the intentional assaults, batteries, and other sexual abuse committed by priests and others for which the RCAB has or may make payments to compensate claimants for the harm inflicted upon them by such persons. *See Doe v. Liberty Mut. Ins. Co.*, 423 Mass. 366 (1996) (sexual misconduct with a minor was intentional as a matter of law.  Insurer had no duty to defend such claims).  LMC further believes and alleges that the harm suffered by many of those compensated by the RCAB by the settlements at issue was not fortuitous and therefore not insured against because the RCAB knew or should have known that such harm was substantially likely to occur in the face of its ongoing failure to act.  *See e.g.*, *Diocese of Winona v. Interstate Fire and Casualty Company*, 89 F.3d 1386 (8th Cir. 1996) (concluding that no coverage was available for claims arising from conduct of pedophile priest for period after defendant Archdiocese knew or should have known that personal injury from child sexual abuse by continuing to allow priest access to children was highly likely to occur).

coverage, LMC will need discovery concerning the merits of each claim for which plaintiff seeks indemnification.[10] .[11]

At the present juncture, the defendant believes that it will need to take a minimum of 100 depositions of persons falling into the following general categories: (1) Senior Managers for the RCAB for the period 1955 – 1983; (2) Supervisory personnel for this period; (3) Priests accused of abuse for this period; (4) Counsel to the Archdiocese in the underlying disputes for which the RCAB seeks indemnity; (5) Coverage Counsel to the Archdiocese in the underlying disputes for which the RCAB seeks indemnity; (6) persons who were involved in determining the amounts and terms of the settlements for which the RCAB seeks indemnity; and (7) persons involved on the RCAB's behalf in procuring insurance and reporting occurrences allegedly falling within the scope of coverage afforded under the various policies of insurance at issue to the RCAB's insurance carriers.[12]

---

[10] As discussed further, *infra*, the sheer volume of usual course discovery on such claims necessary in this action is the product of the RCAB's apparently conscious decision not to seek a judicial determination regarding the coverage afforded it with respect to any of the hundreds of sexual abuse claims it has settled over the past ten years, although all the facts relating to coverage for such claims have been known to it over this entire period. The RCAB's contention that the reasonableness of its lump-sum settlement may be determined without the disclosure of facts concerning each claim within the group of settled claims defies logic, and is contradicted by the RCAB's own observation that it is obligated to demonstrate that "it reached a settlement that was reasonable in view of the prospect of an actual finding of liability and the extent of related damages." *See* Section I. A. 2 at p.6, *supra*.

[11] Because new claims for alleged sexual abuse continue to be made against the RCAB involving events alleged to have occurred during LMC policy periods, and because the RCAB seeks a declaration of the parties' respective rights and obligations as to *future* claims, it is not possible to determine at the present juncture precisely how many alleged "occurrences" there are for which the RCAB seeks coverage. *See e.g.*, Ralph Ranalli, *St. Joseph Nuns Sued in Abuse Claim, School for Deaf Case Also Names 4 Others*, BOSTON GLOBE (May 12, 2004); John McElhenny, *Lawyers Ready Claims of More Clergy Abuse*, BOSTON GLOBE (May 24, 2004). As a result, it is impossible to determine with precision at present how many depositions will be necessary in LMC's defense of the RCAB's claims, and in the prosecution of LMC's counterclaims.

[12] Consistent with its apparent penchant for hyperbole, the RCAB paints a picture of LMC seeking in excess of 6000 depositions in this case. LMC has no intention of taking 6000 depositions, and expects, on its receipt of the RCAB's initial disclosures, to be in a better position to assess what overall number of

-16-

In addition, LMC believes it may be necessary for it to take limited depositions of certain of the alleged victims of such abuse, and/or of persons who brought such abuse to the attention of employees or officials of the RCAB.  While LMC is aware of the sensitivity of this request, LMC believes that there are genuine and material issues concerning when RCAB was notified of the alleged occurrences for which he seeks indemnity by this action, and that discovery limited to the employees and agents of the RCAB will not be adequate to discover when the RCAB was notified of such claims.

> 3.     Discovery Phasing Is Appropriate, But Its Content Should Not be Dictated By the RCAB's Interests Alone

LMC has considered the desirability of conducting phased discovery in this matter, and has consulted with the RCAB on the question.  LMC understands that the RCAB's position is that the first phase of discovery should be limited to matters directly addressing the terms and conditions of the various contracts of insurance pursuant to which the RCAB seeks coverage, and that no discovery concerning any of the claims for which the RCAB seeks defense or indemnity should be permitted; and no discovery concerning LMC's counterclaim should be allowed.  The RCAB contends that this approach will reduce the amount of discovery necessary in this action, and that it is justified by two factors – the merits of its complaint; and the financial condition of LMC.  See Section I A. 1 at p. 3, *supra*.  Notably, the RCAB has put *no evidence* before the court in support of either proposition.  As noted above, LMC has answered the

---

depositions it reasonably expects to be necessary for it to prepare its defense and to prosecute its counterclaim.  LMC believes that there are likely to be a number of witnesses whose testimony may be relevant to multiple claims for coverage.  LMC does not intend to take separate depositions of the same witness with respect to different claims for coverage.  However, LMC does anticipate that, due to the breadth and nature of the claims in this action, it will not be possible to complete a substantial number of depositions in this case within the presumptive time limits provided by Fed.R.Civ.P. 30(d)(2).  Thus, both the overall number of depositions and their duration will have to be determined as discovery proceeds.  LMC therefore reserves the right to seek an amendment to any Scheduling Order entered by the Court in this matter with respect to both the numbers and duration of depositions permitted in this action.

RCAB's complaint and denies most of the material allegations contained within it.  At this juncture, the RCAB's complaint presents nothing more than unproven allegations.

> i.    The RCAB's Contentions Regarding LMC's Financial Condition Should Be Given No Weight in Determining What Discovery Is Reasonably Necessary for Each Party to Prepare Its Case for Trial

With respect to LMC's financial condition, the RCAB's contentions are overblown and unsupported.  There is no dispute that LMC is presently in run-off under the supervision of the Illinois Department of Insurance.[13]  Because LMC is no longer writing new insurance policies, the pool of policyholders to whom it owes defense and indemnity obligations is capped.  While the RCAB makes the claim that the run-off means that LMC has adopted some sort of affirmative policy of handling claims in bad faith, the assertion is utterly without factual support. In fact, LMC's primary function in the run-off process is to marshal its assets to the payment of insured claims by treating all similarly situated policy holders similarly.  See generally Illinois Insurance Code, Article XIII, 215 ILCS 5/Art. XIII; 215 ILCS 5/35A-30 (3)(c) (2004).  The RCAB's unfounded accusations to the effect that LMC's run-off plans are designed to harm it should be disregarded by the Court.  LMC's financial condition provides no basis on which to curtail LMC's right to defend itself from the RCAB's claims in this action.  To the contrary, it is in the interest of LMC's policyholders that LMC not pay claims like those asserted against it in this action, where such claims have no legal merit.

> ii.    LMC Should Be Provided The Same Opportunity As Any Other Party to a Civil Case to Develop Its Claims and Defenses

---

[13] The RCAB's suggestion that it intends to conduct discovery in this action concerning the management of LMC by Kenning Capital LLC, apparently in an effort to question the propriety of a management plan which has the approval of the Illinois Department of Insurance, is an invitation for this Court to adopt the role of a super-regulator of Illinois insurers it should decline.  Illinois has a comprehensive statutory and regulatory scheme for the supervision and oversight of insurers organized under its laws that this Court need not and should not oversee through this action.  *See* Illinois Ins. Code Art. XIII; Illinois Administrative Code, Title 50.

LMC should be afforded the same rights any other party would have in the ordinary course to defend itself and to engage in ordinary course discovery on the merits of the RCAB's claims. To the extent that the RCAB invites the Court to impose orders on LMC which would require it to post bond in order to obtain ordinary course discovery, the Court should reject the invitation as unfounded. First, the RCAB has presented no evidence to the Court to support a claim that it has a substantial likelihood of success on the merits of its complaint. Second, the RCAB has presented nothing to support the conclusion that it faces a genuine risk of irreparable harm in the absence of an order providing it such prejudgment security.

The mere fact that LMC is in run-off in no way suggests that LMC will be unable to pay, in full, any claims for which the Court determines LMC has an obligation under any applicable policies of insurance issued to the RCAB. The RCAB essentially requests that the Court *assume* that it will prevail on its claims, and *assume* that LMC will be unable to pay any judgment which may enter. The RCAB cites no authority to suggest that this would be an appropriate approach to take in this or any other case. In essence, the RCAB seeks an order which would provide it a preference for its unliquidated, unproven claims over the claims of other LMC policy holders. There is no basis for the Court to entertain such a contention.[14] Moreover, the proposition that the RCAB proffers by implication, i.e., that every LMC policyholder who has any dispute with LMC over coverage under any LMC policy should race to court in every jurisdiction in which they are located and seek an order segregating funds sufficient to pay their claim, would render the Illinois regulatory scheme utterly ineffective to perform its function – to ensure that the affairs of insurers in run-off under its jurisdiction are handled in a fashion which serves to

---

[14] Indeed, the RCAB relegates its request for a bond to a footnote, and has placed no motion before the Court as a vehicle for considering the question.

facilitate full payment of legitimate policyholder claims, and to reduce the likelihood of a liquidation.[15]  Determinations of what actions are needed to protect LMC's policyholders including the RCAB are committed to the Illinois regulators to whom LMC reports, and who are in a position to assess the overall needs of LMC policy holders, rather than the needs of just a single policy holder concerned about a single class of claims against it.  In short, the Court should not give any credence to the RCAB's contention that it should be given either expedited discovery or a bond in some unstated, unproven amount.

> iii.  The RCAB's Unexplained Delay in Asserting its Claims
>        Warrants Denial of its Request for an Expedited Trial Schedule

The RCAB chose to wait for over ten years to assert its claims, notwithstanding that all the facts on which its complaint is based have been known to it for all that time.  Now it seeks an expedited hearing at the expense of a full airing of the merits of its claims.  There is no equitable basis on which to grant its requests. *See e.g.*, *Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs*, 60 F.3d 867, 879 (1st Cir. 1995) (noting that "equity ministers to the vigilant, not to those who sleep upon their rights." citing, *Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 87 (1st Cir. 1990).  Having chosen, for its own reasons, not to challenge LMC's coverage position in any of the literally hundreds of separate instances in which it now claims it has been improperly denied indemnity, the RCAB should not be heard to complain that airing the merits of its claims will be too burdensome.  LMC's defense cannot justifiably be hog-tied in these circumstances.

---

[15] *See* Douglas McLeod, *Regulators Aid Kemper Runoff Plans*, BUSINESS INSURANCE (March 15, 2004) (noting that "Regulators granted the accounting concessions to aid a runoff plan that will allow Lumbermens to continue paying policyholder claims and avoid formal rehabilitation or liquidation proceedings, confirmed Tom Lurkins, acting supervisor with the Illinois Insurance Department's property/casualty financial analysis unit.")

       iv.     The RCAB's One-sided Proposal Will Not Advance the Disposition of this Case

As set out in LMC's counterclaim, it is LMC's position that because neither the RCAB nor LMC had the original policies for all the years for which the RCAB sought coverage, LMC and the RCAB agreed to terms on which LMC would provide defense and indemnity for the sexual abuse claims at issue pursuant to a general reservation of rights. The parties operated under that agreement for over ten years, and LMC has contributed over $17,000,000 to the resolution of such claims on that basis.[16]

One of the terms on which the parties operated was a joint understanding that the primary policies had contained aggregate annual limits of $300,000. This understanding was based on the presence of such limits on the face of certain declaration pages for policies covering certain years. The RCAB apparently contends that the issue whether any such aggregates which appeared in the actual policies were applicable to the sexual abuse claims at issue may be largely dispositive of the case because if such aggregate limits were contained in the policies, and if such limits were applicable to the claims at issue, then the primary policies have largely been exhausted.

The RCAB's position disregards that even if the Court were to determine, in some summary proceeding, that there were such aggregates and that they did apply to the claims at issue, this will not advance the disposition of LMC's counterclaims or its affirmative defenses, and will have no impact on other aspects of the RCAB's claims, including its claim of bad faith.[17]

---

[16] The bare amount LMC has paid in defense and indemnity on the RCAB's behalf for sexual abuse claims gives the lie to its accusations that LMC was engaged in dilatory and bad faith conduct.

[17] Indeed, the presence of the RCAB's bad faith claim entitles LMC to obtain discovery concerning all the circumstances surrounding its conduct, including discovery concerning the merits of the underlying

If the Court were to limit discovery in the fashion the RCAB suggests, and if the RCAB's position is upheld – i.e., that even if such aggregates were contained in the policies, they did not apply, and the parties did not agree that they did, the result will not be the prompt disposition of the case, but simply the postponement of basic discovery on the underlying claims for which the RCAB seeks indemnity.[18]  In sum, the RCAB's proposal accomplishes nothing more than to place a priority on the discovery that the RCAB believes will advance its affirmative claims, and does nothing to address LMC's defenses or its counterclaims.  To the extent that phasing may provide some impetus for the parties to reach agreement on a settlement, permitting one party to

---

claims, and the degree to which the RCAB's settlement of those claims was based on an appropriate assessment of the RCAB's potential exposure on covered claims, or was prompted by other factors. *See Forcucci v. USF&G*, 11 F.3d 1, 2 (1st Cir. 1993) (reasonableness of defendant insurer's conduct is to be considered "in light of the situation as a whole"); *see also Schulz v. Liberty Mut. Ins.Co.*, 940 F. Supp. 27, 31 (D. Mass. 1996)(plaintiff's alleged failure to make a timely demand and refusal to negotiate realistically may well be relevant in defending a claim based on violation of G.L. c. 176D §3(9)(f)).  To prevail on its G.L. c. 93A bad faith claim, the RCAB must demonstrate that LMC's response to the claims shows an absence of good faith and the presence of extortionate tactics. *Guity v. Commerce Insurance Co.*, 36 Mass. App. Ct. 339, 343 (1994).  Even were the Court to conclude that LMC's position on coverage was incorrect, an incorrect interpretation by an insurer of the relevant policy and consequent denial of coverage do not, without more, form the basis of a claim for unfair trade practices. *Boston Symphony Orchestra v. Commercial Union Insurance Co.*, 406 Mass. 7, 14-15 (1989).  LMC is entitled to discovery from the RCAB on these issues, irrespective of the outcome of the aggregate issue.

[18] LMC understands that the RCAB contends that LMC cannot have discovery on the underlying claims, and is estopped from questioning the reasonableness of any settlement the RCAB entered into with respect to such claims.  The contention is without merit.  There is no dispute that LMC provided defense and indemnity coverage to the RCAB on the underlying claims pursuant to a general reservation of rights.  As such, LMC can challenge the amounts of the settlement and the allocation made by the RCAB and the underlying plaintiffs of settlement funds between allegedly covered claims, and uncovered claims – i.e., compensation for harm caused by the abusive conduct of the priests themselves, as opposed to harm caused by the negligent supervision of such priests by Archdiocesan supervisors and policymakers. *See Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 406 (2003) (an insurer's defense of its insured pursuant to reservation of rights did not estop the insurer from subsequently disclaiming liability because the insured had been put on notice of such possible disclaimer and could thus take necessary steps to protect its rights. citing *Salonen v. Paananen*, 320 Mass. 568, 572-573 (1947)).  Moreover, the RCAB's complaint makes allegations with respect to its own rationale for entering into the settlements at issue (*See* Complaint, ¶ 38, alleging that then Bishop Sean O'Malley concluded that early settlement of the so-called "Recent Claims" was necessary to "provide reasonable and appropriate compensation for the claimants and to minimize … financial risk to the Archdiocese…").  Discovery on the basis for such settlements is therefore directly relevant to the RCAB's claims, irrespective of the outcome of the aggregate issue.

set the agenda with respect to discovery, while relegating the other to essentially standing by until the other has completed the discovery it deems significant, fails to create the conditions for such an outcome. As in any other case, any hope of resolution before trial must lie in an expectation that both parties will have the opportunity to explore the relative strengths and weaknesses of their respective cases.[19]

Moreover, even if, as the RCAB suggests, its burden were limited to demonstrating the reasonableness of the settlements into which it entered (a legal proposition that LMC vigorously disputes), meeting that burden will unavoidably require an examination of the relative strengths and weaknesses of each claim for which the RCAB seeks indemnity through this action and a determination whether the amounts paid by RCAB in settlement were reasonable in the circumstances. The RCAB's apparent expectation that it should be permitted to present its case on these issues to a factfinder, while refusing to provide any discovery on them is unprecedented.

     v.    A Content-Neutral Phasing Order Could Facilitate the Disposition of this Case

LMC concurs with the RCAB, however, that phasing of discovery may assist in the prompt disposition of the case. Rather than adopting either party's view of what discovery may prove significant, LMC proposes instead that the Court simply permit each party to conduct the number of discovery events contemplated under the provisions of Local Rule 26.1(C) as Phase I of the discovery process (permitting each party to prioritize its discovery and take what it believes is the most important discovery in Phase I), and that the Court hold a Rule 16 conference following the completion of the Phase I discovery by both sides to discuss the scope

---

[19] The RCAB's scheduling proposal appears calculated to result in postponing necessary, relevant discovery until late in the life of the case, and would create time pressures which could curtail the completion of discovery LMC needs to support its defenses and counterclaim.

of the next Phase or Phases of discovery necessary to prepare the case for trial or other

disposition.  LMC proposes that the Phase I period conclude on November 30, 2004.

　　　　3.　　　The Scheduling Order Should Mandate Broad Initial Document
　　　　　　　　Disclosures

LMC contemplates that it will require document disclosures from the RCAB regarding

each claim of clergy sexual abuse in connection with which the RCAB seeks an award of

damages or a declaration by this action.  Such disclosures will have to include underlying

litigation files, as well as all documentation pertaining to the valuation and settlement of each

claim.  LMC believes that these materials, as well as all documentation pertaining to the

coverage dispute which is the subject of the case, should be made available without the necessity

for formal document requests in a single wave of the exchange of electronic databases containing

this information as part of the initial disclosures made by the parties in the case.[20]  Exchanging

documents in this fashion will permit the parties to get started on taking essential depositions

early in the life of the case.

　　　　4.　　　Amendments and Potential Third Party Claims

Because the RCAB seeks payment from LMC for amounts paid in settlement of claims

arising from the intentional acts of sexual abuse by its employees as well as from the allegedly

negligent conduct of supervisory employees, and because the settlements the RCAB has entered

into include no allocation of settlement payments between such claims,[21] LMC understands and

believes that it is entitled to indemnity from the priests themselves.  As such, it is LMC's

---

[20] *See* discussion, *infra*, regarding LMC's efforts to organize all the documentation which may pertain to this matter in electronic form, so as to facilitate a broad, prompt disclosure of potentially relevant materials by both parties.

[21] The RCAB's complaint alleges that the settlement payments were to compensate for both the acts of sexual abuse themselves and for alleged negligent supervision.  *See* Complaint, ¶ 41.

intention to assert third party claims against each priest (or other employee) for whose conduct the RCAB seeks indemnity by this action.  Until the RCAB has specified each claim for which it seeks indemnity payments, however, it is impossible for LMC to assert all its claims in this regard.  LMC therefore proposes that the RCAB be required, as part of its initial disclosures in this action, to identify each claim for which it seeks indemnity payments from LMC.  LMC proposes that such disclosure include the name of each claimant; each priest or other employee alleged to have engaged in abusive conduct; whether such priest or other employee remains in the employ of the RCAB or any other Archdiocese; the last known address of each such person; and the time period during which the abuse was alleged to have occurred, so as to facilitate LMC bringing all persons potentially liable for the harm the RCAB alleges it suffered in its complaint in this action before the Court.

## II.    DISCOVERY AND MOTIONS SCHEDULE

### A.    Plaintiff's Position

The RCAB proposes the following schedule for the completion of discovery, the filing of summary judgment motions and final pretrial conference:

- The parties shall produce all information and materials subject to automatic disclosure under Fed. R. Civ. P. 26(a)(1) and Local Rule 26.2 as soon as practicable; and they shall complete the production by **July 1, 2004**;

- Phase I fact discovery to be completed by **September 3, 2004**;

- Motions for partial summary judgment on Phase I issues and for rulings concerning scope of trial to be filed no later than **September 15, 2004**, with oppositions by **September 30, 2004**;

- Phase II fact discovery to be completed by **December 31, 2004**;

- Trial experts shall be designated, and disclosure of information contemplated by Fed. R. Civ. P. 26(a)(2) shall be provided by plaintiff no later than **January 15, 2005** and by defendant no later than **January 31, 2005**.  Expert depositions shall be completed by **February 15, 2005**;

- Motions for summary judgment (if any) to be filed by **February 1, 2005**, with oppositions by **February 15, 2005**;

- Final pre-trial conference to be held by **March 15, 2005.**

**B.    Defendant's Position**

The defendant proposes the following schedule for completion of discovery, the filing of summary judgment motions and final pretrial conference:

A.    The parties shall produce all information and materials subject to automatic disclosure under Fed. R. Civ. P. 26(a)(1) and Local Rule 26.2 as soon as practicable; and they shall complete the production by **July 15, 2004**;

B.    Phase I discovery to be completed by **November 30, 2004**;

C.    Fact discovery to be completed by **May 30, 2006**;[22]

D.    Expert discovery and final reports produced by **July 30, 2006**;

E.    Motions for Summary Judgment, if any, to be filed by **October 30, 2006**; and

F.    Final Pretrial Conference to be held during **December 2006**.

**III.    INITIAL DISCLOSURES**

**A.    Plaintiff's Position**

The plaintiff is in the process of preparing its Rule 26 Initial Disclosures and intends to provide those to the defendant by July 1, 2004.  The plaintiff notes that, consistent with its above

---

[22] LMC notes that this proposal is reflective of both the number of depositions which are anticipated to be necessary in this case, and the fact that many witnesses may not be within the control of the parties, and may not be within the jurisdiction of the Court.  Such circumstances are likely to delay how quickly the parties will be able to complete the needed deposition discovery.

position, it does not intend to produce information (if it exists) that pertains to individual claims. The plaintiff asserts that the defendant should likewise be able to submit its materials by said date.

**B.    Defendant's Position**

LMC is in the process of preparing its Rule 26 Initial Disclosures and Local Rule 26.1(B)(2) Sworn Statement and expects to be able to provide same to the plaintiff by July 15, 2004.

At present, LMC has determined that it is in possession of approximately 169,000 pages of materials which may be relevant to this action. LMC has gathered these materials and is processing them to create digital images of each, which must then be reviewed for privilege and a determination whether such materials may be used by the defendant to support its claims and defenses. In view of the volume of materials at issue, LMC requests that the 14 day period provided in Local Rule 26.2(A) for completion of Automatic Disclosures be enlarged up to and including July 15, 2004.

LMC objects to the RCAB's stated intention to withhold production of documentation and other initial disclosure materials that relate to the underlying claims for which it seeks indemnity. LMC states that there appears to be no basis on which the RCAB may properly, and in good faith, contend that such materials fall outside the scope of initial disclosure requirements of Rule 26 (a)(1)(A)-(D). Such materials plainly fall within the scope of "materials bearing on the nature and extent of injuries suffered" by the RCAB; and plainly too fall within the scope of materials that the RCAB "may use to support its claims or defenses." *Id.*

**IV.    LOCAL RULE 16.1(D)(3) REQUIREMENTS**

The parties submit their certificates pursuant to Local Rule 16.1(D)(3) herewith.

**THE ROMAN CATHOLIC ARCHBISHOP
OF BOSTON, A CORPORATION SOLE**
By its attorneys,
ROPES & GRAY LLP


/s/ Paul B. Galvani

Paul B. Galvani, BBO No. 183800
Thomas H. Hannigan, Jr., BBO No. 220420
Kate Cimini, BBO No. 654336
Ropes & Gray LLP
One International Place
Boston, MA  02110
(617) 951-7000

May 26, 2004

**LUMBERMENS MUTUAL CASUALTY
COMPANY**
By its attorneys,
ROBINSON & COLE LLP


John E. Tener, BBO No. 563791
Michael D. Lurie, BBO No. 553024
Anthony R. Zelle, BBO No. 548141
Brian P. McDonough, BBO No. 637999
Robinson & Cole LLP
One Boston Place
Boston, Massachusetts 02108
(617) 557-5900