**9/2/2004  Paul Fallon**

1              Vol. 1
2
3
       IN THE UNITED STATES DISTRICT COURT
4       FOR THE DISTRICT OF MASSACHUSETTS
5             C.A. NO. 04-10461-DPW
6
7
       THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON,
8       a Corporation sole,
                 Plaintiff,
9
             vs.
10
       LUMBERMEN'S MUTUAL CASUALTY COMPANY,
11             Defendant.
12
13
14
15       DEPOSITION OF PAUL J. FALLON, taken
16   pursuant to Notice under the applicable
17   provisions of the Federal Rules of Civil
18   Procedure on behalf of the Defendant, before
19   Simonne J. Elwood, R.P.R. and a Notary Public
20   in and for the Commonwealth of Massachusetts,
21   at the office of Robinson & Cole, LLP, One
22   Boston Place, Boston, Massachusetts, commencing
23   on Thursday, September 2, 2004 at 10:02 a.m.
24
25
26
       NEAL A. SALLOWAY - COURT REPORTERS
27         FIVE CARDIGAN ROAD
         WEST PEABODY, MA 01960
28   781-581-3993 - 978-535-0313 - FAX 978-536-3142

**9/2/2004  Paul Fallon**

```
 1                    Vol. 1

 2

 3    APPEARANCES:

 4

          PAUL B. GALVANI, ESQ.

 5    ROPES & GRAY

          ONE INTERNATIONAL PLACE

 6    BOSTON, MA  02108-4404

            REPRESENTS THE PLAINTIFF

 7

          ANTHONY R. ZELLE, ESQ.

 8    BRIAN P. McDONOUGH, ESQ.

          ROBINSON & COLE, LLP

 9    ONE BOSTON PLACE

          BOSTON, MA  02108

10          REPRESENTS THE DEFENDANT

11

12

13

14

15

16

17

18

19

20

21

22

23
```

**9/2/2004  Paul Fallon**

1                  I N D E X

2    DEPONENT          DIRECT REDIRECT CROSS RECROSS

3    PAUL J. FALLON

4      By Mr. Zelle      4     78

5      By Mr. Galvani              77    --

6

7

8

              E X H I B I T S

9

      EXHIBIT NO.      DESCRIPTION      PAGE NO.

10

              (No Exhibits)

11

12

13

14

15

16

17

18

19

20

21

22

23

**9/2/2004  Paul Fallon**

```
1              S T I P U L A T I O N S

2              It is agreed by and between counsel

3       for the respective parties that the

4       stipulations will be pursuant to the Federal

5       Rules of Civil Procedure.

6              It is also agreed that the reading and

7       signing of the deposition are not waived and

8       to be read and signed under the pains and

9       penalties of perjury.

10

11

12              PAUL J. FALLON

13              A witness called on behalf of the

14      Defendant, having been satisfactorily

15      identified by the production of his driver's

16      license and duly sworn, under oath, by the

17      Court Reporter and Notary Public, was

18      examined and testified as follows:

19

20      DIRECT EXAMINATION

21   Q    (By Mr. Zelle)  Mr. Fallon, will you state

22      your name and spell your last name, please.

23   A    Paul J. Fallon.  F-A-L-L-O-N.
```

4

**9/2/2004  Paul Fallon**

1    Q    Where do you live?

2    A    Malden, Mass.

3    Q    Okay.  Give us an address, please?

4    A    50 Rivers Lane.

5    Q    And how long have you been there?

6    A    One year.

7    Q    Okay.  Any expectation on moving in the near

8         future?

9    A    No.

10   Q    That's great.  When were you employed by

11        the --

12   A    1975.

13   Q    -- RCAB?

14   A    1975.

15   Q    Just do me a favor.  I'm going to be --

16   A    Okay.

17   Q    -- asking questions, and I'm sure you're

18        going to anticipate what I'm asking you, but

19        just let me finish the question.  It makes it

20        a lot easier for our reporter here.

21   A    Okay.

22   Q    You said 1955?

23   A    '75.

**9/2/2004  Paul Fallon**

1    Q    I'm sorry.  1975.  And you were -- And were

2          you with the Risk Management Department at

3          that time?

4    A    That is correct.

5    Q    And how long were you with the RCAB Risk

6          Management Department?

7    A    Up until 2000.

8    Q    What was your position at the RCAB Risk

9          Management Department?

10   A    I was the Claims Manager.

11   Q    Were you the Claims Manager throughout that

12         time period, '75 through 2000?

13   A    Correct.

14   Q    Can you describe your responsibilities?

15   A    Handle and process all the self-insured

16         claims.

17   Q    What do you mean self-insured?

18   A    Self-insurance program on property; and in

19         '89, we became -- our retention program on

20         the liability was National Catholic Risk

21         Retention.

22   Q    Can you explain that for me?

23   A    It was 250,000 retention program per claim.

**9/2/2004  Paul Fallon**

1   Q   Okay.  This was on property claims?

2   A   Liability.

3   Q   Okay.  This was after what year, you said?

4   A   '89.

5   Q   And what did you say the name of the carrier

6       was?

7   A   National Catholic Risk Retention Group.

8   Q   Prior to 1989, what was the involvement you

9       had with respect to liability insurance?

10  A   We would send the claims to the proper

11      carrier or broker.

12  Q   All right.  Can you explain to me why it is

13      that you're describing the RCAB's insurance

14      program as including a self-insured

15      retention --

16          MR. GALVANI:  Objection.

17  Q   -- for liability?

18  A   Okay.  Because it was a retention policy.

19  Q   And what does that mean?

20  A   We are responsible for the first part of the

21      retention.

22  Q   Okay.  And this was on liability claims?

23  A   Uh-huh.

**9/2/2004  Paul Fallon**

1   Q   And what was the -- Do you understand what I

2       mean if I use the term, "SIR," which stands

3       for self-insured retention?

4   A   250,000.

5   Q   Okay.  And when -- During what period of time

6       was the SIR 250,000?

7   A   From the beginning, from '89.

8   Q   Okay.  Prior to 1989, did the RCAB have a

9       self-insured retention on liability claims?

10  A   No, we did not.

11  Q   Okay.  Will you please describe your

12      responsibilities for liability claims prior

13      to 1989?

14  A   When the claim was --

15          MR. GALVANI:  Objection.  It's been

16      asked and answered.

17          THE WITNESS:  Pardon?

18          MR. GALVANI:  I objected but go ahead.

19  A   If the claim came in to us directly, we would

20      forward it to the broker or the carrier or

21      both.

22  Q   Okay.  Let's break that down.  When the claim

23      came in, what do you mean by that?

**9/2/2004  Paul Fallon**

1  A   A letter, usually, from the parish.

2  Q   Were there other manners in which a claim

3      would come in?

4  A   Some may go directly to our attorney's

5      office.

6  Q   Okay.  And who was that?

7  A   It was Attorney Rogers, but I can't tell when

8      he came into the picture.

9  Q   At some point, it was Dunn & Rogers?

10  A   Dunn & Rogers.

11  Q   To whom in the Risk Management Department did

12      the claims come in to?

13  A   It came probably to the Risk Manager or maybe

14      directly to myself.

15  Q   Okay.  When you began in 1975, who was the

16      Risk Manager?

17  A   A man by the name of Francis Walsh.

18  Q   And how long did he serve as the Risk

19      Manager?

20  A   I'd say about two years.

21  Q   Who took over after him?

22  A   Arthur Powers.

23  Q   Do you know who the Risk Manager was before

**9/2/2004  Paul Fallon**

1       Mr. Walsh held that role?

2    A    I believe it was a man by the name of William

3         Hahn.

4    Q    Can you spell that?

5    A    H-A-H-N, I believe.

6    Q    And why is it that you believe Mr. Hahn was

7         the Risk Manager prior to 1975?

8    A    I was told.

9    Q    By Mr. Walsh?

10   A    By Mr. Walsh.

11   Q    Did you ever see correspondence or

12        documentation --

13   A    Yes.

14   Q    -- reflecting --

15   A    Yes.

16   Q    -- Mr. Hahn's role?

17   A    Yes.

18        MR. GALVANI:  Mr. Fallon, please let

19   him finish his question.

20        THE WITNESS:  Okay.

21        MR. GALVANI:  Just let him finish the

22   question.

23        THE WITNESS:  Okay.  Fine.

**9/2/2004  Paul Fallon**

1    Q    On what type of documentation did you see Mr.

2         Hahn's name?

3    A    I can't recall.

4    Q    Describe the organization, the structural

5         organization of the Risk Management

6         Department when you started in 1975?

7    A    There was a Risk Manager, and there was a

8         Claims Manager and a few clerical persons.

9    Q    Okay.  Explain what the Risk Management

10        Department did in 1975 in connection with

11        procuring insurance policies?

12   A    I was the Claims Manager.

13   Q    Okay.

14   A    I do not procure any policies.

15   Q    Okay.  I understand that your role is on the

16        claims side.  But I'm asking you to explain,

17        if you can, --

18   A    It would be an assumption on my part.

19   Q    Okay.  Well, do you know who, at the RCAB in

20        the Risk Management Department, had the

21        responsibility in 1975 for procuring

22        insurance?

23   A    It would be the Risk Manager.

**9/2/2004  Paul Fallon**

| | | |
|---|---|---|
| 1 | Q | That would be Mr. Walsh? |
| 2 | A | Uh-huh. |
| 3 | | MR. GALVANI:  Also, Mr. Fallon, try to |
| 4 | | avoid saying "uh-huh," and say yes; yes or no |
| 5 | | or I don't know or whatever the answer is. |
| 6 | A | Yes. |
| 7 | Q | And, in your role as the Claims Manager, what |
| 8 | | did you do to apprise yourself of the |
| 9 | | available coverages? |
| 10 | A | On what type of coverage? |
| 11 | Q | Well, that's what I'm asking.  If a claim |
| 12 | | came in, that ultimately was your |
| 13 | | responsibility, is that correct? |
| 14 | A | Yes. |
| 15 | Q | Okay.  What did you do to discern the |
| 16 | | available coverage and specifically whether |
| 17 | | coverage may be available for a claim that |
| 18 | | came in? |
| 19 | A | It was rather standard insurance language. |
| 20 | Q | What do you mean by that? |
| 21 | A | Standard property coverage. |
| 22 | Q | Okay.  What about on the liability coverage? |
| 23 | A | Standard liability coverage. |

9/2/2004  Paul Fallon

1    Q    Were there other lines apart from what you've

2         referred to as standard liability and

3         standard property coverage?

4    A    There was some crime policies.

5    Q    Okay.  Anything else?

6    A    Not that I was responsible for.

7    Q    Okay.  Do you know whether there were other

8         lines such as professional liability?

9    A    There were.

10   Q    Who was responsible for professional

11        liability claims?

12   A    The Risk Manager.

13   Q    When a claim came in, what interaction did

14        you have with the broker or agent?

15   A    If the broker was involved, I would put them

16        on notice.

17   Q    And who was the broker in the 1975 time

18        frame?

19   A    On what coverage?

20   Q    On the liability coverage?

21   A    The James S. Kemper Agency.

22   Q    Did that change at any time between 1975 and

23        2000?

**9/2/2004  Paul Fallon**

1    A    Yes.

2    Q    When did that change?

3    A    I can't recall.

4    Q    Who succeeded the James S. Kemper Agency as

5         the broker for the RCAB?

6    A    There was one agency called Rawlings, Burdick

7         & Hunter (phonetic).

8    Q    Is that Rawlings (phonetic)?

9    A    Yeah.

10   Q    Do you know if they directly superceded the

11        James S. Kemper Agency?

12   A    I do not recall.

13   Q    Who else served as a broker or agent for the

14        RCAB on liability claims or on liability

15        coverage?

16   A    Marsh McClellan or Marsh, Inc.

17   Q    Okay.  Anyone else?

18   A    Not that I recall.

19   Q    And can you give me any sense as to the time

20        frame that those various brokers were

21        involved apart from the fact that you said

22        JSK was involved in 1975?

23   A    The later broker was the Marsh Company.

**9/2/2004  Paul Fallon**

1    Q    Okay.  That's fine.  After providing to the

2         broker the notification of a claim, what

3         interaction did you have with the broker?

4              MR. GALVANI:  Objection.  Go ahead.

5         You may answer.

6    A    Okay.  I would set up a folder, and any

7         correspondence that came from the broker or

8         the insurance company would come through me,

9         and I would try to ascertain the information

10        for them.

11   Q    Did you put in that folder the initial letter

12        or suit papers or other documentation by

13        which the RCAB was notified of the claim?

14   A    If I had them, I did.

15   Q    Okay.  What did you do in the 1975 time frame

16        to investigate claims?

17   A    I would call the parish or the location to

18        ascertain the facts.

19   Q    And?

20   A    And they would be conveyed to the broker or

21        to the insurance company.

22   Q    Who did you deal with at the parishes?

23   A    The pastor.

**9/2/2004  Paul Fallon**

1    Q    Were there instances where you dealt with

2         other people?

3    A    If there was a school involved, possibly, the

4         principal.

5    Q    Were there instances where the RCAB's general

6         counsel undertook the effort to ascertain

7         facts pertaining to claims?

8         MR. GALVANI:  Objection.

9    A    Objection.

10   Q    You can answer the question.

11   A    Okay.  Not until we started the program with

12        National Catholic Risk Retention.

13   Q    What relationship did the Risk Management

14        Department have with general counsel in

15        connection with claim handling?

16   A    Up until '89, very little.

17   Q    Can you explain what little involvement there

18        was between the Risk Management Department

19        and general counsel with respect to --

20   A    If I had a specific question, I would call.

21   Q    What questions did you call --

22   A    I can't recall.

23   Q    -- general counsel about?

**9/2/2004  Paul Fallon**

1    A    I can't recall.  Something that I would need

2         a legal answer.

3    Q    Okay.  Who, in the Risk Management Department,

4         was responsible for providing information to

5         the parishes or institutions regarding the

6         insurance coverage that the RCAB procured to

7         cover those entities?

8         MR. GALVANI:  Objection.

9         THE WITNESS:  Huh?

10        MR. GALVANI:  I objected, but you may

11        go ahead and answer.

12   A    The Risk Manager.

13   Q    Can you describe what documents were included

14        in the folders that you set up for specific

15        claims?

16   A    Any correspondence from the parish and,

17        usually, a copy of my letter to the broker or

18        the company and any subsequent correspondence

19        that came through me.

20   Q    Okay.  Would those folders include

21        correspondence from counsel?

22   A    On the -- After '89, yes.

23   Q    What about before '89?

**9/2/2004  Paul Fallon**

1   A   Usually not.

2   Q   Where was correspondence with counsel

3       maintained?

4          MR. GALVANI:  Objection.

5   A   What counsel?

6   Q   If you had an attorney or if an attorney was

7       representing the RCAB in connection with a

8       claim and the attorney communicated with the

9       RCAB relative to that claim, where would that

10      correspondence be filed?

11   A   If it was '89, there would be a copy in my

12      folder.

13   Q   What about before 1989?

14   A   There may be correspondence from the

15      insurance companies if it went in suit.

16   Q   And where did the RCAB's Risk Management

17      Department file the correspondence that it

18      received from the attorney defending the RCAB

19      prior to 1989?

20   A   In the specific claim file.

21   Q   Okay.  Would the specific claim file also

22      contain correspondence from the insurance

23      company?

**9/2/2004  Paul Fallon**

1    A    I can't recall.

2    Q    Was that something that was within the scope

3         of your responsibility to maintain the claim

4         files?

5    A    That's correct.

6    Q    You indicated that you would call the parish

7         and, specifically, a pastor, to ascertain

8         facts relating to a claim, is that right?

9    A    That is correct.

10   Q    Would you record the information that you

11        obtained?

12            MR. GALVANI:  Objection.

13   Q    Strike that.  Did you record the information

14        that you obtained?

15            MR. GALVANI:  Objection.

16            THE WITNESS:  Do I answer it?

17            MR. GALVANI:  Yes.

18   A    I would put it in the claim folder, and I

19        would send it on to the carrier or the

20        broker.

21   Q    During the time that you served as the Claims

22        Manager, were there ever instances, in

23        connection with general liability claims,

**9/2/2004  Paul Fallon**

1          when there were disputes between the RCAB and

2          the insurer relating to coverage for the

3          claim?

4              MR. GALVANI:  Objection.  What time,

5          right up until the end?

6              MR. ZELLE:  Yes.

7     A    Until the end?

8     Q    Yes.

9              MR. GALVANI:  Do you want to take a

10         break?

11             MR. ZELLE:  Well, let me just get an

12         answer to the question before we take a

13         break.

14             THE WITNESS:  Okay.

15             MR. GALVANI:  If you want to confer

16         with me, you may.

17    Q    You can, but I need an answer to the

18         question.

19             MR. GALVANI:  Well, no.

20    Q    For example, "I can't answer the question

21         without conferring with counsel," and that's

22         fine.

23             MR. GALVANI:  No, you don't need that.

**9/2/2004  Paul Fallon**

1  Q    But you can't take a break while there's a

2        question pending.

3            MR. GALVANI:  If you want to take a

4        break, you may.

5            THE WITNESS:  I want to take a break.

6  Q    Let me just explain to you:  You can follow

7        the advice of your counsel.  What I'm telling

8        you is that it's impermissible to take a

9        break while a question is pending, and that's

10       a risk you run if you want to follow the

11       advice of Mr. Galvani.

12           MR. GALVANI:  Don't worry about Mr.

13       Zelle's advice.

14           (Mr. Fallon and Mr. Galvani exit the

15       conference room at 10:23 a.m.)

16           (Mr. Fallon and Mr. Galvani re-enter

17       the conference room at 10:24 a.m.)

18  Q   After conferring with your counsel, Mr.

19       Fallon, can you now answer the question?

20  A   Yes.  During the onset of the molesting abuse

21       claims, initially, there was a question as to

22       the definition of injury whether it was

23       bodily injury or mental.

**9/2/2004  Paul Fallon**

1          And then later on, there was a

2      question on the amount of coverage, what was

3      left, whether there was aggregate coverage or

4      there wasn't.

5          Can I add something?

6    Q   Sure.

7    A   After about -- I worked up until 2000, '99, a

8      few months before my wife died, and then I..

9      worked as a consultant one day a week --

10   Q   Okay.

11   A   -- which I'm still doing.

12   Q   Did the RCAB include in what you've described

13      as the claim files the information that was

14      recorded concerning the coverage issues that

15      you've just mentioned?

16   A   There were letters from the insurance

17      company, and there was correspondence from

18      our counsel, Wilson Rogers.

19   Q   And was that kept in what you've described as

20      claim files?

21   A   If I received it, it was kept in the files.

22   Q   You mentioned aggregate limits.  What do you

23      mean by that?

**9/2/2004  Paul Fallon**

1          MR. GALVANI:  Objection.

2    A    Objection.

3    Q    You can answer.

4    A    Well, the policy usually covers a per person

5          per occurrence; and in the aggregate, there

6          are many more occurrences or continual, it

7          would go into the aggregate.

8    Q    So what does the aggregate mean?

9    A    100 per person per occurrence and maybe 300

10         on the aggregate.

11   Q    Okay.  And what does that 300 per aggregate

12         mean?

13         MR. GALVANI:  Objection.

14   A    I object.

15   Q    You may answer.

16   A    That -- As many occurrences the aggregate

17         amount would apply.

18   Q    Okay.  So that once you paid -- the $300,000

19         was paid, there wouldn't be anymore insurance

20         available?

21   A    No, but it would continue.

22   Q    Why is that?

23   A    Each occurrence.

**9/2/2004  Paul Fallon**

1    Q    Okay.  So what does the aggregate mean?

2         MR. GALVANI:  Objection.

3    A    Objection.

4         MR. GALVANI:  Well, I state the

5         objection.

6         THE WITNESS:  Okay.

7         MR. GALVANI:  You don't have to repeat

8         the objection.

9    A    That would be 300 per occurrence, but it

10        would continue.  Each incident was a separate

11        occurrence.

12   Q    Okay.  I think I understand what you are

13        explaining with respect to occurrence.  What

14        does the aggregate number mean?

15        MR. GALVANI:  Objection.

16   A    Objection.  That's a 300,000 per continued

17        occurrence, each specific occurrence.

18   Q    Okay.

19   A    Like if there was one abuse and there were

20        six more afterwards, the 300,000 would apply

21        separately to the six separate occurrences.

22   Q    Okay.  So, is it your understanding that the

23        aggregate was just another term for

**9/2/2004  Paul Fallon**

1       occurrence?

2            MR. GALVANI:  Objection.

3    A    I don't understand that.

4    Q    Did you ever -- Have you ever read an

5       insurance policy?

6    A    Yes.

7    Q    Okay.  Have you ever read a liability

8       insurance policy?

9    A    Yes, I have.

10   Q    Have you ever read any of the materials that

11      the RCAB claims were part of the insurance

12      policies issued by Lumbermen's to the RCAB?

13           MR. GALVANI:  Objection.

14   A    I'm sure I did, but I can't recall.

15   Q    Okay.  Did you understand the policies issued

16      by Lumbermen's to the RCAB to have aggregate

17      limits?

18           MR. GALVANI:  Objection.

19   A    I didn't understand there was a limit to the

20      aggregate.

21   Q    What did you do to form that understanding?

22           MR. GALVANI:  Objection.  He just said

23      the opposite.  He said he did not understand.

**9/2/2004  Paul Fallon**

1          MR. ZELLE:  Yes.  That's his

2      understanding.

3  A    Yes.  Where did I get this information?

4          MR. GALVANI:  Objection.

5  Q    Yes.

6  A    From our legal counsel.

7  Q    Okay.  When did you get that information?

8          MR. GALVANI:  Well, I'm going to

9      object and instruct him not to disclose

10     communications with counsel.

11  Q    When did you get the information?

12          MR. GALVANI:  I'm going to instruct

13     him not to answer that.

14  Q    When did you develop an understanding as to

15     the -- Strike that.

16          Prior to speaking with legal counsel,

17     did you have any understanding as to whether

18     the Lumbermen's policies had aggregate

19     limits?

20          MR. GALVANI:  Objection.

21  A    I did not.

22  Q    Did you look at the policies?

23  A    I can't recall.

**9/2/2004  Paul Fallon**

1    Q    When did legal counsel tell you that the

2         policies did not have aggregate limits?

3              MR. GALVANI:  Objection.

4    A    Privileged information.

5    Q    Okay.  Was it -- I'm not asking for you to

6         disclose anything that your lawyer told you.

7         You already have.  What I'm asking you to

8         tell me is when you learned, not from whom,

9         when you learned that the -- Strike that.

10             When did you form the understanding

11        that the Lumbermen's policies did not have

12        aggregate limits?

13             MR. GALVANI:  I object to the form.

14   A    I object.

15   Q    But you can answer the question.

16             MR. GALVANI:  Well, I object to the

17        form.

18   A    I would say -- When did I know they didn't

19        have it?

20   Q    Yes.

21   A    I never remember them not having it, you

22        know.

23   Q    Okay.  So when --

**9/2/2004  Paul Fallon**

1    A    It never became an issue.

2    Q    Okay.  What, specifically, are you referring

3         to when you say it never became an issue?

4    A    The claims were processed and handled.

5    Q    And were they processed and handled to your

6         satisfaction as the Claims Manager for the

7         RCAB?

8         MR. GALVANI:  Objection.

9    A    It was to the satisfaction of our legal

10        counsel.

11   Q    Okay.  And how about you as the Claim Manager

12        for the RCAB, was it to your satisfaction as

13        well?

14        MR. GALVANI:  Objection.

15   A    Objection.  An opinion.

16   Q    You can give me your opinions.

17        MR. GALVANI:  He's not here to express

18        opinions.  He's here to testify as to facts.

19   Q    Okay.  Tell me:  What were the facts?  Tell

20        me the facts?  What was your impression of

21        the manner in which the claims were processed

22        and handled?

23        MR. GALVANI:  Objection.

**9/2/2004  Paul Fallon**

1    A    Objection.

2           MR. GALVANI:  There's no foundation.

3    What claims are you talking about?

4           MR. ZELLE:  I'm talking about the

5    sexual abuse.

6           MR. GALVANI:  In what time period?

7           MR. ZELLE:  The time period that he

8    was the Claim Manager.

9           MR. GALVANI:  I object to the form of

10   the question.

11   Q    You may answer.

12          MR. GALVANI:  And he's not here to

13   give expert opinion.

14          MR. ZELLE:  No, he's not.

15          MR. GALVANI:  He's here to answer fact

16   questions.

17          MR. ZELLE:  That's right.

18   A    The claims were settled by our attorney and

19        the insurance carrier.

20   Q    Okay.

21   A    And my opinion, really, didn't come into the

22        picture.

23   Q    Did you have any involvement in the

9/2/2004  Paul Fallon

1      processing and settlement of claims?

2          MR. GALVANI:  Objection.

3   A   Objection.

4          MR. GALVANI:  Compound.

5   A   I was at meetings, but my opinion was not

6      asked as to the value.

7   Q   Okay.  And were decisions made without your

8      approval?

9          MR. GALVANI:  Objection.

10  A   Objection.  Some of the large global

11     settlements, they were made without my input

12     or opinion.

13  Q   Okay.  What about individual claims, were

14     those matters handled without your direction?

15  A   Yes.

16  Q   Were they settled without your approval?

17         MR. GALVANI:  Objection.

18  A   Objection.

19         MR. GALVANI:  Don't repeat the

20     objection.

21  A   Okay.  I can't answer that question.  It was

22     settled by our attorney.

23  Q   Okay.  With or without your approval?

**9/2/2004  Paul Fallon**

1    A    Our attorney was working for the Archdiocese

2          of Boston, and they were settled with his

3          opinion and approval.

4    Q    With counsel's you're saying?

5    A    Uh-huh.

6    Q    Okay.  Was there someone else at the

7          Archdiocese that worked with the attorney in

8          handling claims?

9          MR. GALVANI:  Objection.

10    A    Some of the original information came to the

11          delegate, and he would send it to the

12          counsel, and the counsel may have a question

13          back for him.

14    Q    Okay.  And would you been in the loop there?

15    A    After the fact.

16    Q    Yes.  But you, ultimately, would be in that

17          line of communication such that you would

18          have the information that was communicated by

19          the delegate to counsel?

20          MR. GALVANI:  Objection.

21    Q    Is that right?

22    A    I would say yes in most cases.

23    Q    Other than the delegate, was there anyone

**9/2/2004  Paul Fallon**

1     else at the RCAB who worked with counsel in

2     connection with the handling of the sexual

3     abuse claims?

4   A   I'm sure there were, but I wasn't told who

5     they were.

6   Q   Was there anyone else from the Risk

7     Management Department involved?

8   A   Not really.

9   Q   How old are you, Mr. Fallon?

10   A   I'll be 72 on my next birthday on March 9th.

11   Q   Are you on any medications?

12   A   Yes, lots of medication.

13   Q   Can you tell me:  Are there any medications

14     that -- Well, maybe you can't give a medical

15     opinion, so let me just ask you what

16     medications you're on?

17   A   I have Type 2 diabetes, and I'm on two

18     medications for that; plus a pill for high

19     blood pressure which I don't have to

20     counteract kidney problems.

21        I'm on a heart medication for a slight

22     blockage on the right-hand side, and I'm on a

23     pill called Flomax to relax the prostate

**9/2/2004  Paul Fallon**

1       gland.

2   Q    Are any of the medications which you take --

3       Strike that.

4           Do any of the medications that you

5       take affect your memory?

6   A    No, not that I know of.

7   Q    Do any of the medications that you take

8       affect your thinking, your cognitive ability?

9   A    No.

10  Q    Obviously, your health is far more important

11      than any information that I need to elicit.

12      So, please, you know, we'll take whatever

13      time you need to make sure that you feel well

14      and don't hesitate to let me know if you want

15      to take a break.

16  A    I have to eat every two hours, so I have

17      crackers in my pocket.

18  Q    Sure.  That's fine.

19          During the pendency of your

20      involvement with the sexual abuse claims, did

21      you ever look at any document that you

22      understood was a part of a policy issued by

23      Lumbermen's?

**9/2/2004  Paul Fallon**

1   A   Not that I recall.

2   Q   Did you ever look at any documents that

3       reflected what you believed were the terms of

4       any Lumbermen's policy?

5   A   I can't recall.

6   Q   Did you ever see any document that stated the

7       limits of the Lumbermen's policies that were

8       applicable to the sexual abuse claims?

9   A   I don't recall.

10  Q   What did you do to make sure that Lumbermen's

11      was providing the RCAB with everything that

12      you believed the RCAB was entitled to under

13      policies issued by Lumbermen's?

14  A   All the abuse claims you're talking about?

15  Q   Yes.

16  A   They all went through our attorney, Wilson

17      Rogers, and he was conferring with

18      Lumbermen's, and I'm sure they were making

19      sure the Diocese got the coverage up to the

20      point there was questions.

21  Q   And did you, as the risk -- as the Claim

22      Manager, ever have any objection to the

23      manner in which the claims were handled?

**9/2/2004  Paul Fallon**

1    A    The claims were being settled.  What can you

2         object to?

3    Q    What information did the RCAB obtain with

4         respect to its investigation into the sexual

5         abuse claims?

6         MR. GALVANI:  Objection.

7    A    That's kind of privileged information, but

8         our attorney would confer with the delegate

9         and --

10   Q    Is this going all the way back to 1975?

11   A    No.

12   Q    Okay.  Let me then break this down because if

13        the process changed, I want to understand

14        that.

15        In 1975, what -- In 1975, what

16        investigation did the RCAB do in connection

17        with claims asserted for sexual abuse?

18        MR. GALVANI:  Objection.  No

19        foundation.

20   A    No foundation.

21   Q    You can respond.  If you know.  If you don't

22        know, you don't know.

23        MR. GALVANI:  That's the problem with

**9/2/2004  Paul Fallon**

1          no foundation.

2     A    I would have no information until the first

3          abuse claims started coming in which was in

4          the '90s.

5     Q    Okay.

6               MR. GALVANI:  Can we go off the record

7          for a second?

8               MR. ZELLE:  Hold on just a minute.

9          Okay.

10              (Whereupon an off -the-record

11         discussion took place.)

12              MR. ZELLE:  Back on the record.

13    Q    Mr. Fallon, you're saying the first sexual

14         abuse claims that you ever became aware of

15         came in the 1990s, is that right?

16    A    Yes.

17    Q    Did you do anything to determine whether,

18         prior to that time, there had been any sexual

19         abuse claims?

20    A    There would be no reason to.

21    Q    Did you, though?

22    A    No.

23    Q    Did you do anything to determine, after the

**9/2/2004  Paul Fallon**

1     first sexual abuse claim came in to you, to

2     determine whether there had ever been any

3     complaints made against any of the priests or

4     other alleged perpetrators of sexual abuse

5     claims?

6   A    I would call the parish and try to talk to

7     the people involved; and mostly, they said

8     they never knew of any.

9   Q    Okay.  Did the parish, on those other

10     occasions, other than the most claims, tell

11     you that there had been prior complaints?

12         MR. GALVANI:  Well, I'm going to

13     object.  I believe this is beyond the scope

14     of Phase 1 of the individual claims.

15   A    I can answer that.  They were not aware of

16     any other claims other than the specific

17     claim in question.

18   Q    Okay.  And are you aware of the information

19     that was turned over by the RCAB to the

20     Attorney General's Office in connection with

21     the abuse claims?

22   A    Can I answer?  No I'm not.

23   Q    Okay.  Do you know what the RCAB did with the

**9/2/2004  Paul Fallon**

1        files, the claims files that you maintained

2        after you left the full-time employ of the

3        RCAB and became a consultant?

4    A    I do not know.

5    Q    When the sexual abuse claims first came in,

6        to your knowledge, was there any policy in

7        place at the RCAB for maintaining the secrecy

8        of the information?

9            MR. GALVANI:  Objection.

10   A    Not that I'm aware of.

11   Q    Is there a policy now?

12           MR. GALVANI:  Objection.  That's

13       beyond the scope of this discovery.

14   A    Nothing to do with the claims operations.

15   Q    Okay.  So there wasn't, as far as your claims

16       operation is concerned, is that right?

17   A    Right.  That is correct.

18   Q    You indicated that the -- Strike that.

19           I don't want to put words in your

20       mouth.

21           How did you describe the information

22       in the claim files that related to

23       confidential or private information?

**9/2/2004  Paul Fallon**

1           MR. GALVANI:  Objection.

2    A    It was all confidential.  All my information

3         was confidential.

4    Q    Okay.  And did you share that information

5         with Lumbermen's?

6    A    If our counsel approved of same.

7    Q    Okay.  Did counsel approve of that?

8    A    I would say in most of the cases.

9    Q    In what cases -- In those cases that counsel

10        did not approve sharing claim information

11        with Lumbermen's, why wasn't it shared with

12        Lumbermen's?

13          MR. GALVANI:  Objection.

14   A    Well, I can answer that.  I didn't know the

15        information, too.  So I wouldn't know if it

16        was shared with Lumbermen's or not.

17   Q    You didn't know what information was in your

18        claim files?

19   A    Confidential as in -- Strictly confidential

20        information.

21   Q    Are you saying that information wasn't in

22        your claim files?

23   A    Some of it was not in my claim file.

**9/2/2004  Paul Fallon**

1   Q    Where was that information?

2   A    I have no idea.

3   Q    Okay.  And is it your understanding that

4        information was not shared with Lumbermen's?

5   A    I have no idea.

6   Q    Who made the decision as to what information

7        to share with Lumbermen's?

8             MR. GALVANI:  Objection.

9   A    I do not know.

10  Q    Do you recognize that in not sharing all

11       information with Lumbermen's, Lumbermen's was

12       in a position where it could not fully

13       discern what coverage may be available?

14            MR. GALVANI:  Objection.  Can you

15       explain how this is within the scope of

16       Phase 1?

17            MR. ZELLE:  No, I'm not going to

18       explain anything to you.

19            MR. GALVANI:  You won't?  Well, I'm

20       not going to let him answer that question.

21            MR. ZELLE:  That's your prerogative.

22            MR. GALVANI:  You're going into

23       individual cases.  You're going far beyond

**9/2/2004  Paul Fallon**

1       the scope of Phase 1 discovery.  You're

2       asking him hypothetical questions without

3       foundation, asking his opinion and

4       speculation.  It's all totally improper; and

5       since you won't explain how you think this is

6       relevant under Phase 1, I'm not going to

7       allow him to answer that question.

8              MR. ZELLE:  I will tell you that

9       applying the terms and conditions of the

10      policy to specific claims requires knowing

11      the specific information relative to the

12      claim.

13             Can you read the last question back,

14      Sam?

15             (Whereupon the Stenographer read back

16      the requested information.)

17             MR. GALVANI:  I'll just say:  You also

18      know that it's contrary to facts because you

19      sat in on Mr. Maloney's and Mr. Vega's

20      deposition.

21  Q   Can you respond to that question?

22             MR. GALVANI:  No, don't answer it.  I

23      told him not to.

**9/2/2004  Paul Fallon**

1    A    I can't respond to that question.

2    Q    During the time you were involved in handling

3         the sexual abuse claims, were you aware that

4         there was information that was not being

5         shared with Lumbermen's?

6              MR. GALVANI:  Objection.

7    A    I do not.

8    Q    Is there any part of your responsibilities,

9         as the Claim Manager, that you did not

10        delegate to counsel in connection with the

11        sexual abuse claims?

12   A    No.

13   Q    Was there anyone, other than Wilson Rogers

14        and his firm, that served as counsel in

15        connection with the claim-handling functions

16        that you delegated?

17             MR. GALVANI:  Objection.

18   A    Wilson Rogers handled the diocese's legal

19        matters and the claims.  Whether there were

20        other attorneys representing individuals, I

21        can't say.

22   Q    Okay.  Did you delegate to Attorney Rogers

23        all of the responsibilities for making

**9/2/2004  Paul Fallon**

1      decisions with respect to insurance coverage

2      issues relating to the sexual molestation

3      claims?

4            MR. GALVANI:  Objection.

5  A    I did not.  I don't recall ever saying he did

6      or he didn't.  I don't know.

7  Q    Well, did you permit him to handle all of

8      those matters?

9            MR. GALVANI:  Objection.

10  A    That's a yes.

11  Q    And did you, as the Claim Manager, ever

12      object to any of his decisions or the manner

13      in which he handled claims?

14  A    Not that I recall.

15  Q    Do you know who Paul Meany is?

16  A    I do.

17  Q    Who was Paul Meany?

18  A    He was a liability examiner for Lumbermen's

19      Kemper.

20  Q    And was he involved in the sexual abuse

21      claims?

22  A    Yes, he was.

23  Q    Were you aware that he was deposed in July of

**9/2/2004  Paul Fallon**

1      2000?

2    A    I understand that he was.

3    Q    Were you aware, at that time, that he

4        produced certain documents including policy

5        materials?

6    A    I can't recall.

7    Q    Do you know whether Mr. Rogers ever reviewed

8        those policy materials?

9    A    I do not know.

10   Q    Did you ever review them?

11   A    I do not recall reviewing them.

12   Q    Prior to January of 2003, did the RCAB ever

13       object to the application of aggregate limits

14       to the sexual abuse claims?

15           MR. GALVANI:  Objection.

16   A    Not that I recall.

17   Q    Did the RCAB rely on the existence of the

18       aggregate limits in an effort to limit its

19       exposure to the claimants on the sexual abuse

20       claims?

21           MR. GALVANI:  Objection.

22   A    Objection.  It wasn't an issue until later.

23   Q    Okay.  At that time, tell me:  Did the RCAB

**9/2/2004  Paul Fallon**

1       rely upon the existence of the aggregate

2       limits to reduce its exposure on the sexual

3       abuse claims?

4           MR. GALVANI:  Objection.

5   A   Objection.  We felt there was more money than

6       was being offered to settle the claims.

7   Q   Offered by whom?

8   A   Lumbermen's.

9   Q   In the course of the RCAB's claim handling of

10      the sexual abuse claims, was anything done to

11      locate documents that were originally created

12      in the 1960s and 1970s?

13  A   Yes.  We did look.  We did make a search.

14  Q   Okay.  What did you look for?

15  A   Policies, correspondence.

16  Q   Did you look for claim information?

17  A   Yes, claim information.

18  Q   Did you find any claim information?

19  A   We received some oral testimony that there

20      was coverage back in the '50s and '60s from

21      our personnel at the James S. Kemper

22      Brokerage Company.

23  Q   Okay.  Anything else?

**9/2/2004  Paul Fallon**

1  A   Not that I recall.

2  Q   Did you follow up on that?

3  A   Statements were made from people.  There were

4      statements were on file at our attorney's

5      office.

6  Q   Did the RCAB ever find anything?

7        MR. GALVANI:  Objection.

8  A   Did the who?

9  Q   Did the RCAB ever find anything in terms of

10      policy information that was created in the

11      '60s or '70s?

12        MR. GALVANI:  Objection.

13  A   Objection.  I guess much oral information and

14      a magazine with one of their co-op employees

15      from Northeastern going back to the '60s,

16      late -- early '60s, maybe in the '50s, was

17      working at the RCAB, and there was

18      Lumbermen's saying one of our large risk

19      insured which would indicate the policy was

20      in effect then, and it was before.

21  Q   Did you ever find any policies or policy

22      information?

23  A   I did not find the policies.

**9/2/2004  Paul Fallon**

1    Q    How were you involved in the efforts to

2          locate policy information?

3    A    I asked our people in the archives to make a

4          diligent search.  I went through boxes upon

5          boxes of folders in one of the basements of

6          the chancery buildings and asking the

7          brokerage if they had any information,

8          correspondence and whatever, you know.

9    Q    Did you ask people at the parishes?

10   A    If the occasion came up, if they had any

11         information concerning coverage.

12   Q    What did you ask them?

13   A    Did they know of what coverage was in

14         existence.

15   Q    What did -- What information did you get

16         through those channels?

17   A    They couldn't recall.

18   Q    Did you ask the parishes to look for

19         documents?

20   A    Yes.

21   Q    And did they find anything?

22   A    No, not that I'm aware of.

23   Q    Let me show you what's been marked as Exhibit

**9/2/2004  Paul Fallon**

1  3, Rogers 3.  The date is 8/5/04.

2  (Indicating)

3  MR. GALVANI:  Which Rogers exhibit?

4  MR. ZELLE:  It says Rogers 3, 8/5/04.

5  Q  I'm going to show you part of Exhibit 3.

6  MR. ZELLE:  Here's a copy for you,

7  Paul, Mr. Galvani.  (Indicating)

8  Q  It's Bates No. RCA14000005.  Do you see that

9  document there, Mr. Fallon?

10  A  Yes.

11  Q  Can you describe what that is?

12  A  It's a certificate of insurance.

13  Q  Okay.  And who's the named insured?

14  A  Archdiocese Parochial Cemeteries.

15  Q  Okay.  And does it identify the insurance

16  company?

17  A  Kemper Group.

18  Q  Okay.  Does it identify the locations

19  covered?

20  A  This specific one here is St. Catherine's

21  Cemetery, Graniteville, and I'm sure that

22  must be up by Westford.

23  Q  Does it identify a year, policy term?

**9/2/2004  Paul Fallon**

| | | |
|---|---|---|
| 1 | A | The year is 3/31/80 to 3/31/83. |
| 2 | Q | Okay.  Do you see at the top, there's a fax |
| 3 | | line? |
| 4 | A | Yep. |
| 5 | Q | Does that say St. Catherine's Church? |
| 6 | A | Yep.  That's the parish. |
| 7 | Q | You understand that to reflect that's where |
| 8 | | the document came from? |
| 9 | A | I don't recall.  I'm not familiar with the |
| 10 | | fax data. |
| 11 | Q | Okay.  Do you see down below the halfway line |
| 12 | | on the page, there's limits; do you see that? |
| 13 | A | I do. |
| 14 | Q | What does that say? |
| 15 | A | 300,000 each occurrence; 300,000 aggregate. |
| 16 | Q | And you didn't see anything like this when |
| 17 | | you were handling the claims, is that right? |
| 18 | A | Not that I recall. |
| 19 | Q | Okay.  If you look at the next page, it's |
| 20 | | Bates No. RCA145066.  Do you see that? |
| 21 | A | Yes. |
| 22 | Q | What is that? |
| 23 | A | It's a letter to an administrator. |

**9/2/2004  Paul Fallon**

1    Q    That's an administrator where?

2         MR. GALVANI:  I object.

3    A    I object because, I mean, it could be a

4         parish.  It could be a non-parish.

5    Q    Okay.  That's fine.  But it's on chancery

6         letterhead, right?

7    A    Correct.

8    Q    Okay.  And have you ever seen a letter like

9         this?  It seems to be -- Well, would you

10        agree with me it's a transmittal letter?

11        MR. GALVANI:  Objection.

12   A    I object.  I'm sure there are all kinds of

13        letters.  I can't recall seeing a letter of

14        this type, you know.

15   Q    Okay.  You didn't receive these documents or

16        locate these documents in the course of your

17        efforts to obtain information from the

18        parishes relating to insurance coverage that

19        may be issued by Lumbermen's to apply to the

20        sexual abuse claims, did you?

21   A    Not that I recall.

22   Q    Okay.

23   A    Can we take a break?

**9/2/2004  Paul Fallon**

1   Q    Yes.

2            (Break takes place at 11:01 a.m.)

3            (Back on the record at 11:07 a.m.)

4   Q    During the time you were handling the sexual

5        abuse claims, or the RCAB was handling the

6        sexual abuse claims, did you believe that

7        there were general liabilities in effect

8        issued by Lumbermen's?

9            MR. GALVANI:  Objection.

10  A    Was there a policy?

11  Q    Yes.

12  A    When I first learned about -- that we covered

13       these losses?

14  Q    Right.

15  A    Yes.

16  Q    Were you aware of any particular coverage

17       parts or sections of the policy that would

18       apply to the sexual abuse claims?

19  A    When we first learned about them in the '90s?

20  Q    Yes.

21  A    I assumed it would cover all of them.

22  Q    What did you base that assumption upon?

23  A    That this was an injury that was covered

**9/2/2004  Paul Fallon**

1  under the policy definition of what an injury

2  is.

3 Q Okay.  Were you aware at that time that

4  general liability policies don't cover

5  intentional acts?

6   MR. GALVANI:  Objection.

7 A Yes.

8 Q And were you, at that time, aware that the

9  RCAB was intentionally concealing information

10  about sexual abuse by its priests?

11   MR. GALVANI:  Objection.  There's no

12  foundation for that question.

13 A I have no knowledge.

14 Q If you know, you know.

15 A I have no knowledge that that took place.

16 Q Okay.  During the course of your involvement

17  with the sexual abuse claims against the

18  RCAB, were there ever claims that were

19  alleged to have involved sexual abuse in the

20  1950s?

21 A I would assume there were, yeah.

22 Q Were you aware of any correspondence or --

23  Let me strike that question.

**9/2/2004  Paul Fallon**

1          Were you aware of any documentation in

2          the RCAB files which reflected the fact that

3          there was no liability insurance in effect in

4          any parish in the Archdiocese in that time

5          period?

6             MR. GALVANI:  Objection.

7  A   I do not recall of any statement that there

8          was no liability coverage during that period

9          of time.

10  Q   What about documents that showed that?

11          MR. GALVANI:  Objection.

12  A   Objection.  I don't recall seeing any

13         documents.

14  Q   All right.  Let me just show you what's a

15         part of Exhibit 3, Rogers Exhibit 3, dated

16         8/5/04.  It's Bates No. 14000032.

17         MR. GALVANI:  Is that part of this?

18         (Indicating)

19         MR. ZELLE:  Yes.  It's 32 is the page

20         number.

21  Q   Do you see on the bottom of those numbers, if

22         you can flip to 32.

23  A   Here you go.  32.

**9/2/2004  Paul Fallon**

1   Q   Okay.  Would you just read that?  You can

2       read it to yourself and tell me whether the

3       information expressed was information that

4       you were aware of when you were handling the

5       RCAB claims?  I'm sorry.  The sexual abuse

6       claims against the RCAB?

7   A   (Reviewing document)  First, I've seen this

8       letter.

9   Q   Right.  Do you see where it says in that

10      second paragraph, "As your Excellency knows,

11      there is no public liability insurance in

12      effect in any parish in the Archdiocese."  Do

13      you see that?

14   A   Yes.

15   Q   And this letter is dated November 27, 1957,

16      right?

17   A   Uh-huh.

18   Q   You need to speak; yes or no.

19   A   I don't know what --

20   Q   The question is:  The letter is dated

21      November 27, 1957, correct?

22   A   Yes, that's correct.

23   Q   During the time you were involved with the

**9/2/2004  Paul Fallon**

1      sexual abuse claims against the RCAB, was the

2      RCAB taking the position that there were

3      insurance policies in effect that would cover

4      the sexual abuse claims that took place in

5      the 1950s?

6   A   Yes.

7   Q   And what was the basis other than what you've

8      told me the statements that you gathered?

9   A   The basis of what I told you I had gathered.

10  Q   That's it?

11  A   Yeah.

12  Q   Okay.  But the RCAB did not consider this

13     document, did they?

14  A   No.

15  Q   If you can turn ahead to -- the page number

16     ends in 51.

17  A   All right.

18  Q   That's another certificate of insurance,

19     isn't it?

20  A   Right.

21  Q   Now, during the time that you were handling

22     the sexual abuse claims against the RCAB, did

23     you see any certificates of insurance?

**9/2/2004  Paul Fallon**

```
1    A    For this period of time?

2    Q    For any period of time, any certificates of

3         insurance referencing Lumbermen's Mutual

4         Casualty Company?

5    A    I can't recall seeing that.

6    Q    That was information that you were looking

7         for, though, wasn't it?

8    A    That is correct.

9    Q    Okay.  Do you see the limit of liabilities

10        section there?

11   A    Yes.

12   Q    And the limit of liability for each

13        occurrence is how much?

14   A    300,000.

15   Q    And the limit of liability for aggregate is

16        how much?

17   A    It says 300,000.

18   Q    Okay.  And prior to 2003, the RCAB was

19        operating with the understanding that this --

20        that there was a policy issued by Lumbermen's

21        which was in effect from 9/23/74 to 9/23/77,

22        is that right?

23   A    That's correct.
```

**9/2/2004  Paul Fallon**

1    Q    And they were operating with the

2         understanding that that policy had an

3         aggregate limit of $300,000 per year, right?

4              MR. GALVANI:  Objection.

5    A    Objection.  I don't feel the 300 aggregate

6         pertains to an annual limit.

7    Q    What does that mean; that it was for the

8         three-year period?

9    A    I think that aggregate pertains to completed

10        operations.

11   Q    What completed operations did the RCAB have?

12             MR. GALVANI:  Objection.

13   A    I can't think of any.

14   Q    Okay.  The RCAB didn't engage in construction

15        activities, did they?

16   A    No, not that I know of.

17   Q    They didn't serve as a contractor to engage

18        in any building of any structures or

19        operations that resulted in physical

20        structures, did they?

21             MR. GALVANI:  Objection.

22   A    They hired contractors.

23   Q    Right.

**9/2/2004  Paul Fallon**

1    A    Their contractors were obliged to file

2         certificates of insurance.

3    Q    So the contractors who engaged in work

4         resulting in completed operations had their

5         own insurance, right?

6    A    Yep.

7    Q    But the RCAB didn't do completed operations,

8         correct?

9              MR. GALVANI:  Objection.

10   A    Not that I know of.

11   Q    Okay.  And the RCAB didn't manufacture any

12        products, did they?

13             MR. GALVANI:  Objection.

14   A    Objection.  I can't recall manufacturing any

15        products.

16   Q    They didn't create any products, did they?

17   A    I can't recall.

18   Q    So, was your understanding that limits --

19        insurance limits that applied to completed

20        operations or products, did they have any

21        application to claims that would be made

22        against the RCAB?

23             MR. GALVANI:  Objection.  Go ahead.

**9/2/2004  Paul Fallon**

1    A    Not that I know of.

2    Q    In the course of your efforts to locate

3         policy information that may have provided

4         further insight into the coverages available

5         from Lumbermen's, did you speak to the people

6         at the RCAB who were responsible for

7         procuring those policies back in the 1950s or

8         '60s or '70s?

9    A    I assume most of them did.

10   Q    But did you speak with anyone?

11   A    If I could find someone, I did.

12   Q    Who did you find?

13   A    I couldn't find anybody.

14   Q    Okay.  Was there any information relating to

15        the availability of coverage under policies

16        issued by Lumbermen's that the RCAB obtained

17        that didn't come from Lumbermen's or from a

18        broker?

19           MR. GALVANI:  Objection.

20   A    I can't recall if there were or were not.

21   Q    What information did you look for in RCAB

22        claim files relative to your efforts, that

23        is, the RCAB's efforts, to locate policy

**9/2/2004  Paul Fallon**

| | | |
|---|---|---|
| 1 | | information? |
| 2 | A | I would look for a claim notice letter and |
| 3 | | who it was sent to. |
| 4 | Q | And how far back did those claim files go? |
| 5 | A | Not too far. |
| 6 | Q | Did you speak to anyone about the RCAB's |
| 7 | | document retention system? |
| 8 | A | No, I did not. |
| 9 | Q | Prior to working in the Risk Management |
| 10 | | Department at the RCAB, what experience had |
| 11 | | you had with liability insurance policies? |
| 12 | A | I worked for Sentry Insurance which used to |
| 13 | | be Hardware Mutual located in Park Square. |
| 14 | Q | What did you do for them? |
| 15 | A | I started out as a claims adjuster and became |
| 16 | | an examiner, became a chief adjuster and then |
| 17 | | became a senior liability examiner. |
| 18 | Q | Okay.  What type of liability policies did |
| 19 | | you work with? |
| 20 | A | Auto. |
| 21 | Q | Did you ever work with general liability |
| 22 | | policies? |
| 23 | A | Not that I recall. |

**9/2/2004  Paul Fallon**

1    Q    At the very beginning, 1992, the very

2         beginning of your involvement -- Well, strike

3         that.  Let me ask you:  In what year was your

4         first involvement with any sexual abuse claim

5         against the RCAB?

6    A    Early '90s.

7    Q    At that time, did you submit any information

8         to Lumbermen's?

9    A    On claims?

10   Q    Yes.

11   A    Yes.

12   Q    How did Lumbermen's respond?

13        MR. GALVANI:  Objection.

14   A    I really can't recall.

15   Q    At some point, Lumbermen's began to reimburse

16        the RCAB for indemnity payments, is that

17        right?

18   A    That's correct.

19   Q    And, at that same time, Lumbermen's paid for

20        the defense of the sexual abuse claims, is

21        that right?

22        MR. GALVANI:  Objection.

23   A    I would say yes.

**9/2/2004  Paul Fallon**

1    Q    And was that arrangement in place from the

2         very beginning of your involvement with the

3         sexual abuse claims against the RCAB?

4    A    I do not recall specifically when it became

5         in place.

6    Q    Okay.  But was it in place at the very

7         beginning?

8    A    I can't recall.

9    Q    Okay.  Do you recall who you spoke with at

10        Lumbermen's in connection with the sexual

11        abuse claims?

12            MR. GALVANI:  Objection.

13   A    There were several.  I can't remember

14        specifically which one.

15   Q    Okay.  Who did you speak with?

16            MR. GALVANI:  Objection.

17   A    I can't recall the names.

18   Q    You can't recall anyone?

19   A    No.  I can't recall a specific name.

20   Q    Did you ever meet with anyone from

21        Lumbermen's in connection with the sexual

22        abuse claims?

23   A    I can't recall any specific meetings.

**9/2/2004  Paul Fallon**

1  Q    Did Lumbermen's ever inform the RCAB that it

2        would -- Strike that.

3            When Lumbermen's informed the RCAB

4        that it would reimburse the RCAB for

5        indemnity payments made to settle sexual

6        abuse claims, did you understand that

7        Lumbermen's would be applying those payments

8        to the aggregate limits of Lumbermen's

9        policies?

10           MR. GALVANI:  Objection.

11  A    Not that I know of.

12  Q    Regardless of your understanding of that, --

13           MR. GALVANI:  Objection.

14           MR. ZELLE:  What's the objection?  I

15       haven't asked my question yet.

16           MR. GALVANI:  I thought that was a

17       question.

18           MR. ZELLE:  Regardless of your

19       understanding?

20           MR. GALVANI:  Yes.  I thought you were

21       questioning his answer by saying, "Regardless

22       of your understanding?"

23           MR. ZELLE:  No, I'm not questioning

**9/2/2004  Paul Fallon**

1     his answer.  I was starting a new question,

2     and you interrupted me.

3   Q   Did anyone from Lumbermen's ever inform you

4     that payments made to indemnify the RCAB for

5     sexual abuse claims would be applied to the

6     aggregate limits that the Lumbermen's

7     policies had?

8     MR. GALVANI:  Objection.  It's

9     contrary to fact.  That's a totally improper

10    question, and you know it.  Go ahead.

11  A   I don't recall the aggregate term was ever

12    mentioned in any of the conversations from

13    the people from Lumbermen's Liability

14    Insurance Department.

15  Q   Do you know whether a woman named Christine

16    Zinoman had any involvement in handling the

17    claims for Lumbermen's?

18  A   Yes, I've seen her name on letters, and I've

19    probably sent her letters.

20  Q   You met with Ms. Zinoman at one point, didn't

21    you?

22  A   I may have met her once, yes.  I don't

23    recall, but I probably did.

**9/2/2004  Paul Fallon**

1   Q   There was a meeting that you attended here in

2        Boston that was also attended by Wilson

3        Rogers, Ms. Zinoman and a Mr. Frank Bennett,

4        isn't that right?

5   A   I don't recall that specifically, no.

6   Q   Okay.  Do you recall any meetings in person

7        with any representative from Kemper?

8            MR. GALVANI:  Objection.

9   A   Paul Meany.

10  Q   Okay.  When did you meet with Mr. Meany?

11  A   Many times.

12  Q   In person?

13  A   Uh-huh.  Yes.

14  Q   And were those meetings -- During the course

15       of those meetings, there were discussions

16       about the sexual abuse claims, is that right?

17  A   That's correct.

18  Q   And you conveyed or the RCAB through you or

19       Mr. Rogers conveyed information to Mr. Meany,

20       isn't that right?

21  A   That is correct.

22  Q   And Mr. Meany conveyed information to you and

23       Mr. Rogers, correct?

**9/2/2004  Paul Fallon**

1   A    That's correct.

2   Q    And Mr. Meany conveyed to you and Mr. Rogers

3        that payments were being made to indemnify

4        the RCAB, is that right?

5   A    That's correct.

6   Q    And the RCAB received checks, didn't they?

7   A    That's correct.

8   Q    And, in the course of those meetings with Mr.

9        Meany, he also explained to you and Mr.

10       Rogers the application of those payments to

11       the aggregate limits of policies, didn't he?

12          MR. GALVANI:  Objection.

13  A    I don't recall the term, "aggregate," ever

14       coming up in the conversations.

15  Q    He told you that there were limited funds

16       available under certain policies because

17       limits had been exhausted, isn't that right?

18  A    I recall that was true.

19  Q    Okay.  And there were instances when he told

20       you that there was no money available under

21       any policy?  I'm sorry.  Let me begin again.

22          Mr. Meany told you, at times, that

23       there was no money remaining under a

**9/2/2004  Paul Fallon**

1        particular policy because it had been

2        exhausted by prior payments, isn't that

3        right?

4    A    That's my understanding.

5    Q    And in any of those meetings that you had

6        with Mr. Meany, did either you or Mr. Rogers

7        object to Mr. Meany's statement that the

8        policies had been exhausted?

9    A    I can't recall.  Mr. Rogers was running the

10        meeting.  I can't recall what specifically

11        was said.

12    Q    Okay.  Did you ever object to the statement

13        by Mr. Meany that the payments being made to

14        indemnify the RCAB for sexual abuse claims

15        were exhausting the policies?

16    A    No, because our attorney said that's what he

17        was told.

18    Q    Okay.  Did you ever ask Mr. Meany to provide

19        you with copies of the Lumbermen's policies

20        or materials relating to the Lumbermen's

21        policies?

22    A    I did not, personally, ask him to supply

23        policies; copies.

**9/2/2004  Paul Fallon**

1    Q    Did you ever write to Mr. Meany or anyone

2         else at Lumbermen's requesting copies of

3         insurance policies or insurance policy

4         materials?

5    A    Not that I recall.

6    Q    Did the RCAB ever write to Lumbermen's

7         requesting --

8    A    I don't know.

9    Q    -- copies of policies or policy materials?

10   A    I do not know.

11   Q    Why didn't you say anything in any meeting

12        with Mr. Meany about the exhaustion of

13        policies by the indemnity payments?

14            MR. GALVANI:  Objection.

15   A    Our attorney was running the meeting.

16   Q    Okay.  And you delegated to your attorney all

17        of the authority you had in connection with

18        claim handling, isn't that right?

19            MR. GALVANI:  Objection.

20   A    That's correct.

21   Q    At some point, -- Strike that.

22            Did you understand that Lumbermen's

23        had -- Strike that.

**9/2/2004  Paul Fallon**

1              Do you know what an excess insurance

2        policy is?

3    A    Yes.

4    Q    What's your understanding of an excess

5        policy?

6    A    Coverage that can be applied after the basic

7        coverage is exhausted.

8    Q    Okay.  And have you ever seen an excess

9        liability insurance policy?

10   A    I have seen some excess policies.

11   Q    Where did you see them?

12   A    I can't recall.  I've seen them.

13   Q    Was it in connection with the sexual abuse

14       claims against the RCAB?

15   A    I can't recall.

16   Q    At any point in the course of your

17       involvement with the sexual abuse claims, did

18       you come to understand that Lumbermen's

19       issued excess policies to the RCAB?

20   A    I understood they did.

21   Q    What was the basis of that understanding?

22   A    I was told.

23   Q    By whom?

**9/2/2004  Paul Fallon**

1   A   I can't recall.

2   Q   Did you ever have any discussions with anyone

3       at Lumbermen's about the availability of

4       excess coverage?

5   A   No, I did not, personally.

6   Q   During the course of your involvement with

7       the sexual abuse claims against the RCAB,

8       were you aware of an individual at

9       Lumbermen's named Augy Vega (phonetic)?

10  A   Yes, I am.

11  Q   What was your understanding of his role in

12      the claims?

13  A   I believe he took Paul Meany's place.

14  Q   When was that?

15  A   When Paul had a heart attack.  I can't give

16      you -- I don't know the specific year.

17  Q   Did you ever speak with Mr. Vega?

18  A   No, I didn't, but I sent him all kinds of

19      correspondence.

20  Q   What types of correspondence did you send to

21      Mr. Vega?

22  A   Copies of correspondence I sent to our

23      attorney or information that I figured he may

**9/2/2004  Paul Fallon**

1       need for his file.

2    Q    And what type of information was that?

3    A    What I learned, personally, from talking to

4        the pastors and whatever.

5    Q    Did you ever send Mr. Vega the privileged

6        information, what you've called privileged

7        information relating to claims against

8        specific priests?

9            MR. GALVANI:  Objection.

10   A    Objection.  Some of the information became

11       public, and I am positive Attorney Rogers

12       sent it to Lumbermen's and the copies to me.

13   Q    At that time, it became public, is that what

14       you mean?

15   A    Yes.

16   Q    Prior to that time, had you, personally, Mr.

17       Fallon sent to Mr. Vega any of the

18       information pertaining to the priests accused

19       of sexual abuse that you've previously

20       referred to as privileged information?

21           MR. GALVANI:  Objection.  It's not the

22       prior testimony.  Go ahead.

23   A    The information wasn't given to me, so I

**9/2/2004  Paul Fallon**

1      couldn't have sent it to anybody.

2  Q    Okay.  Was it your understanding, Mr. Fallon,

3      that when Lumbermen's first -- Strike that.

4        Was it your understanding, Mr. Fallon,

5      that when Lumbermen's began to reimburse the

6      RCAB for settlements it had -- settlement

7      payments it had made for sexual abuse claims

8      that Lumbermen's was acting subject to a

9      reservation of rights?

10     MR. GALVANI:  I object.  Objection.

11  A   There were reservation of the rights that was

12     never filed.

13  Q   In every file?

14  A   It's standard insurance practice.

15  Q   And is it your understanding that throughout

16     its participation in the defense and

17     indemnity of the sexual abuse claims against

18     the RCAB, Lumbermen's was acting under a

19     reservation of rights?

20     MR. GALVANI:  Objection.

21  A   They were -- I'm sure there was a reservation

22     of rights non-waiver letter in every file.

23     It's standard claims practice.

**9/2/2004  Paul Fallon**

1   Q   I'm just asking about your understanding,

2       though.  Was it your understanding that

3       throughout the course of its involvement in

4       the sexual abuse claims, Lumbermen's was

5       acting under reservation of rights?

6   A   Correct.

7   Q   When you first began handling the sexual

8       abuse claims against the RCAB, what efforts

9       were taken to keep the claims from gaining

10      any media attention?

11         MR. GALVANI:  Objection.

12  A   Nothing in my job required me to do that

13      aspect of the claim.

14  Q   Was it important to the RCAB to prevent any

15      media attention from focusing on the claims?

16         MR. GALVANI:  Objection.

17  A   I really don't know.

18  Q   You never spoke to the media about these

19      claims, did you?

20  A   No, I did not.

21  Q   Did you ever say anything to anyone urging

22      them not to speak to the media about these

23      claims?

**9/2/2004  Paul Fallon**

1   A   No, I didn't.

2   Q   Did you have any discussions with anyone at

3       the RCAB about potential media exposure?

4   A   Not that I recall.

5   Q   Who took over for you as the RCAB Claims

6       Manager when you left in 2000?

7   A   Joseph McGinnis (phonetic).

8   Q   And what discussions did you have with Mr.

9       McGinnis (phonetic) in connection with the

10      sexual abuse claims?

11  A   I don't recall having any discussions with

12      him.

13  Q   You don't recall any discussions with him?

14  A   (Nods head)

15  Q   Did you tell Mr. McGinnis (phonetic) who

16      counsel was?

17  A   He knew who counsel was.

18  Q   How did he know that?

19  A   It was widely-accepted information.

20  Q   Did Mr. McGinnis (phonetic) have any

21      employment with the RCAB before he took over

22      as a Claim Manager?

23  A   Not that I know of.

**9/2/2004  Paul Fallon**

1  Q    Did you have any discussions with him about

2       his new job?

3  A    I'm sure I did, but I can't recall specifics.

4           MR. ZELLE:  I think that's all I

5       have.  If you don't mind, I'm going to use

6       the mens room and take a couple minutes just

7       to flip through these documents; and if I've

8       got anything more, it will just be a few

9       minutes.

10          (Break takes place at 11:45 a.m.)

11          (Back on the record at 11:51 a.m.)

12  Q   I have a couple more things, Mr. Fallon.

13          In your present role as a consultant

14      to the RCAB, what are your responsibilities?

15  A   More or less just maintain the files, set up

16      the new claims as they come in.

17  Q   And is that limited to sexual abuse claims or

18      all claims?

19  A   Only sexual abuse claims.

20  Q   Have you reviewed any documents in preparing

21      for your deposition today?

22  A   Yes.

23  Q   What documents did you review?

**9/2/2004  Paul Fallon**

1   A   This correspondence.  (Indicating)

2           MR. GALVANI:  Let me interject.

3   Q   Let me just ask you.

4           MR. ZELLE:  I'll try to clean it up

5       here, Paul, Mr. Galvani.

6   Q   Can you tell me what correspondence?  You

7       were indicating Exhibit 3?  Are you saying

8       that you reviewed the materials that are --

9   A   No.

10  Q   Tell me what documents that you have

11      reviewed, what correspondence?

12  A   Correspondence to Paul Meany and some

13      correspondence to Wilson Rogers.

14  Q   And did any of that correspondence pertain to

15      the exhaustion of Lumbermen's policies by

16      payments -- by indemnity payments?

17  A   I can't recall any specifics.

18  Q   What were the subjects of the correspondence

19      that you reviewed?

20  A   Letters on files and file information.

21  Q   When you say file information, what,

22      specifically, are you referring to?

23  A   Some information I may have found out and

**9/2/2004  Paul Fallon**

```
1       passed on to Paul Meany or Wilson Rogers.

2   Q   Information that you found out about a

3       specific claim?

4   A   Yeah.

5   Q   Did any of the correspondence you reviewed

6       pertain to the existence or terms of the

7       policies that were issued by Lumbermen's to

8       the RCAB?

9   A   I really can't recall any specific stuff like

10      that.

11          MR. ZELLE:  That's all I have.

12          MR. GALVANI:  I have a couple of

13      questions.

14

15      CROSS EXAMINATION

16  Q   (By Mr. Galvani)  I just want to be clear,

17      Mr. Fallon.  At one point, you were asked

18      your understanding of the reference on the

19      certificates of insurance of per occurrence.

20      What is the per occurrence amount as you

21      understood it?

22  A   It was 300, the latest one and the first one.

23  Q   And 300 for --
```

**9/2/2004  Paul Fallon**

1   A   Per incident, and there was a 300 for

2       occurrence -- for every occurrence

3       thereafter.

4   Q   And the reference to aggregate was what?

5   A   The aggregate, in my opinion, was to products

6       completed operations.

7   Q   And that language was in a standard general

8       liabilities policy, right?

9       MR. ZELLE:  Objection.

10   A   Yes.

11       MR. GALVANI:  I have no further

12       questions.

13

14       REDIRECT EXAMINATION

15   Q   (By Mr. Zelle)  When did you come to this

16       understanding that aggregate was for products

17       of completed operation?

18   A   I can't recall.

19   Q   Was it prior to January of 2003?

20   A   Possibly.  I don't recall specifically.

21   Q   Would it refresh your recollection if I told

22       you that in December of 2003, the law firm of

23       Goodwin Procter was retained in sexual --

**9/2/2004  Paul Fallon**

1        Strike that.

2            Would it refresh your recollection if

3        I told you that it was in late 2002 that

4        Goodwin Procter was retained by the RCAB in

5        connection with these matters?

6    A    I don't recall.

7    Q    All right.

8            MR. ZELLE:  That's all I have.

9            MR. GALVANI:  I have no further

10       questions.

11           (Whereupon the deposition of Paul J.

12       Fallon concluded at 11:56 a.m.)

13

14

15

16

17

18

19

20

21

22

23

**9/2/2004 Paul Fallon**

4          C E R T I F I C A T E

5

6                    I, PAUL J. FALLON, do hereby

7     certify that I have read the foregoing transcript

8     of my testimony and further certify that said

9     transcript is a true and accurate record of said

10    testimony and signed under the pains and

11    penalties of perjury.

12

13                Dated this          day of

14                   2004.

15

16

17

18            PAUL J. FALLON

19

20

21

22

23

**9/2/2004  Paul Fallon**

4          C E R T I F I C A T E

5

6                I, Simonne J. Elwood, R.P.R. and

a Notary Public within and for the Commonwealth

7     of Massachusetts, duly commissioned, qualified

and authorized to administer oaths and to take

8     and certify depositions, do hereby certify that

heretofore, to wit, on the 2nd day of September

9     2004, personally appeared before me Paul J.

Fallon, at the office of Robinson & Cole, LLP,

10    One Boston Place, Boston, Massachusetts, in the

aforecaptioned cause pending in the United States

11    District Court, Commonwealth of Massachusetts;

that the witness was by me duly sworn to testify

12    to the truth, the whole truth and nothing but the

truth; that thereupon and while said witness was

13    under oath, the within deposition was taken down

by me in shorthand at the time and place herein

14    named and was thereafter reduced to computer

transcription under my supervision.  I further

15    certify that I am not interested in the event of

the action.

16

17                IN WITNESS WHEREOF, I have

18    hereunto subscribed my hand and affixed my seal

19    of office this        day of        ,

20    2004.

21

22                Simonne J. Elwood

REGISTERED PROFESSIONAL REPORTER

23    My Commission Expires:  February 14, 2008

81

**9/2/2004  Paul Fallon**

4           ERRATA SHEET

5       Date of Deposition:  September 2, 2004

6       Case Name:  The Roman Catholic Archbishop of

                Boston, a Corporation sole vs.

7               Lumbermen's Mutual Casualty Company

                Case No. 04-10461-DPW

8

        Deponent's Name:  Paul J. Fallon

9

                I, the undersigned, do hereby

10      certify that I have read the foregoing deposition

        transcript and that to the best of my knowledge,

11      said deposition transcript is true and accurate

        (with the exceptions of the following changes

12      listed below):

13

                PAUL J. FALLON

14

                Dated

15

16      Page No.    Line No.    Correction

17      Page No.    Line No.    Correction

18      Page No.    Line No.    Correction

19      Page No.    Line No.    Correction

20      Page No.    Line No.    Correction

21      Page No.    Line No.    Correction

22      Page No.    Line No.    Correction

23      Page No.    Line No.    Correction

24      Page No.    Line No.    Correction

25      Page No.    Line No.    Correction

26      Page No.    Line No.    Correction

27      Page No.    Line No.    Correction

28

29

30

**9/2/2004  Paul Fallon**

4    Page No.    Line No.    Correction

5    Page No.    Line No.    Correction

6    Page No.    Line No.    Correction

7    Page No.    Line No.    Correction

8    Page No.    Line No.    Correction

9    Page No.    Line No.    Correction

10    Page No.    Line No.    Correction

11    Page No.    Line No.    Correction

12    Page No.    Line No.    Correction

13    Page No.    Line No.    Correction

14    Page No.    Line No.    Correction

15    Page No.    Line No.    Correction

16    Page No.    Line No.    Correction

17    Page No.    Line No.    Correction

18    Page No.    Line No.    Correction

19    Page No.    Line No.    Correction

20    Page No.    Line No.    Correction

21    Page No.    Line No.    Correction