**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
                 - - - - - - - - - - - - - - - -

THE ROMAN CATHOLIC ARCHBISHOP        :
OF BOSTON, a Corporation sole,       :
        Plaintiff,                   :
VS.                                  :  CASE NO.
LUMBERMEN'S MUTUAL CASUALTY          :  04-10461-DPW
COMPANY,                             :
        Defendant.                   :
                 - - - - - - - - - - - - - - - -
```

30(b)(6) DEPOSITION OF THE ROGERS LAW FIRM by WILSON D. ROGERS, III, a witness called by and on behalf of the Defendant, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Sandra L. Bray, Registered Merit Reporter, CSR Number 103593, and Notary Public in and for Commonwealth of Massachusetts, at the offices of Robinson & Cole, LLP, One Boston Place, Boston, Massachusetts, on Tuesday, August 24, 2004, commencing at 12:43 p.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

**Page 2**

APPEARANCES:

Representing the Plaintiff:
   ROPES & GRAY
   One International Place
   Boston, Massachusetts 02110
   BY: BRYAN R. DIEDERICH, ESQUIRE

Representing the Defendant:
   ROBINSON & COLE, LLP
   One Boston Place
   Boston, Massachusetts 02108
   BY: ANTHONY R. ZELLE, ESQUIRE and
       MARY L. CATAUDELLA, ESQUIRE

Representing Wilson D. Rogers, III:
   THE ROGERS LAW FIRM
   One Union Street
   Boston, Massachusetts 02108
   BY: WILSON D. ROGERS, JR., ESQUIRE

**Page 3**

                    I N D E X
WITNESS:                                    PAGE NO.
WILSON D. ROGERS, III
   BY MR. ZELLE                                4


                    E X H I B I T S
NO.       DESCRIPTION                       PAGE NO.
 1        Subpoena                             5


         (EXHIBITS RETAINED BY COUNSEL.)

**Page 4**

                 P R O C E E D I N G S
         (The driver's license number of the
         deponent was entered into the record
         as follows: Massachusetts 015646783.)
             WILSON D. ROGERS, III, having duly
    sworn or affirmed that his testimony would be
    the truth, the whole truth, and nothing but
    the truth, testified as follows:
                     *   *   *
    EXAMINATION BY MR. ZELLE:
Q.  Please state your name, please.
A.  Wilson D. Rogers, III.
Q.  And, Mr. Rogers, you're appearing here for
    this deposition in response to a subpoena
    served on the Rogers Law Firm?
A.  I am.
Q.  And what we'll mark as Exhibit 1 here, is that
    that subpoena?
A.  It appears to be, yes.
         MR. DIEDERICH: Can I take a look
    at that?
         MS. CATAUDELLA: It doesn't have
    the return of service on it. We couldn't
    locate it.

**Page 5**

1  MR. DIEDERICH: I will note for the
2  record that the notice that was sent to us of
3  the service for the subpoena did not include a
4  schedule, as I understand it.
5  MR. ZELLE: You need a copy?
6  MR. DIEDERICH: I would appreciate
7  a copy. I think we may have one at this
8  point. Then I do object to the notice on that
9  ground. I'm not going to say we should
10 suspend. I'm just noting that.
11          (Subpoena was marked Exhibit
12           Number 1 for identification.)
13 Q. Mr. Rogers, did you bring any documents with
14    you today?
15 A. No, pursuant to our previous discussion,
16    Mr. Zelle.
17 Q. Can you explain why you have not produced any
18    documents in connection with this subpoena?
19 A. Sure. As we've had -- you and I, I think,
20    have spoken twice on this issue. As I
21    explained, incident to this litigation and
22    even prior to the institution of this
23    litigation, our office had provided all
24    responsive documents to Ropes & Gray, which we

**Page 6**

1  understand they've also turned over incident
2  to this litigation or would have identified in
3  the privilege log.
4       The one caveat that I mentioned to you
5  yesterday that it occurred to me after we
6  spoke last Friday was that when we produced
7  materials from our office from the claim
8  files, we did not turn over to Ropes & Gray
9  internal memoranda or handwritten notes. For
10 instance, if I met with one of our clients and
11 took notes that were otherwise summarized in a
12 letter, the handwritten notes wouldn't have
13 been turned over. If I had handwritten notes
14 from a deposition, the handwritten notes would
15 not have been turned over; just the deposition
16 summary that I would have set forth in the
17 letter would have been turned over.
18      As I indicated, I don't know if it's
19 particularly responsive or not. I'd have to
20 go back and look, but that small category
21 would not amount to many documents. The only
22 thing we would not otherwise have turned over
23 to Ropes & Gray which I had understood would
24 have otherwise been produced to you folk or

**Page 7**

1     identified in the privilege log.
2  Q. Can you tell me whether any of the documents,
3     the internal memoranda or handwritten notes,
4     that were not provided to Ropes & Gray
5     included any information or reference to the
6     existence of insurance policy or insurance
7     policy information, the efforts to locate
8     insurance policies or insurance policy
9     information, the terms or conditions of any
10    insurance policies issued by Lumbermen's?
11 A. No. I believe that any internal memoranda we
12    had regarding the topics of -- you had a
13    laundry list there, but by way of coverage
14    issues, I think we did turn over any internal
15    memoranda we had regarding the issue of
16    coverage or what transpired in discussions
17    with Chris Zinoman and/or anyone else from
18    Lumbermen's. Those were turned over. I think
19    the category of documents we're talking about
20    that would not have been turned over would be
21    notes with respect to individual claims. Any
22    insurance issue relevant in play here, I
23    believe we've turned over to Ropes & Gray.
24 Q. Okay. Just to make it clear, I used the term

**Page 8**

1     "coverage issues" and then "insurance issues
2     at play." I just want to make sure we're on
3     the same page, that you include within those
4     generic descriptions the existence of policies
5     or policy information, the terms and
6     conditions of any policies that may have been
7     issued by Lumbermen's, and the efforts by the
8     RCAB or your firm or anyone else on behalf of
9     the RCAB, which I guess would include the
10    James S. Kemper Agency or AON, to locate any
11    policy information.
12 A. Yes, we turned over all of that information to
13    Ropes to the extent it still exists, and I
14    guess the category -- to define a little more
15    clearly for you, Mr. Zelle, I think the
16    category would be simply within our claim
17    files. Those internal memoranda or notes
18    regarding the case that we generated simply
19    internally were the only things we did not
20    turn over to Ropes & Gray but on insurance,
21    coverage, terms and conditions, otherwise,
22    anything along that line has been turned over
23    to Ropes & Gray, and I understand they've
24    either produced it to you or identified it in

**Page 9**

1  the privilege log.
2  Q. Did your files include any documentation
3  relating to the existence of insurance
4  policies either intact or parts of policies or
5  information that would help the RCAB to
6  establish that there were policies issued by
7  Lumbermen's?
8       MR. DIEDERICH: I'll object to
9  form.
10 A. I'm not sure I follow your question.
11 Q. Sure. I'll break it down. Did the Rogers
12 Firm's files include documentation that
13 pertained to the efforts by and on behalf of
14 the RCAB to locate insurance policy
15 information?
16 A. I don't recall. I don't recall. I mean I
17 know there was some general files that were
18 maintained on insurance issues, and those were
19 turned over in their entirety.
20 Q. Can you describe them for me?
21 A. They were some brown folders.
22 Q. No, I mean the substance of the documents.
23 A. Substance?
24 Q. Yes. And white paper?

**Page 10**

1  A. Yellow. No, it would include -- the insurance
2  files that I'm talking about were generated
3  primarily as a result of what happened in the
4  early 1990s, and I think they were accumulated
5  by me when we were trying to go back to try to
6  put the indemnity issue together for Kemper
7  when they came to the table. We sent a 93A
8  letter at some point along the line. There
9  was coverage -- there was issues with respect
10 to us writing back to Lumbermen's saying we
11 disagreed with their opinion that coverage was
12 not applicable post-'71. There was a package
13 where we sent some affidavits. Any issues
14 with respect to the coverage in play in the
15 early '90s were included in those files that
16 were turned over en masse to Lumbermen's --
17 excuse me, to Ropes & Gray.
18 Q. And what was the Rogers Firm's -- strike it.
19 How did the Rogers Firm define the issue
20 concerning the lack of complete policies
21 issued by Kemper to the RCAB?
22       MR. ROGERS: I'd object. I don't
23 know what you mean.
24       MR. DIEDERICH: Join.

**Page 11**

1  Q. What was the issue as the Rogers Firm
2  perceived it resulting from the fact that the
3  RCAB could not locate complete copies of
4  policies issued by Lumbermen's?
5  A. At what point in time?
6  Q. At the outset, '92.
7  A. At the early '90s?
8  Q. Right.
9  A. Again, I was only first or second year in '92.
10 So as I understood it, as these claims were
11 being presented and I had some initial
12 involvement, Lumbermen's took two positions.
13 They were saying there were no policies prior
14 to '71, and they were saying that as to
15 post-'71, coverage did not apply.
16      We then undertook efforts -- well, let
17 me respond to the second part of that. We
18 then wrote to Lumbermen's under my dad's
19 signature, indicating we disagreed the
20 coverage did not apply, and Lumbermen's stuck
21 to its guns. The view of the Diocese was we
22 should proceed and try to resolve cases, and
23 while we were trying to do that in the early
24 '90s, there was efforts to try to establish

**Page 12**

1  the existence of coverage prior to '71 and to
2  address these issues. And that's what
3  generated ultimately the affidavits. That's
4  what generated the 93A letter. I think that's
5  what you're trying to ask me.
6  Q. Not quite, but let me try to refine it here.
7  With respect to simply the existence of
8  insurance policies -- and I am distinguishing
9  that from their application to any particular
10 claims that have been asserted against the
11 RCAB, but just the existence of the policies
12 themselves or parts of policies or documents
13 that may refer to policies -- what did the
14 Rogers Law Firm do to advance the interests of
15 the RCAB in connection with the fact that the
16 RCAB didn't have complete policies?
17      MR. ROGERS: Wait, wait, wait.
18      MR. DIEDERICH: Object.
19      MR. ROGERS: Object. This is not a
20 30(b)(6). I disagree. This was a request for
21 production of documents. That was in the last
22 deposition that's been suspended pending the
23 resolution of the motion to compel. That's
24 not the subject here. This is a request for

**Page 13**

production of documents.

MR. ZELLE: And a subpoena for testimony as well.

MR. DIEDERICH: Without a schedule. You don't have any topics.

MR. ROGERS: No topics. It's just document requests.

MR. ZELLE: I beg to differ. There is a Schedule A, and it identifies documents to be produced.

MR. DIEDERICH: Sure.

MR. ZELLE: Insofar as it commands the witness to appear to testify, it is with respect to the documents that are listed on Schedule A.

MR. DIEDERICH: Sure, let's talk about the documents. That question had nothing to do with the documents.

MR. ZELLE: I beg to differ. I think it's related very closely to the subject, but what I am trying to ascertain specifically is the content or likely content of documents that we believe were improperly withheld here. And insofar as there were

**Page 14**

communications or documents reflecting communications by the Rogers Firm to the RCAB concerning the existence of policies, the search for policies, the terms and conditions of policies, limits of policies, that's well within the scope of the documents listed on this schedule.

MR. ROGERS: You've sought documents, and that last question was what did you do or what did the Rogers Law Firm do, not documents.

MR. ZELLE: I understand. And it's intended --

MR. ROGERS: I think that's entirely within the context of the scope of the deposition we just finished, not here. I don't -- you know -- I mean what we -- the documents we have, fine, he can testify as to, you know, what documents were produced, what they -- the general areas, but to say what did you do or what did the firm do --

MR. ZELLE: Let me put it in these terms. I think you're misconstruing the scope.

**Page 15**

Q. But what I'm asking you to tell me, Mr. Rogers, is what your firm did so that I will be able to discern whether there may be documents reflecting those efforts. Because the problem we have and the subject of the motion to compel is, in part, the fact that thousands and thousands of documents that have been withheld have not been described in a manner that permits me to discern from the privilege log what they have to do with.

MR. ROGERS: But that's not an issue for the Rogers Law Firm.

MR. ZELLE: Well, it is -- it is an issue that is the subject of this deposition insofar as the deposition calls for documents. No documents have been produced. I'm entitled to inquire as to the identity and substance of those documents.

MR. ROGERS: Well, we can certainly -- the witness has identified the documents that have been turned over to Ropes & Gray and has described by category those that were not. What's happened once they've gone there, we can't respond to that.

**Page 16**

MR. ZELLE: Well, let me try to go a different route. I think you can.

Q. Mr. Rogers, were there communications in a written form by the Rogers Law Firm to the RCAB concerning the existence of policies issued by Lumbermen's?

MR. ROGERS: Well, I object to that. That gets into privileged communications; does it not?

MR. ZELLE: That's the whole issue. I don't know because I have a privileged log that doesn't tell me the substance of a document. And how can I be expected to move to compel a subject that is well within the scope of discovery, that is, the existence of insurance policies, if nobody's telling me what these documents relate to? They haven't done it, that is, they, Ropes & Gray, in their privilege log. And now, there are instructions for the 30(b)(6) designee of your firm to not disclose that. If that's the position you're taking, that's fine, but let's just put that on the record and we'll let the judge decide.

17

1  MR. ROGERS: Look, I don't want to
2  get into what has been produced and what has
3  been identified and how it's been identified
4  in a privilege log because I have not seen --
5  from Ropes & Gray. I have not seen that. I
6  have not reviewed that. We've turned over
7  documents with one exception as described by
8  my son.
9      Now, to turn around and to say because
10 you can't follow or fathom the privilege log
11 or it's not detailed enough we should identify
12 the substance of communications between our
13 firm and our client is bothersome. That's an
14 area of privilege. If we're writing to our
15 client and rendering advice to our client,
16 that is privileged.
17     MR. ZELLE: It is privileged, but
18 if you are communicating to your client
19 information that is not confidential, then it
20 is not privileged. And if there are documents
21 that include nonconfidential information
22 concerning the existence or terms of insurance
23 policies, concerning the applicability of
24 aggregate limits, I'm entitled to know, first

18

1  of all, whether those documents exist. And as
2  I said -- and I understand this isn't your
3  problem -- Ropes & Gray's privilege log, in
4  our view, doesn't answer that. In addition,
5  I'm entitled to know the substance of those
6  communications because it's not confidential.
7      MR. ROGERS: Whether you are or
8  not, I don't see how you can expect us to come
9  to a 30(b)(6) and give specifics about
10 correspondence where we were in constant
11 communication with our client over all of
12 these years from 1992 right up to date and how
13 we can give -- and say, "Well, wait a minute.
14 There are seven letters that deal with this.
15 There are nine that deal with that." We can't
16 give that kind of detail, but that's what
17 you're asking for, without gathering all of
18 the documents, without sitting down and going
19 through them.
20     As a general rule, if we're
21 communicating with our client -- as a general
22 rule -- and I don't disagree with the
23 observation that you can communicate with your
24 client and include in that communication

19

1  either whole or parts of it that aren't
2  privileged, but there's no way we can parse
3  that out in a 30(b)(6) without getting the
4  thousands of thousands of pages that fit
5  within the purview of that.
6      MR. ZELLE: I agree it may be
7  necessary to review all those thousands and
8  thousands of documents, and that's what the
9  30(b)(6) deposition calls for, but I'm not
10 anywhere close to that level of examination.
11 I've only asked whether there are documents
12 prepared by the Rogers Law Firm that pertain
13 to the issue of the existence of insurance
14 policies.
15     MR. ROGERS: Some of which, if
16 there are, that would include privileged
17 communications.
18     MR. ZELLE: Maybe, but I'm not
19 asking for the substance.
20     MR. ROGERS: Yes, you are. That is
21 the substance if it deals with advice.
22     MR. ZELLE: I disagree. All you're
23 telling me is yes, there are documents, and
24 some of them may have confidential

20

1  communications. If you're telling me they
2  don't have communications, that's great,
3  because then Ropes & Gray has gone off the
4  deep end. I'm assuming that at least in part
5  Ropes & Gray has a good-faith basis for
6  objecting and withholding documents, but if
7  you don't tell me that there are documents
8  containing privileged communications, then I
9  have no reason to believe that there are.
10 A.  I'll answer that. Obviously, there are
11     documents that are privileged, Mr. Zelle.
12     I'll acknowledge that.
13 Q.  I'm sure there are, but that's not my
14     question.
15 A.  That was --
16 Q.  My question is whether there are documents
17     that refer to the issue of existence of
18     insurance policies. And if you don't want to
19     answer, just let's have a clear record.
20 A.  I want to have a conference here.
21         (Conference off the record between
22         Mr. Rogers, Jr. and the witness.)
23     MR. ROGERS: Let's go outside.
24 Give us a minute.

**Page 21**

```
 1          (Conference off the record between
 2          Mr. Rogers, Jr., Mr. Diederich, and the
 3          witness.)
 4  A.  What's the question?
 5          MR. ROGERS:  Can we have the
 6  question?
 7          MR. ZELLE:  Yes.
 8  Q.  The question is, are there documents that were
 9      prepared by the Rogers Law Firm that were
10      turned over to Ropes & Gray that pertain to
11      the existence of insurance policies issued by
12      Lumbermen's or efforts by the RCAB to locate
13      information relating to insurance policies
14      issued by Lumbermen's to the RCAB?
15          MR. ROGERS:  Now, let me ask you.
16  Can we -- to move this along, can we have an
17  agreement between counsel that responding to
18  this question will in no way be deemed to be a
19  waiver of any underlying privilege --
20          MR. ZELLE:  Sure.
21          MR. ROGERS:  -- with respect to the
22  contents of any such communications?
23          MR. ZELLE:  Yes.
24          MR. ROGERS:  Okay, fine.
```

**Page 22**

```
 1  A.  In general terms, yes, there were discussions
 2      about -- I can't be specific as to what was in
 3      any one letter.  In general terms, I can say
 4      that there was communications with the client
 5      about these issues that have been ongoing with
 6      Lumbermen's.
 7  Q.  At the outset of these claims --
 8  A.  '92?
 9  Q.  -- yes -- when it was determined by the RCAB
10      that actual policies issued by Lumbermen's
11      couldn't be located, were there communications
12      by the Rogers Law Firm to the RCAB --
13      documents I speak of, communications, written
14      communications -- that reflected how to
15      proceed in the absence of insurance policies?
16  A.  And, again, the same caveat, the stipulation
17      on this whole line of questioning.
18  Q.  Right.
19  A.  That it does not constitute a waiver of the
20      privilege.
21  Q.  Yes.
22  A.  As I sit here, I'm not sure there were written
23      communications how we intended to proceed.
24      The relationship was there were numerous
```

**Page 23**

```
 1      verbal communications by my dad primarily with
 2      the Archdiocese as general counsel, and so, as
 3      I sit here today -- and I have gone through
 4      much of all of these -- I don't have a
 5      recollection of any such letter that outlined
 6      in letter form or documentary -- document form
 7      the intended course for the Diocese in light
 8      of those circumstances.
 9  Q.  All right.  Just to, again, make it clear on
10      the record, you don't know whether there are
11      any documents, whether they're letters or
12      notes or memos, that were included within the
13      Rogers files turned over to Ropes & Gray that
14      reflect the manner in which the Rogers Firm or
15      the RCAB intended to proceed with respect to
16      the issue concerning missing policies?
17  A.  To the best of my knowledge, there are no such
18      documents.
19  Q.  Okay.  Are there documents provided by the
20      Rogers Firm, created by the Rogers Firm or
21      maintained by the Rogers Firm relating to the
22      efforts by either the firm or the RCAB to
23      search for insurance policies or insurance
24      policy information?
```

**Page 24**

```
 1  A.  Repeat it again.  I'm sorry.
 2  Q.  Are there any documents that were either
 3      created by the Rogers Firm or maintained by
 4      the Rogers Firm that relate to efforts by
 5      either the firm or the RCAB to search for
 6      insurance policies or insurance policy
 7      information?
 8  A.  Well, inferentially, for example, by the
 9      affidavits that were secured?
10  Q.  That would be certainly a document that
11      reflects efforts to locate information, yes.
12  A.  I don't recall, and I had gone through these
13      files.  I don't recall seeing anything by way
14      of my communication with AON Risk Management
15      that was referenced at my earlier deposition
16      earlier this morning.
17  Q.  Yeah, I'm not talking about communications
18      with third parties.  I'm talking about
19      communications with the RCAB.
20  A.  No, I understand that, but it goes to the same
21      topics.
22  Q.  All right.  Let me represent to you that I
23      have the communications that you had that are
24      reflected in the Moriarty affidavit and a
```

**Page 25**

```
 1        memo pertaining to that.
 2   A.   Taking that out? No, as I sit here, I don't
 3        recall any others.
 4   Q.   Did the Rogers Firm communicate in writing
 5        with the RCAB -- strike that. Are there any
 6        documents that were either created by the
 7        Rogers Law Firm or maintained by the Rogers
 8        Law Firm that pertain to the issue of the
 9        aggregate limits of the policies issued by
10        Lumbermen's?
11   A.   Yes.
12   Q.   And did the Rogers Firm communicate in writing
13        to the RCAB information concerning the
14        aggregate limits?
15   A.   Yes, as enunciated by Lumbermen's, yes.
16   Q.   Did the RC -- did the Rogers Firm communicate
17        to -- internally -- I shouldn't say
18        communicate. Did the Rogers Firm maintain or
19        create any documents used internally that
20        relate to the erosion of aggregate limits of
21        the Lumbermen's policies?
22   A.   The reason I hesitate is relate to -- yes.
23        I'd say yes, and I would say that those have
24        been provided to Ropes.
```

**Page 26**

```
 1   Q.   By way of example, there are charts that --
 2   A.   Yes, that's what I'm thinking of.
 3   Q.   And in addition to the charts, were there any
 4        other documents that refer or relate to the
 5        existence of aggregate limits or the Rogers
 6        Firm's understanding that aggregate limits
 7        applied in the sexual abuse cases?
 8   A.   There were certain correspondence that was
 9        shared with Lumbermen's and the client, and I
10        believe there were some internal memoranda
11        reflecting that issue as to what the remaining
12        balances were, et cetera.
13   Q.   When the Rogers Firm received copies of the
14        deposition exhibits from the Paul Meany 2000
15        deposition, did the firm provide to the RCAB
16        copies of the policy materials that were
17        produced at that deposition?
18   A.   I don't recall as I sit here right now us
19        doing it specifically, but knowing my
20        practice, I'm certain that we did.
21   Q.   Okay. Were there any communications with
22        anyone in the RCAB insurance department
23        concerning the policy information that was
24        produced at the Meany deposition?
```

**Page 27**

```
 1             MR. DIEDERICH: Just broad
 2        communications? And we're still operating
 3        under this understanding --
 4             MR. ZELLE: I mean you put your
 5        understanding on the record. I don't think by
 6        answering these questions you're waiving
 7        anything. That's my personal view, but I'm
 8        not going to make a motion that it is.
 9   A.   No, no, we have a stipulation.
10             MR. ROGERS: We have an agreement
11        that by answering these, we will not be deemed
12        to waive any privilege that might exist,
13        right?
14             MR. ZELLE: Absolutely. I will
15        never argue. We have an agreement that your
16        response to these questions will never
17        constitute a waiver of any privilege that may
18        be asserted with respect to the content of any
19        documents that you're identifying.
20             THE WITNESS: Or communications.
21             MR. ZELLE: Or communications,
22        right.
23             MR. ROGERS: Say that again. You
24        will not --
```

**Page 28**

```
 1             MS. DIEDERICH: We've got a
 2        negative there.
 3             MR. ROGERS: You have a double
 4        negative.
 5             MR. DIEDERICH: We got confused.
 6             MR. ZELLE: We have an agreement
 7        that your response to these questions will
 8        never constitute a waiver of any privilege
 9        with respect to the content of any documents
10        that you're identifying or any communications.
11             MR. ROGERS: Okay. I thought you
12        said we don't have an agreement. We have an
13        agreement. That's fine.
14   A.   What's the question?
15   Q.   Do we have an agreement with respect to
16        waiver -- no.
17             THE WITNESS: Mary, ask him if he's
18        almost done. Will you?
19             MR. ZELLE: I think I probably am.
20        I don't remember.
21             (Reporter read back the last question.)
22   A.   That's different than what we've agreed to on
23        the stipulation. Did I have any
24        communications --
```

29

1  Q. Let me put it in these terms: Are there any
2     documents that reflect communications?
3  A. I can't think of any off the top of my head,
4     but I suspect there are given my practice of
5     reporting on depositions that I attend.
6  Q. Okay. Are there any documents that reflect
7     communications concerning the Coverage Part 7
8     form that was included in the materials that
9     were produced by Mr. Meany at his deposition?
10        MR. DIEDERICH: Limiting this to
11    documents again?
12        MR. ZELLE: I thought I said are
13    there any documents that reflect
14    communications concerning the Coverage Part 7
15    form.
16 A. There would have been nothing that specific,
17    no. It would have been included in general
18    terms that I would have sent over the policies
19    or partial policies that would have been
20    produced, but there would have been no
21    reference to that particular section.
22 Q. Are there any documents that reflect
23    communications or consideration by the Rogers
24    Law Firm of the terms or conditions of any

30

1     policy that was or may have been issued by
2     Lumbermen's to the RCAB?
3         MR. DIEDERICH: Reflect
4     consideration?
5  Q. Yes, that reflect communications or a
6     consideration by the Rogers Law Firm.
7         MR. DIEDERICH: I object to the
8     consideration part of that as getting into
9     work product.
10        MR. ZELLE: Again, you've got the
11    agreement with respect to waiver. You're not
12    waiving anything. It's just whether it was...
13 A. Mr. Diederich is here on behalf of the client.
14    I'm not going to answer with a work product
15    objection pending.
16 Q. I'm not asking for disclosure of any work
17    product. Just whether there are any documents
18    that reflect communications that you had with
19    the RCAB or your firm's consideration, which
20    may be work product -- maybe it isn't -- of
21    the terms or conditions of any policy that was
22    or may have been issued by Lumbermen's.
23 A. Well, there's certainly communication in
24    documents addressing the position that was

31

1     taken with respect to the original claims
2     presented in the early '90s that addressed
3     that issue.
4  Q. Okay.
5  A. Other than that, I mean addressing the
6     policies, we didn't have the policies until
7     2000, so the only thing we would be able to
8     address would be what we understood to be the
9     working terms -- working aggregates. Excuse
10    me. The aggregate balances.
11        And subsequent to when the policies were
12    provided, other than forwarding them on to the
13    client when they were originally secured and
14    following Paul Meany's deposition, yes, I
15    think there were written communications
16    thereafter in general terms speaking about
17    this issue that's in play.
18 Q. Okay. There are documents that were created
19    or maintained by the Rogers Firm that reflect
20    communications or consideration of the
21    buy-back of the exposure under the purported
22    1973 to 1977 excess policy?
23 A. I'm not sure I follow what you mean by
24    "consideration."

32

1  Q. That your firm's consideration of the issue or
2     consideration of an offer made by Lumbermen's
3     or your consideration of the fact that all we
4     have is a binder, that sort of thing.
5  A. Written communication, as I sit here, I
6     don't -- I can't think of any written
7     communication in that regard other than when
8     we finalized the terms and exchanged copies of
9     the proposed buy-back written agreement, if
10    you will.
11 Q. Did the Rogers Law Firm maintain any documents
12    that reflect the substance of the ongoing
13    negotiations it had with Lumbermen's in
14    connection with the buy-back of the '73 to '77
15    excess exposure?
16 A. I can't think of any.
17 Q. Are there documents that reflect
18    communications that the Rogers Firm had with
19    Frank Bennett, Christine Zinoman, Mary Kay
20    Reardon, Augie Vega, Pat Maloney or anyone
21    else acting on behalf of Kemper?
22 A. On any topic?
23 Q. Yes.
24 A. Yes, any such letter or internal memoranda on

**33**

1  those general topics like that would have been
2  provided to Ropes & Gray.
3  Q. And did the firm communicate in writing to the
4  RCAB the substance and developments resulting
5  from discussions with Mr. Bennett or
6  Ms. Zinoman or Ms. Reardon or anyone else
7  working on behalf of Kemper?
8  A. Depending upon the topic, yes. I mean there
9  were topics that warranted follow-up written
10 reports to the client regarding those
11 developments. Other topics, no. I put it in
12 this context also: Given the relationship of
13 the office -- my dad is general counsel --
14 there were daily communications verbally, but
15 yes, there are certainly internal memoranda
16 and correspondence regarding ongoing
17 discussions and developments on various topics
18 with Lumbermen's previous.
19 Q. Did the Rogers Firm prepare or maintain any
20 documents as a result of the analysis
21 undertaken by Goodwin & Procter that relate to
22 the specific policy language on which the
23 Goodwin firm relied for its conclusion that
24 the policy's aggregate limits do not apply to

**34**

1  sexual molestation claims?
2      THE WITNESS: Could you read that
3  back?
4      (Reporter read back the last question.)
5  A. There was certain work product generated by
6  Goodwin Procter shared with us.
7  Q. Right.
8  A. You asked if maintained.
9  Q. Maintained. I appreciate that. Did the Rogers
10 Firm prepare any documentation itself on that
11 issue after receiving the Goodwin analysis?
12 A. There may be reference drawn to that
13 conclusion by Goodwin Procter, but no separate
14 analysis.
15 Q. There may be documentation that refers to the
16 analysis?
17 A. As -- possibly.
18 Q. Are there any documents that were prepared or
19 maintained -- no, let's just -- strike that.
20 Were there any documents that were prepared by
21 the Rogers Firm that reflect an analysis of
22 the Claimants' or Plaintiffs' evidence of
23 negligent supervision on behalf of the RCAB?
24 A. What you do you mean by "Plaintiffs'

**35**

1  evidence"?
2  Q. Maybe "evidence" is too narrow. The evidence
3  or the arguments that would be made or that
4  you anticipated would be made by the
5  Plaintiffs or Claimants to support their
6  allegations that it was not simply the
7  perpetrator but the RCAB that could be held
8  liable based on the claim of negligent
9  supervision.
10 A. Yes.
11     MR. DIEDERICH: Wait. Do you mean
12 with specific specificity to an individual
13 claimant or claimants in general?
14     MR. ZELLE: I didn't narrow it
15 either way.
16     MR. DIEDERICH: Jumped a little too
17 fast. I object to the question. I think it
18 calls for work product, but with the agreement
19 we had going forward, that's fine. Let's just
20 move on.
21     MR. ZELLE: Let me just take a
22 second here.
23     MR. ROGERS: Yes.
24     MR. ZELLE: I think I've covered

**36**

1  what I need to.
2  Q. Did the RCAB create or maintain any documents
3  that relate to the -- what we've referred to
4  as the global settlement -- it's specifically
5  titled the Settlement and Arbitration
6  Agreement -- which was finalized in October of
7  2003?
8      MR. ROGERS: Objection. You said
9  did RCAB.
10     MR. ZELLE: I'm sorry. Let me
11 rephrase the question.
12     MR. DIEDERICH: Yes, join.
13 Q. Did the Rogers Firm create or maintain any
14 documents that relate to what we've referred
15 to as the global settlement and what is
16 specifically titled the Settlement and
17 Arbitration Agreement, which became final in
18 October 2003?
19 A. The Rogers Law Firm did not create. We
20 maintain copies of the memoranda of
21 understanding, the settlement agreement, and a
22 settlement chart.
23 Q. Okay. And let me make a proviso here that I'm
24 going to ask you this question, even though I

**37**

1  don't think it's within Phase 1. It'll
2  perhaps expedite -- and I won't have to ask
3  you --
4      MR. DIEDERICH: I object in
5  advance.
6      MR. ROGERS: Do you think anybody
7  will object?
8  Q. I won't have to ask you this question
9  subsequently. I won't have to have you back.
10 A. So if I answer this, I'm excused from Phase 2?
11 Q. Well, let's just say it's one more arrow in
12 your quiver. Did the Rogers Firm create or
13 maintain documents that reflect its
14 investigation of the sexual abuse claims
15 against the RCAB?
16 A. Yes.
17 Q. Did the Rogers Firm create or maintain
18 documents that reflect the involvement of
19 Lumbermen's in the investigation of those
20 claims?
21 A. I don't know what you mean by that.
22 Q. Insofar as Lumbermen's Mutual Casualty Company
23 was involved in sharing information that the
24 Rogers Firm obtained relating to specific

**38**

1  claims and the investigation of those specific
2  claims --
3  A. Are you asking did we share information with
4  Lumbermen's?
5  Q. Well, I'm asking if documents that reflect
6  that sharing of information were created or
7  maintained.
8  A. Yes.
9  Q. Did the Rogers Firm create or maintain
10 documentations that reflect its analysis or
11 assessment of Lumbermen's response to claims,
12 whether those response were denials,
13 reservations of rights, agreements to
14 participate or indemnify?
15     MR. DIEDERICH: Object to form.
16 A. Did we maintain an analysis of Lumbermen's
17 position?
18 Q. No. Did you maintain documents that reflect
19 your firm's analysis of Lumbermen's position?
20 A. On claim settlement?
21 Q. No, not claims settlements.
22 A. On claims?
23 Q. On coverage issues.
24 A. On coverage issues.

**39**

1  Q. Either denial, reservation of rights.
2  A. Yes.
3  Q. And you anticipated my next question. With
4  respect to individual claims, did you create
5  or maintain documents that reflect the firm's
6  assessment or criticism or objection to
7  positions that Lumbermen's took?
8  A. Yes, I can think of a couple.
9      MR. ZELLE: All right. I think
10 that's all I have. Obviously, I'm going to
11 reserve the right to ask you for the substance
12 of those documents and examine you on the
13 substance of those documents if, in fact, we
14 prevail on our motion to compel.
15     (Deposition adjourned at 1:31 p.m.)

**40**

                C E R T I F I C A T E

    I, WILSON D. ROGERS, III, do hereby certify
that I have read the foregoing transcript of
my testimony, given on August 24, 2004, and I
further certify that said transcript is a true
and accurate record of said testimony (with
the exception of the corrections listed
below):

Page        Line         Correction
_____
_____
_____
_____
_____
_____
_____

Dated at _____, this
_____ day of _____, 2004.

                _____
                WILSON D. ROGERS, III
SIGNED UNDER THE PAINS AND PENALTIES OF
PERJURY

slb

```
                        CERTIFICATE                    41

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS
        I, Sandra L. Bray, Registered Merit
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby
certify:
        That WILSON D. ROGERS, III, the witness
whose deposition is hereinbefore set forth,
was duly sworn by me and that such deposition
is a true record of my stenotype notes taken
in the foregoing matter, to the best of my
knowledge, skill and ability.
        IN WITNESS WHEREOF, I have hereunto set
my hand this 30th day of August, 2004.


                _____
                Sandra L. Bray, RMR
                Registered Merit Reporter
```