**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE, <br><br> Plaintiff, <br><br> v. <br><br> LUMBERMENS MUTUAL CASUALTY COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 04-10461-DPW |

**THE RCAB's MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

This Memorandum is filed by the plaintiff, the Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB"), in support of its Motion for Partial Summary Judgment against the defendant Lumbermens Mutual Casualty Company ("Lumbermens" or "LMC"). In the Motion, the RCAB seeks adjudication of certain critical issues in this action, including the scope of insurance coverage issued to it by LMC.

LMC sold Comprehensive General Liability ("CGL") insurance to the RCAB from at least March 31, 1961 through March 31, 1983. For that entire period, one set of CGL policies issued by LMC covered the RCAB and its affiliated institutions while a second set of primary policies covering the RCAB and its parishes was in place from September 23, 1971 through March 31, 1983. In addition, LMC sold to the RCAB umbrella or excess coverage for the period September 1973 through March 1983. There were never any applicable aggregate limits in any of the policies -- primary or excess -- despite of the continuous false assertions of LMC to the contrary. While discovery has revealed that LMC now concedes (internally) that the policies

themselves contain no such limits, LMC nonetheless desperately pleads that an unwritten "agreement" was reached between the parties that superseded the actual terms and conditions of the policies and capped the coverage on an annual basis. In fact, no such agreement ever was reached, and LMC cannot contend otherwise in good faith. The RCAB, which could not find any of its own copies of the policies, simply accepted its insurer's representations as to coverage, and took payments in accordance with the fictitious aggregate limits dictated to it by LMC.

After an initial period of disclaiming all coverage for sexual abuse claims, LMC began in 1995 to pay all claims that arose out of acts of abuse during the period 1964 through 1983 -- the years during which it acknowledged having insured the RCAB. However, because of its indefensible, unilateral assertion of aggregate ceilings of $300,000 per year on its primary policies, LMC informed the RCAB that those primary policies were steadily being eroded by the payments. In fact, in July 1998, LMC informed the RCAB that all primary policies issued by it prior to 1977 had been exhausted. Consequently, LMC asserted that its only remaining exposure was under the primary and excess policies for the years 1977-1983, and directed the RCAB to refrain from submitting any more claims for prior years. Subsequently, LMC advised the RCAB that all primary policies were exhausted (including for the years 1977-1983) and that the only remaining coverage was under excess policies for 1977-1983.

Last year, outside counsel for the RCAB analyzed copies of policies that had been provided by LMC in a deposition and discovered that there were no applicable aggregates at all. Accordingly, the RCAB confronted LMC with the absence of aggregate limits in the policies in early 2003. With LMC now facing a large exposure that it thought it had avoided, its outside Chicago counsel concocted the notion of an "agreement" supposedly limiting coverage to

$300,000 per policy year -- an agreement bereft of evidentiary support and belied by every other witness in the case, both for LMC and the RCAB.

Because LMC had disclaimed coverage for any abuse and negligent supervision claims prior to 1977, based upon its fictitious contention that its policies were exhausted or non-existent, it cannot now contend that the RCAB's defense and handling of such claims was inappropriate.

By this Motion, the RCAB seeks a judgment of the Court that LMC issued general liability policies to the RCAB from 1961–1983; that those policies contained no aggregate limits that are applicable to the claims at issue; and that LMC, by virtue of its wrongful disclaimers and rejection of claims arising out of pre-1977 conduct, cannot now challenge the RCAB's defense and handling of such claims.

## STATEMENT OF FACTS

### I.    THE RCAB PURCHASED LIABILITY INSURANCE COVERAGE FROM LUMBERMENS.

The RCAB long has owned general liability insurance to protect it against risk in its operations.  In the 1950s, the RCAB placed what was then known as "public liability insurance" (as well as other forms of coverage, including boiler and workman's compensation) through a Boston broker, Kaler, Carney, Liffler & Co. ("Kaler").[1]  (*See* McEnness dep. 15:2–16:10.)[2]  In

---

[1] Prior to the term "general liability" gaining general acceptance, "public liability" was a term used to describe liability insurance.  *See* McEnness Dep. 27:8–11; Gerald R. Singer, *Shifting Risk of Accidental Loss in Business Contracts* in LEGAL PROBLEMS OF MUSEUM ADMINISTRATION (1998).  Like general liability insurance, public liability insurance is "[a] general term applied to forms of third party liability insurance with respect to both bodily injury and property damage liability."  GLOSSARY OF INSURANCE TERMS 162 (1982).

[2] All citations are to material contained in the volumes appended to the Transmittal Affidavit of Bryan R. Diederich.  Deposition Materials appear in the volume labeled deposition materials.  Each deponent is indicated by a tab in the volume.  Behind each tab are deposition excerpts followed by, in some cases, deposition exhibits.  References to deposition transcripts are to the name of a deponent followed by a line and page citation.  Reference to deposition exhibits are to the name of a deponent followed by an exhibit number, as in "(McEnness Ex. __.)."  Materials not from depositions are attached as exhibits to the Transmittal Affidavit and are indicated by the convention "(Diederich Aff. Ex.__.)".

1954, the RCAB undertook a review of its insurance program (*see* Diederich Aff. Ex. 10.), which led to the cancellation of its insurance placed through Kaler (*see* Diederich Aff. Ex. 11.), and the establishment of a new approach to insurance. As a result, in March 1955, the RCAB accepted competing bids from several insurers, including Lumbermens. (*See* Diederich Aff. Ex. 13.) With respect to public liability insurance, in a document contemporaneous with this review process, the author noted that public liability insurance would be "[o]f no value if the [insurance] company insists on using the charitable defense" and that "Lumberman's [*sic*] will write this and waive the defense . . ." (*See* Diederich Aff. Ex. 12.)

While the RCAB most assuredly purchased liability coverage from LMC in 1955, we do not at this time seek judgment that such coverage was in place that early, because the evidence of the amount of coverage before 1961 cannot be said to be undisputed. The same is not true, however, for the period that followed. Accordingly, the RCAB now seeks an adjudication that coverage was in place with LMC from 1961 until 1983 on the terms and conditions explained below.

A.   **Lumbermens Provided Liability Insurance to the Archdiocese from 1961 to 1983.**

Lumbermens' own records reveal that the RCAB had in place a general liability insurance policy in effect from March 31, 1964 through March 31, 1967. (*See* Reardon Ex. 5.)[3] Indeed, in a letter from LMC's claims person, Christine Zinoman, to the RCAB dated July 30, 1996, LMC confirmed such coverage. (*See* Reardon Ex. 7.) The policy bore the basic number LL 64263A, as is reflected in a spreadsheet of Ms. Zinonman's successor Paul Meany. (*See* Reardon Ex. 10). Before the basic number was prefix that reflected the year in question.

---

[3] In fact, such coverage continued until March 31, 1983, as will be shown.

Accordingly, as reflected in the Meany spreadsheet, for 1964, the number began 4LL, for 1965, it commenced with 5LL and so on. (*See* Meany dep. 73:7-25; Reardon dep. 146:8–16.)

It is also clear, however, that the RCAB in fact had acquired general liability insurance through LMC that predated 1964. First, documents recovered from the RCAB's archives reflect that the policy numbered 4LL 64263 for the years 1964-1967 actually was a *renewal* policy, and that there also was a policy numbered 2LL 64263 (the prefix "2" referring to 1962). (*See* Diederich Aff. Ex. 21.) Second, a document dated April 15, 1964 indicates with regard to "General Liability & Hospital Liability" that "[t]his coverage was formerly written 3/31/61 – 3/31/64." (Diederich Aff. Ex. 15.)

Even more telling, however, are the events surrounding a claims against the RCAB for an injury that occurred on March 10, 1963. That date preceded the primary policy's anniversary date of March 31, and, therefore, would have been covered under the policy year beginning March 31, 1962. On May 18, 1964, John J. Gartland, then General Counsel to the RCAB, wrote as follows to LMC:

> The Chancery Office of the Archdiocese forwarded to me the enclosed Writ and Summons in connection with the above entitled matter . . . . It is my understanding that this action arises out of an alleged accident which purportedly occurred at the Donnelly Memorial Theatre on *March 10, 1963*. It is my further understanding that preliminary negotiations for settlement were carried on by counsel for the plaintiff and with one Simpson of your company.

(Diederich Aff. Ex. 16 (emphasis added).)[4]

This letter was followed by a letter of May 29, 1964 from (Rt. Rev.) Thomas J. Finnegan, Jr., Vice-Chancellor, to LMC, attention of Mr. Edward P. Ryan, Legal Department. In his letter, Fr. Finnegan wrote concerning the accident:

---

[4] The Donnelly Theatre was owned by the RCAB at the time. (Diederich Aff. Ex. 70.)

> I have discussed the question of applying the charitable immunity in this case with our attorney.  He has advised me to authorize the use of this defense because of the ad damnum of $150,000 *as based on our coverage of $100,000*.

 (Diederich Aff. Ex. 17 (emphasis added).)  Mr. Ryan responded on June 2, 1964 to Mr.

Gartland:

> Thank you for your letter of June 1, 1964.  We will keep you advised of developments as they occur.

(Diederich Aff Ex. 19.)

Further correspondence about the claim ensued, including a letter from Roland Segalini of LMC to the RCAB on June 3, 1964.  In his letter, Mr. Segalini said, among other things:

> The amount of damages demanded makes it possible to award the plaintiff a sum in excess of the insurance *under our policy*, and because of this you are at liberty, if you consider it necessary to associate your own counsel with ours in defending the above litigation.  This, of course, would have to be done at your own expense.

(Diederich Aff. Ex. 19 (emphasis added).)  It is crystal clear from the forgoing that liability

insurance was provided by LMC to the RCAB for the three-year period from 1961 to 1964 in the

amount of at least $100,000.

Like most other American insurance companies, Lumbermens wrote insurance on forms

developed originally by the National Bureau of Casualty and Surety Underwriters and the

Mutual Casualty Insurance Rating Bureau.  (*See* Connolly Aff. ¶¶16, 17).  In the early 1960s, the

standard general liability policy utilized a form promulgated in 1955, which provided

specifically for three-year policy periods:

> A policy period of three years is comprised of three consecutive annual periods.  Computation and adjustment of earned premium shall be made at the end of the each annual period.  Aggregate limits of liability as stated in this policy shall apply separately to each annual period.

(*See* Connolly Aff. Ex. A.)  Lumbermens undoubtedly wrote three year period insurance policies, a practice that continued throughout the life of the Lumbermens relationship.  (*See* Diederich Aff. Exs.  1, 2, 3, 4, 5, 6.)  The primary policies ultimately produced by LMC are all for three years.  (*See id.*)  This fact is further evidence that a comprehensive general liability policy was in place for the years 1961–1964.  (Diederich Aff. Ex. 15.)

LMC specifically and without debate has acknowledged coverage from 1964 onwards.  It has produced hard copies of the primary policies for the periods March 1974–March 1977 (which bears the annotation that it is a "renewal"), March 1977–March 1980, and March 1980–March 1983.  (Diederich Aff. Exs. 1, 2, 3, 4, 5, 6; *See* Zinoman dep. 14:21–15:7; Powers dep. 36:21–37:13.)

In September 1971, the RCAB obtained a second primacy CGL policy with a September inception date -- also acknowledged by LMC.  This policy was first obtained when the Massachusetts partially abrogated charitable immunity.  (*See* Diederich Aff. Ex. 20.) Lumbermens was able to conclude that the September policy extended back to 1971 based on the fact that 1974 policy was a renewal of a policy numbered 1YL 64 706.  (*See* Diederich Aff. Ex. 68; Reardon Dep. 146:1–148:8; Bennett Dep. 76:2-14).  The RCAB maintained these two sets of comprehensive general liability policies until March 31, 1983.  (*See* Diederich Aff. Ex. 40.)

The LMC employee (Paul Meany) charged with overseeing the RCAB's claims from 1996 until 2002 created and maintained a schedule reflecting the policies acknowledged by LMC.  (Reardon Ex. 10; Meany dep. 74:6–25; Reardon dep. 354:20–355:11.)  That schedule demonstrates beyond peradventure that LMC issued March primary CGL policies to the RCAB from 1964-1983 and September primary policies from 1971-1983.  The document alone suffices

to establish that primary policies were issued for those years. All the Court need do at this time, therefore, is add the coverage for the March policy for the period from 1961 to 1964.

### B.    Excess Coverage

While LMC has agreed that it issued excess coverage to the RCAB from 1977 to 1983, in addition to the primary policies, it steadfastly has refused to acknowledge that such a policy in fact dated back to 1973. Its familiar obstinacy again is contradicted by the facts. There is no doubt that LMC first wrote excess coverage for the RCAB in 1973.

Initially, the RCAB unearthed a 1973 binder, which LMC rejected as proof that it had provided excess coverage to the RCAB. (*See* Meany Ex. 10.) But now, evidence developed during discovery demonstrates that an excess policy was undeniably in place during the disputed years of 1973 to 1977. First, a report of June 28, 1974 from the RCAB's Insurance Department to the Insurance Review Committee reflects that, by June 1974, the RCAB had acquired a $5 million excess (umbrella) liability policy. (*See* Connolly Affidavit Ex. J.)

Second, in 1973, the RCAB actually began billing parishes for their share of the excess liability coverage premium, citing policy number SX002269, with a prefix "3" for 1973, "4" for 1974, etc.. (*See, e.g.,* Diederich Aff. Exs. 36, 37, 38, 39; *see also* Reardon Dep. 355:12–356:24 (describing Lumbermens numbering system for excess policies).) Although LMC concedes that it issued umbrella policies bearing that number for the years 1977-1983, its claims personnel testified that the same number on the invoices for the years 1973-1977 might be pure coincidence and that some other company might have issued the coverage. (*See* Meany dep. 88:24–90:19; Vega dep. 105:23–106:3.) This preposterous explanation is belied not only by logic, but also by the fact that LMC actually paid a claim in 1982 from the 1974 umbrella. (Powers Ex. 1 at 6; Powers dep. 68:16–23.) The RCAB maintained this "Umbrella" insurance

policy with LMC until 1983 in varying amounts and conditions.  (*See, e.g.,* Reardon Ex. 10.; Reardon Ex. 12.)

      **C.**     **The Terms of the RCAB's Insurance Policies.**

     Lumbermens wrote general liability insurance policies on standard forms used throughout the industry.  (*See* Connolly Aff. ¶ 17; Vega dep. 33:3–15; Reardon dep. 93:3–12.)  For the policies that the RCAB held between 1961 and 1966, the standard governing form was the 1955 form produced by the National Bureau of Casualty and Surety Underwriters and the Mutual Casualty Insurance Rating Bureau.  (Connolly, Aff. ¶ 18.)  The 1955 policy provided that the insurance company (here, Lumbermens) agreed

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . sustained by any person and caused by accident.

(Connolly Aff. Ex. A.)  The limits of liability in the 1955 standard policy form are thus on a "per accident" basis.  (*Id.*)  The 1955 standard policy, however, prescribes aggregate limits *only* for products liability and for property liability.  (*Id.*)  It does not include aggregate limits for bodily injury *not* caused by products liability.  (*Id.*)  Consequently, the only relevant limitation was the per accident limit, without any annual ceiling.

     In 1966, the standard policy was replaced by a revised form.  (*See* Connolly Aff. ¶ B.) The revised form provided that

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A.  bodily injury . . .
>
> to which this insurance applies, caused by an occurrence . . .

(Connolly Aff. Ex. B).  This is the form that LMC used during the years 1966 through 1973, when it switched to the form shown in Ex. C.  In a memo to Morrison, Mahoney & Miller in

1994 or 1995, Ms. Zinoman attached the standard policy jacket and wrote: "1966 Policy Jacket Would be applicable if we concede cov'g for 9/23/71–9/23/74 and 3/31/71–3/31/74." (Diederich Aff. Ex. 65.)[5]

Like the 1955 standard form, the 1966 standard form provided limits of liability. For "bodily injury" claims, the limits were on a "per occurrence" basis, except for *products liability* or *completed operations* liability. In those latter cases, the 1966 standard form policy provided that

> . . . the total liability of the company for all damages because of (1) all bodily injury include within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate."[6]

(Connolly Aff. Ex. B.)  Again, no aggregates that were relevant to the sexual molestation and negligent supervision claims brought against the RCAB are included.

In 1973, the standard forms were changed once again.  (Connolly Aff. ¶16).  The new form, however, is virtually identical in content to the 1966 form regarding coverage for bodily injury and limits applicable thereto.  Like the 1966 standard form, the 1973 standard form provides that

> This company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A.  bodily injury . . .
>
> to which this insurance applies, caused by an occurrence . . . .

---

[5] This memo and the attached 1966 Policy Jacket were just produced to the RCAB by Morrison Mahoney & Miller.  (*See* Diederich Aff. Ex. 58.)
[6] Neither "completed operations" nor "products hazard"—terms defined in the policies—is at issue here.

(Connolly Aff. Ex. C).  Like the 1966 standard form, the 1973 standard form limits liability for bodily injury arising out of either "completed operations" or "product liability" to an aggregate amount, but provides no such aggregate limit for bodily injury arising out of other hazards.  The policies obtained from Lumbermens which name the RCAB are both written on standard forms which contain the same provisions regarding bodily injury and aggregate limits as the 1973 standard form.  (*See* Diederich Aff. Exs. 1, 2, 3, 4, 5, 6. )

Lumbermens, not surprisingly, and in keeping with industry practices, also placed excess coverage on the basis of standard forms.  (*See* Bennett dep. 81:9-14).  As with its primary policies, Lumbermens' excess policies provided coverage for bodily injury with aggregates applicable only to bodily injury arising out of products liability, completed operations or occupational disease of employees.

The Lumbermens primary CGL policies purchased by the RCAB did, of course, contain limits.  Commencing in 1964, each primary policy contained an occurrence limit of $300,000, as reflected in a memo of October 20, 1997 from Paul Meany to Mary Kay Reardon (Reardon Ex. 14) and, of course, as reflected in the policies themselves.  (*See* Diederich Aff. Ex. 14.)

By this Motion, RCAB seeks judgment that the coverage from LMC for the period 1961–1964 was at least $100,000 per accident, while for the period 1964–1983, each primary policy provided coverage of $300,000 per occurrence.  No aggregate limitations apply to any of the coverage.  In addition, the RCAB seeks judgment that its excess coverage from LMC was $5 million per occurrence for the years 1973–1980, when it doubled to $10 million per occurrence for 1980-1982.  (*See* Meany Dep. 104:14–105:10; Reardon Ex. 10; Reardon Ex. 11; Reardon Ex. 17.)  In 1983, the final year of Lumbermen's coverage of the RCAB, its umbrella coverage was

$2 million per occurrence.  (Reardon Ex. 11; Reardon Ex. 17.)  Again, no aggregate limitations apply to any of this coverage.[7]

## II.    LUMBERMENS TRIES TO EVADE ITS OBLIGATIONS

In 1992 or 1993, the RCAB began to receive claims relating to sexual abuse of minors by clergy members.  (*See* Rogers, Jr. Dep. 32:14–33:6; McEnnes Dep. 62:9–14; Reardon Ex. 12). The RCAB informed Lumbermens of these claims as they came in, explaining that, because they alleged negligent supervision by RCAB hierarchy over the allegedly molesting clergy, Lumbermens policies must respond to the claims.  (*See, e.g.*, Diederich Aff. Ex. 46; Reardon Ex. 12.)

### A.    The Syracuse Guidelines:  Lumbermens Begins Its Pattern of Evasion

In 1993, Mike Romano, an employee at Lumbermens Division Claim office in Syracuse, New York, developed a strategy to respond to incoming claims from the RCAB.  All of the claims were to be denied by LMC on one of two erroneous theories:  Lumbermens would assert either that it could not establish that there was an applicable policy, or that there was no "occurrence" of "bodily injury" within the meaning of the policies.  (*See* Diederich Aff. Ex. 45; Reardon Ex. 11.)  This practice continued for the next two years, in spite of the fact that counsel for the Archdiocese protested Lumbermen's repeated disclaimers of coverage.  (*See* Reardon Ex. 11.)  LMC wrote numerous letters to the RCAB rejecting claims on one or both theories.

Indeed, the practice persisted, even though certain employees even within Lumbermens believed that the coverage was being applied incorrectly.  In 1994, for example, a Division Claims examiner wrote to Benjamin Bennett -- the top claims handler in the Summit Division -- regarding one such claim:

---

[7] The existence of the excess policies for the years 1973-1977 was disputed by LMC, as noted, and a "buy-back" occurred in the year 2002.  We do not now address the validity of that buy-back.  We reserve that issue for further proceedings.

> In this case agency is alleged in pp 4 and physical injury in 9, 12 &
> 15. In my opinion this triggers duty to defend this case. In
> discussion with Dick Quinn he agrees with the technicality of that
> analysis but past procedures have been to disclaim on several
> claims against priest and the archdiocese *without considering the*
> *exact words in the complaint language* based on Mike Romano's
> 9/23/93 bulletin.

(Reardon Ex. 20 (emphasis added).) The claims handler was pointing out that LMC's practice

violated hornbook law.

What is more, LMC repeatedly denied the very existence of insurance policies prior to

1971. (*See* Diederich Aff. Ex. 45.) In fact, Lumbermens initially stated that it would not pay

any claim dated prior to 1971 until the RCAB produced "proof" of coverage prior to that date.

(*See* Diederich Aff. Ex. 41.) Consequently, Steve Pickup, a claims handler for Lumbermens,

wrote to Paul Fallon, the RCAB's claims manager, in April 1993, asking him to "forward any

proof of insurance with this company prior to 9/23/1971 . . . . [w]e need policy numbers and

effective dates covering the period of 1954–9/23/71." (Diederich Aff. Ex. 42.) Mr. Fallon wrote

back that the RCAB was looking for proof of coverage and would pass on what information it

could. (Diederich Aff. Ex. 43.)

It was clear to Lumbermens at this point that the RCAB did not have copies of its

insurance policies. In fact, between 1993 and 1995, the RCAB asked Lumbermens to provide it

with copies of its policies. As Wilson D. Rogers, Jr. testified:

> Well, we certainly asked for copies of RCAB policies.
> Lumbermens' position was that they could not find any, and that
> was the position that was maintained until a deposition of Paul
> Meany sometime in 2000. That was the first time anyone from
> RCAB was aware that Lumbermens had located any policies or
> parts thereof for the RCAB.

(Rogers, Jr. Dep. 43:14–20.)

Even though Lumbermens did not acknowledge it until over five years later, it turns out that it did, in fact, have copies of some of the RCAB's policies. At least by 1994, if not before, Lumbermens had discovered a "box of policies and certificates of insurance regarding the Roman Catholic Archdiocese account." (Reardon Ex. 14). The policies were never shared with the RCAB until their production was compelled by subpoena.

### B. Lumbermens Abandons the Syracuse Guidelines and Manufactures "Aggregates" Applicable to Sexual Misconduct Cases.

In 1994, the Syracuse Division was closed, and the Summit, New Jersey Division of LMC began to oversee the administration of RCAB claims. (*See* Reardon dep. 25:18–26:13; Bennett dep. 27:72-28:4). The claims handling was assigned to Christine Zinoman, a Division Examiner in Lumbermens' Summit, New Jersey Division Office. (*See* Reardon dep. 26:1–13; Zinoman dep. 8:13–20, 13:8–14:2). In response to one of the claims, Ms. Zinoman sought a legal opinion from the Boston law firm Morrison, Mahoney & Miller. (*See* Zinoman dep. 26:6–27:7). Ms. Zinoman received a response from Morrison on July 26, 1994, opining that the damages alleged in that particular case constituted "bodily injury" under Lumbermens insurance policies and that Lumbermens consequently had a duty to defend and indemnify the RCAB. (*See* Reardon Ex. 38).

Although not asked to opine on "aggregates", the Morrison partner did analyze the meaning of "occurrence", and the issue of "Single v. Multiple Occurrences". (Zinoman Ex. 38 at 11–12). He wrote:

> In this regard, we note that the Section III. Limits of Liability provides that "[t]he limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any occurrence. Accordingly, *because these limits are not subject to a policy aggregate*, we can expect that Attorney Bergstresser will seek to trigger multiple limits under the policy.

(*Id*. at 12 (emphasis added).)

Ms. Zinoman, though a layperson, disagreed, and wrote in the margin: "There is an aggregate. CZ." (*Id.*). Some seven months later, she requested a follow-up opinion from Morrison, this time asking whether sexual molestation cases in which Lumbermens had disclaimed coverage to the RCAB should have been defended. (*See* Diederich Aff. Ex. 68.) In response, Morrison said that Lumbermens had breached its duty to defend the RCAB. (*See* Reardon Ex. 42). Zinoman then wrote to the Home Office and recommended that it reimburse the RCAB for some of the cases already settled and that it begin to defend and indemnify the RCAB on a going forward basis. (*See* Reardon Ex. 12.)

Ms. Zinoman also wrote to Morrison, Mahoney & Miller the following on February 15, 1995:

> For those cases within our confirmed policy periods, has there been an "occurrence" as defined in our policy? If so, will these cases trigger 1 or multiple "occurrences" within our policies? *Please note, there is an aggregate limit for each policy period.* (Under the . . . opinion, it appears that the "occurrence" date will be the date of the first alleged molestation. Is this still true with regards to these additional cases?)

(Reardon Ex. 42 at 1 (emphasis added).) Without analysis, Morrison responded: "In this regard, we acknowledge that each policy is subject to a $300,000 aggregate." (*Id.* at 2.) Even Ms. Reardon could not characterize this exchange as a legal opinion on anything. It was only an *ipse dixit* from Ms. Zinoman. (*See* Reardon dep. 658:22–659:15.)

Ms. Zinoman and her supervisor, Frank Bennett, met with Paul Fallon and Wilson D. Rogers, Jr. in Boston in June 1995. Mr. Bennett and Ms. Zinoman informed the RCAB that LMC now agreed that there was coverage for certain prior claims and that reimbursement would be forthcoming. (*See* Bennett Dep. 38:1-39:17; Zinoman dep. 152:14–153:5; Bennett Ex. 5; Diederich Aff. Ex. 47.) At no point during this meeting, however, was there any discussion

regarding the possibility that aggregate limits would be applied by LMC to the RCAB's claims. (*See* Bennett dep. 85:10-12; Zinoman dep. 81:13–18.)

In fact, without ever discussing the issue of aggregates with anyone at the RCAB, Ms. Zinoman simply began to assert that, as Lumbermens reimbursed the RCAB for claims settlements, aggregate limits on the insurance policies were being eroded. (*See* Zinoman dep. 81:23–82:12.) These pronouncements, which began almost as soon as Lumbermens began paying claims,[8] were based solely on Ms. Zinoman's superficial reading of the declarations page of the RCAB policies that Lumbermens possessed. While that page contains a reference to an aggregate of $300,000, directly above the entry about aggregates appears the statement that "[t]he limit of the company's liability against each Coverage shall be as stated here, *subject to all the terms of the policy having reference thereto*." (Diederich Aff. Exs. 1-6). Had Ms. Zinoman only read the governing language in the policy ("III Limits of Liability; Coverage A") she would have seen that "aggregates" had no bearing on the claims in question. In fact, any claims executive of an insurance company most assuredly would have understood that the reference to aggregates on the declarations page was irrelevant to the claims of the RCAB.

Nevertheless, relying solely on her construction of the declarations page, Ms. Zinoman began tracking the depletion of the RCAB's supposed aggregate limits of coverage. (*See* Zinoman Ex. 15; Zinoman dep. 104:13–23.) No one at the RCAB was able to contradict her, not having any policies, and no one with LMC questioned her conclusion, obviously delighted with her limitation of liability for LMC's benefit, until 2003, when confronted by the RCAB with the truth about the policies. (*See* Meany dep. 51:21-52:7.)

---

[8] *See, e.g.*, Zinoman Ex. 18.

### C.  Lumbermens Concedes the Existence of Coverage Back to 1964, But Continues Falsely to Assert the Existence of Aggregates.

In January 1996, Lumbermens began to reimburse the RCAB for claims it had settled for conduct arising post-1971, with Ms. Zinoman and later Mr. Meany routinely deducting each payment from a fictitious cap.  In due course, however, it became clear to Lumbermens that it had insured the RCAB for far longer than it had initially conceded.  As Ms. Zinoman wrote in the summer of 1995:  "We have had a strong suspicion all along that our coverage went back further than 1971."  (Reardon Ex. 25.)  And indeed, that was the case, as by the summer of 1996, she wrote to Wilson D. Rogers, III acknowledging policies dating back to 1964 and setting forth the purported aggregate limits on those policies.  (*See* Reardon Ex. 7.)

On January 1, 1997, Ms. Zinoman was transferred and Paul Meany took over the RCAB account.  (*See* Meany dep. 42:22–43:14.)  Ms. Zinoman told Mr. Meany that there were annual aggregates within the RCAB policies that applied to the RCAB.  (*Id.* 44:8–45:16.)  Incredibly, Mr. Meany simply took Ms. Zinoman's word for it, and never independently attempted to confirm the existence of applicable aggregate limits.  (*Id.*)  He testified that he never so much as read the policies, although they sat in his office for the next five years.  (*See* Meany dep. 66:2–68:8.)

In 1998 Lumbermens began to reject claims on the ground that the apocryphal aggregate limits for all policies prior to 1977 had been exhausted.  (*See* Diederich Aff. Ex. 50.)  In January 1999, Lumbermens went so far as to direct the RCAB not to send it any further information about pre-1977 claims.  (*See* Reardon Ex. 26.)  By 2000, LMC was asserting that *all* primary coverage (1964–1983) had been exhausted, (s*ee* Diederich Aff Ex. 64), and that the RCAB was thereafter left to its own devices not only to resolve claims predating 1977, but to defend them as well.

**D.    The Alleged "Agreement" Regarding Aggregates**

In early 2003, the RCAB learned from its bankruptcy lawyers at Goodwin Procter LLP that the CGL policies contained no aggregates that bore on the claims for sexual misconduct and negligent supervision. Representative of the RCAB and lawyers from Goodwin went to Chicago to confront LMC and its counsel. The latter asked for time. A month later, they came to Boston and, while acknowledging at long last that there were no applicable aggregates in the primary policies, they suggested that one be imposed by agreement. The RCAB rejected the suggestion out of hand. (*See* Reardon Ex. 29; Rogers III dep. 84:5–86:24; Rogers, Jr. dep. 179:6–180:5.)

There is no evidence to support the fatuous proposition that the RCAB entered into an agreement that "superseded" (*see* Maloney dep. 82:7–83:7) the actual policies and that it, thirty years after the fact, agreed retroactively to revise the policies downward to limit radically its coverage. No such written "agreement" exists, and every witness denies participating in or having knowledge of any such oral agreement. (*See* Zinoman dep. 57:19–58:17; Bennett dep. 63:9–64:1; Meany dep. 39:6–11; Vega dep. 92:19–23; Rogers, III dep. 118:2–24.)[9]

Ms. Reardon wrote an extensive memo in July 2003, acknowledging that no aggregates can be found in the policies, but stating that "[o]ur attorneys feels that we can argue estoppel by representation . . . ." This memo was produced by LMC after Ms. Reardon's 30(b)(6) deposition. The counsel in question is Patrick Maloney.[10]

Mr. Maloney alone contends that an "agreement" was reached to impose aggregates where none exist in the policies. But by his own admission, his "evidence" is predicated on his

---

[9] In fact, Ms. Zinoman and Mr. Meany actually argued at their depositions that the policies do contain "aggregates" -- a proposition obviously at odds with the notion of a superseding agreement to add them. (*See* Zinoman dep. 43:20–23; Meany dep. 47:23–48:11.)

[10] The Reardon memo was provided by LMC *after* her 30(b)(6) deposition.

review of bits and pieces of correspondence in the file, all of which, of course, in turn is predicated on LMC's assertion to an unsuspecting RCAB that aggregates not only existed, but had been exhausted.  The Maloney analysis is noting more than argument.  It is not evidence of an agreement.  No such evidence exists.

### E.    The RCAB Settles an Additional 552 Claims.

Even as Lumbermens was denying coverage on the basis of its trumped up aggregates argument, the RCAB continued in good faith to seek a reasonable resolution to the many claims it faced.  In 2003, the RCAB worked to resolve these claims by establishing a global settlement. The RCAB concluded that a global settlement reached via mediation would be the most practical and effective solution.  (*See* Rogers, Jr. dep. 226:19–227:4.)  The RCAB invited Lumbermens to participate in the mediation process, but Lumbermens declined.  (*See* Reardon dep. 226:19–227:4.)  It paid nothing on account of the claims, and even today, it continues to reject any claims that arose prior to 1977.  (*See* Diederich Aff. Exs. 56, 57.)  While it agrees that excess coverage remains in place for the years 1977–1983, it has left and continues to leave the RCAB to its own devices for pre-'77 claims.

### ARGUMENT

### I.    LUMBERMENS PROVIDED GENERAL LIABILITY COVERAGE TO THE RCAB FROM 1961 TO 1983.

LMC has conceded coverage from 1964 to 1983 pursuant to primary policies it sold to the RCAB, and from 1977 to 1983 pursuant to excess policies.  The only open "lost policy" issues for the Court at this point, therefore, are two narrow questions:  was there in place a primary policy for the years 1961–1964, and was there an excess policy for the years 1973–1977?  No genuine issue of material fact exists on these points, and the RCAB is entitled to summary judgment on them as a matter of law.  Both state and federal courts in Massachusetts

have concluded that the preponderance of evidence standard is appropriately applied in cases such as these. (*See Continental Ins. Co. v. The Roman Catholic Archbishop of Fall River*, slip op., No. 92-12016-MA at 5–8 (D. Mass. Aug. 12, 1993) *accord Rubenstein v. Royal Ins. Co. of Am.*, 694 N.E.2d 381, 384 (Mass. App. Ct. 1998).

### A.    The RCAB Conducted a Diligent Search for Its Policies.

The RCAB is entitled to use secondary evidence to establish the existence and terms of the insurance policies that it purchased from Lumbermens because it has conducted a diligent search for those policies and has been unable to find copies of the missing policies. *See* Fed. R. Evid. 1004; *Sylvania Elec. Prods., Inc. v. Flanagan*, 352 F.2d 1005, 1008 (1st Cir. 1965); *Burt Rigid Box Inc. v. Travelers Prop. Casualty Corp.*, 126 F. Supp. 2d 596, 614 (S.D.N.Y. 2001); *aff'd in part, rev'd in part* 302 F.2d 83 (2d Cir. 2002). Beginning in 1992 or 1993, the RCAB (1) searched its files for policies or copies thereof, (2) interviewed current and former RCAB employees, and (3) interviewed its former brokers. (*See* Fallon dep. 46:21–47:22.) The RCAB also asked parishes to look in their files for insurance records. (*See* Fallon dep. 47:18–22; Powers dep. 48:23–49:11.)

More recently, as part of the discovery in this case, additional searches have been made of the RCAB's files. As with its prior searches, the RCAB was unable to locate any policies. An additional request to parishes to provide any policies they had did produce additional secondary evidence of the 1973 excess policy, but no copies of any actual insurance policies. Also, a subpoena was issued to AON Risk Services, the successor to the RCAB's insurance brokers. AON has responded that it has no policies. And, of course, LMC itself has failed to produce any policies prior to 1974.

This record is indistinguishable from the record on which a Court of the District of Massachusetts concluded that a sufficiently diligent search had been conducted by an insured.

*See Continental Ins.*, No. 92-12016-MA, at 8–9; *see also Burt Rigid Box*, 126 F. Supp. 2d at 613-

-14 (search sufficiently diligent when it initially searched its own premises and three years later

asked broker to search its files). The only conclusion is that the policies have been lost, not

through dishonesty or foul play, but because they are old, and that further attempts to locate them

will fail. Consequently, the RCAB is entitled to use secondary evidence to make its case with

respect to the 1961-1964 primary and the 1973-1977 excess policies. That secondary evidence

overwhelmingly demonstrates that Lumbermens insured the RCAB from at least 1961 onward.[11]

      **B.    Lumbermens *Admits* that it Provided Coverage From 1964 Onward.**

      Lumbermens' internal documents are replete with evidence that it insured the RCAB at

least back to 1964. In 1997, Paul Meany wrote to Mary Kay Reardon that "[t]he Archbishop of

Boston carried general liability insurance with us for a period of 1964 through 1983 under

various policy numbers." (Reardon Ex. 14.) Similarly in early 1997, Christine Zinoman wrote

that "WE HAVE BEEN ABLE TO CONFIRM COVERAGE AS FAR BACK AS 1964."

(Diederich Aff. Ex. 63.) Indeed, Ms. Zinoman noted in the internal files over and over again that

Lumbermens had confirmed coverage back to 1964. (*See, e.g.*, Diederich Aff. Exs. 59-63.) It is

therefore all the more remarkable that Lumbermens would file a pleading with this Court

asserting that it "admits only that there is *some evidence* that it issued one or more primary

insurance policies to the RCAB beginning March 31, 1964." (*See* Answer & Countercl. ¶ 7

(emphasis added)). In fact, Mary Kay Reardon, Lumbermens' designated 30(b)(6) witness,

testified that, "[b]ased on the information we have, *we can confirm that there was coverage from*

---

[11] Though the RCAB believes that the evidence demonstrates that Lumbermens provided it with
liability coverage from at least 1955, it has determined that it is not appropriate to move at this
time for summary judgment as to the existence, terms and conditions of the 1955 through 1960
coverage.

*1964*, but we cannot confirm anything prior to that."  (Reardon dep. 507:14–20 (emphasis added)).

### C.    Secondary Evidence Clearly Establishes Coverage Dating Back to 1961.

Moving beyond what Lumbermens already has admitted but apparently now seeks to deny, it is clear from the record that coverage for the RCAB existed prior to 1964. Contemporaneous correspondence referring to insurance coverage is valid secondary evidence of the existence of insurance policies.  *See Burt Rigid Box*, 126 F. Supp. 2d at 618 (including evidence of prior claims handling by the insurer as evidence of existence of insurance policies). Here, not only are there documents which reference Lumbermens as the RCAB's carrier *prior* to the date for which Lumbermens now acknowledges coverage, but there is actual claims handling correspondence between Lumbermens and the RCAB that demonstrates that general liability coverage was in place before 1964.

Among the documents unearthed in an extensive search of the RCAB's archives is an exchange of letters between Lumbermens and the RCAB in May and June 1964, concerning the defense of a bodily injury accident that occurred on RCAB property in March 1963.  One letter, addressed to Lumbermens and dated May 29, 1964, is from the Vice-Chancellor to LMC's law department.  It refers to coverage of $100,000 and requests that the RCAB be kept advised of the progress of the suit.  (Diederich Aff. Ex. 17.)  In addition, the letter also gives an accident date of "3/10/63."  *Id.*  Likewise, a June 1, 1964 letter from RCAB's counsel to Lumbermens refers to a "3/10/63" accident.  (*See* Diederich Aff. Ex. 18.)

Mr. Ryan acknowledged receipt of the letters and promised to keep the RCAB apprised of developments.  Had Lumbermens not insured the RCAB in 1963, it would have disclaimed coverage altogether.  Instead, on June 3, 1964, Lumbermens wrote back, taking control of the defense of the action and requesting that the RCAB "afford [Lumbermens] the cooperation

which *the policy* requires." (Diederich Aff. Ex. 19 (emphasis added).) It is obvious from this correspondence that LMC was insuring the RCAB in at least 1963.

In fact, we know that the primary policies ran from March 31, so that an accident date of March 10, 1963 would have been covered for a policy year beginning March 31, 1962. Because LMC wrote policies on a three-year cycle (*see* Diederich Aff. Exs. 1-6.) and because LMC has conceded coverage starting in 1964, the conclusion is inescapable that the policy in effect on March 10, 1963 in fact was issued on March 31, 1961.

This conclusion is consistent with other RCAB docments relating to insurance coverage. In notes from the RCAB dated April 15, 1964, it is stated that "General Liability & Hospital Professional Liability" insurance that coverage was "formerly written "3/31/61-3/31/64." (Diederich Aff. Ex. 15.)

Yet another document from the RCAB's archives lists a policy number 4LL 64263 for a policy incepting March 31, 1964, and running until March 31, 1967. (*See* Diederich Aff. Ex. 21.) This policy number is consistent with the policy numbers listed on the sheets tracking alleged aggregate balances which were maintained by Lumbermens. (*See* Reardon Ex. 10.) RCAB's internal documentation, however, also refers to a policy which was numbered 2LL 64263. (*See* Diederich Aff. Ex. 21.) The prefix "2" means that the policy was in place in 1962.

In addition, on September 13, 1993, Paul Fallon of the RCAB wrote to Gerald Wolfe, a Lumbermens claims representative. In the letter, Mr Fallon notes the same basic policy number and attaches a document which reads in part:

<u>GENERAL LIABILITY</u>

Lumbermen's Mutual Casualty (Thru Associated Mutuals)

Policy 3/1/64 -3/31/67- 4LL 64263A

(*See* Diederich Aff. Ex. 44.)  He enclosed a second document with that letter which includes

1961 notes indicating under "General Liability", that "Lumberman's [*sic*] have waived the right

to invoke eleemosynary defense."  (*Id.*)

The policy numbers identified in internal RCAB documents, of course, are consistent

with Lumbermens numbering system.  In responding to Mr. Fallon's evidence, a Lumbermens

employee wrote in the internal computer notes system that:

> FALLON SENT US SOME CORRESPONDENCE FROM
> CORPORATE COUNSEL ROGERS.  ALSO, DUG UP FROM
> ARCHIVES INTERNAL MEMORANDA RECORDING A
> POLICY NO. FOR GENERAL LIABILITY 3/1/64-3/1/67, 4LL
> 64263A, AN LMC POLICY.  THEN, AN ALLEGED 1961
> DOCUMENT, AGAIN A CHURCH INTERNAL RECORD, IS
> INDICATIVE THAT LMC WAS THE GL CARRIER.  IF THIS
> WERE CONFIRMED AND ACCURATE, THE POLICY NO.
> APPLICABLE TO THIS CLAIM WOULD BE 1LL64263A.

(Focus Notes, (Diederich Aff. Ex. 59.)

The hypothesized number 1LL64263A corresponding with a policy incepting in 1961

dovetails with the remaining documentary evidence from the RCAB's archives.  As noted above,

along with one of the documents reciting the policy number 4LL64263 is a reference to a

cancelled policy numbered 2LL 64263, which corresponds to the referenced renegotiated policy

incepting on 3/31/1962.  (*Compare* RCA7003506 (Diederich Aff. Ex. 15) *with* RCA7003507

(Diederich Aff. Ex. 20.)

Based on the foregoing, it is indisputable that the policy predating the 1964 through 1967

policy was a policy incepting in 1961 and providing coverage until 1964.  The answer to the first

narrow question is clear:  LMC issued a general liability policy to the RCAB providing coverage

of at least $100,000, that was in effect form March 31, 1961 to March 31, 1964.  In light of

LMC's concessions of coverage thereafter, the Court should award summary judgment that the

RCAB was insured by primary general liability policies issued to it by LMC as follows:

| Period | March Policy | | September Policy | |
|---|---|---|---|---|
| | Number | Per occurrence/Per Accident limit | Number | Per occurrence/Per Accident limit |
| 1961–1962 | 1 LL 64263 | $100,000[12] | | |
| 1962–1963 | 2 LL 64263 | $100,000 | | |
| 1963–1964 | 3 LL 64263 | $100,000 | | |
| 1964–1965 | 4 LL 64263A | $300,000 | | |
| 1965–1966 | 5 LL 64263A | $300,000 | | |
| 1966–1967 | 6 LL 64263A | $300,000 | | |
| 1967–1968 | 7 LL 64263A | $300,000 | | |
| 1968–1969 | 8 LL 64263A | $300,000 | | |
| 1969–1970 | 9 LL 64263A | $300,000 | | |
| 1970–1971 | 0 LL 64263A | $300,000 | | |
| 1971–1972 | 1 YL 75700 | $300,000 | 1 YL 64706 | $300,000 |
| 1972–1973 | 2 YL 757500 | $300,000 | 2 YL 64706 | $300,000 |
| 1973–1974 | 3 YL 757500 | $300,000 | 3 YL 64706 | $300,000 |
| 1974–1975 | 4 YL 75700 | $300,000 | 4 YL 64706 | $300,000 |
| 1975–1976 | 5 YL 75700 | $300,000 | 5 YL 64706 | $300,000 |
| 1976–1977 | 6 YL 75700 | $300,000 | 6 YL 64706 | $300,000 |
| 1977–1978 | 7 YL 75700 | $300,000 | 7 YL 64706 | $300,000 |
| 1978–1979 | 8 YL 75700 | $300,000 | 8 YL 64706 | $300,000 |
| 1979–1980 | 9 YL 75700 | $300,000 | 9 YL 64706 | $300,000 |
| 1980–1981 | 0 YL 75700-00 | $300,000 | 0 YL 64706-00 | $300,000 |
| 1981–1982 | 0 YL 75700-01 | $300,000 | 0 YL 64706-01 | $300,000 |
| 1982–1983 | 0 YL 75700-02 | $300,000 | 0 YL 64706-02 | $300,000 |

(*See* Reardon Ex. 10.)

**D.    An Excess Policy Was In Place Commencing September 1973.**

It is also beyond dispute that the RCAB purchased umbrella coverage from LMC in 1973. The RCAB has produced a binder dated 1973 binding LMC to provide it with $5 million in excess coverage. (*See* Diederich Aff. Ex. 31.) A binder constitutes secondary evidence that a policy was in fact issued to the RCAB. *See Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670, 680 (W.D. Mich. 2003). In addition, the RCAB now has found invoices showing that individual parishes and institutions were billed for their share of an excess policy bearing numbers 3SX002269, 4SX002269 and 5SX002269. (*See* Diederich Aff. Exs. 36-39.) LMC conceded at deposition that those policy numbers would correspond to an excess policy for the years 1973 through 1976. (*See* Reardon dep. 356:18–24.)

---

[12] The $100,000 coverage for the years 1961-1964 would be a per person limitation at a minimum, with a higher per occurrence limit.

Internal RCAB documents also reflect the existence of the umbrella policy.  In October 1973, the RCAB's insurance department sent out a circular to the parishes, stating that "it has become necessary to purchase excess Limits of Liability, commonly known as Umbrella Liability.  We have purchased such a policy in the name of the Corporation Sole, with a $5,000,000 limit of liability."  (Diederich Aff. Ex. 30.)  This note unmistakably refers to the LMC binder, as the binder preceded the note by just one month.

The Insurance Department also generated a report dated June  28, 1974 that referred to the fact that the RCAB had an excess policy of $5,000,000 in place.  (*See* Connolly Aff. Ex. J.) Finally and most important, a later 1982 report by the RCAB Insurance Department reflects that Lumbermens actually made a payment out of the excess policy for 1974.  (Powers Ex. 1.)  Of course, evidence of prior claims history is compelling evidence that the insurance actually existed.  *See Burt Rigid Box*, 126 F. Supp. 2d at 618.  Against this record, LMC cannot credibly continue to contest that it sold excess coverage to the RCAB for the period 1973-1977.

## II.    THE TERMS AND CONDITIONS OF THE RCAB'S POLICIES ARE CLEAR.

Having established the existence of LMC policies insuring the RCAB from at least 1961, the next issue is to establish the terms of that coverage.  Here, too, there is no genuine issue of material fact in dispute.  LMC now has produced copies of all of the actual primary policies it issued to the RCAB from 1974 to 1983.  The open issue, therefore, is only with respect to the policies issued before 1974.  The policies actually unearthed in this case are all standard forms. (*See* Connolly Aff. ¶ 17.)  LMC used standard form policies for primary liability insurance in the 1960s and 1970s.  (*See* Connolly Aff. ¶ 18; Vega dep. 33:5–15; *see also* Reardon dep. 93:3–12; Bennett dep. 69:13–70:1.)  These standard form policies were generally approved by ISO (or one of its predecessors).  (*See id.*).  Both present and former Lumbermens claims personnel testified

that they would often assess coverage issues by looking to standard forms.  (*See* Reardon dep. 61:21–62:3; Bennett dep. 16:22-18:1).

Courts in many jurisdictions (including Massachusetts) have held that, where original policies are lost or destroyed, a party seeking to prove the contents of those policies may do so by demonstrating the terms and conditions of standard policies.  *See State Mut. Assurance Co. of Am. v. Lumbermens Mut. Cas. Co.*, 874 F. Supp. 451, 455 (D. Mass. 1995) (holding that insurers obligations were governed by standard forms which tracked industry standard forms); *see also In re Wallace & Gale Co.*, 275 B.R. 223, 242–43 (D. Md. 2002) *vacated on other grounds*, 284 B.R. 557 (D.Md. 2002) (evidence that company wrote insurance on 1955 standard NBCU form sufficient to establish terms of insurance); *American States Ins. Co. v. Mankato Iron & Metal, Inc.*, 848 F. Supp. 1436, 1442 (D. Minn. 1993) (evidence that standard forms did not contain pollution exclusion sufficient to withstand summary judgment).

Standard CGL forms were promulgated in 1955, 1966, 1973 and 1986 (*See* Connolly Aff. ¶ 16.)  The 1955, 1966 and 1973 forms are all appended to the Connolly Affidavit.  The actual policies provided in discovery for the years 1974-77, 1977-1980 and 1980-1983 are attached as Exhibits 1-6 to the Diederich Affidavit.  The record is compelling that insurance policies were written prior to 1966 on the basis of the "1955" form, and that from 1966 to 1974, the 1966 standard form was used.  Lumbermens was a member of the Mutual Insurance Rating Board ("MIRB"), which required it to use standard forms.  (*See* Connolly Aff. ¶ 16.)  Consequently, there can be no doubt that Lumbermens was obligated to sell the RCAB coverage on the same terms as the 1955 specimen wording.  *See Coltec Indus. Inc. v. Zurich Ins. Co.*, No. 99 C 1087, 2002 WL 31185789, at *7–*8, *15 (N.D. Ill. Sept. 30, 2002) (granting summary judgment to

insured as to terms of policies that were written by member of the National Bureau of Casualty Underwriters ("NBCU"), a sister organization to the MIRB.)

When seeking the legal opinions of Morrison Mahoney & Miller in 1994 and 1995, Christine Zinoman forwarded a package of policy documentation for the years spanning 1974 to 1983. (*See* Diederich Aff. Ex. 66-67.) These packets contained, among other documents, Lumbermens standard 1973 wordings for general liability policies. *See, e.g.*, Diederich Aff. Ex. ___ at 000210-0000213).[13] Importantly, Ms. Zinoman included in her packet of documents a copy of the 1966 standard form along with the note:

> 1966 Policy Jacket
>
> Would be applicable if we concede cov'g for
>
> 9/23/721 - 9/23/74
>
> & 3/31/71 - 3/31/74

(*See* Diederich Aff. Ex. 66)). The fact that Ms. Zinoman provided the specimen wordings for 1966 through 1983 is compelling evidence that Lumbermens understood (and still understands) that its coverage of the RCAB was written on the basis of standard Lumbermens forms in use at the time.

The terms of the excess policy are likewise clear. Benjamin Bennett, who joined Lumbermens in the mid-1970s, confirmed that Kemper (of which Lumbermens is part) used ISO forms when writing excess insurance policies. (*See* Bennett dep. 81:9–16). As with the primary policies, given LMC's practices, it is clear that the excess policies were written on standard ISO excess forms.

---

[13] There are various editions of the 1973 wording, which appear to have slightly different typefaces and formatting (*Compare* 1980 policy with 1977 policy.) However, Ms. Zinoman's notes indicate that these were merely reprintings, not changes in the actual text of the standard forms. *See* 000098 ("I confirmed that 9-79 was a new printing <u>only</u> - no change in policy language), 000242 ("Same wording as 9-79").

A.    **There are No Applicable Aggregate Limits in the Policies Lumbermens Sold to the RCAB.**

Because we have the primary policies actually issued in 1974, 1977 and 1980, there is no issue as to their terms.  The only open questions again are narrow:  what did the CGL primary policies sold by LMC to the RCAB in the 1960s and in 1971 provided with respect to bodily injury.  The evidence is indisputable.  In fact, in a memorandum dated July 23, 2003, Mary Kay Reardon has acknowledged what others at LMC also now concede on the critical question:  there simply never were any aggregate limits on bodily injury coverage.  Here, too, there is no genuine issue of material fact and the RCAB is entitled to judgment as a matter of law.

The language in the RCAB's insurance contracts is clear.  There can be no doubt that the insurance contracts did not contain any sort of aggregate, as Lumbermens has falsely asserted, applicable to the claims at issue.  Indeed, the 1966 and 1973 editions of the Lumbermens standard form policy contain substantially identical language about aggregates:

> The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury stated in the declarations as applicable to "each occurrence."
>
> Subject to the above provisions respecting "each person" and "each occurrence", the total liability of the company for all damages because of (1) all bodily injury included within the *completed operations hazard* and (2) all bodily injury included within the *products hazard* shall not exceed the limit of proper damage liability stated in the declarations as "aggregate" . . . .

(*See* Connolly Aff. Exs. B, C (emphasis added)).  And, of course, this language in fact appears in the actual 1974, 1977, and 1980 policies.  (*See* Diederich Aff. Ex. 1; [other policy forms as cited in L.R. 56.1 Stmt.].)

Similarly, the 1955 standard form in use by the industry called for aggregate limits in only limited circumstances. That form provides that:

> The limit of bodily injury liability sated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one accident; the limit of such liability stated in the declarations as applicable to "each accident" is, subject to the above provision respecting each person, the total limit of the company's liability for all damages, including damages for  are and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons as the result of any one accident.

*See* "1955" Form.

The 1955 Form further provides that:

> Subject to the limit of liability with respect to "each accident," the limits of bodily injury liability and property damage liability stated in the declaration as "aggregate products" are respectively the total limits of the company's liability for all damages arising out of the *products hazard*. All such damages arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one accident.

*Id.* (emphasis added). The foregoing language in the 1955 and 1966 forms applied to the primary policies issued to the RCAB.

On their face, the language of Lumbermens' primary policies restricts the application of aggregates to two specific hazards only: completed operations and product liability. Lumbermens admits that neither of those coverages is at issue in this case. (*See* Reardon dep. 160:6–15; Diederich Aff. Ex. 55; Diederich Aff. Ex. 69.)

If the plain terms of a contract favor either side in a contract dispute, summary judgment is warranted. *See Bank v. International Bus. Mach. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998). As with any other contract, Massachusetts law requires that courts "construe and enforce

unambiguous terms according to their plain meaning." *Somerset Savings Bank v. Chicago Title Ins. Co.*, 420 Mass. 422, 427 (1995).[14] Here, there is no ambiguity to resolve. The policies clearly provide that there is no aggregate limit applicable to the bodily injury claims.

Despite the suggestion by Ms. Zinoman that the declarations page demonstrates an annual aggregate of $300,000, such a reading is belied by the policies. Immediately above the line titled "limits of liability", the declarations pages provide that, "The limit of the company's liability against each Coverage shall be as stated herein, *subject to all the terms of the policy having reference thereto*." (Diederich Aff. Exs. 1-6). It could not be plainer that the more specific language in the actual policy terms regarding limits controls over the general language on the declarations pages. In fact, in her July 23, 2003 memo, Ms. Reardon so concedes, writing that "our review confirms that the aggregate only applies to Products and Completed Operations." (*See* Diederich Aff. Exs. 55, 69)).

Massachusetts law requires that contracts be read to give meaning to all of their terms and to avoid readings which would render terms superfluous. *See, e.g.*, *Associated Credit Servs., Inc. v. City of Worcester*, 596 N.E.2d 388, 389 (Mass. App. Ct. 1992). Lumbermens' gloss on the terms would render pointless the detailed clauses regarding aggregate limits and their application to products liability and completed operations claims. Were there an omnibus annual aggregate, there would be no need to specify that the aggregate applied to the specified perils of products liability and completed operations. Lumbermens cannot advance a plausible reading that would suggest any ambiguity in the terms of the RCAB's insurance policies. Consequently,

---

[14] Were Lumbermens able to identify any ambiguity in these terms, that ambiguity would be construed against LMC and in the RCAB's favor. *See Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990).

the RCAB is entitled to summary judgment that the terms of its insurance policies in effect from 1961 through 1983 did not impose any annual aggregate limits on its claims.[15]

### III.    THERE IS NO "AGREEMENT" TO IMPOSE AGGREGATE LIMITS ON THE RCAB'S INSURANCE POLICIES.

Lumbermens recognizes that its attempt to locate an applicable aggregate limit in the RCAB's policies is unavailing, as Mary Kay Reardon acknowledged in writing just last year.  In an internal memorandum, Ms. Reardon wrote that her review of the policies "confirms that the aggregate only applies to Products and Completed Operations.  Obviously, this adds significant exposure under our primary policies."  (Diederich Aff. Ex. 55.)  Reardon concludes later in the memorandum:  "We really have no argument on the aggregate . . . ."  *Id.*  This inescapable conclusion is confirmed in the memorandum reporting the advice of Sidley, Austin that LMC now seeks to retrieve and bury.  (*See* Lumbermen's Motion for Protective Order, Sept. 3. 2004.)  In that memorandum, the following statement is made -- twice:  "Given the lack of applicable aggregates in the primary and excess policies . . . ."  (*Id.*)

As a result of this recognition, Lumbermens counsel Patrick Maloney concocted an argument that there was some unwritten agreement with the RCAB to supersede the written contracts and create annual, fictitious limits on the primary policies of $300,000.  This purported agreement has no basis in fact or law -- indeed, it is just the opposite.  It comprises bad faith.

First, if there was such an agreement, those who supposedly participated in its creation are unaware of its existence.  Christine Zinoman, who was handling the RCAB's claims at the time that Lumbermens finally conceded that its insurance policies provided coverage for the RCAB, did not testify to an agreement to impose aggregates.  Instead, she testified that she

---

[15] Just like the primary policies, the excess policies only impose aggregates on specified perils—products, completed operations and occupational diseases.  (*See* Reardon Ex. 17.)  There are no aggregates in the excess policies that apply to claims of the type facing the RCAB.

merely informed the RCAB that she was applying payments to the RCAB to "aggregates" she

asserted are actually contained somewhere (though she could not find them) in the policies:

> Q.  Did you represent to the RCAB or representatives of the RCAB
> that there were aggregate limits contained in these policies that
> applied to the negligent supervision claims?
>
> A.  I don't think I ever specifically told them that there were
> aggregates on the policy.  I told them that we were applying as far
> as the payments of the various claims in the reimbursement of the
> claim, that that would be applied against an aggregate, yes.

(Zinoman dep. 57:19–58:17.)  Surely, if Ms. Zinoman had reached some agreement with the

RCAB regarding the application of aggregates, she would have indicated that the imposition of

the aggregates was pursuant to a negotiation with the RCAB, and was not a simple assertion by

LMC, as in fact was the case.

Similarly, Ms. Zinoman's supervisor at the time, Frank Bennett, recalls no such

agreement.  (*See* Bennett dep. 63:9–64:1.)  In fact, no Lumbermens personnel testified that such

an agreement existed.  Paul Meany, who later supervised Zinoman and then managed the RCAB

account himself, testified that she had told him of no agreement with the RCAB.  (*See* Meany

dep. 39:6–11.)  Meany himself never reached an agreement with the RCAB to vary the terms of

the RCAB's insurance either.  (*See id.* 52:8–12.)  Augie Vega, who succeeded Meany, likewise

testified that he was unaware of any written or oral agreement with the RCAB.  (*See* Vega dep

92:19–23.)  Wilson D. Rogers III, with whom Lumbermens dealt regarding many insurance

issues, denied any such agreement.  (*See* Rogers, III dep. 118:2–24.)  And Mary Kay Reardon,

LMC's 30(b)(6) designee, testified that when Ms. Zinoman asserted that there were aggregates

back in 1995, she did so on the basis of her interpretation of the policy, not on the basis of an

agreement with the RCAB.  (*See* Reardon dep. 399:10–16.)

Indeed, the only person who actually testified that such an agreement existed was

Lumbermens' counsel, Patrick Maloney.  Mr. Maloney testified as follows:

> Q.  When was this agreement that you say was reached?
>
> A.  Over the course of the years.
>
> Q.  So it wasn't reached in 1995?
>
> A.  In part.
>
> Q.  When was there, in your judgment, a final binding agreement with respect to aggregates in primary policies?
>
> A.  Probably by 1998.
>
> Q.  What was it in 1998 that resulted in there being an agreement?
>
> A.  Exactly what I said.  Various correspondence between the parties and the conduct of the parties and the agreement of the parties to existence of aggregate limits, the agreement of the parties that all of the Rogers firm was keeping tabs of the money spent on.
>
> The agreement was that when aggregate limits in one policy were exhausted, they would roll it over to the next year so long as there was some alleged abuse during that policy period.  All of that combined.

(Maloney dep. 39:1–22.)

When pressed, Mr. Maloney testified that this "agreement", which Mary Kay Reardon in

her July 26, 2003 memo said counsel described as "estoppel by representation", actually

superseded the policies.  (*Id.*)  Suffice it to say that the conduct to which Mr. Maloney points was

all predicated on LMC's assertions to the RCAB that annual aggregate limits of $300,000

applied; it does not provide the basis to conclude that a mutual agreement founded in

consideration was reached to that effect, revising in dramatic fashion thirty-year-old policies.

Mr. Maloney's spin on the meaning of the parties' actions and writings is nothing more

than an argument masquerading as fact testimony.  His argument is, of course, inadmissible.  *See*

*Neives-Villaneuva v. Soto-Rivera*, 133 F.3d 92, 99–100 (1st Cir. 1997); *Marx & Co., Inc. v.*
*Diners' Club, Inc.*, 550 F.2d 505, 509–11 (2d Cir. 1977) (error for court to permit "expert" to
opine on parties' obligations under contract). Because only admissible evidence can be used to
support or oppose a motion for summary judgment, Maloney's inadmissible arguments are
irrelevant to the summary adjudication of this case. *See Hillstrom v. Best Western TLC Hotel*,
354 F.3d 27, 32 (1st Cir. 2003) (inadmissible hearsay evidence cannot be considered at summary
judgment); *Strauman Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 134–37 (D. Mass.
2004) (incompetent expert affidavit insufficient to defeat motion for summary judgment).

Indeed, Mr. Maloney's analysis should be disregarded if for no other reason than that it is
wrong. Neither he nor any other witness could identify any writing which embodied the
supposed agreement between the RCAB and Lumbermens to apply aggregate limits to the
RCAB's claims. (*See* Maloney dep. 38:20–24; Reardon dep. 342:23–343:5; Vega dep. 38:11–
20; *see also* Reardon dep. 194:22–195:5). No witness could identify such a writing, because no
such writing exists. And without a written agreement, Lumbermens cannot now claim that it has
struck a deal with the RCAB to change the policy terms. Each of the RCAB's policies includes a
"Changes" clause which provides that "the terms of this policy [shall not] be waived or changed,
except by endorsement issued to form a part of this policy, signed by a duly authorized officer or
representative of this company." (*See* Diederich Aff. Ex. 2; *see also* 1955 Form).

The rule in Massachusetts, moreover, is that the party asserting that a written integrated
contract has been subject to a parole modification bears a heavy burden of proof. *See*
*Cambridgeport Savings Bank v. Boersner*, 413 Mass. 432, 439–40 & n. 10 (1992). The Court's
decision in *Cambridgeport Savings Bank* demonstrates precisely why Lumbermens cannot now
claim that the insurance policy has been modified orally. In *Cambridgeport Savings Bank*,

though the parties argued in court that there was an oral modification of the contract, they testified that the alleged terms of the modification were actually part of the *original* contract. *See id.* at 440.  This circumstance is factually indistinguishable from the current case.  Zinoman, Bennett, Meany and Vega all testified that they thought that the Lumbermens policies imposed aggregate limits from the inception.  (*See* Zinoman dep. 47:1–4; Bennett dep. 57:1–9; Vega dep. 57:23–58:16; Meany dep. 47:23–48:11).  The claim that the aggregates were in the original RCAB policies is factually inconsistent with the claim that the aggregates were later added by oral modification.  On that record, as in *Cambridgeport Savings Bank*, the proponent of the oral modification cannot carry its burden.

Further, even if LMC attempts to recast its argument as "estoppel by representation" -- whatever that may be --  it cannot succeed.  In order to make out a case for estoppel, LMC must show that the RCAB (1) made a representation intended to induce LMC's reliance; (2) that LMC acted in reliance on the representation; and (3) that LMC suffered detriment as a result of its actions in reliance.  *See Bongaards v. Millen*, 440 Mass. 10, 15 (2003).  LMC cannot begin to make a showing sufficient to support such a defense.  First, the RCAB made no representations regarding aggregates; rather it was Ms. Zinoman and her colleagues at LMC that made (patently false) representations to the RCAB.  Second, LMC concedes that it did nothing in detrimental reliance on any representation made by the RCAB:

> Q.  So my question is:  Did Lumbermens do anything between 1995 and today with respect to payment of claims that it would not have done had there been no applicable aggregates?
>
> A.  No, I don't believe so.

(Reardon dep. 462:7–12.)  Third, even if LMC could surmount such hurdles, it still would not be entitled to the equitable remedy of estoppel given its bad faith and unclean hands in responding to and handling the RCAB's claims.  *See Bird v. Centennial Ins. Co.*, 11 F.3d 228, 234 (1st Cir.

1993).  If the parties were mistaken about the terms of the policies, that misunderstanding can and should be corrected now.

## IV.    HAVING DISCLAIMED COVERAGE, LMC CANNOT CHALLENGE THE RCAB'S DEFENSE OR SETTLEMENT OF CLAIMS

Left to its own devices in 1998 to resolve all claims pre-dating 1977, the RCAB had to address the claims on its own.[16]  Settlements of claims which alleged acts of abuse between 1961 and 1977 in fact account for over half of the reimbursement now sought by the RCAB.  Though LMC wrongly denied its obligations, the terms of each and every one of its policies are clear: where its insured faces potential liability, LMC is obligated to provide it with a defense.

Under Massachusetts law, when an insurer unjustifiably disclaims coverage, it is liable for the reasonable costs of defense and settlement.  *See Liberty Mut. Ins. Co. v. Metropolitan Life Ins. Co.*, 260 F.3d 54, 63 (1st Cir. 2001); *Colonial Gas Co. v. Aetna Cas. & Sur.*, 823 F. Supp. 975, 980 (D. Mass. 1993).  The RCAB does not yet seek a summary adjudication as to the reasonableness of its settlement of the 1961–1977 claims, though it does not anticipate that it will be difficult to establish.  Once LMC rejected  a claim on the untenable ground that applicable policies were exhausted, it surrendered the ability to challenge the RCAB's defense or settlement of the claim.[17]  Instead, the RCAB need do no more than demonstrate that its settlement was reasonable in light of the possible size of recovery and the risk of the claimants' success in court. *See Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd.*, 780 F.2d 1082, 1091 (2d Cir. 1986). The rule of *Luria Brothers* properly has been extended to the situation of global settlements:

---

[16] Indeed, LMC continues to disclaim coverage for all claims pre-dating 1977, even those that have been brought to its attention subsequent to the discovery that there are no applicable aggregates.  (*See* Diederich Aff. Exs. 56, 57.)  Of course, as there are no aggregates, LMC is in breach of its duty to defend these claims as well.

[17] In any event, LMC would not have any reasonable grounds on which to challenge the settlements.  Perhaps unsurprisingly the current LMC claims person has testified that he has not even read the claims files for the 500+ participants in the global settlement.  (*See* Vega dep. 124:18–125:5.)

"where a reluctant insurer fails to participate in an insured's settlement discussions, and the insured becomes party to a global settlement agreement, the insured may be indemnified for any amount of the total settlement package for which it can establish a reasonable anticipation of liability." *Vitkus v. Beatrice Co.*, 127 F.3d 936, 945 (10th Cir. 1997); *see also United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1242, 1248 (Ill. App. Ct. 1995).

The RCAB does, however, now seek summary adjudication that LMC, because of its wrongful disclaimers and other dilatory tactics cannot assert defenses with respect to the rejected claims. As the Supreme Judicial Court explained,

> An insurer which reserves its rights and takes no action in defense of its insured, when it knew, or should have known of a covered claim, or which fails to investigate diligently, despite repeated claims of coverage and requests for a defense from an insured facing demands for immediate action, could be found to have committed a breach of the duty to its insured. Such a breach on the part of the insurer could be found to excuse an insured's failure to comply with the notice or cooperation provisions of the policy.

*Sarnafil, Inc. v. Peerless Ins. Co.*, 418 Mass. 295, 305 (1994). As LMC breached its contractual obligations to the RCAB, it cannot now use the contract it once disclaimed as a tool to inhibit the RCAB's acts of self defense, and is no longer entitled to question the RCAB's handling and settlement of the claims. Based on the undisputed facts, the RCAB is entitled as a matter of law to a judgment that LMC cannot now challenge the RCAB's handling of any wrongfully rejected claims.[18]

---

[18] The RCAB does not now seek, however, by this motion to establish the amount to which it is entitled. The damages, instead, will be the subject of later proceedings. LMC's discovery, however, in Phase II should be limited in accordance with the rule of law articulated herein. Of course, the RCAB will seek recovery for all claims unpaid by the LMC that arose during the years 1961-1983, and not simply for those rejected on the wholly fallacious, bad faith assertion that the primary policies had been exhausted.

**CONCLUSION**

For all of the foregoing reasons, the Plaintiff's Motion for Partial Summary Judgment should be allowed in all respects.

Respectfully submitted,

THE ROMAN CATHOLIC ARCHBISHOP
OF BOSTON, A Corporation Sole
By its attorneys,


___/s/ Paul B. Galvani_____
Paul B. Galvani (BBO # 183800)
Thomas H. Hannigan, Jr.
   (BBO # 220420)
Bryan R. Diederich (BBO # 647632)
Kate Cimini (BBO # 654336)
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7000

Dated:  September 15, 2004