# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE, <br><br> Plaintiff, <br><br> v. <br><br> LUMBERMENS MUTUAL CASUALTY COMPANY, <br><br> Defendant. | Civil Action No. 04-10461-DPW |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, the Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB"), submits this statement of material facts as to which there is no genuine issue to be tried in support of its Motion for Partial Summary Judgment.

## I.     Liability Policies Issued by Lumbermens Mutual Casualty Company to the RCAB.

### A.     Overview

1.     Lumbermens Mutual Casualty Company ("Lumbermens" or "LMC") is a mutual company organized and existing under the laws of the State of Illinois. It is a member of the Kemper Insurance Companies group.

2.     Lumbermens issued primary general liability policies to the RCAB from at least 1961 to 1983.

3.     From March 31, 1961 to March 31, 1983, Lumbermens issued a series of primary policies to the RCAB which were referred to as the "institutional policies", with each policy covering a three year period.

4.      Starting in September 1971, and continuing until March 31, 1983, Lumbermens also issued a second series of primary policies to the RCAB, which were referred to as the "parish policies". Each of these policies also covered a three year period.

5.      In addition to the two sets of primary policies issued by Lumbermens to the RCAB, Lumbermens also issued excess liability policies to the RCAB from September 14, 1973 to March 31, 1983.

**B.      Evidence of Policies Issued by Lumbermens**

6.      The evidence that Lumbermens issued policies to the RCAB from at least 1961 to 1983 consists of two types – actual primary and excess policies for certain years, and secondary evidence of policies for other years.

7.      The RCAB, prior to the commencement of this action, had not located in its records copies of any primary or excess policies issued by Lumbermens.

8.      The RCAB did not receive copies of any policies issued by Lumbermens until July 13, 2000, at a deposition of Paul Meany, a claims manager for Lumbermens, taken by the office of Mitchell Garabedian, an attorney for certain of the claimants in the underlying action. At that deposition, the RCAB received partial copies of the following primary policies issued by Lumbermens:

| Policy No. | Period | Exhibit |
|------------|--------|---------|
| 4YL 757 500 | 3/31/74 – 3/31/77 | Affidavit of Bryan R. Diederich ("Diederich Aff."), Ex. 1 |

| | | |
|---|---|---|
| 4YL 64 706 | 9/23/74 – 9/23/77 | Diederich Aff. Ex. 4 |

9.    Although Lumbermens never produced other policies to the RCAB, discovery in this action has revealed that, by 1994, Lumbermens also had located a box of policies including not only the policies produced by Meany at his deposition, but copies of the following additional primary and excess policies issued by Lumbermens:

| Policy No. | Period | Exhibit |
|---|---|---|
| 7YL 757500 | 3/31/77 – 3/31/80 | Diederich Aff. Ex. 2 |
| 0YL 757500 | 3/31/80 – 3/31/83 | Diederich Aff. Ex. 3 |
| 7YL 64706 | 9/23/77 – 9/23/80 | Diederich Aff. Ex. 5 |
| OYL 64706 | 9/23/80 – 3/31/83 | Diederich Aff. Ex. 6 |
| 1SX 002269 | 9/23/81 – 9/23/82 | Diederich Aff. Ex. 8 |
| 2SX 002269 | 9/23/82 – 3/31/83 | Diederich Aff. Ex. 9 |

LMC also sent copies of these policies (other than the excess policies) to Morrison, Mahoney & Miller in July 1994.

C.    **Primary Policies from March 1961 to March 1964**

10.    The RCAB has not located, nor has Lumbermens produced, copies of primary insurance policies issued by Lumbermens from March 1961 to March 1964.  However, the RCAB has uncovered irrefutable secondary evidence of coverage by Lumbermens in that time period.

11.    First, there is evidence that the insuring relationship between Lumbermens and the RCAB preceded March 1961 by as many as six years.  In 1955, the RCAB cancelled all insurance placed through its then insurance broker (Kaler, Carney & Lifler) and obtained bids on replacement coverage from several companies, including Lumbermens.  (Diederich Aff. Ex. 11; Diederich Aff. Ex. 13; Diederich Aff. Ex. 10.)  The RCAB is confident that Lumbermens began issuing insurance policies to it at or around 1955, although it does not press the Court at this time for a ruling on the period 1955-1960, because there is as yet no undisputed evidence as to the amounts of coverage for that period.

12.    By March 31, 1961, at the latest, Lumbermens issued a three year general liability policy to the RCAB.  A document from the RCAB Archives, dated April 15, 1964, refers to coverage for "General Liability" written "3/31/61-3/31/64."  (Diederich Aff. Ex. 15.)  An internal document explaining the RCAB's new insurance procedures after the cancellation of all its previous coverage refers to Lumbermens as carrying the RCAB's general liability coverage, and states that "Lumberman's (sic) have waived the right to invoke eleemosynary defense." (Diederich Aff. Ex. 14.)

13.    The RCAB corresponded with Lumbermens concerning at least one liability claim involving an accident which occurred during the period 3/31/61-3/31/64.  The date of the accident alleged in the suit was March 10, 1963.  (Diederich Aff. Ex. 16; Diederich Aff. Ex. 17; Diederich Aff. Ex. 18.)  When Lumbermens wrote back to the RCAB with respect to this suit,

Lumbermens referred to the fact that the complaint sought recovery "in excess of the insurance under <u>our policy</u>." (Diederich Aff. Ex. 19.) Inasmuch as liability policies were written on an "occurrence" basis, Lumbermens' response to a suit arising out of a March 10, 1963 accident, as well as the other evidence cited above, establish that Lumbermens provided general liability coverage before March 31, 1964, and in fact from at least March 1961.

14.    Further evidence of the existence of coverage by Lumbermens prior to March 31, 1964 can be found in the series of policy numbers used by Lumbermens to identify the RCAB policies. It is undisputed that the policy number for the policy starting on March 31, 1964 was "<u>4</u>LL 64263."(*See* Deposition of Mary Kay Reardon, Exhibit 10 ("Reardon Ex. 10")) It is also undisputed that for each annual period thereafter, up to March 1971, the first digit of the Lumbermens' policy number was increased by one; so, for example, the policy number for the period starting March 196<u>5</u> was "<u>5</u>LL 64263," and so on, with the first digit of the policy number corresponding to the last number of the year in question. (Reardon Ex. 10; Diederich Aff. Ex. 59; Meany dep. 73:15-25; Reardon dep. 146:8-16.) Proof, therefore, that Lumbermens issued policies to the RCAB earlier than March 1964 can be found in references to policy numbers starting with lower numbers. Documents located in the RCAB Archives refer to policy <u>2</u>LL 64263, indicating coverage by Lumbermens at least by March 1962. (Diederich Aff. Ex. 21; Diederich Aff. Ex. 15; Diederich Aff. Ex. 44.)

15.    The secondary evidence thus establishes conclusively the existence of a liability policy issued by Lumbermens to the RCAB at least by March 31, 1961 and continuing for three years to March 31, 1964. Lumbermens itself does not deny that it may have issued policies to the RCAB before 1964. (Reardon Dep. 507:14-23.)

### D.    <u>Primary policies from March 1964 to March 1971</u>

16.     No copies of the actual policies issued by Lumbermens to the RCAB in the period March 31, 1964 to March 31, 1971 have been located by the RCAB, or produced by Lumbermens.  However, much secondary evidence exists to establish the existence of general liability policies issued by Lumbermens in that time period.

17.     The Rule 30(b)(6) designee for Lumbermens (Mary Kay Reardon) testified, at p. 507, that Lumbermens could confirm coverage dating back to at least 1964:

> Q.     You don't know when Lumbermens first wrote a policy, do you, for the Archdiocese?
>
> A      Based on the information we have, *we can confirm that there was coverage from 1964*, but we cannot confirm anything prior to that.

(Emphasis added.)

18.     Lumbermens' testimony in its 30(b)(6) deposition is consistent with previous statements made by representatives of Lumbermens.  In 1997, for example, Lumbermens' claims representative Paul Meany wrote to Mary Kay Reardon that "[t]he Archbishop of Boston carried general liability insurance with us <u>for a period of 1964 through 1983</u> under various policy numbers."  (Reardon Ex. 14 (emphasis added).)

19.     The RCAB began to receive claims related to sexual abuse by clergy and negligent supervision of said clergy in 1992 or 1993.  (*See* Rogers, Jr. dep. 32:14-33:6; McEnness dep. 62:9-14; Reardon Ex. 12.)  Initially, Lumbermens only confirmed coverage back to September 23, 1971.[1]  However, in May 1994, Christine Zinoman of Lumbermens received an

---

[1] In fact, Lumbermens would not acknowledge coverage for years prior to 1971 without "proof" of coverage.  (Diederich Aff. Ex. 41.)  Steve Pickup, a claims person for Lumbermens, wrote to Paul Fallon, the RCAB's claims manager, in April 1993, asking him to "forward any proof of insurance with this company prior to 9/23/1971 . . .. [w]e need policy numbers and effective dates covering the period of 1954–9/23/71."  (Diederich Aff. Ex. 42.)  The RCAB informed Lumbermens that it was searching for information and would provide whatever it could. (Diederich Aff. Ex. 43.)

entire box of policy information from the Lumbermens Burlington office. (*See* Reardon Ex. 39; Zinoman dep. 30:23–31:14.) Included in the box were "underwriting dailies" for RCAB policies dating back to 1974. (*See* Zinoman dep. 17:20–18:10, 77:13–19; Reardon Ex. 12.) Because the 1974 policies indicated that they were renewals of prior policies, Zinoman concluded that Lumbermens should concede that coverage also existed for 3/31/71 – 3/31/74. (Reardon Ex. 12.)

20.     Subsequently, Zinoman contacted Lumbermens' statistical and actuarial department in order to determine whether coverage extended to years <u>before</u> 1971. (*See* Zinoman dep. 16:23–17:12; Reardon dep. 122:23–124:12; Reardon Ex. 5.) By January 1996, the actuarial department had identified an RCAB policy number dating back to 1964. (*See* Reardon Ex. 5.) Subsequently, on July 30, 1996, Lumbermens acknowledged to the RCAB in writing that its coverage extended back to at least March, 1964 and set out the purported "aggregate balance" for the policy periods from 1964-1968. (Reardon Ex. 7.)

21.     In 1997, Paul Meany created a spreadsheet which set forth policy numbers for two sets of primary policies, one set starting in 1964 and a second set starting in 1971. (Reardon Ex. 10; Reardon dep. 354:20–355:4; Meany dep. 74:6–21.) In January 1998, Meany asked for and received permission to send a coverage spreadsheet to representatives of the RCAB. His supervisor, Ms. Reardon, approved the transmission of the spreadsheet, so long as Lumbermens' reserve information was redacted. (Diederich Aff. Ex. 49.) On January 14, 1998, Meany provided this spreadsheet to RCAB's counsel, reflecting coverage from March 1964 to March 1983. (Meany Ex. 10.)

22.     During 1996 and 1997, Christine Zinoman repeatedly wrote in the Lumbermens internal claims handling computer system that the Lumbermens coverage for the RCAB had been confirmed dating back to 1964. (*See* Diederich Aff. Exs. 60-63.)

23.    Although the actual policies from 1964 to 1971 have not been located, the secondary evidence, including representations by Lumbermens itself, confirms the existence of liability policies issued by Lumbermens to the RCAB from March 31, 1964 to March 31, 1971.

**E.    Primary Policies from March 1971 to March 1983**

24.    Lumbermens itself located the policy incepting on March 31, 1974.  (Diederich Aff. Ex. 1.)  That policy was expressly stated to be a renewal of a policy issued in March 1971. (*Id.*; Reardon Ex. 12.)

25.    Since commencement of this action, the RCAB has also received, from records maintained by institutions covered by the RCAB insurance program, certificates of insurance issued in 1974 that explicitly reference the "previous policy" number, as well as invoices from the RCAB in the period from 1971-1974 that reference Lumbermens policy numbers.  (Diederich Aff. Exs. 24-26.)  Accordingly, Lumbermens provided coverage to the RCAB from March 1971 to March 1974.

26.    Lumbermens has now produced in discovery copies of the primary policies issued to the RCAB from March 31, 1974 to March 31, 1983.  The primary policies issued from March 1974 to March 1983 are as follows:

| Policy No. | Period | Exhibit |
|---|---|---|
| 4YL 757 500 | 3/31/74 – 3/31/77 | Diederich Aff. Ex. 1 |
| 7YL 757500 | 3/31/77 – 3/31/80 | Diederich Aff. Ex. 2 |
| 0YL 757500 | 3/31/80 – 3/31/83 | Diederich Aff. Ex. 3 |

27.     Accordingly, there is no dispute that Lumbermens provided liability coverage to the RCAB from March 31, 1971 to March 31, 1983.

**F.     Primary Policies September 1971 to September 1983**

28.     Beginning in September 1971, Lumbermens issued a second set of primary policies to the RCAB.  (*See* Diederich Aff. Ex. 4; Reardon dep. 143:5-149:15)  These policies were referred to as the "parish policies."  The reason for the issuance of this second set of policies was the partial abrogation of charitable immunity in the Commonwealth.  (*See* Diederich Aff. Ex. 22.)

29.     The "parish" policies were also issued on a three year basis by Lumbermens. Lumbermens has produced the parish policy issued on September 1974.  (Diederich Aff. Ex. 4.) Lumbermens has also conceded that the 1974 parish policy was a renewal of one issued in September 1971.  (*See* Reardon Ex. 12; Reardon dep. 143:5-149:15.)   Lumbermens also produced a signed endorsement to the 1971 parish policy.  (Diederich Aff. Ex. 23.)  Since the commencement of this action, the RCAB has received, from records maintained by various parishes covered by the RCAB insurance program, endorsements to the 1971 parish policy.  (*See* Diederich Aff. Exs. 32, 33, 34, 35.)  Lumbermens has now produced in discovery copies of the primary policies in this series for the years September 23, 1974 to March 31, 1983.  They are as follows:

| Policy No. | Period | Exhibit |
|---|---|---|
| 4YL 64 706 | 9/23/74 – 9/23/77 | Diederich Aff. Ex. 4 |
| 7YL 64706 | 9/23/77 – 9/23/80 | Diederich Aff. Ex. 5 |

| OYL 64706 | 9/23/80 – 3/31/83 | Diederich Aff. Ex. 6 |
|-----------|-------------------|----------------------|

30.    Accordingly, there is no dispute that Lumbermens provided liability coverage to the RCAB from September 23, 1974 to March 31, 1983 under a second set of primary policies, the so-called "parish policies".

**G.    Excess Policies September 1973 to March 1983**

31.    Lumbermens has conceded that it issued excess liability policies to the RCAB in the period September 23, 1977 to March 31, 1983.  (Reardon Ex. 10.)  The excess policies were expressly excess to both sets of primary policies issued by Lumbermens.  Lumbermens produced copies of the actual policies for the period September 23, 1981 to March 31, 1983.  They are as follows:

| **Policy No.** | **Period** | **Exhibit** |
|----------------|------------|-------------|
| 1SX 002269 | 9/23/81 – 9/23/82 | Diederich Aff. Ex. 8 |
| 2SX 002269 | 9/23/82 – 3/31/83 | Diederich Aff. Ex. 9 |

32.    The policy issued on September 23, 1981 is clearly marked as a renewal of the September 23, 1980 policy.  (Reardon Ex. 12; Diederich Aff. Ex. 8.)

33.    Lumbermens also does not dispute that excess coverage was issued from September 23, 1977 to September 23, 1981.  (Reardon Ex. 10; Reardon Ex. 18)

34.      However, Lumbermens has disputed that it ever issued excess policies prior to September 1977.  The RCAB originally located a binder with respect to excess coverage placed with Lumbermens in 1973.  (Diederich Aff. Ex. 31.)  LMC rejected the binder as insufficient proof of coverage.  (*See* Diederich Aff. Ex. 50.)

35.      The RCAB now has located additional evidence of the excess policies issued by Lumbermens for the period September 1973 to September 1977.  On October 19, 1973, the Archdiocesan Insurance Department sent a memorandum to the parishes and institutions participating in the RCAB insurance program, informing them that "it has become necessary to purchase Excess Limits of Liability, commonly known as Umbrella Liability."  It further informed them that the RCAB had "purchased such a policy in the name of The Corporation Sole, with a $5,000,000 Limit of Liability." (Diederich Aff. Ex. 30.)  The RCAB has also located invoices sent from the RCAB insurance department to the various parishes and institutions.  Those invoices reference policy numbers for general liability and umbrella liability coverage.  The policy numbers are consistent with those acknowledged by Lumbermens.  (*See* Diederich Aff. Exs. 32, 33, 34, 35.)  The RCAB has also located binding memoranda sent to the parishes relating to the 1971-1974 primary policy.  (*See* Diederich Aff. Ex. 27.)  The RCAB has also located information about a claim Lumbermens paid out of the excess policy for the period 1974.  (Powers Ex. 1.)

36.      Because of LMC's refusal to acknowledge issuance of excess policies for the period September 1973 to September 1977, at a time when LMC was also asserting that all primary coverage for the period prior to September 1977 had been exhausted, the RCAB agreed with LMC to allow LMC to "buy back" the disputed excess policies at the time of the Geoghan settlement in 2002.

37.    It is now indisputable that Lumbermens in fact issued excess policies to the RCAB for the entire period from September 1973 to March 1983.

## II.    The Terms and Conditions of the RCAB's Liability Policies

### A.    Overview

38.    Lumbermens wrote its policies on standard forms.  Lumbermens' standard forms for primary liability insurance policies were standard forms approved by trade organizations like ISO.  (*See* Vega dep. 33:3–15; Bennett 10:7-11:6.)  Lumbermens, like most other domestic insurers, generally used forms approved by ISO or one of its predecessor organizations.  (*See* Connolly Aff. ¶¶16-18.)

39.    All of the available RCAB insurance policies were written on standard forms. (*See* Reardon dep. 62:9–63:1; Connolly Aff. ¶¶16-18.)  Christine Zinoman in fact advised Morrison, Mahoney & Miller that, prior to the 1974 policy, LMC would have used the 1966 form, a copy of which she sent to Morrison, Mahoney & Miller in 1994.  (Diederich Aff. Ex. 65.)

40.    Lumbermens itself maintained (or maintains) copies of old standard form policies. (*See* Reardon dep. 88:8–89:7.)  These standard forms were maintained not only at Kemper's home office, but also at branch and division offices.  (*See* Reardon dep. 89:8–19; Bennett dep. 13:3–14:4.)

41.    Lumbermens claims adjusters often used these standard forms when evaluating coverage issues on pending claims.  (*See* Reardon dep. 61:21–62:3; Bennett dep. 15:10–22, 16:5–18:1.)

### B.    The 1961 through 1966 Policies

42.    Policies incepting from 1961 to 1966 were written on a policy form released in 1955 (the "1955 Form").  The 1955 Form obligates Lumbermens

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.

(*See* Connolly Aff. Ex. A.)

43.     The 1955 Form includes limits of liability for "all damages including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one accident . . .." (*Id.*)

44.     This coverage was not limited by any annual amount.  In fact, the 1955 Form provides for an aggregate limit only with respect to product liability.  (*Id.*)

45.     The 1955 Form includes a provision which states that "the terms of this policy" many not be "waived or changed, except by endorsement . . . ."  (*Id.*)

46.     In 1996, Lumbermens conceded that the policies incepting from 1964 to 1971 had $300,000 per occurrence limits. (*See* Reardon Ex. 14.)  Secondary evidence demonstrates that the 1961-1964 policy had, at a minimum, $100,000 per accident limits of liability for bodily injury claims.  (*See* Diederich Aff. Ex. 16; Diederich Aff. Ex. 19.)

**C.     The 1966 Through 1973 Policies**

47.     Writing to counsel for Lumbermens in 1996, Christine Zinoman indicated that the 1966 policy form would apply to RCAB's insurance prior to 1973.  (Diederich Aff. Ex. 65.) Zinoman presented to said counsel a copy of the 1966 Lumbermens standard policy form, along with her request for advice.

48.     The terms of the Lumbermens 1966 policy form are the same as those in the 1966 standard form approved by ISO's predecessors.  (the "1966 Form".)

49.     The 1966 Form obligates Lumbermens to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury . . to which this insurance applies, caused by an occurrence . . . ."  (*See* Connolly Aff. Ex. B.)

50.     The 1966 Form provides that "[t]he limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence . . . ."  (*Id.*)

51.     The 1966 Form further provides that:

> Subject to the above provisions respecting "each person" and "each occurrence", the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate."

(*Id.*)  This language, like that of the 1955 Form and of the subsequent forms used for the period 1974-1983, contains no aggregate limit applicable to the sexual abuse/negligent supervision claims at issue in this case.

53.     Like the 1955 Form, the 1966 Form provides that "the terms of this policy" shall not "be waived or changed, except by endorsement."  (*Id.*)

52.     Lumbermens has conceded that the policies incepting from 1966 to 1973 have $300,000 per occurrence limits of liability.

**D.     The 1974 through 1983 Primary Policies**

53.     The terms of the insurance policies issued to the RCAB for the period from March 31, 1974 through March 31, 1983 are the same as those in the standard ISO form issued in 1973. When Christine Zinoman wrote to counsel for Lumbermens in 1996, she sent not only the 1966 Lumbermens policy form, but the 1973 policy forms, with "73 Edition" handwritten on their covers.  (*See* Diederich Aff. Ex. 66.)

54. The RCAB primary policies obligate Lumbermens to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of …bodily injury …to which this insurance applies caused by an occurrence … ." (Diederich Aff. Exs. 1- 6). This language is consistent with that of the 1973 ISO standard form. (*See* Connolly Aff. ¶ 19.)

55. The Coverage Part 7, Declarations page of the parish and institution primary policies states that the limits of liability for bodily injury are $300,000 per occurrence, and $300,000 aggregate. Immediately above the limits of liability, the policy states: "The limit of the Company's liability against each Coverage shall be as stated herein, subject to all the terms of the policy having reference thereto." (*See* Diederich Aff. Exs. 1 - 6.)

56. The Coverage Part 7, Section III, Limits of Liability, Coverage A section of the policies issued by LMC to the RCAB states: "The total liability of the company for all damages…because of bodily injury …as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence." (*Id.*)

57. Coverage Part 7, Section III, Limits of Liability, Coverage A, further provides:

> "Subject to the above provisions respecting "each occurrence", the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate".

(*Id.*) This language, like that of the 1955 and 1966 forms, contains no aggregate limit applicable to the sexual abuse claims at issue in this case.

58. Like the 1955 and 1966 forms, the primary policies issued to the RCAB by Lumbermens after 1973 provide that the "terms of the policy" shall not "be waived or changed, except by endorsement."

**E.      The Excess Policies Issued to the RCAB by Lumbermens**

59.      The Insuring Agreement in the excess policies issued to the RCAB by Lumbermens obligates Lumbermens to "indemnify the insured for all sums which the insured shall become obligated to pay as damages … because of personal injury … caused by or arising out of an occurrence."  (Diederich Aff. Exs. 8, 9.)

60.      Section II, Limits of Liability, of the excess policies states: "the total limit of the company's liability for any one occurrence shall be the ultimate net loss resulting therefrom in excess of the underlying limit and then only up to the amount stated in the declarations as the occurrence limit …." (*Id.*)

61.      It further states:

> "[H]owever, the company's liability is further limited to the amount stated in the declarations as the aggregate limit, with respect to all ultimate net loss resulting from one or more occurrences during each annual period … arising out of either (1) products-completed operations liability, or (2) occupational diseases of employees of insureds, such aggregate limit applying separately to (1) and (2)."

(*Id.*)  This language, like that of the primary policies, contains no aggregate limit applicable to the sexual abuse/negligent supervision claims.

**III.    Lumbermens' Handling of Sexual Misconduct Claims**

**A.      Lumbermens Initially Denies All Claims for Cases Arising Out of Allegations of Sexual Misconduct.**

62.      Beginning in 1992 or 1993, the RCAB began notifying Lumbermens of claims relating to sexual misconduct.  (*See* Rogers, Jr. dep. 33:7–19; McEnness dep. 94:12–21; Reardon dep. 43:15–45:12.)

63.      Lumbermens' initial response to these claims was to deny coverage. (*See* Rogers, Jr. dep. 33:20–35:5.)

64.    Lumbermens had in place a policy denominated the "Syracuse Guidelines," which mandated rejection of all claims by the RCAB under one of two theories.  For cases prior to 1971, Lumbermens would inform the RCAB that it could not locate a policy covering that period and that, "as a result, we can not honor their claim."  (Diederich Aff. Ex. 45.)  Further, Lumbermens determined that

> [f]or those years a policy is acknowledged to be in existence, it is
> our intent to disclaim coverage citing that there is no 'occurrence,'
> no 'BI,' no 'PD' as defined.

(*Id.  See also* Reardon Ex. 11.)

65.    The Archdiocese disputed Lumbermens' initial disclaimers of coverage.  (*See* Diederich Aff. Ex. 46.)

**B.    Lumbermens Changes Its Position on Sexual Abuse Claims**

66.    In 1994, the Syracuse Division was closed and the Summit, N.J., Division began reviewing claims previously under the jurisdiction of the Syracuse Division.  (*See* Bennett dep. 27:22–28:19; Zinoman dep. 11:19-13:16.)

67.    Within the Summit Division, the RCAB claims were reviewed by Christine Zinoman in or about 1994.  (Zinoman dep. 11:19-12:2.)

68.    Prompted by a lawsuit on one of the RCAB claims, Christine Zinoman sought a coverage opinion from the Boston law firm of Morrison, Mahoney & Miller.  (Zinoman dep. 11:19-13:16.)

69.    On July 26,1994, Stephen Andrick and Laurie Condos of Morrison, Mahoney & Miller wrote to Christine Zinoman.  In their letter, Attorneys Andrick and Condos opined that the allegations in the complaint might constitute a "bodily injury" as defined under Lumbermens'

policy and that Lumbermens therefore owed a duty to the RCAB to defend the suit.  (*See* Reardon Ex. 38.)

70.    In the July 26, 1994 letter, Andrick and Condos also wrote, at p. 12:

> …we note that the Section III.  Limits of Liability provides that "[t]he limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence."  Accordingly, because these limits *are not subject to a policy aggregate*, we can expect that Attorney Bergstresser will seek to trigger multiple limits under the policy.

(*Id.* (emphasis added).)

71.    On February 15, 1995, Zinoman wrote to Andrick and Condos with news that she had received, subsequent to their July 26, 1994 letter, "an entire BOX of coverage information that was unearthed from our Braintree, MA underwriting files."  (*See* Diederich Aff. Ex. 68.)  In that letter, Zinoman informed Andrick and Condos that Lumbermens had approximately 50 claim files for the RCAB and that many claims had been disclaimed in 1993 and 1994.  (*Id.*)

72.    In her February 15, 1995 letter, Zinoman asked whether, in those 50 cases, there was an "occurrence" of "bodily injury" triggering the policies that Lumbermens had sold to the RCAB.  (*See id.*)  In addition, Zinoman asked in her letter:

> For those cases within our confirmed policy periods, has there been an "occurrence" as defined in our policy?  If so, will these cases trigger 1 or multiple "occurrences" within our polices?  Please note, *there is an aggregate limit for each policy period.* (Under the Christi opinion, it appears that the "occurrence date will be the date of the first alleged molestation.  Is this still true with regards to these additional cases?)

(*Id.*)  (Emphasis added)

73.    On March 16, 1995, Condos wrote back to Zinoman that Lumbermens had a duty to indemnify the RCAB in the 50 cases pending and recommending that it reimburse the RCAB

for cases already disclaimed.  (*See* Reardon Ex. 42.)  In addition, the letter responded to Zinoman's assertion of aggregates, writing simply that, "we acknowledge that each policy is subject to a $300,000 aggregate."  (Reardon Ex. 42.)

74.    Lumbermens' corporate representative acknowledged at her deposition that Zinoman's letter did not request an opinion from Morrison, Mahoney & Miller regarding the application of aggregates to the underlying claims.  (*See* Reardon dep. 660:4–661:15.)

75.    Zinoman recommended on March 29, 1995 to Lumbermens' home office that it reimburse the RCAB for claims already settled and defend them on a going forward basis. (Reardon Ex. 12; Zinoman dep. 73:5-74:6.)

76.    On June 1, 1995, representatives of Lumbermens (Frank Bennett, Christine Zinoman, Brent Twyon and Dick Quinn) met with Paul Fallon of the RCAB and Wilson D. Rogers, Jr., its counsel, regarding the RCAB's insurance coverage.  (*See* Bennett Ex. 5; Diederich Aff. Ex. 47; Bennett dep. 39:6–17; Zinoman dep. 75:5-77:5.)

77.    The "primary purpose" of the June 1, 1995 meeting "was to advise the Archdiocese and their counsel that we were reversing our disclaimer on a number of items.  And that we would continue with their defense counsel that they had employed."  (Bennett dep. 42:24–43:4.)

78.    At the June 1, 1995 meeting, there was no discussion of the concept of an aggregate limit applicable to the RCAB's insurance coverage.  (*See* Zinoman dep. 81:13-21; Bennett dep. 63:5–13.)

79.    When Zinoman began in April 1996 making payments to the RCAB, however, she set forth annual aggregate balances supposedly remaining under the RCAB's insurance

policies and tracking the purported erosion of those aggregates by payments to the RCAB.  (*See* Zinoman 81:22-82:12.)

80.     Zinoman concluded that there were aggregate limits by simply looking at the declarations page attached to the RCAB's insurance policies—but not at the terms of the actual insurance policies, to which the declaration pages refer.  (Zinoman dep. 55:5-16.)

81.     Zinoman told the RCAB that payments by Lumbermens were being deducted from aggregate limits.  (Zinoman dep. 58:1-21.)

### C.    Lumbermens "Exhausts" the Purported Aggregate Limits For Policies Prior to 1977.

82.     In 1997, Zinoman was reassigned within Lumbermens and Paul Meany took over the handing of the RCAB's claims.  (*See* Meany dep. 42:22–43:14.)

83.     Zinoman told Meany that she was taking the position that the RCAB's claims were subject to an annual aggregate of $300,000.  (*See* Meany dep. 44:4–18.)  Mr. Meany never challenged this position and never read the available RCAB policies to determine whether Zinoman's position was correct.  (Meany dep. 45:10–47:6, 63:13–65:11.)

84.     Meany continued the practice of tracking the supposed depletion of the aggregate limits in the RCAB's policies, informing the RCAB as policy aggregates supposedly were exhausted by the payment of claims.  (*Id.* 62:8–63:12.)

85.     By December 1997, Lumbermens was preparing to "exhaust" all policies prior to 1977 by paying to the RCAB a lump sum of $1.9 million.  (*See* Meany Ex. 11.)  In January 1998, Meany wrote to counsel for the RCAB, extending settlement authority for $1.9 million (plus additional funds to be allocated to excess policies).  (*See* Meany Ex. 10.)  In that same letter, Meany asserted that "payments of these claims will eliminate any claims with a pre 9/23/1977 loss date."  (*Id.*)

86.     Later that year, after meeting with RCAB representatives, Meany informed Mary Kay Reardon that "There is also about 1.6 million in unsettled claims for this period [pre-1977]. I advised AOB that we would not honor those claims due to the exhaustion of the primary aggregate."  (Meany Ex. 8.)

87.     In 1998, Lumbermens began rejecting outright all claims from the RCAB pre-dating 1977 and declined to provide either defense costs or indemnity.  (*See* Meany Ex. 10; Diederich Aff. Ex. 50; Reardon Ex. 26; Meany dep. 117:23–118:22.)  In July 1998, Meany wrote to Wilson D. Rogers, III with the request that Rogers "[p]lease advise Paul Fallon that because the aggregates have been exhausted he doesn't need to send me any new claims with a loss date prior to September 23, 1977."  (Diederich Aff. Ex. 50.)  He advised Fallon directly of that position in a letter dated January 19, 1999. (Reardon Ex. 26.)  By January 7, 2000, Lumbermens had started paying claims for the 1977-1983 period under the excess policies on the ground that all of the primary policies were exhausted.  (Diederich Aff. Ex. 64.)

88.     During the time that Meany was asserting that various policies' purported aggregate limits were being eroded, he was aware that the RCAB was without copies of any of its insurance policies.  At deposition, he testified as follows:

> Q.  Well, did you understand in 1998, or whenever it was that you got this document [Reardon Ex. 27], that in fact the Archdiocese was attempting to determine other policy years that might have been in place?
>
> A.  Yes.
>
> Q.  Did they tell you we can't find the actual policies?
>
> A.  I believe so, yes.
>
> ****
>
> Q.  And did they tell you they couldn't find any of the actual policies?

A.  I believe so.

Q.  So you understood the only policies were in your possession?

MR. TENER:  Objection.

A.  Yes.

(Meany dep. 121:2–17.)

89.     In fact, the RCAB had no copies of any of its Lumbermens insurance policies until Meany was deposed in 2000.  (Rogers, III dep. 56:6–58:12.)  At that deposition, Meany produced partial copies of the primary policies for 1974 to 1977 only, which Lumbermens had had since at least 1994.

### D.     The Geoghan Settlement

90.     In 2002, the RCAB entered into a settlement with 86 claimants alleging sexual abuse by John Geoghan.  The RCAB agreed to pay $10,000,000 to settle the claims; LMC agreed to contribute $2,160,000 to the payment of those claims arising between 1977-1983.  (Vega dep. 129:10-129:13; Diederich Aff. Ex. 51.)  Lumbermens denied any obligation to contribute to the settlement of claims arising prior to September 23, 1977, and contributed only on the basis of claims that fell within the excess coverage period from 1977-1983.  (*See* Vega dep. 72:19-74:12).

### E.     The RCAB Discovers that its Policies Are Not Subject to Aggregate Limits

91.     In 2002, the RCAB considered declaring bankruptcy.  It retained the firm of Goodwin Procter LLP to review its financial situation.  As part of that review, Nancer Ballard examined the insurance policies produced by Meany at his deposition.  (*See* Rogers, III dep. 81:1–83:17.)  Ballard concluded that the RCAB's policies did not, in fact, have aggregate limits applicable to the sexual misconduct/negligent supervision claims tendered to Lumbermens by the RCAB.  (*See id.*; Rogers, Jr. dep. 136:14–137:24.)

92.    In January 2003, Ms. Ballard and attorneys from The Rogers Firm met with Patrick

Maloney, outside counsel to LMC, and Augie Vega in Chicago.  (Rogers, Jr. dep. 135:19-

136:13; Rogers, III dep. 79:4-81:2).  At that meeting, the RCAB's representatives asked

Maloney why he thought there were aggregate limits in the policies that applied to the claims

brought against the RCAB, and he replied that the policies stated that they had such aggregate

limits.  (Maloney dep. 30:12-30:14).  After showing Maloney the relevant sections of the

policies, counsel for the RCAB asked whether there was other documentation that supported

Lumbermens' claim that there were aggregate limits applicable to the RCAB's claims.  (*See*

Rogers, Jr. dep. 136:14-137:24.)  Maloney indicated that he would get back to the RCAB on the

issue.  (*See* Rogers, III dep. 81:3-82:17).

93.    In February 2003, Vega and Maloney traveled to Boston where they met with lawyers

from The Rogers Firm and Goodwin Procter.  In this meeting, Maloney conceded that there was

nothing in writing which modified the aggregate limits in the RCAB's insurance policies to make

them applicable to the RCAB's claims.  (*See* Rogers, Jr. dep. 180:17-181:15; Diederich Aff. Ex.

54.)

94.    In this meeting, Maloney proposed that the parties simply agree to impose aggregate

limits on the policies, in light of the past dealings between the parties.  He asserted that since

both the RCAB and LMC had made statements to the plaintiffs concerning the aggregate limits,

the RCAB might face additional exposure if it did not agree to impose aggregates.  (*See*

Diederich Aff. Ex. 55; Rogers III dep. 84:5-85:11.)  Counsel for the RCAB refused to agree to

impose aggregate limits where none existed. (*See* Rogers, III dep. 85:11-86:10)

95.    Counsel for the RCAB immediately sent out a letter to the mediators and the plaintiffs'

counsel stating that, although they previously had said that all coverage prior to 1977 was

exhausted, it now appeared that such coverage had not been exhausted. (Diederich Aff. Ex. 52.)
Maloney responded by saying it was "grossly deceptive" of Rogers to make that statement.
(Diederich Aff. Ex. 53.)

96.    On April 17, 2003, Wilson D. Rogers, Jr. sent a letter to Patrick Maloney referring to the
RCAB's discovery that there were no applicable aggregate limits, and Maloney's proposal that
the parties just "agree in light of past practice" to impose aggregate limits on the policies.
(Diederich Aff. Ex. 54.) Maloney never responded to the letter in writing. (Maloney dep. 74:3-
75:9.)

97.    It was not until after the February 2003 meeting that Maloney stated, for the first time,
that agreements had been reached concerning coverage, and that the RCAB was obligated to
accept the existence of aggregate limits in the primary policies issued by LMC. (*See* Reardon
Ex. 29.)

98.    In his deposition, Maloney stated that he developed his position after a review of the
correspondence and the course of dealings between the RCAB and Lumbermens. (*See* Maloney
dep. 33:5-34:9.) He has alternatively characterized the agreement as one in which the RCAB
agreed to the imposition of aggregate limits in exchange for the extension of coverage back to
1964 (*see* Maloney dep. 50:20-50:23) and one where the RCAB agreed to impose the aggregates
in exchange for Lumbermens' agreement to pay claims out of "unexhausted" policy years when
the abuse occurred over several policy periods. (*See* Maloney dep. 39:10-39:22.) Maloney
admits that this supposed agreement was never reduced to writing, but contends that it was
evidenced by the parties' correspondence concerning the erosion of the purported aggregate
limits. (*See* Maloney dep. 37:1-38:24.) Maloney was unable to explain when the supposed

agreement took place, except to say that it happened over the period from 1995 to 1998. (*See* Maloney dep. 39:1-40:22.)

### F.    Lumbermens Maintains Its "Aggregates" Argument

99.    Zinoman concluded that there were aggregate limits contained in the policies by looking at the declarations page attached to the RCAB's policies.  She did not claim that there had been an agreement to impose aggregates; to the contrary, she stated that the initial decisions about coverage were made by her superiors after she made recommendations about LMC's obligations. (*See* Zinoman dep. 143:18-144:7).  Those decisions were then presented to the RCAB.  (*See* Zinoman dep. 144:2-7)  Her supervisor, Bennett, was unaware during his tenure at LMC of any agreement to apply aggregates to the RCAB's claims.  (Bennett dep. 63:9-64:1).  Neither Reardon nor Augie Vega, who has handled the RCAB's claims since 2002, has seen any written document expressing an agreement between LMC and the RCAB with regard to the imposition of aggregates.  (*See* Reardon dep. 342:23-343:5; Vega dep. 38:11-20; *see also* Reardon dep. 194:22-195:5).  Rogers, III stated that there was never any agreement to impose aggregates on the policies.  (Rogers, III dep. 118:2-11)  Even Maloney stated in his deposition that, when first confronted by the RCAB on the aggregate issue, he asserted that the aggregates were contained in the policies themselves. (Maloney dep 28:17-30:14; Diederich Aff. Ex. 54.)

100.    In July 2003, Mary Kay Reardon wrote to Jim Meehan and Dennis Brand of Lumbermens regarding the RCAB claims.  In her memorandum, she admitted that "[w]e really have no argument on the aggregate …." (*See* Diederich Aff. Ex. 55.)  She further stated that LMC's "attorney feels we can argue estoppel by representation.…*The attorneys for the RCAB relied on our interpretation and never questioned our analysis.*" (*See id.* (emphasis added)).

101.    The memorandum that is the subject of Lumbermens' Motion for Protective Order specifically states twice that there are no applicable aggregates in the primary and excess policies issued by Lumbermens to the RCAB.  (Diederich Aff. Ex. 69.)

102.    Lumbermens continues to assert that there was an agreement between the parties to modify the terms of the policies issued to the RCAB by Lumbermens.  (*See* LMC's Answer and Counterclaims).

       **G.**    **Lumbermens Failure to Indemnify and Defend the RCAB**

100.    Because of Lumbermens' position that all the primary policies were exhausted, it stopped defending and indemnifying the RCAB for claims arising prior to 1977.  As a consequence, Lumbermens rejected a whole host of claims both prior to the Geoghan and global settlements, and it refused to participate in the global settlement although over half of the claims relate to the pre-1977 policy periods.  Since the global settlement, Lumbermens has written letters declining to defend or indemnify the RCAB for new claims related to the pre-1977 era, on the basis that the policies are exhausted.  (Diederich Aff. Exs. 56, 57.)  Lumbermens also has failed to pay claims arising during the years 1977-1983, where it concedes excess coverage is available.

Respectfully submitted,


THE ROMAN CATHOLIC ARCHBISHOP
OF BOSTON, A Corporation Sole

By its attorneys,


_/s/ Paul B. Galvani_____
Paul B. Galvani (BBO # 183800)
Thomas H. Hannigan, Jr.
  (BBO # 220420)
Bryan R. Diederich (BBO # 647632)
Kate Cimini (BBO # 654336)
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7000

Dated:  September 15, 2004