UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Roman Catholic Archbishop of Boston, a )
Corporation Sole, )
)
        Plaintiff )
) Civil Action No. 04-10461-DPW
        v. )
Lumbermens Mutual Casualty Company, )
)
        Defendant. )

## AFFIDAVIT OF DENNIS R. CONNOLLY

1. I have been retained by the Roman Catholic Archbishop of Boston, a Corporation sole, (the "RCAB") as an expert in this proceeding. I have spent my entire nearly 40-year career in the field of insurance. I am, therefore, familiar with many aspects of insurance, particularly (as relates to this case) with the underwriting and interpretation of casualty insurance policies issued in the 1960's, 1970's and 1980's, claims handling with respect to such policies, and, more generally, the nature and practices of the property and casualty insurance industry during those decades.

### Qualifications

2. I retired last year as a Managing Director of Marsh USA Inc. ("Marsh USA"), the world's largest insurance broker, working in Marsh USA's Risk Consulting Group. I am now an independent consultant with respect to insurance matters. Attached to this report as Ex. 1 is my current resume. In addition, I will describe certain aspects of my experience, some of which are

Dennis Connolly (2)

not discussed in my resume, that directly relate to issues in this case.

3. I graduated in 1962 from Colby College and in 1965 from Brooklyn Law School. After law school, from 1965 to 1976, I worked for two law firms that effectively served as "captive counsel" for two insurance companies. From 1965 to 1973, I worked for Fogarty & Nielsen, which provided legal services to Liberty Mutual Insurance Company; and from 1973 to 1976, I worked for Katz & Gantman, which provided legal services to Public Service Mutual Insurance Company. During my employment with both firms, I handled all aspects of litigation for these insurance companies, including litigation with the respective insurance companies' insureds, as well as other litigation involving these companies' insurance policies (e.g., litigation relating to denials of coverage, contribution claims, interpretation of policy provisions, "stacking" and similar issues). Among other things, I handled several matters involving assault and sexual incidents.

4. From 1976 to 1986, I worked for the American Insurance Association ("AIA"), the leading trade association for American property and casualty insurers. As a spokesperson for the insurance industry, I wrote articles, gave presentations and testified before state and federal legislators and regulators on insurance issues. I also frequently consulted and worked with the Insurance Services Office ("ISO"), the largest insurance statistical and insurance policy drafting body in the world.

5. In connection with my work for AIA, in October 1979, I wrote a committee report, "Product Liability Insurance: Underwriting, Rates, Reserves, Business Cycles." The report provided guidance to underwriters with respect to underwriting product liability risks, e.g, what information to collect, how to obtain it, how to collate it to particular types of policies, how to

draft appropriate exclusions and how to set rates. I drafted the report based on my own experience, research, and the input of other committee members, including the chief underwriters of a number of the nation's largest insurers. This paper was used by the United States Interagency Task Force on Products Liability to provide background information about certain aspects of the workings of the insurance industry. I also learned that it was subsequently used as an underwriter training manual by several large insurance companies.

6. During this period, I also worked with various groups to help develop information to enable companies seeking property and casualty insurance to identify insurers who might be able to provide the insurance they needed, including by analyzing the insurers' relevant underwriting criteria. The groups I worked with included the Risk and Insurance Management Society, the Chemical Manufacturers Association, the National Association of Manufacturers, the Chamber of Commerce, and the Pharmaceutical Manufacturers Association (now known as PHARMA).

7. I was appointed by the National Association of Insurance Commissioners ("NAIC") to serve as chairman of two task forces on major liability insurance issues, including environmental liability. In that capacity, I worked closely with underwriters, policy writers, insurance executives and insurance buyers to analyze the then difficult insurance market conditions and, in some cases, recommend possible legislative reforms.

8. In 1986, I joined Johnson & Higgins, the third largest insurance broker in the world, and became a Principal in the company. In particular, I managed the Claims Department and co-managed the Casualty Department in Johnson & Higgins' New York office (its home and largest office). The departments I supervised placed insurance and processed claims. In connection with placing insurance, I was responsible for negotiating policy wording, and for supervising

brokers who conducted such negotiations. I also managed the Law Advisory Division which, among other things, helped develop procedures and guidelines for the conduct of Johnson & Higgins's brokerage business.

9. In 1989, while I was with Johnson & Higgins, I served as the spokesperson for the National Association of Insurance Brokers during hearings on the NAIC Model Managing General Agents Act in 1989 (the "Model MGA Act"). The Model MGA Act was subsequently promulgated by the NAIC and has been adopted in numerous states. Also, during the time that I worked at Johnson & Higgins, I served on a joint committee of the American Bar Association and the NAIC to draft a new insurance policy form for environmental liability insurance. While the final form was never agreed upon, much of the language the committee drafted has been adopted in policy forms that are in use today.

10. Between 1984 and 1988, I served as a member of a number of projects of the Keystone Center. The Keystone Center tries to develop consensus solutions to various policy issues. One of the projects I was involved in at the Keystone Center was an attempt to draft model legislation to address perceived problems in underwriting and obtaining product liability insurance, and the possibility of model product liability legislation. At the Keystone Center, I also worked on an environmental liability report to Congress that was influential in the Superfund Reauthorization Act of 1986.

11. From 1986 until 1994, I was a member of the Wharton School Risk and Decision Processes Center Advisory Committee. From 1992-1994, I was chairperson of that Committee. The Committee was influential in the development of methods to underwrite and draft insurance policy language for environmental liability.

12. In 1997, Marsh USA acquired Johnson & Higgins and I became a Managing Director with Marsh USA. I handled Marsh's client's largest claims, helping to develop settlements and negotiate claims payments from insurers. I also assisted in reviewing and advising clients with respect to insurance policy language, particularly relating to mass tort and environmental exposures.

13. I have participated in special liability programs at the University of Houston Law School, the Wharton School of Business and Yale Law School. In 2002, I taught a four-credit course on insurance and tort law at Harvard Law School, and, in 2002 and 2003, I taught classes on insurance and major liabilities at the University of Pennsylvania Law School.

14. Based upon my knowledge, training, education and experience of approximately forty years in the insurance industry, I am able to render an opinion with respect to certain matters that I understand are relevant to this action. In particular, based upon my experience in underwriting coverage and handling claims for liability for bodily injury, I gained knowledge of the forms of general liability policies utilized in the insurance industry from 1955 to date.

15. I have reviewed the copies of certain Comprehensive General Liability and Catastrophe (Umbrella) insurance sold by Lumbermens Mutual Casualty Company ("LMC") to the RCAB from 1974 till 1983. Specifically, policies that I have reviewed include: 4YL 757 500; 7YL 757 500; OYL 757 500; 4YL 64 706; 7YL 64 706; OYL 64 706; 1SX 002269; and 2SX 002269. I understand that these policies are attached as Exhibits to the Affidavit of Bryan R. Diederich.

16. The policies referenced in the preceding paragraph are all standard form policies approved by ISO. Since 1971, ISO has promulgated standardized policy language that was used

by its members (including LMC) and is filed with state insurance commissioners. Before ISO, a similar function was served by the National Board of Casualty Underwriters and the Mutual Bureau of Casualty Underwriters. In fact, a standard policy was promulgated by the industry in 1955, and was modified in 1966, 1973 and again in 1985. Attached hereto as Exhibits A, B, C, and D are copies of these forms.

17. Based upon my knowledge and experience, an insured like the RCAB was issued standard form general liability policies, not only during the period 1974-1983, but for at least the twenty years prior thereto. I have reviewed the policies issued by LMC to the RCAB during the years 1974-1983. They are standard ISO forms.

18. In my opinion, any general liability policy issued by LMC to the RCAB from 1955 – until 1966 would have been on the 1955 standard form (Ex. A), and form 1966 until 1973, the 1966 standard form (Ex. B) would have been used. Christine Zinoman of LMC, in a memorandum apparently sent by her in the mid-1990's to outside counsel, states that the 1966 form would have been in use for the policy period 1971-1974. See Ex. E.

19. I have reviewed the primary policies sold by LMC to the RCAB, including the standard forms for the years prior to 1974 and the actual policies thereafter. A "per occurrence" limit applies to the alleged negligence in connection with the sexual molestation claims that underlie this action. No aggregate limit on liability, however, ever applied to the period 1955 through 1983 with respect to such claims. The only aggregate for negligence in the policies was an aggregate for completed operations hazard and products hazard as defined in the policies, neither of which is relevant to claims for sexual molestation or negligent supervision. See, for example, Coverage 7, Section III, Limits of Liability, Coverage A.

20. The only applicable limit in the primary and excess policies, therefore, is a per occurrence (or "per accident") limit. Such a limit does not impact the number of occurrences. Therefore, each separate occurrence was covered, regardless how many occurrences (or accidents) may take place in a year. In other words, ten separate occurrences in a year would equate to potential coverage of $3,000,000 for the RCAB on each primary policy. And so on. The excess policies -- themselves limited only on a per occurrence basis -- would be tapped only if one occurrence resulted in a loss in excess of the primary per occurrence limit.

21. I also have reviewed the aggregate limitation in the umbrella policies and it too has no bearing on the claims in question. That aggregate applied only to products liability, completed operations, and occupational disease hazards.

22. I have reviewed the memorandum of Mary K. Reardon to Jim Meehan and Dennis Brand dated July 23, 2003. I agree with her conclusion that no bodily injury aggregates in the primary policies are applicable.

23. I also have reviewed the letter from Christine Zinoman to the RCAB of July 30, 1996 in which she acknowledges that LMC wrote coverage for the RCAB from 1964 to 1983 (attached hereto as Exhibit F) and I have reviewed the spreadsheet of Paul Meany in which he sets further policy numbers for primary and excess coverage dating back to 1964 (attached hereto as Exhibit G). While those documents reflect insurance of the types and for the years set forth, it is my opinion that LMC also sold general liability insurance to the RCAB for years prior to 1964.

24. I have reviewed correspondence between John Gartland and Rt. Rev. Thomas J. Finnegan, Jr. for the RCAB and Edward P. Ryan of the Legal Department of LMC. The

correspondence was exchanged in 1964 concerning an accident to one Annie McCabe that occurred on March 10, 1963. Mr. Gartland states that coverage for the 1963 accident was $100,000. (Attached hereto as Exhibit H) I have also reviewed a memorandum of the RCAB that references a policy in place from March 1961 to 1964. (Attached hereto as Exhibit I) I conclude, based on the foregoing, that LMC most assuredly insured the RCAB against liability starting in 1961 at the latest, and not 1964 as asserted by Ms. Zinoman.

25. I also have reviewed documents relative to excess coverage for the period 1973 to 1977. In my opinion, such coverage in fact was sold by LMC to the RCAB with a $5,000,000 per occurrence limit. I base this opinion both on a report to the Insurance Review Committee of June 28, 1974 (attached hereto as Exhibit J), a binder for excess coverage of 1973 (attached hereto as Exhibit K), invoices from the RCAB to various parishes for the years 1973-1977 that bear the LMC excess policy number concededly used by LMC (attached hereto as Exhibit L), and on the payment by LMC in 1982 of a claim from the excess policy for the year 1974 as described in a memorandum of Arthur Powers, dated 10/26/82 (attached hereto as Exhibit M).

26. In my opinion , based upon my experience in, and knowledge of, the insurance industry, LMC has breached its duties to its insured the RCAB at a minimum by asserting that aggregate limits applied to the claims in question, by misrepresenting that its primary policies were exhausted and by denying coverage as a result, by denying the very existence of excess coverage for the years 1973 to 1977, and by failing to investigate claims as acknowledged by Augustin Vega.

Signed under the pains and penalties of perjury this 14th day of September, 2004.

_____
Dennis R. Connolly

Sworn to before me this 15th day of November, 2004.

_____
Notary Public
My commission expires 04/03/06.

[Notary Seal: IVAN M. BALEV, NOTARY PUBLIC, STATE OF NEW JERSEY, My Comm. Expires 4/03/2006, No. 2273810]