UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
THE ROMAN CATHOLIC                      )
ARCHBISHOP OF BOSTON,                   )
A CORPORATION SOLE,                     )
Plaintiff,                              )
                                        )
v.                                      )    C.A.04-10461-DPW
                                        )
LUMBERMENS MUTUAL                       )
CASUALTY COMPANY,                       )
            Defendant.                  )
_____)

**LUMBERMENS MUTUAL CASUALTY COMPANY'S OPPOSITION TO
THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON'S
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**

Lumbermens Mutual Casualty Company ("LMC") respectfully submits this memorandum in opposition to the Roman Catholic Archbishop of Boston, a Corporation Sole's ("RCAB") Motion to Compel the Production of Documents.

## OPERATIVE FACTS

The RCAB contends that LMC has waived the attorney client privilege and the work product protections from disclosure based on the production of (1) correspondence provided by coverage counsel to LMC in 1994 and 1995; (2) notes prepared in 2004 reflecting the mental impressions and advice of counsel retained in connection with reinsurance matters; and (3) a July 23, 2003 memorandum prepared by an LMC claim director that reflects communications from counsel.  For independent reasons, the production of these documents does not support the RCAB's contention.

BOST1-837189-4

1.  <u>The correspondence provided by coverage counsel.</u>

The coverage opinions provided to LMC by Morrison, Mahoney & Miller (the "MMM Coverage Opinions") contain privileged attorney-client communications and protected work product materials and were listed on the privilege log that LMC provided to the RCAB at the time of its initial disclosure. On July 26-28, 2004, the RCAB deposed Mary Kay Reardon, the 30(b)(6) designee of LMC in this matter. During the first day of Ms. Reardon's deposition, LMC's counsel sought information concerning LMC's determination that certain policies issued to the RCAB had aggregate limits of $300,000 per year. In responding to this line of examination, Ms. Reardon testified that in reaching that determination, LMC relied, in part, on the MMM Coverage Opinions. In connection with the bad faith claim asserted by the RCAB, which is based on LMC's alleged misrepresentation regarding the policies' aggregate limits, LMC intends to rely on the advice of counsel defense. Accordingly, LMC agreed to produce the MMM Coverage Opinions which address this issue. The specific deposition testimony that led to the production of the MMM opinions developed as follows:

BY MR. GALVANI:

Q. Is Lumbermens relying solely on the dec page for the argument that there is an aggregate applicable to these cases of $300,000 per year?

A. Lumbermens is not relying solely on the dec page. Lumbermens is relying on several people within the organization who were familiar with the forms and familiar with the policies after review, in addition to an outside coverage opinion, in addition to the Archdiocese of Boston who never took exception and agreed and confirmed that there was a $300,000 aggregate.

Q. I move to strike. That wasn't my question. We will come back to that. Who gave the outside opinion?

A. A law firm in Massachusetts Morrison, Mahoney & Miller.

*   *   *

Q. Is it your position apart from any agreement that you say may have been reached that there, in fact, are aggregates applicable under these policies to these claims?

A. Based on the information that I have read and researched, it was clear that everyone believed that aggregates -- everyone interpreted this coverage that aggregates applied.

Q. Everyone meaning who?

A. Everyone who looked at the policies, everyone who looked at the coverage and reviewed the coverage including outside counsel.

Q. They all concluded that that policy language provided aggregates?

A. Yes.

Q. And please name these people -- Zinoman, Donohue?

A. Yes.

Q. Morrison, Mahoney & Miller?

A. Yes.

Vol. I Deposition Transcript of Mary Kay Reardon, 86:6-86:24; 242:2-23 (see Exhibit A hereto).

LMC produced the MMM Coverage Opinions at the second day of Ms. Reardon's deposition because the examination by counsel for the RCAB raised the subject of the bad faith claim and the MMM Coverage Opinions are evidence which LMC intends to rely upon in the defense of that claim. Contrary to the unfounded assertion in the RCAB's argument, LMC did not simply change its mind and voluntarily produce the MMM Coverage Opinions. See the RCAB's Motion to Compel Production of Documents at p. 2.

2. <u>The notes reflecting the mental impressions and advice of counsel retained in connection with reinsurance matters.</u>

The document that includes the mental impressions and advice provided to LMC by the law firm of Sidley, Austin, Brown & Wood, LLP ("Sidley Austin") is the subject of LMC's pending Motion for a Protective Order and Request for Return of an Inadvertently Produced

3

Document.  In fulfillment of its disclosure obligations in this case, LMC, through an initial disclosure of documents on July 1, 2004, and a number of supplemental disclosures thereafter, has provided the RCAB with more than 168,000 pages of documents.  Inadvertently included among these, was a two-page document which contains privileged attorney-client information and attorney work product relative to LMC's investigation into the availability of reinsurance for the claims paid to the RCAB.  LMC discovered this inadvertent disclosure on August 17, 2004, after receiving notice that the RCAB had served a subpoena on Sidley Austin, a law firm retained by LMC in connection with its investigation into the availability of reinsurance.  Upon reviewing the document, counsel for LMC confirmed with counsel at Sidley Austin that the document was privileged and contained confidential information intended only for LMC.  Significantly, during the period of review and production, LMC's counsel in this action had not been informed that the Sidley Austin firm had been retained by LMC in connection with reinsurance matters related to the RCAB claims.  Thereafter, on August 23, 2004, counsel for LMC sent a letter to the RCAB's counsel informing the RCAB's counsel that the document had been inadvertently produced.  By this letter, LMC requested the RCAB to delete the document from all media on which it was stored electronically and to destroy all hardcopies.  By letter dated August 24, 2004, counsel for the RCAB rejected LMC's request.  As detailed in LMC's Memorandum in Support of its Motion for a Protective Order and Request for Return of an Inadvertently Produced Document, the disclosure of this document did not constitute a waiver of any privilege or protection from disclosure for this document, for the subject of reinsurance, or for other matters addressed therein.

3.  The July 23, 2003 memorandum prepared by Mary Kay Reardon.

The third document that the RCAB asserts as a basis for its motion to compel is a Memorandum dated July 23, 2003 from Mary Kay Reardon, to Jim Meehan, a Claim Executive also at Kemper and copied to Dennis Brand, an Executive at Kemper (the "Reardon Memorandum"). The Reardon Memorandum summarizes the history of the handling of the RCAB's sexual misconduct claims and provides an update of those claims. It also discusses the efforts taken by LMC and its counsel when they met with representatives of the RCAB and their attorneys. The Reardon Memorandum states that during this meeting, the applicability of aggregate limits was discussed and Patrick Maloney "raised the issue that all parties agreed with our coverage interpretation and that both parties told the plaintiffs that the primary policies were exhausted." [1] The Reardon Memorandum also refers to an argument made by LMC's counsel during the course of this meeting: "[o]ur attorney feels that we can argue estoppel by representation, since they [the RCAB] had the opportunity to review policies and argue coverage."

## ARGUMENT

I.  **The Production of the MMM Coverage Opinions Waives Nothing More than Counsel's Opinions in those Letters which Are Relied upon to Support LMC's Defense to the RCAB's Bad Faith Claim.**

Count III of the RCAB's Complaint against LMC alleges a breach of the covenant of good faith and fair dealing. In particular, the RCAB contends that LMC made material misrepresented concerning the applicability of aggregate limits to the claims asserted against the

---

[1] To put this in context, from the inception of the sexual abuse claims in 1992 through February of 2003, LMC believed that the policies had aggregate limits, informed the RCAB and its counsel of this belief, and the RCAB and its counsel agreed to apply all payments made by LMC, under a reservation of rights, against the aggregate limits. See, e.g., Deposition Transcript of Wilson D. Rogers, Jr. (30(b)(6) Designee of the RCAB), 77:23-80:2 (see Exhibit B hereto). After the aggregate limits agreed to by the RCAB were exhausted, the RCAB advised the counsel for the plaintiffs that the primary policies were exhausted. See, e.g., Deposition Transcript of Jeffrey A. Newman, 16:5-18:9 (see Exhibit C hereto).

5

RCAB.  See, e.g., RCAB's Complaint at ¶ 70.  While LMC denies these allegations (see, e.g. LMC's Answer at ¶ 70)--and the existence, terms and conditions, and applicability of the policies issued by LMC to the sexual abuse claims remain a subject of dispute--it has raised the advice of counsel defense in connection with the bad faith claim.  Consequently, when during the course of 30(b)(6) deposition of LMC, the RCAB's attorney asked about the bases for LMC's determination that the policies had aggregate limits, Mary Kay Reardon stated that LMC relied, in part, on the MMM Coverage Opinions.  Hearing that LMC intended to rely on the advice of Morrison, Mahoney & Miller as a defense to the bad faith claim, counsel for the RCAB requested the production of the MMM Coverage Opinions and all additional correspondence between LMC and the attorneys at MMM.  Those materials were produced the following day. See, e.g., Vol. III Deposition Transcript of Mary Kay Reardon, 627:1-627:4 (By Galvani:  Q.  I would like to turn to, if I may, the opinion letters from Morrison, Mahoney & Miller that were produced to us last night.)

       The MMM Coverage Opinions and the additional communications between LMC and Morrison were produced because "[w]hen a party asserts an advice of counsel defense, it waives the attorney-client privilege with respect to 'all communications to and from counsel concerning the transaction for which counsel's advice was sought.'"  Saint-Gobain/Norton Industrial Ceramics Corp. v. General Electric Co., 884 F. Supp. 31, 33 (D. Mass. 1995) (citations omitted). There were two "transactions" for which LMC sought advice from Morrison Mahoney & Miller. The first was a single claim filed against the RCAB (the "Christi Claim"); the second was "various claims" asserted against the RCAB based on alleged sexual abuse by priests.  Morrison Mahoney & Miller's involvement began in May 1994 and ceased in April 1995.  Since the sole basis of the RCAB's bad faith claim pertains to representations allegedly made by LMC in

connection with the application of aggregate limits to the sexual abuse claims asserted against the RCAB, LMC intends to rely on the MMM Coverage Opinion solely for the fact that they refer to the applicability of a $300,000 limit in the policies that they reviewed. While the MMM Coverage Opinions address other issues, which the RCAB has parsed out and delineated as sixteen different subjects, the RCAB's contention that LMC has waived the privilege or work product protection to all documents that refer to any of those subjects is both facile and fallacious. Moreover, as delineated by the RCAB, the sixteen subjects are so impermissibly vague and overbroad as to encompass materials that cannot, under any construction, be deemed to be relevant to this case.[2]

LMC produced the MMM Coverage Opinions and the additional correspondence between LMC and MMM because "an assertion of the defense of advice of counsel results in a waiver of the attorney-client privilege and work product protection." Micron Separations, Inc. v. Pall Corp., 159 F.R.D. 361, 363 (D. Mass. 1995). LMC does not dispute that the RCAB is

---

[2] As with the entire Phase I discovery effort, which has taken three months and cost the financially strapped LMC hundreds of thousands of dollars, the RCAB's motion to compel appears to be nothing more than an effort to exhaust LMC's resolve and resources without any regard to the issues on which this litigation will ultimately be resolved. A substantial dispute exists between the RCAB and LMC regarding the existence of coverage for the RCAB. However, insofar as the RCAB may be able to establish that certain policies were issued, and may be able to establish the terms and conditions of those policies, it will still have to establish that the claims for which it seeks coverage fall with this the scope of coverage provided. The RCAB has conceded that it has no actual policies, and LMC has not located any polices. Nevertheless, nearly a decade ago, LMC undertook exhaustive efforts to locate policies and located underwriting dailies, which contained policy forms that may have been included in primary policies issued to the RCAB from 1974-1983. LMC also located information in its statistics/actuarial department that indicated that some type of liability policy was issued to the RCAB for the period from 1964 to 1974. However, the information on the "line cards" did not indicate the type of policy, the limits, the specific insureds, or any other terms or conditions of coverage. Some of these issues may be resolved by the court in its rulings on the Phase I summary judgment motions. Others will be left for determination by the jury. But of far greater significance to the ultimate resolution of this case is the issue of the RCAB's institutional knowledge of the sexual abuse being committed by its priests. There is no coverage under any insurance policy issued by LMC, nor could there be coverage as a matter of public policy, for intentional conduct by the RCAB that caused or failed to prevent the rampant pedophilia, rape, and other sexual abuse committed by its priests. The RCAB has strived to defer the discovery on this subject; but insofar as it is a critical element of their claims for insurance coverage, it cannot be avoided. Neither the subject motion to compel, nor any other peripheral issue raised by the RCAB, will prevent the litigation of this dispositive issue.

entitled to take depositions of the attorneys involved in preparing the MMM Coverage Opinions. However, it is not entitled to other privileged or protected documents or privileged testimony. LMC has only waived the attorney-client privilege and work product protection as to those documents that have already been produced because a party only waives privilege as to those materials and communications that were used or considered in preparing the coverage opinion. Dunhall Pharmaceuticals, Inc. v. Discus Dental, Inc., 994 F. Supp. 1202, 1210 (C.D. Cal. 1997), citing Steelcase, 954 F. Supp. at 1198-99; Micron Separations, Inc. v. Pall Corp., 159 F.R.D. 361, 363 (D. Mass. 1995).

Courts have narrowly construed the scope of subject matter to which the waiver of attorney-client privilege applies when asserting an advice of counsel defense. Saint-Gobain, supra, at 34. In this case, LMC asserts reliance on advice of counsel in connection with its determination that aggregate limits applied to the RCAB's claims for insurance coverage for the sexual abuse claims. This is the ***only*** subject matter for which LMC has waived any privilege or protection from disclosure. "The 'waiver of the attorney-client privilege as to one issue does [not] serve as a waiver of the privilege as to all issues.'" Nitinol Medical Technologies., Inc. v. AGA Medical Corp., 135 F. Supp. 2d 212, 217 (D. Mass. 2000), quoting Micron Separations, Inc., 159 F.R.D. at 365, n.8 (insert in original). Claims of implied waiver must be evaluated in light of principles of logic and fairness and the waiver of the attorney-client privilege should only be so broad as to prevent prejudice to the opposing party. Kirschner v. Klemons, 2001 U.S. Dist. LEXIS 17863, *11 (S.D.N.Y. Oct. 31, 2001); In re Keeper of the Records XYZ Corp., 348 F.3d 16, 23 (1st Cir. 2003). Because LMC only intends to rely upon the MMM Coverage Opinions as a defense to the RCAB's claims for insurance coverage for the sexual abuse claims,

this is the only subject matter to which the RCAB would be entitled to additional production to prevent prejudice.

LMC has already produced those documents required to prevent prejudice to the RCAB. The RCAB's attempt to use the these materials to indiscriminately gain access to every document on LMC's privilege log that relates to any of the sixteen vaguely delineated topics for which RCAB claims subject matter waiver, is preposterous. The principles of fundamental fairness upon which waiver of privilege is based require that the RCAB's overreaching effort be quashed. LMC has not waived its attorney-client privilege with respect to any communications other than those with MMM, which have already been produced.

In <u>Robertson v. Allstate Ins. Co.</u>, 1999 U.S. Dist. LEXIS 2991 (E.D. Pa. March 10, 1999), an insurance company asserted reliance on advice of counsel as a defense to a bad faith claim. The moving party attempted to compel the production of all attorney-client privileged documents. <u>Id</u>. The insurance company argued that while they had waived privilege with respect to their outside counsel upon whose advice it relied, it had not waived privilege with respect to communications with in-house counsel. <u>Id</u>. The court agreed and held that the insurance company had not taken the affirmative step of placing the advice of in-house counsel at issue, and to allow discovery of those communications would undermine the principals of fairness, the ultimate purpose behind the exception to the attorney-client privilege. Id. at *16. While MMM was retained by LMC in 1994, and issued coverage opinions in 1995, there subsequently have been other counsel retained by LMC in connection with other coverage matters--i.e., at a time when the factual landscape had dramatically changed. In 1994-95, the RCAB's intentional, institution-wide efforts to conceal not only the sexual misconduct of its priests, but its knowledge of and participation in the cover-up, had not been revealed. The privilege attending

9

communications between LMC and subsequent counsel, including Tressler Soderstrom Maloney & Priess, Sidley Austin, and Robinson & Cole LLP, is not waived by virtue of the fact that LMC produced the MMM Coverage Opinions to support the good faith position it took in 1995 with respect to the applicability of aggregate limits.

Nor does the production of the MMM materials effect a subject matter waiver of attorney work product protection.  The work product doctrine safeguards the integrity of the adversarial process by protecting (1) document or other tangible things, (2) prepared in anticipation of litigation, (3) by or for a party or its representative.  Milford Power Limited Partnership v. New England Power Co., 896 F. Supp. 53, 56 (D. Mass. 1995).  The work product doctrine preserves a zone of privacy in which a party, his attorney, and in many cases his non-attorney, can prepare for litigation free from unnecessary intrusion by his adversaries.  In re Grand Jury Subpoena, 220 F.R.D. 130, 141 (D. Mass. 2004).  Broad concepts of subject matter waiver of attorney work product are inappropriate when applied to Fed. R. Civ. P. 26(b)(3).  Fleet National Bank v. Tonneson, 150 F.R.D. 10, 16 (D. Mass. 1993).

The sweeping scope of waiver that the RCAB contends to result from the production of the MMM materials is neither equitable, nor fair.  Such a finding would require a party to choose at the earliest stage possible in the case between surrendering all of its litigation files, or sacrificing its "bad faith" defense of reliance on advice of counsel.  See Dunhall Pharmaceuticals, 994 F.Supp. at 1210 (explicitly rejecting the holding of Mushroom Associates v. Monterey Mushrooms, Inc., 1992 U.S. Dist. LEXIS 19664 (N.D. Cal. 1992)); see also, K.W. Muth Co. v. Bing-Lear Mfg. Group, L.L.C., 219 F.R.D. 554 (E.D. Mich. 2003).  Further, the bad faith claim made by the RCAB against the LMC goes to the mental state of LMC, not that of LMC's counsel.  See Nitinol, 135 F.Supp. at 218.  As a result, there is no subject matter waiver

regarding any MMM work product that was not transmitted to the LMC, as such bears no relevance to LMC's state of mind.  Id.  In addition, there has been no waiver with regard to any subject other than the existence of aggregates--the only subject put in issue.

II. **The Document Reflecting the Opinions of Counsel from Sidley Austin Was Inadvertently Produced and Its Production Has Not Resulted in any Attorney Client Privilege or Work Product Waiver.**

As detailed in LMC's September 3, 2004 Motion for Protective Order, there has been no waiver of attorney-client privilege or work product immunity based on the inadvertently produced document reflecting the opinions of counsel from Sidley Austin.  In addition, there has been no subject matter waiver with regard to subjects referenced in this inadvertently produced document.

The RCAB presents no legal or factual support for its contention that the disclosure of the document containing opinions of counsel from Sidley Austin was not inadvertent.  The factors this Court has considered in determining whether a claimed inadvertent disclosure was, as a matter of law, "inadvertent," include: (1) the quantity of material that is claimed to have been inadvertently produced; (2) the amount of time that has elapsed since the production of the documents; and (3) the manner in which the documents were reviewed for privilege or work product and how the document production was managed.

    A.    <u>The production of the document containing opinions of counsel from Sidley Austin was inadvertent as a matter of law.</u>

The RCAB cannot credibly argue that the scope of the inadvertent production was small.  The document containing opinions of counsel from Sidley Austin is a single two-paged document in the context of a production which included more than 168,000 pages.  This supports a finding of inadvertence.  See <u>Milford Power Limited Partnership v. New England Power Co.</u>, 896 F. Supp. 53 (D. Mass. 1995) (A production of eight privileged documents produced did not

result in a waiver). Further, LMC's attorneys made a prompt request for the return of the inadvertently produced document. See <u>VLT Corp. v. Vicor Corp.</u>, 194 F.R.D. 8 (D. Mass. 2000) (The Court found an inadvertent production when counsel discovered its production of privileged documents two months after the rolling initial disclosures ended and made a prompt request for their return). Finally, the manner in which the documents were reviewed support a finding of inadvertence. Two attorneys and a paralegal reviewed these documents carefully resulting in only a single two-paged document in a production of over 168,000 pages being inadvertently produced. See, <u>Fleet National Bank v. Tonneson</u>, 150 F.R.D. 10 (D. Mass. 1993) (The court found an inadvertent production where plaintiff's counsel reviewed and screened more than 50,000 documents for privilege, but failed to remove one of three volumes of an accounting report). These factors demonstrate that the disclosure of the document containing opinions of counsel from Sidley Austin should be found to be inadvertent as a matter of law.

>  B.  <u>The inadvertent production of the document containing opinions of counsel from Sidley Austin does not waive its attorney-client privilege or work product protection.</u>

In <u>Ken's Foods, Inc. v. Ken's Steak House, Inc.</u>, 213 F.R.D. 89 (D. Mass. 2002), this Court noted that there have been three different approaches applied to determining whether an inadvertent disclosure constitutes a waiver and observed that in the District of Massachusetts there has been developing judicial support for the "middle ground" approach. The "middle ground" approach considers: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice." <u>Id</u>. at 95, quoting <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 190 F.R.D. 287, 290-292 (D. Mass. 2000).

These five factors were addressed in LMC's Motion for Protective Order filed on September 3, 2004.  The middle ground test applies many of the same factors that were considered above in determining whether the disclosure itself was inadvertent.  What is also considered in determining whether a waiver has occurred is the overriding interest of fairness and justice.  In balancing the equities in <u>Fleet National Bank</u>, the court considered whether the opposing party was misled by the disclosure, whether the opposing party relied upon the inadvertently produced document, and whether it would be unjust, at this point, not to compel production.  The court stated, "the appropriate question to ask when inadvertent disclosure . . . is involved is not whether it remains essential to continue to recognize the privilege; the question, rather, is whether there is cause not do so . . . ."  150 F.R.D. at 15.

Where the document in question does not provide any information relative to the existence of policies issued by LMC to the RCAB, or the terms or conditions of any policies issued by LMC to the RCAB, the RCAB cannot credibly contend that it was misled by, or relied upon the material to its detriment.  Moreover, LMC is seeking to protect opinion work product, which is granted greater protection.  See, <u>In re Grand Jury Subpoena</u>, 220 F.R.D. 130, 144 (D. Mass. 2004).  Further, "while lawyers have an obligation to vigorously advocate the positions of their clients, this does not include the obligation to take advantage of a clerical mistake in opposing counsel's office where something so important as the [work product] privilege is involved." <u>Milford Power</u>, supra, at 59 (insert in original), quoting <u>Resolution Trust Corp. v. First of America Bank</u>, 868 F. Supp. 217, 219-220 (W.D. Mich. 1994).

C. <u>The inadvertent disclosure of the document containing opinions of counsel from Sidley Austin has not caused a subject matter waiver.</u>

In <u>Texaco Puerto Rico v. Department of Consumer Affairs</u>, the First Circuit stated, "[i]n general, a waiver premised on inadvertent disclosure will be deemed to encompass 'all other

13

communications on the same subject.'" 60 F.3d 867, 883-884 (1st Cir. 1995), quoting <u>Weil v. Investment/Indicators, Research & Mgmt., Inc.</u>, 647 F.2d 18, 24-25 & n.13 (9th Cir. 1981). However, since 1995, the District of Massachusetts has backed away from the harsh and exacting standard that the First Circuit stated--"in general"--should be applied. For example, in <u>Amgen</u>, although the court found a waiver of privilege for the documents produced, it nevertheless refused to find a subject matter waiver. Rather, Judge Young expressed reservations regarding the prospect that "rigid application of . . . a subject matter waiver rule effectively could force Hoechst to open its confidential files for Amgen inspection." <u>Amgen</u>, 190 F.R.D. at 293.

In <u>VLT, Inc. v. Vicor Corp.</u>, 2003 U.S. Dist. LEXIS 723, at *13 (D. Mass. Jan. 21, 2003), the court found a subject matter waiver for certain documents produced because the disclosures were deemed "grossly negligent or reckless" due to repeated production of the very same documents the movant claimed were produced inadvertently. In contrast, the single document that was inadvertently disclosed in this case was produced just once in a set of documents exceeding 168,000 pages, was explicably missed since counsel reviewing and producing the documents was unaware of LMC's retention of Sidley Austin, and was not grossly negligent or reckless. <u>VLT, Inc.</u> provides a stark contrast to the circumstances of this case. Based on the inadvertence of the disclosure of the document containing opinions of counsel from Sidley Austin, the Court should not find any waiver. However, should the Court find that the privilege has been waived with respect to the document containing opinions of counsel from Sidley Austin, the Court should recognize that there is no cognizable basis for finding that there has been a broad subject matter waiver with respect to the topics found in the inadvertently produced document. See <u>Prudential Insurance Co. v. Turner & Newall, PLC</u>, 137 F.R.D. 178, 182-83 (D.

Mass. 1991) (The court declined to find a subject matter waiver and held that there was no waiver of privilege beyond the documents actually disclosed).

### III.   As a Matter of Law, the Reardon Memorandum Is Not a Privileged Attorney-Client Communication.

In its argument that the production of the Reardon Memorandum waives any privilege related to the subject matters addressed in the memorandum, the RCAB has overlooked a critical step in the analysis of a claim of privilege waiver.  For a waiver to occur, the document produced must have been privileged in the first place.  The Reardon Memorandum is not privileged, which is why LMC produced it to the RCAB.  All of the matters discussed in the Reardon Memorandum are matters that LMC and its counsel discussed with the RCAB and its counsel. "The privilege protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice." In re Keeper of the Records XYZ Corp, supra, at 22.

In this case, the RCAB points to the statement in the Reardon Memorandum indicating that LMC's attorney "feels that we [LMC] can argue estoppel by representation, since they [the RCAB] had the opportunity to review policies and argue coverage . . . [they] relied on our interpretation and never questioned our analysis," as a waiver of privilege.  However, as the Reardon Memorandum, itself, indicates, this specific argument had been previously communicated to the RCAB and its counsel by LMC's then counsel, Attorney Patrick Maloney, and an LMC representative, Augie Vega:  "Augie Vega and Pat Maloney met with the RCAB and their attorneys.  They raised the issue that all parties agreed with [LMC's] coverage interpretation and that both parties told the [claimant's counsel] that the primary policies were exhausted."  By definition, this information is not privileged because the information was not intended to be kept confidential.

LMC did not place the Reardon Memorandum on its privilege log, nor neglect to review the document in question.  Contrary to the RCAB' position, "it is the unquestioned rule that the mere relationship of attorney-client does not warrant a presumption of confidentiality." Winchester Capital Management Co., Inc. v. Manufacturers Hanover Trust Co., 144 F.R.D. 170, 174 (D. Mass. 1992).  LMC produced the document to the RCAB because the Reardon Memorandum was not privileged and its production to the RCAB effectuates absolutely no waiver of any privilege to the subject matters contained therein.

## CONCLUSION

The RCAB is not entitled to the production of any documents on the LMC privilege log based on the production of the MMM materials, the document containing opinions of counsel from Sidley Austin, or the Reardon Memorandum. The production of these documents, for the reasons set forth above, does not effect any waiver of the disclosure protections afforded by the attorney-client privilege and/or the work product doctrine. As a result, the RCAB's Motion to Compel the Production of Documents should be denied in its entirety.

Respectfully submitted,

LUMBERMENS MUTUAL CASUALTY COMPANY,

By its attorneys,

ROBINSON & COLE LLP,

/s/ Brian P. McDonough
John E. Tener, BBO No. 563791
Mary L. Cataudella, BBO No. 553350
Anthony R. Zelle, BBO No. 548141
Brian P. McDonough, BBO No. 637999
Nancy M. Cremins, BBO No. 658932
Robinson & Cole LLP
One Boston Place
Boston, Massachusetts 02108
(617) 557-5900

September 17, 2004