# B

8/5/2004 Wilson D. Rogers Jr. (Fina)

| | | |
|---|---|---|
| 1 | | MR. GALVANI:  Object to the form.  Go |
| 2 | | ahead. |
| 3 | A. | Okay.  Well, basically, basically, RCAB went |
| 4 | | forward and continued to try and resolve these |
| 5 | | cases, and it relied upon the representations of |
| 6 | | Lumbermen's that in certain time periods the |
| 7 | | annual aggregate had been reached, and to the |
| 8 | | extent that there was on that basis no remaining |
| 9 | | coverage, RCAB would still try to resolve the |
| 10 | | case. |
| 11 | Q. | And did the RCAB then contribute to the |
| 12 | | settlement funds? |
| 13 | A. | Yes, it did. |
| 14 | Q. | And does that help to clarify the time frame |
| 15 | | when the exhaustion issue first created |
| 16 | | financial exposure to the RCAB? |
| 17 | A. | No, it really doesn't.  No. |
| 18 | | MR. GALVANI:  Would this be a good |
| 19 | | time to break for lunch? |
| 20 | | MR. ZELLE:  It's fine. |
| 21 | | (Luncheon recess taken from 12:22 p.m. to |
| 22 | | 1:38 p.m.) |
| 23 | Q. | Mr. Rogers, when it reached a point in time |
| 24 | | where Lumbermen's policies had been exhausted |

| | | |
|---|---|---|
| 1 | | and the RCAB was called upon to contribute to |
| 2 | | settlements of the claims, did you at that point |
| 3 | | do anything to determine the basis for the |
| 4 | | statement that Lumbermen's made that there were |
| 5 | | aggregate policy limits? |
| 6 | | MR. GALVANI:  Objection. |
| 7 | A. | Well, we had had discussions with Lumbermen's |
| 8 | | over a period of time as to where they were |
| 9 | | allocating or to what policy year they were |
| 10 | | allocating settlements.  So I think at one level |
| 11 | | it wasn't like a surprise that all of a sudden |
| 12 | | we get a phone call and said, "Nothing left for |
| 13 | | this particular year."  We were working towards |
| 14 | | that in certain years.  So, you know, there were |
| 15 | | ongoing discussions based upon the |
| 16 | | representations of Lumbermen's that there were |
| 17 | | annual aggregates. |
| 18 | Q. | And I just want to focus you in on that time |
| 19 | | period when the exhaustion of the aggregates in |
| 20 | | certain time periods required the RCAB to |
| 21 | | contribute money to settle claims.  At that |
| 22 | | point in time, did the RCAB do anything to |
| 23 | | discern the basis for the statement made by |
| 24 | | Lumbermen's that there were aggregate limits? |

8/5/2004  Wilson D. Rogers Jr. (Fina)

```
 1              MR. GALVANI:  Objection.
 2    A.   No.  I think RCAB, going back in time to the
 3         mid-1990s and really the early 1990s, since
 4         there had been an acknowledgment of policies and
 5         coverage, we had accepted the representation
 6         that Lumbermen's had made that there were
 7         aggregates, which we now understand is not
 8         accurate, but we had accepted that.
 9    Q.   And throughout the time period beginning when
10         Lumbermen's first acknowledged the existence of
11         policies issued to the RCAB, did the RCAB ever
12         request the basis for the representation made by
13         Lumbermen's that the policies had aggregate
14         limits?
15    A.   Can I have that read back?
16    Q.   Sure.
17    A.   I'm sorry.
18    Q.   No problem.  It may not have been the most
19         precise question.
20              (Reporter read back the last question.)
21    A.   Well, the representation by Lumbermen's had been
22         that policies issued, there is coverage, but
23         there are annual aggregates of $300,000.  So I
24         mean that was the -- we just accepted the
```

8/5/2004 Wilson D. Rogers Jr. (Fina)

```
 1          representation that they made.  It wasn't like
 2          we were looking for a more detailed explanation.
 3          That was our relatively succinct representation.
 4     Q.   Okay.  When did the RCAB first have any
 5          information about the terms or conditions of any
 6          Lumbermen's policy?
 7     A.   Well, I suppose that the first time would have
 8          been in '92 or '93, whichever that time frame
 9          is, when we got a -- started getting that form
10          type of letter which I've referenced earlier,
11          where there would be specific quoted sections in
12          what we understood to be the standard policy
13          language.  Now, that would be the first time.
14     Q.   All right.  And in those letters, was there any
15          reference to the aggregate limits?
16     A.   I do not believe so, but I -- I don't believe
17          so.
18     Q.   There was a reference to the occurrence language
19          in the policy; is that right?
20     A.   That's right, occurrence language, bodily
21          injury, and maybe one other term defined,
22          quoted.
23     Q.   With respect to the occurrence, was it the
24          RCAB's understanding that the language quoted in
```