## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE, Plaintiff, v. LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant. | ) ) ) ) ) ) ) ) ) ) ) | C.A.04-10461-DPW |

## LUMBERMENS MUTUAL CASUALTY COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Through its motion for partial summary judgment, the RCAB seeks to establish that LMC issued certain primary and excess liability insurance policies to the RCAB. It also seeks to establish the terms of those policies. Lastly, the RCAB contends that it is entitled to coverage under those policies for the costs it has incurred in defending and settling sexual claims.

In 1995, LMC informed the RCAB that it issued primary policies for the period from March 31, 1964 to March 31, 1983 and that the policies issued after March 31, 1974 included comprehensive general liability coverage under a form entitled "Coverage Part 7." In 1995, LMC also informed the RCAB that it had issued excess liability policies for a period from September 23, 1977 to March 31, 1983. While no original or certified copies of any policies have ever been located, LMC located underwriting files that included forms and endorsements and does not dispute that these forms were included in the policies issued to the RCAB. Material issues of fact preclude a determination that LMC issued any primary policy to the RCAB for a period prior to March 31, 1964. Material issues of fact also preclude any determination

concerning the terms and condition of policies issued prior to March 31, 1974. A material dispute concerning the applicability of aggregate limits to the indemnity payments provided to the RCAB for sexual abuse claims precludes any summary adjudication on that issue. Finally, as a matter of law, the RCAB is not entitled to a summary adjudication that LMC is precluded from contesting coverage for the claims covered by the global settlement.

## STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, set forth below are the material facts of record which preclude the summary adjudications requested by the RCAB:

1)   Neither LMC nor the RCAB has located any original or certified copy of any insurance policy issued by LMC to the RCAB.

2)   LMC issued primary policies covering certain RCAB parishes for the period from September 31, 1974 to March 31, 1983 (the "parish policies").

3)   LMC issued separate primary policies covering certain RCAB institutions, such as schools and hospitals, for the period from March 31, 1964 to March 31, 1983 (the "institution policies").

4)   LMC issued excess liability policies to the RCAB for the period from September 23, 1977 to March 31, 1983.

5)   The documents which the RCAB has submitted as Exhibits 1-6 to the Diederich Affidavit are compilations of copies of declaration pages and policy forms that were contained in LMC's underwriting files. These files, referred to as "underwriting dailies" or "dailies," did not contain the actual policies that were issued to the RCAB. **Exhibit A to Transmittal Affidavit of Brian P. McDonough (hereafter, "Ex. A"), Tab 1 (Deposition of Mary Kay Reardon as Rule 30(b)(6) designee of LMC**

2

(hereafter, "Reardon Deposition")), 160:16-18; Ex. A, Tab 2 (Deposition of Wilson D. Rogers, Jr., as Rule 30(b)(6) Designee of the RCAB (hereafter, "Rogers Deposition")) 15:13-17.

6)      The declaration pages of the institution policies in effect from March 31, 1974 to March 31, 1983 and the parish policies in effect from September 31, 1974 to March 31, 1983 state that the annual aggregate limit for bodily injury claims is $300,000. **Transmittal Affidavit of Bryan R. Diederich (hereafter "Diederich Aff."), Ex. 1-6, Bates Nos. LM0018245 and LM0018247, LM0017788-89, LM0017922-23, LM0021371-72, LM0022502, LM0022508.**

7)      The institution policies in effect from March 31, 1974 to March 31, 1983 and the parish policies in effect from September 31, 1974 to March 31, 1983 include a form entitled "Coverage Part 7." **Diederich Aff., Ex. 1-6, Bates Nos. LM0017984-85, LM0018246-47, LM0017789-90, LM0017923-24, LM0021373, LM0022508-09.**

8)      During the course of this litigation, the RCAB has produced from its own records more than nineteen (19) separate copies of Coverage Part 7. Specifically, on August 4, 2004, the RCAB produced twelve (12) copies, and on September 3, 2004, the RCAB produced seven (7) more copies. **Exhibit B to Transmittal Affidavit of Brian P. McDonough (hereafter, "Ex. B"), Tab 1 (documents produced on August 4, 2004, as well as cover letter under which they were forwarded) and Tab 2 (documents produced on September 3, 2004, as well as cover letter under which they were forwarded).**

9)      As evidenced by representations made by the RCAB's counsel, Ropes & Gray, during the depositions of the RCAB's two Rule 30(b)(6) designees, as well as the document

production coverage letters from Ropes & Gray, the nineteen (19) separate copies of Coverage Part 7 produced by the RCAB were obtained from various parishes within the RCAB as the result of requests to same made by Ropes & Gray, again, *after* the initiation of this litigation.[1] **Ex. A, Tab 4 (Deposition of Joseph McEnness, as Rule 30(b)(6) designee of the RCAB (hereafter, "McEnness Deposition")), 39:9-13; Ex. A, Tab 2 (Rogers Deposition), 107:20-109:7; Ex. B, Tab 1 (documents produced on August 4, 2004, as well as cover letter under which they were forwarded); Ex. B, Tab 2 (documents produced on September 3, 2004, as well as cover letter under which they were forwarded).**

10)    Four of the witnesses presented by the RCAB – including each of its Rule 30(b)(6) designees – testified that they did not know if the RCAB's prior efforts to locate policy materials (*i.e.*, prior to its initiation of this lawsuit), included asking the parishes and institutions to search their records for policy related information. **Ex. A, Tab 5 (Deposition of Paul Fallon (hereafter, "Fallon Deposition")), 45:9-47:23; Ex. A, Tab 6 (Deposition of Arthur W. Powers (hereafter, "Powers Deposition")), 46:16-47:17, 48:23-49:11; Ex. A., Tab 2 (Rogers Deposition), 116:14-20; Ex. A, Tab 4 (McEnness Deposition), 37:11-39:8, 41:2-42:1.**

11)    As expressly acknowledged by the RCAB's General Counsel and Rule 30(b)(6) designee, there is no legal distinction between the RCAB and its parishes; they are one and the same. **Ex. A, Tab 2 (Rogers Deposition), 142:1-4.**

12)    In a letter dated February 25, 1994, from Thomas H. Thompson at LMC to the RCAB's General Counsel, Wilson D. Rogers, Jr., Mr. Thompson wrote: "I direct your

---

[1] In light of these late productions (*i.e.*, subsequent to LMC's Rule 30(b)(6) examination Mr. McEnness), LMC has moved to compel further testimony regarding the circumstances of their recovery at the parish level.

attention to the 'Insuring Agreement' section under Coverage Part 7 of the Combination Automobile General Liability Policy . . . ." **Ex. B, Tab 3.**

13)     Neither the RCAB nor its General Counsel ever requested a copy of Coverage Part 7 from LMC, nor for that matter, any policy materials.  **Ex. A, Tab 1 (Reardon Deposition), 78:8-24, 79:1; Ex. A, Tab 7 (Deposition of Paul D. Meany (hereafter, "Meany Deposition")), 60:3-7; Affidavit of Christine M. Zinoman, ¶ 5; Affidavit of Benjamin F. Bennett, III, ¶ 5.**

14)     On July 13, 2000, in connection with one of the sexual abuse claims, counsel for the plaintiff took a 30(b)(6) deposition of LMC.  The RCAB was represented at this deposition by Wilson D Rogers, III.  At this deposition, the LMC designee, Paul Meany, produced copies of certain underwriting dailies, including Coverage Part 7, which contains the language that the RCAB relies upon to support its claim that the aggregate limits of the primary policies do not apply to the sexual abuse claims. **Ex. B, Tab 15 (excerpts from deposition transcript confirming date conducted and appearance thereat by Wilson D. Rogers, III); Plaintiff's Statement of Material Facts, ¶ 91 (confirming RCAB's reliance upon materials produced at Meany deposition for contention that no aggregate limits apply).**

15)     Wilson D. Rogers, Jr., testifying as a 30(b)(6) corporate designee for the RCAB on the subject of the RCAB's knowledge and understanding of the coverage afforded under the policies issued by LMC testified that he never read Coverage Part 7, even after it was produced at the July 13, 2000 deposition.  **Ex. A, Tab 2 (Rogers Deposition), 110:13-21.**

16) Coverage Part 7, which includes the language that the RCAB relies upon to support its claim that the aggregate limits of the primary policies do not apply to the sexual abuse claims, has been in the actual possession of the RCAB, or otherwise available to it, from the time the RCAB first sought coverage for these claims from LMC. **See factual references at ¶¶ 7-15, herein.**

17) The declaration page of the excess policy in effect from September 23, 1977 to September 23, 1978 states that the aggregate limit is $5,000,000. **Diederich Aff., Ex. 7, Bates No. RCA7001608.**

18) The declaration page of the excess policy in effect from September 23, 1981 to September 23, 1982 states that the aggregate limit is $10,000,000. **Diederich Aff., Ex. 8, Bates No. LM0017717.**

19) The declaration page of the excess policy in effect from September 23, 1982 to September 23, 1983 states that the aggregate limit is $2,000,000. **Diederich Aff., Ex. 9, Bates No. LM0017728.**

20) The RCAB has not presented any documentary evidence of the terms of any excess policy in effect for the period from September 23, 1978 through September 23, 1981. **Plaintiff's Statement of Material Facts, generally.**

21) In December, 2001, LMC and the RCAB entered into an agreement "to put to rest and resolve all disputes and controversies between them relating in any way to whether coverage is available under the LMC Policies" that the RCAB contends were issued by LMC for the period from 1973 to 1977. By the terms of this "Buy-Back Agreement and Release of Policies," the "RCAB acknowledge[d] that as of the date of this agreement RCAB has no liability coverage under the LMC Policies" that may

have been issued for the period from 1973 to 1977. **Ex. B, Tab 4 (Buy-Back Agreement).**

22)  On June 1, 1995, LMC informed the RCAB that although it did not have any actual policies, it could confirm that both the parish primary liability policies and the institution primary liability policies had been issued for the period from 1971 to 1983. **Complaint, ¶ 16.**

23)  By correspondence dated January 31, 1996, LMC informed the RCAB that the existence of the "March 'Set' of policies" had been verified back to 1964. **Ex. B, Tab 5.** In addition, LMC advised the RCAB that it had issued excess liability policies to the RCAB for a period beginning September 23, 1977 and ending March 31, 1983; though again, LMC was not able to locate any original or certified copies of policies. **Complaint, ¶ 16.**

24)  With respect to the primary policies issued by LMC for the period from March 31, 1961 to March 31, 1974, the RCAB has not submitted any testimonial or documentary evidence to establish any of the policies terms or conditions, apart from that offered through its purported expert witness. **Plaintiff's Statement of Facts, generally.**

25)  LMC's 30(b)(6) designee on the subject of the existence and terms and conditions of the policies issued to the RCAB testified that she believed that the policies issued prior to 1974 did not provide general liability coverage. Rather, she testified that those policies likely contained the Owner, Landlord and Tenant liability form. **Ex. A, Tab 1 (Reardon Deposition), 95:1-15, 96:2-97:4.**

26)    From the time the RCAB first sought insurance coverage from LMC for the sexual abuse claims, LMC has participated in the defense and settlement of these claims under a reservation of rights. **Ex. A, Tab 5 (Fallon Deposition), 72:1-24, 73:1-6.**

27)    During a meeting on  June 1, 1995, LMC informed the RCAB that, subject to a full reservation of its rights, LMC would reimburse the RCAB for the settlement payments and defense costs incurred in connection with the sexual abuse claims against the RCAB (as opposed to the claims asserted against the priests themselves) arising out of the conduct of its priests.  In addition, during this meeting, which was attended by Benjamin Frank Bennett, a Division Claim Manager for LMC, Christine M. Zinoman, a Division Claim Supervisor, Wilson D. Rogers, Jr., the RCAB's General Counsel, Paul Fallon, the RCAB's Insurance Claim Manager, LMC informed the RCAB that all indemnity payments would be applied against the policies' aggregate limits.  **Complaint, ¶ 16.; Ex. A, Tab 2 (Rogers Deposition), 57:15-58:13.**

28)    During their June 1995 meeting in Boston, the RCAB communicated to LMC "that the [Archdiocese] really wanted to keep Kemper personnel out of [the personnel records of accused priests] as much as possible because of the highly sensitive nature." **Ex. A, Tab 3 (Zinoman Deposition), 79:18-80:17.**

29)    Kemper is the trade name of LMC. **Ex. A, Tab 1 (Reardon Deposition), 6:3-5.**

30)    By letters dated January 14, 1998, July 14, 1998, and September 15, 1998, LMC informed the RCAB that all of the primary policies in effect through September 23, 1977 were exhausted by indemnity payments. **Ex. B, Tab 6.**

31)     By thirteen (13) separate letters from April 22, 1996 to June 12, 2003, the RCAB
        acknowledged its understanding that the indemnity payments made by LMC were
        being applied against the policies' aggregate limits of $300,000. **Ex. B, Tab 7.**

32)     By fifty-seven (57) separate letters from April 25, 1996 to January 7, 1997, LMC
        informed the RCAB how the indemnity payments were being applied to the aggregate
        limits and advised the RCAB of the remaining aggregate balances available under the
        LMC primary policies. **Ex. B, Tab 8.**

33)     On October 22, 1998, LMC issued sixteen (16) checks to the RCAB to reimburse the
        RCAB for settlement payments made to resolve sexual abuse claims.  Each of these
        checks explicitly stated that the payment reflected thereon fully exhausted the
        applicable aggregate limit of the policy to which it was applied. **Ex. B, Tab 9.**

34)     By letter date January 14, 1998, Paul Meany of LMC wrote to the RCAB General
        Counsel, Wilson D. Rogers, to "confirm discussions prior to the holidays . . . ."  In
        this letter, Mr. Meany informed Attorney Rogers that the amount LMC authorized
        Attorney Rogers to settle pending claims implicating both the parish policies and the
        institution policies "is the remaining balance on both primary policies."  By this
        letter, LMC also informed the RCAB that because the aggregate limits were
        breached, "payments of these claims will eliminate any claims with a pre 9/23/77 loss
        date." **Ex. B., Tab 10.**

35)     By letter dated July 14, 1998 from Mr. Meany to Attorney Rogers, LMC again
        "advised that any pending claims with a loss date prior to September 23, 1977 would
        not be honored due to the exhaustion of aggregates."  Mr. Meany also requested
        Attorney Rogers to "advise Paul Fallon [the RCAB's Claim Manager] that because

9

the aggregates have been exhausted, he doesn't need to send me any new claims with a loss date prior to September 23, 1977." **Ex. B, Tab 11.**

36)    Thereafter, including by letter dated March 15, 2000 from the RCAB's General Counsel, Wilson D. Rogers, Jr., the RCAB acknowledged that submission of pre-1977 claims was only appropriate under the excess policies as the primary policies had been exhausted. **Ex. B, Tab 12.**

37)    Prior to February 24, 2003, the RCAB never raised any objection or in any other manner contested the application of aggregate limits to the sexual abuse claims, even though the limits had been exhausted and LMC had stopped paying for the defense or settlement of those claims in 1998. **Plaintiff's Statement of Material Facts, generally.**

38)    Upon LMC's communication that coverage for clergy sexual abuse claims had been fully exhausted, the RCAB unreservedly endorsed the condition by actually communicating it to counsel for abuse victims. **Ex. A, Tab 8 (Deposition Transcript of Jeffrey A. Newman), 17:6-18:1; Ex. B, Tab 13 (various correspondence between the RCAB's General Counsel, Wilson D. Rogers, Jr., and counsel for abuse victims, regading exhaustion of policies).**

39)    LMC has paid an approximate total of $19,197,181 to the Roman Catholic Archdiocese of Boston, A Corporation Sole ("RCAB") to indemnify for loss and expenses ($17,698,263 for loss, and $1,498,918) resulting from clergy sexual abuse claims. **Affidavit of Mary Kay Reardon (hereafter, "Reardon Aff."), ¶3.**

40)    In its Complaint, the RCAB states that in June of 1995 representatives of LMC informed the RCAB that it would apply indemnity payments made in connection with

the sexual abuse claims against the LMC's policies stated $300,000 aggregate limits. **Complaint, ¶ 16; Reardon Aff., ¶ 4.**

41)    If the RCAB had challenged LMC's statement that the indemnity payments made in connection with the sexual abuse claims would be applied against the policies stated $300,000 aggregate limits, essentially asserting a claim for <u>unlimited</u> coverage, subject only to the $300,000 per occurrence limit, LMC would have filed a declaratory action raising, at a minimum, the coverage issues expressly identified in its reservation of rights letters. **Reardon Aff., ¶ 4.**

42)    For the next three years following the June 1995 meeting, LMC applied the indemnity payments it made to the RCAB against the policies' stated $300,000 aggregates, and for each indemnity payment made, LMC informed the RCAB which policy's aggregate limit it would be applied to.  **Ex. B, Tab 8 (fifty-seven (57) separate letters from LMC to the RCAB between April 25, 1996 and January 7, 1997, informing how indemnity payments were being applied to the aggregate limits and advising of remaining aggregate balances); Reardon Aff., ¶ 5.**

43)    Throughout this period the RCAB never objected to the application of the payments against the policies' stated aggregate limits, though it occasionally challenged the manner in which LMC allocated the payments among the policies.  **Reardon Aff., ¶ 5.**

44)    Had the RCAB ever raised an objection, LMC would have filed a declaratory judgment action raising all of the available coverage and other defenses then known. As indicated in its counterclaim in this action, LMC came to learn of many issues which, for any given claim, might abrogate coverage, in whole or part, including,

without limitation: whether negligent supervision of a particular pedophile priest constituted a cognizable "occurrence"; whether resulting harm constituted cognizable "bodily injury"; whether lack of prior notice of improper conduct by a particular perpetrator priest precluded a finding of negligence; whether prior notice of improper conduct by a particular perpetrator priest precluded a finding of negligence; whether recoverable damages were subject to an asserted charitable immunity defense; and/or whether recovery was time barred. **Reardon Aff., ¶ 5.**

45)    Had the RCAB ever intimated that annual aggregate limits should not apply to clergy sexual abuse claims, LMC would have insisted upon unfettered access to the RCAB's personnel records for accused priests. **Reardon Aff., ¶ 6.**

46)    Based on the statements made by the RCAB's General Counsel, Wilson D. Rogers, LMC did not require the RCAB to provide information concerning the accused priests because the RCAB claimed that the information was highly sensitive and confidential. **Ex. A, Tab 3 (Zinoman Deposition), 79:18-80:17; Ex. B, Tab 14 (file note from April 25, 1996, by Christine Zinoman indicating that "the diocese wants to avoid any publicity on these cases – a suit vs a bishop, etc. would most likely be published"); Reardon Aff., ¶ 6.**

47)    If the RCAB had refused to provide all of the information requested concerning the underlying claims, LMC would have sought a court order compelling the RCAB to provide the information that LMC was entitled to under the terms and conditions of the policies. **Reardon Aff., ¶ 6.**

48) On or about July 23, 2003, LMC's Director of Corporate Claims, Mary Kay Reardon, sent a memo to Jim Meehan and Dennis Brand of LMC, which contained the phrase, "[w]e really have no argument on the aggregate . . . ." **Reardon Aff., ¶ 7.**

49) Ms. Reardon's sole intention for including that phrase was to convey the fact that, in and of themselves, the terms and conditions of Coverage Part 7, do not extend the application of annual aggregate limits to clergy sexual abuse claims. **Reardon Aff., ¶ 7.**

50) In no way can such be construed as a belief on Ms. Reardon's part, then or now, that aggregate limits should not have been applied to clergy sexual abuse claims. To the contrary, it is Ms. Reardon's belief that as evidenced by the deliberate conduct of LMC and the RCAB, the parties understood that aggregate limits would apply, and in keeping with that understanding, they were applied. **Reardon Aff., ¶ 7.**

51) Further acknowledgement of Ms. Reardon's understanding as to the propriety of applying aggregate limits can be found in her memo, itself, wherein she opined that the RCAB would be estopped from attempting to enforce any interpretation at variance with its actual conduct. **Reardon Aff., ¶ 7.**

52) Paragraph 101 of Plaintiff's Statement of Material Facts references a document which is the subject of LMC's pending Motion for Protective Order. As such, the RCAB's reference to, and reliance upon, such document for the purposes of its summary judgment motion is improper. LMC expressly reserves the right to dispute Paragraph 101, and the characterizations it contains, should such become necessary upon the Court's ruling on the pending Motion for Protective Order.

## SUMMARY OF ARGUMENTS

Between 1994 and 2004, the RCAB failed to undertake a diligent search for LMC policies or policy related materials.  Accordingly, it is not entitled to rely on secondary evidence to prove the existence or the terms and conditions of the policies.  Since the RCAB cannot discharge its affirmative obligation to establish the terms and conditions of these policies without relying upon secondary evidence, LMC is entitled to partial summary judgment declaring that there is no coverage for sexual abuse claims arising out of the conduct of the RCAB's priests and other personnel between 1961 and March 31, 1974.  However, even if the court considers the secondary evidence, a genuine issue of fact exists concerning the existence of any primary policy predating March 31, 1964 and whether the primary policies in effect prior to March 31, 1974 included a Comprehensive General Liability form, such as Coverage Part 7.[2]

With respect to the 1974-1983 primary policies, which include Coverage Part 7, the RCAB is not entitled to a determination that the aggregate limits stated on the declaration pages do not apply to the sexual abuse claims arising out of the conduct of its priests.[3]  In relying exclusively on the "Limits of Liability" policy language in Coverage Part 7, the RCAB ignores the evidence embodied in the relationship between LMC and the RCAB from 1995 through 2003.  A material issue of fact exists as to whether the RCAB's conduct during this period precludes this claim.  The RCAB had numerous copies of Coverage Part 7 in its possession from

---

[2] Although the RCAB has alleged "[o]n information and belief, LMC also provided insurance coverage to the RCAB from 1954 until 1964" (Complaint ¶ 10), the RCAB has failed to present any evidence of the existence of any LMC policies pre-dating March 31, 1961.  Similarly, the RCAB has failed to present any evidence to establish the terms or conditions of the excess policies issued by LMC for the period September 23, 1978 through September 23, 1981.  Accordingly, LMC is entitled to partial summary judgment on the RCAB's claim for coverage for sexual abuse claims arising out of the conduct of various priests prior to March 31, 1961 and for claims seeking excess coverage for sexual abuse claims arising out of the conduct of various priests between September 23, 1978 and September 23, 1981.

[3] The RCAB's motion seeks a declaration that ". . . (7) no aggregate limits on recovery are applicable under any of the above-mentioned policies (or otherwise) for claims of clergy abuse or related negligent supervision asserted against the RCAB or its hierarchy; (8) the primary policies issued by the RCAB commencing in 1961 are in full force and effect and are not, as alleged by LMC, exhausted by payment of claims . . . ."

14

the time LMC first informed it that the indemnity payments on the sexual abuse claims would be applied against the aggregate limits.  The factual record demonstrates that for more than eight years, the RCAB affirmatively acknowledged and tracked the exhaustion of the policies' limits. Prior to February 24, 2003, the RCAB never challenged or objected to the application of the indemnity payments against the policies' aggregate limit, though it did challenge other positions taken by LMC based on Coverage Part 7.[4]  Moreover, insofar as the RCAB seeks to evade the consequences of its failure to raise this issue in a timely manner based on its allegations of misrepresentation, it cannot establish that the factual elements of its misrepresentation claim are undisputed.

Finally, the RCAB is not entitled to a determination that "(9) LMC improperly took the position that primary policies for the period prior to 1977 were exhausted and has wrongly disclaimed claims arising before that date; [and] (10) because of its wrongful disclaimers of coverage for events occurring prior to September 1977, LMC cannot assert defenses with respect to rejected claims, nor can it challenge the RCAB's handling of any such claim." See, Plaintiff's Motion for Partial Summary Judgment, p.2.  Since the applicability of aggregate limits to the sexual abuse claims is a matter of dispute, the RCAB cannot presently establish that LMC breached the policy when it stopped defending claims in 1998.  However, even if there were a determination that LMC is obligated to pay more than $300,000 per policy year to indemnify the RCAB, a wrongful disclaimer does not preclude LMC from contesting the applicability of coverage to the specific clergy sexual abuse claims.

---

[4] In addition, discovery in Phase II is expected to establish that the RCAB affirmatively used the exhaustion of the aggregate limits to improve its negotiating position in settling the sexual abuse claims.

**ARGUMENT[5]**

**I.    LMC IS NOT PRECLUDED FROM CONTESTING THE APPLICABILITY OF COVERAGE TO THE SPECIFIC CLERGY SEXUAL ABUSE CLAIMS.**

In its forty-page brief, the RCAB's devotes a scant three paragraphs to its argument that "LMC cannot assert defenses with respect to rejected claims." Unremarkably, in this truncated argument, the RCAB provides no persuasive legal or factual support for its sweeping proposition that LMC is liable for the full amount of the global settlement that was paid for claims arising during the periods the LMC policies were in effect. Two fundamental questions, on which there are material issues of fact in dispute, underlie the RCAB's facile presentation of this issue. First, since the applicability of aggregate limits to the sexual abuse claims is a matter on which there are material issues of fact in dispute, the RCAB cannot presently establish that LMC breached the policy when it refused to provide further coverage for claims arising out of conduct prior to September 23, 1977. Second, even if there were a determination that LMC is obligated to pay more than $300,000 per policy year to indemnify the RCAB, the RCAB has not established that the claims arising out of the clergy's sexual abuse of children are covered.

In support of its contention that it is entitled to summary judgment on the question of LMC's liability for the global settlement, the RCAB argues that LMC breached its contractual duties under the insurance policies when it "took the position that the part policies for the period prior to September 1977 were exhausted." As detailed below in section III, material issues of fact preclude this determination. However, even if the RCAB could establish that LMC breached the policies, it would not be entitled to its requested determination that "LMC cannot assert any defenses with respect to rejected claims." A failure to defend does not bar an insurer from contesting its indemnity obligation." <u>Polaroid Corporation v. The Travelers Indemnity</u>

---

[5] Citations herein to "SOF" are to LMC's Rule 56.1 Statement of Material Facts.

Company,  414 Mass. 747, 762 (1993); see also, Newell-Blais Post No. 443, Veterans of Foreign

Wars of the U.S., Inc. v. Shelby Mut. Ins. Co., 396 Mass. 633, 638 (1986) (an obligation to

indemnify does not automatically follow from the existence of a duty to defend); Magoun v.

Liberty Mut. Ins. Co., 346 Mass. 677, 681-682 (1964) (same).

The LMC policies (for which terms and conditions have been established) do not provide

coverage for injury resulting from acts unless they are "neither expected nor intended from the

standpoint of the insured." Nor, as a matter of public policy, would it be appropriate to afford

the RCAB coverage under any liability policy for injuries that were the result of its institutional

practice of concealing its priests' sexual abuse of children from the public and reassigning priests

who were the subject of claims to other parishes or institutions. Coverage is also not provided

where an insured has failed to cooperate with its insurer in the investigation of a claim and,

throughout the time LMC was defending and indemnifying the RCAB for sexual abuse claims,

the RCAB concealed from LMC its knowledge concerning prior sexual abuse claims asserted

against its priests. Nowhere was this more evident than in the Geoghan cases in which the

RCAB's failure to cooperate in good faith induced LMC to contribute millions of dollars to the

settlements.

The authorities relied upon by the RCAB do not support its argument that it is entitled to

a summary adjudication that LMC is liable for the global settlement. Rather, these cases focus

on an insurer's right to pursue an allocation of the insured's monetary liability (whether incurred

by judgment or settlement) between covered and non-covered claims, where it has been

determined that the insurer breached the policy. See, *e.g.*, Liberty Mutual Ins. Co. v.

Metropolitan Life Ins. Co., 260 F.3d 54 (1st Cir. 2001); Colonial Gas Co. v. Aetna Cas. & Surety

Co., 823 F.Supp. 975 (D.Mass. 1993): See also, Dash v. Chicago Ins. Co., 2004 U. S. Dist.

Lexis 17309, * 43 (D.Mass. 2004) ("An insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within the policy's coverage," quoting Polaroid, 414 Mass. at 764).[6] Clearly, "[i]f an underlying claim is not within the coverage of an insurance policy, an insurer's improper failure to defend that claim would not ordinarily be a cause of any payment that the insured made in settlement of that claim (or to satisfy a judgment based on that claim)." Polaroid, 414 Mass. at 762 (citations omitted). See also, R. Keeton & A. Widiss, *Insurance Law* § 9.5(b)(1)(i), at 1046 (1988) ("the insurer is liable for any good faith settlement within the policy limits subject, of course, to the insurer's right to an adjudication that the coverage applied to the loss.")

In contrast to the issue presented in Polaroid, where the Supreme Judicial Court observed that "Polaroid rightly does not argue that it is automatically entitled to indemnity under various policies because of the breach of the duty to defend" (414 Mass. at 762), by its present motion for partial summary judgment, the RCAB seeks to preclude LMC from pursuing its right to an adjudication that the coverage does not apply to the loss. This proposition is legally untenable. Moreover, the coverage issues should not be considered by this court until LMC has had an opportunity to pursue factual discovery concerning, *inter alia*, whether the injuries for which the RCAB seeks coverage were "neither expected nor intended," whether the RCAB concealed material information relating to the claims from LMC, and whether LMC is entitled to limit its indemnity payments to $300,000 per policy period.

---

[6] A copy of this decision can be found at Exhibit C to Transmittal Affidavit of Brian P. McDonough (hereinafter "Ex. C, Tab 1"), Tab 1.

II.    **THE RCAB HAS FAILED TO ESTABLISH THE TERMS AND CONDITIONS OF ANY PRIMARY POLICY ISSUED BY LMC PRIOR TO MARCH 31, 1974.[7]**

The RCAB has not presented the court with any documentary evidence of the terms and conditions of the actual primary policies issued by LMC prior to March 31, 1974. Consequently, it relies upon secondary evidence in an attempt to establish that LMC issued a policy prior to 1964 and that all of the policies issued prior to March 31, 1974 included a comprehensive general liability coverage form. The RCAB's arguments are unavailing because it has not established that it undertook a reasonable and diligent search to locate the policies or related materials when it first determined they were lost. In addition, the RCAB's self-professed "expert . . . familiar with many aspects of insurance . . ." does not present a credible, much less an undisputed, factual record to support the conclusion that all of the primary policies issued prior to March 31, 1974 included a comprehensive general liability coverage form.

A.    **The RCAB Cannot Rely on Secondary Evidence to Prove the Existence or Terms and Conditions of Any Alleged Policy Because it Has Not Established that it Undertook a Reasonable and Diligent Search to Locate Policies.**

Proof of the existence and terms and conditions of lost or missing insurance policies, is governed by the best evidence rule. Harrington v. United States, 504 F.2d 1306, 1313 (1st Cir. 1974); See, generally Fed. R. Evid. 1001-08. The best evidence rule requires that to prove the material terms of a writing, "the original writing must be produced unless it is shown to be unavailable for some reason other than the serious fault of the proponent." Id.; Fed. R. Evid. 1002, 1004. Secondary evidence is only admissible in place of the original, if the proponent can

---

[7] In December, 2001, LMC and the RCAB entered into an agreement "to put to rest and resolve all disputes and controversies between them relating in any way to whether coverage is available under the LMC Policies" that the RCAB contends were issued by LMC for the period from 1973 to 1977. By the terms of this "Buy-Back Agreement and Release of Policies," the "RCAB acknowledge[d] that as of the date of this agreement RCAB has no liability coverage under the LMC Policies" that may have been issued for the period from 1973 to 1977. Accordingly, this Court should not give any consideration to the RCAB's request for a summary determination concerning any excess policies that may have been in effect between 1973 and 1977. See, Ex. B, Tab 4 (Buy-Back Agreement).

show that "a reasonable and diligent search has been made for the original without success." Harrington, 504 F2d. at 1313. In this case, the RCAB must show that it conducted a diligent but unsuccessful search and inquiry, and that the search encompassed areas in which policies most likely would have been found. See Coltec Indus. Inc. v. Zurich Ins. Co., 2002 U.S. Dist. LEXIS 18979, *7 (N.D. Ill. Sept. 30, 2002). (Ex. C, Tab 2.)

There is "no universal or fixed rule that determines the sufficiency of the proof required that a reasonable or diligent search has been made." Sylvania Electric Products v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965). However, because the RCAB is seeking to introduce secondary evidence to establish the existence and terms of policies, it must show that all reasonable means were employed to obtain the originals. Id. Whether the RCAB employed all reasonable means to obtain the original is a matter of dispute. The RCAB contends that it made a diligent search for the policies; however, it has failed to present any testimonial or documentary evidence to establish what efforts it undertook. There is a material issue of fact as to whether the RCAB ever requested copies of the underwriting dailies or other policy materials from LMC. (SOF, ¶ 13.) Further undermining the RCAB's assertion that it exercised reasonable diligence in searching for policies is the testimony of four of its own witnesses who testified that they didn't know if the efforts included asking the parishes or institutions to search their records for policy related information. (SOF, ¶¶ 8-10.) The most significant evidence that the RCAB did not undertake a reasonably diligent search for policies is the fact that nineteen copies of Coverage Part 7 – Comprehensive General Liability were produced when its counsel, Ropes & Gray, made a request to the parishes for policy materials after the initiation of this lawsuit.[8] (SOF, ¶¶ 8-9.)

---

[8] On August 2, 2004, Joseph McEnness, the RCAB's 30(b)(6) designee on subjects relating to the RCAB's efforts to locate insurance policies issued by LMC, testified that he recently made an inquiry to all parishes and institutions "requesting a search for all documents that they would have in their possession . . . and requesting that they forward any apparent documents to Ropes & Gray." (SOF, ¶ 10.) As a result of this search, on August 4, the RCAB

The RCAB contends that it did not have any policy related materials, and particularly that it did not have any information relating to the applicable aggregate limits of any LMC policies. (See, *e.g.*, Plaintiff's Statement of Material Facts, ¶ 8.) The numerous copies of Coverage Part 7 that the RCAB recently produced establish that the RCAB not only had policy materials relating to the applicable aggregate limits, it had the very document that it now relies upon for its claim that LMC's representations concerning the applicability of aggregate limits were false. The fact that RCAB has now located materials that evidence both the existence and terms and conditions of policies issued by LMC, which for the past decade it has claimed it did not have, clearly indicates that the RCAB has not undertaken a diligent search for policies as required under the best evidence rule. "The best evidence rule should not be applied as a mere technicality." Sylvania Electric, 352 F.2d at 1008; see also, Cartier v. Jackson, 59 F.3d 1046 (10th Cir. 1995) (appeals court affirmed exclusion of secondary evidence because the proponent failed to conduct a diligent search for the original); United States v. Wilderman, 2004 U.S. Dist. LEXIS 17494 (E.D. Penn. Aug. 18, 2004) (district court excluded secondary evidence because proponent failed to establish she conducted a diligent search)[9] (Ex. C, Tab 3.); Harrington, 504 F 2d. at 1314 (First Circuit excluded secondary evidence because proponent only "checked" for the original, which was not a diligent search); Sylvania Electric, 352 F.2d 1005 (First Circuit found there was insufficient evidence to show there was a reasonable search for the original documents); contrast Coltec, 2002 U.S. Dist Lexis 18979, (the court found the proponent was diligent in searching for

---

produced 392 pages and on September 3, 2004, the RCAB produced an additional 225 pages. See Affidavit of John E. Tener, ¶¶ 5, submitted in support of LMC's Motion to Compel Further Testimony of the RCAB's 30(b)(6) designee. The RCAB's General Counsel and 30(b)(6) designee conceded that the materials relating to the LMC policies, in particular, copies of the Coverage Part 7 form, that were in the parish files dating back to the 1970s were in the possession, custody and control of the RCAB insofar he testified: "Well, there was never a discussion about whether it was the parish [as opposed to the RCAB] because the parish is not an entity. It's all RCAB. All of the parishes are part of RCAB." (SOF, ¶ 10.)

[9] A copy of this decision can be found at Ex. C, Tab 3.

21

originals because Coltec's legal personnel in conjunction with an insurance archaeology firm and outside counsel spent hundreds of hours retrieving and canvassing files). Since the RCAB has not adduced sufficient facts to establish that it made a diligent search for lost polices, the court should not consider the secondary evidence proffered through its purported expert witness (or otherwise) and should deny its request for a determination that the pre-1974 policies included a comprehensive general liability coverage form.

      **B.**    **The Secondary Evidence Adduced by the RCAB Fails to Establish the Existence or Terms of any Policy Issued by LMC for the Period 1961 to 1964.**

      Even if the RCAB met the threshold burden that a diligent search was made, the secondary evidence it has presented would not satisfy its heavy burden of establishing the existence or terms of a policy for the period March 31, 1961 to March 31, 1964. Metlife Capital Corp. v. Westchester Fire Ins. Co., 224 F.Supp. 2d 374, 384 (D.P.R. 2002); Coltec, 2002 U.S. Dist. Lexis at *6. In such an instance where the lost writing is central to the very foundation of the claim, more strictness of proof is required than where the writings are only involved collaterally. Metlife Capital, 224 F.Supp.2d at 384. The RCAB correctly states that a preponderance of the evidence standard is applied to determine the existence of lost policies; "[a]t the summary judgment stage, however, the preponderance of the evidence is not enough." Continental Insurance v. Roman Catholic Bishop of Fall River, slip op. No. 92-12016-MA (D. Mass. Aug. 12, 1993) (Ex. C., Tab 4.) For the purpose of the present summary judgment motion, all reasonable inferences must be drawn in favor of LMC and the RCAB must put forth sufficient evidence at this stage so that the only conclusion that could be drawn is that these policies were in fact issued. Continental Insurance, at 7.

Based on an exchange of letters between the RCAB and LMC in June 1964 regarding coverage for an accident that allegedly occurred in March 10, 1963 (Diederich Aff., Exs. 16-19), the RCAB argues that "the conclusion is inescapable that the policy in effect on March 10, 1963 was in fact issued on March 31, 1961." (RCAB's Memorandum of Law at p. 23.)  However, where there is no reference to even a policy number, this correspondence fails to establish that there was any LMC policy in effect on March 10, 1963 and falls far short of the high burden of evidence required at the summary judgment stage to establish a policy in effect from 1961 to 1964.  Apparently recognizing the deficiency in this correspondence, the RCAB references internal documentation unrelated to the correspondence that identifies a policy numbered 2LL 64263 as proof of that there was a policy in existence prior to 1963.  (Diederich, Aff. Ex. 21.) However, what the RCAB fails to note is that the document states "Return premium cancellation previous policy 2LL64263."  Thus, this document provides no support for the proposition that there was a three year LMC policy in effect from 1961 to 1964.

Reaching even further into the realm of speculation, the RCAB refers to an internal LMC claim file note dated September 20, 1993 that comments on an "alleged 1961 document" sent by the RCAB Claim Manager, Paul Fallon.  In response to the RCAB's assertion that LMC wrote a policy beginning in 1961, the file note states that based on the internal RCAB memorandum that refers to an LMC policy numbered 4LL 64263A, "[i]f this were confirmed and accurate, the policy no. applicable to this claim would be 1LL64263A." (Diederich Aff., Ex. 59.)  Drawing the inference most favorable to LMC, this document has no probative value.  Even drawing an inference in favor of the RCAB, the use of the qualifying language in this document merely establishes what that policy number *might* have been *if* a policy had been issued.  It certainly does not establish that a policy actually existed "beyond a factual dispute." Continental, at 7; see

also, Metlife Capital, 224 F.Supp.2d. at 384 ("the mention of a policy number in another document is insufficient to establish the existence or terms of insurance coverage").

Neither RCAB nor LMC could find policies for the period from 1961 to 1964. The Federal Rules of Evidence dictate that the determination of whether the existence of a lost writing has been adequately proven is a matter for the finder of fact. Remington Arms Co. v. Liberty Mut. Ins. Co., 810 F.Supp. 1420, 1422 (D. Del. 1992). Because genuine issues of fact exist as to the both the sufficiency of the evidence itself and the inferences to be drawn from the evidence presented, this Court should not determine as a matter of law that LMC issued a policy to the RCAB for the period from March 31, 1961 to March 31, 1964. Id. at 1428.

> **C.  The Secondary Evidence Adduced by the RCAB Fails to Establish that Policies Issued by LMC for the Period Prior to March 31, 1974 were Standard Form Comprehensive General Liability Policies.**

At the summary judgment stage, the RCAB "must prove the material terms of the policy beyond factual dispute." Continental Insurance, at 7. The only support for the RCAB's assertion that all the policies issued by LMC to the RCAB were standard form general liability policies is the affidavit of the RCAB's purported expert, Dennis R. Connolly.[10] Mr. Connolly opines that "an insured like the RCAB was issued standard form comprehensive general liability policies not only during the period 1974-1983, but for at least twenty years prior thereto." (Affidavit of Dennis R. Connolly, hereafter, ("Connolly Aff."), ¶ 17). He further states that "[in his] opinion, any general liability policy issued by LMC to the RCAB from 1955 until 1966 would have been on the 1955 standard form (Ex. A), and form [sic] 1966 until 1973, the 1966 standard form (Ex. B) would have been used." (Connolly Aff., ¶18).

---

[10] LMC has moved to strike Mr. Connolly's affidavit and if this motion is allowed, there is no basis whatsoever to support the RCAB's request for a determination that the pre-1974 policies included standard comprehensive general liability forms.

Mr. Connolly's opinions are conclusory and insofar as they have any foundational basis, LMC has not had an opportunity to challenge them.[11] In <u>Continental Insurance</u>, the court found that an expert's affidavit and copies of form policies were insufficient to establish the terms of lost policies at the summary judgment stage. The court noted that the expert's use of the subjunctive mood – "would have" – raised issues of expert's credibility better left for the trier of fact. <u>Continental Insurance</u> at 16-17; See also, <u>Century Indemnity Co. v. Aero-Motive Co.</u>, 254 F.Supp. 2d 670, 680 (W.D. Mich. 2003) ("the evidence must allow more than mere speculation regarding the terms and existence of coverage"); <u>Metlife Capital</u>, 224 F.Supp. 2d 374 (denying summary judgment to policyholder because there was insufficient evidence to establish terms of the policy). Mr. Connolly's has never been employed by LMC or the RCAB and, therefore his statement that "an insured like the RCAB was issued standard form general liability policies" is fraught with ambiguity. Does "like the RCAB" mean religious orders? Charitable corporations? Institutions in Boston? Does the passive tense "was issued" mean that Mr. Connolly professes some basis to testify about standard industry practices that were in fact employed by LMC? Does "standard form liability policies" exclude the Owner, Landlord and Tenant policies that LMC's 30(b)(6) designee has testified may have been the form of policy issued to the RCAB for the period prior to 1974? (SOF, ¶ 25.)

The facts that the RCAB posits as undisputed evidence that the policies LMC issued prior to 1974 were standard form comprehensive general liability policies consist of nothing more than untested conclusions. Mr. Connolly's qualifications and opinions do not seem fit enough to survive a *Daubert* challenge, much less the credibility test that Mr. Connolly would face if he

---

[11] The RCAB did not identify Mr. Connolly as a witness or disclose his opinions prior to serving the Connolly Affidavit along with the RCAB's motion for partial summary judgment. In its motion filed pursuant to Rule 56(f), LMC has detailed the reasons why it should be allowed to depose Mr. Connolly, should the court deem that the opinions set forth in his affidavit merit any consideration.

were presented to a trier of fact. Accordingly, even if his affidavit survives LMC's motion to strike, it does not provide the undisputed factual basis required to establish that all of the pre-1974 policies included standard form comprehensive general liability forms.

## III. DETERMINING THE APPLICABILITY OF AGGREGATE LIMITS TO THE SEXUAL ABUSE CLAIMS AGAINST THE RCAB INVOLVES ISSUES ON WHICH THERE ARE GENUINE DISPUTES OF MATERIAL FACT.

From June 1995 to April 2003, the indemnity payments made for the settlement of clergy sexual abuse claims were applied against the stated aggregate policy limits of $300,000 with the RCAB's understanding, acceptance and agreement. Eight years of deliberate conduct cannot simply be ignored. An examination of the RCAB's conduct supports the conclusion that it effected a separate agreement modifying the limitation of the aggregate limits set forth in Coverage Part 7. This modification is ratified by numerous writings signed by the RCAB and its General Counsel and while these writing do not explicitly refer to "a modification of the insurance policies," the RCAB's conduct reflects its intent to waive any requirement of a more formal writing. In addition, as the RCAB's conduct engenders representations that annual aggregate limits would apply to clergy sexual abuse claims, and LMC reasonably relied upon such representations to its detriment, the RCAB is estopped from attempting to enforce terms and conditions at variance with the representations. The RCAB's delay in raising its opposition to the application of aggregate limits also precludes a summary determination that the aggregate limits do not apply to the sexual abuse claims.

A.    **Mere Proof of Terms and Conditions of Policy Forms Does Not Entitle the RCAB to a Summary Adjudication that it is Entitled to More Than $300,000 Per Year in Indemnity Coverage Because From 1995 through 2003, the RCAB Agreed to the Application of Aggregate Limits to Clergy Sexual Abuse Claims.**

The RCAB would have this court believe that all it must do to be entitled to summary adjudication that no aggregate limits apply to clergy sexual abuse claims, is to demonstrate that the Coverage Part 7 form was a part of the policies issued by LMC. The folly of this contention is that the record evidence readily reflects that (1) on February 25, 1994, LMC informed the RCAB that the terms and conditions Coverage Part 7 applied to the claims of sexual abuse; (2) the RCAB had Coverage Part 7 in its possession; and (3) for eight years the RCAB deliberately embraced a course of conduct directly at odds with such terms and conditions.

That full knowledge as to the terms and conditions of Coverage Part 7 must be imparted to the RCAB is amply demonstrated by the fact that from the time it first presented the sexual abuse claims to LMC for coverage, it had numerous copies of the form at its disposal. Indeed, during the course of this litigation the RCAB has produced from its own records,[12] no fewer than nineteen (19) separate copies of this form (SOF, ¶¶ 8-10)  Neither the RCAB nor its General Counsel ever requested a copy of the form or any other policy materials from LMC. (SOF, ¶ 13.) These facts suggest that the RCAB chose a course of willful blindness.[13]

In addition to the material dispute concerning what the RCAB knew or should have known based on the terms and conditions of Coverage Part 7, an assessment of the "aggregate issue" should include consideration of the fact that the RCAB cannot adduce any admissible

---

[12] The forms purportedly come from the insurance files of various parishes and institutions (SOF, ¶ 9.). As expressly acknowledged by the RCAB's General Counsel and Rule 30(b)(6) designee, there is no legal distinction between the RCAB and its parishes; they are one in the same. (SOF, ¶ 11.)

[13] Further discovery on this subject may establish that the RCAB's assertion that it first became aware of the terms and conditions of Coverage Part 7 in April of 2003 is an blatant misrepresentation.

evidence of protest during the time the indemnity payments were being applied against the aggregate limits (1995-1998), or the ensuing four years after the RCAB acknowledged that the aggregate limits were exhausted. In contrast, the evidence established to date demonstrates that the RCAB embraced the practice.[14] The correspondence by which LMC transmitted checks for indemnity payments expressly indicated how the payments would impact the remaining aggregate balances. (SOF, ¶¶ 32-33.) Counsel for the RCAB independently chartered the exhaustion of the aggregate policy limits (SOF, ¶ 31) and both LMC and the RCAB's General Counsel expended considerable time and energy communicating about the erosion of the aggregate limits. (SOF, ¶¶ 30-32.) Finally, when LMC informed the RCAB that the limits of all of the pre-1977 policies had been fully exhausted (SOF, ¶¶ 30 and 35), the RCAB unreservedly endorsed the conclusion by communicating it to counsel for abuse victims (SOF, ¶ 38.) According LMC the benefit of all inferences flowing from this evidence of the state of the RCAB's knowledge and its chosen course of conduct, there are clearly material issues of fact that preclude the RCAB's requested summary adjudication on the aggregate issue.

**B.     The RCAB Is Not Entitled to Summary Adjudication on the Aggregate Issue insofar as It is Predicated on a Finding of Actionable Misrepresentation by LMC.**

Through its repeated assertion that LMC misled it in connection with the applicability of aggregate limits to the sexual abuse claims, the RCAB implicitly concedes that its entire action depends on proof of its misrepresentation claim. Under Massachusetts law, "'[t]o sustain a claim for misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment.'" St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 61 (1st Cir. 2001),

---

[14] Further discovery on this subject is expected to show that the RCAB recognized the application of aggregate limits would provide it with a basis to negotiate better settlements with the claimants and that avoiding conflict with LMC would improve the RCAB's ability to keep the sexual abuse claims quiet. (SOF, ¶¶ 2 and 46.)

quoting Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991). Though the RCAB has failed to establish as undisputed facts any of the requisite elements of misrepresentation, the summary judgment record most clearly demonstrates LMC is entitled to have a jury decide whether the RCAB reasonably relied upon LMC's alleged misrepresentation that annual aggregate limits should apply to coverage for clergy sexual abuse claims.

Since February 25, 1994, the RCAB knew that LMC would be applying Coverage Part 7 to determine the availability of coverage for the sexual abuse claims (SOF, ¶ 12) and either knew or should have known that the terms and conditions of Coverage Part 7 included the language it now relies upon to support its position regarding the application of aggregate limits. (SOF, ¶ 7-15) In the face of such knowledge, clearly a question of fact exists as to the reasonableness of the RCAB's reliance upon any alleged statement by LMC regarding the applicability of aggregate limits. Absent actionable misrepresentation on LMC's part, unsettled questions remain, which cannot be resolved by this proceeding, as to whether the RCAB agreed to the application of annual aggregate limits, or alternatively, whether it has impermissibly slept on its rights.

The RCAB is not entitled to summary adjudication on the aggregate issue because its deliberate course of conduct established its acceptance of the applicability of aggregate limits. Under Massachusetts law, it is well settled that parties to an agreement may alter it by their joint conduct. See, e.g., Findlen v. Winchenden Housing. Auth., 28 Mass. App. Ct. 977, 978 (1990) ("Parties to a written contract may, of course, alter it subsequently, by... their joint conduct..."); R&R Chemicals, LLC v. Cellect, LLC, 2002 U.S. Dist. LEXIS 16379, *14 (D.Mass. 2002) (Ex. C, Tab 5.) ("'It is open to the parties to modify a written agreement by a later agreement not in writing. The later agreement may be proved through the conduct of the parties.'"), quoting

Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct., 41, 47 (1991); New England Mutual Life Ins. Co. v. Stuzin, 1990 U.S. Dist. LEXIS 13137, *6 (D.Mass. 1990) ("Since its is settled law that a contract may be modified by a course of dealing or other conduct of the parties which evidences an agreement to modify a contract . . . .")[15]  Moreover, a "dispute about whether a contract has been formed as result of words and conduct over a period of time presents interpretative issues traditionally understood to be for the trier of fact." Ismert and Assoc., Inc. v. New England Mutual Life Ins. Co., 801 F.2d 536, 542 (1st Cir. 1986), characterizing Charbonnages de France v. Smith, 597 F.2d 406, 414-15 (4th Cir. 1979), and applying same to interpretation of purported contract modification under Massachusetts law.

There is substantial record evidence of deliberate, joint conduct which supports the conclusion that the parties' agreed to the application of aggregate limits to coverage for clergy sexual abuse claims.  While the RCAB knew or should have known that the written terms and conditions of Coverage Part 7 did not provide for the application of annual aggregate limits to such claims (SOF, ¶¶ 8-10 and ¶¶ 12-13), it nonetheless accepted the application of annual aggregate limits.  (SOF, ¶¶ 30, 35 and 37.)  Indeed, time and again, the RCAB expressly acknowledged its agreement to the application of aggregate limits. (SOF, ¶ 31.)  Since a question of fact exists as to whether the parties' mutual understanding and joint conduct in applying the indemnity payments against aggregate limits established an agreement that precludes the RCAB's contention that aggregate limits should not be applied, the RCAB's request for a summary adjudication of this issue should be denied.

---

[15] A copy of this decision can be found at Ex. C, Tab 6.

1.    **The RCAB's Contention That No Consideration Exists to Support a Modification Is Unfounded.**

Recognizing that its conduct over a span of eight years creates a factual impasse to its argument that aggregate limits should not be applied, the RCAB claims that the parties' mutual understanding of and agreement to the application of aggregate limits is immaterial to the aggregate issue because the agreement lacks consideration.   While the need for consideration is a matter of factual dispute (see section III.B.2, *infra*), there are record facts that controvert the RCAB's assertion that there was no consideration.

"In Massachusetts, the law is well settled that forbearance to press a claim will constitute adequate consideration . . . ."  Mathewson Corp. v. Allied Marine Industries, Inc., 827 F.2d 850, 856  (1st Cir. 1987).  The Massachusetts Supreme Judicial Court has instructed:

> [T]he abandonment or postponement of an honest purpose to [proceed with] litigation believed to be well founded and not frivolous, vexatious or unlawful, although not of such character in law or fact or both as finally to commend itself to the judgment of the tribunal of last resort, is the surrender of a thing of value and is a sufficient consideration for a contract.

Id. (brackets in original), quoting Codman v. Dumaine, 249 Mass. 451, 458 (1924).

Due to the RCAB's agreement to the application of annual aggregate limits to the indemnity payments made for clergy sexual abuse claims, LMC "abandon[ed] or postpone[ed] an honest purpose [to proceed] with litigation" – *i.e.*, the institution of declaratory actions, on a claim-by-claim basis, seeking judicial determination as to the extent of available coverage, if any.  Affidavit of Mary Kay Reardon ("Reardon Affidavit"), ¶¶ 4-5.  Indeed, in its Complaint, ¶ 16, the RCAB states that in June of 1995, representatives of LMC informed the RCAB that it would apply indemnity payments made in connection with the sexual abuse claims against the LMC policies' stated $300,000 aggregate limits.  If the RCAB had challenged LMC's statement that the indemnity payments made in connection with the sexual abuse claims would be applied

against the policies' stated $300,000 aggregate limits, essentially asserting a claim for <u>unlimited</u> coverage, subject only to the $300,000 per occurrence limit, LMC would have filed a declaratory action raising, at a minimum, the coverage issues expressly identified in its reservation of rights letters. Reardon Affidavit, ¶¶ 4-5

Over the next three years, LMC applied the indemnity payments it made to the RCAB against the policies' stated $300,000 aggregates, and for each indemnity payment made, LMC informed the RCAB which policy's aggregate limit it would be applied to. (<u>Id</u>., SOF, ¶ 32.) The RCAB never objected to the application of the payments against the policies' stated aggregate limits, though it occasionally challenged the manner in which LMC allocated the payments among the policies. (Reardon Affidavit, ¶¶ 4-5.) Had the RCAB ever raised an objection, LMC would have filed a declaratory judgment action raising all of the available coverage and other defenses then known. <u>Id</u>. As indicated in its counterclaim in this action, LMC came to learn of many issues which, for any given claim, might abrogate coverage, in whole or part, including, without limitation: whether negligent supervision of a particular pedophile priest constituted a cognizable "occurrence"; whether resulting harm constituted cognizable "bodily injury"; whether lack of prior notice of improper conduct by a particular perpetrator priest precluded a finding of negligence; whether prior notice of improper conduct by a particular perpetrator priest precluded a finding of negligence; whether recoverable damages were subject to an asserted charitable immunity defense; and/or whether recovery was time barred. <u>Id</u>. Moreover, as the course of attendant discovery ultimately would have revealed the true magnitude and scope of the clergy sexual abuse problem, such declaratory actions inevitably would have addressed LMC's contention that there can be no coverage for clergy sexual abuse claims as the RCAB's deliberate

misconduct in dealing with pedophile priests rendered the abuse of children an expected or intended consequence.

Separate and additional consideration flows from LMC's agreement to the RCAB's limitation of access to the personnel files of accused priests. The insuring agreement between LMC and the RCAB required the RCAB to cooperate with LMC in the investigation and defense of claims. (See, Diederich Aff., Ex. 67, Bates No. 00065.) Clearly, this included providing LMC with copies of personnel files and any other information pertaining to the employment history, prior complaints against, or concerns with the alleged perpetrators. However, during their June 1995 meeting in Boston, the RCAB communicated to LMC "that the [archdiocese] really wanted to keep Kemper[16] personnel out of those records as much as possible because of the highly sensitive nature." (SOF, ¶ 28.) Similarly, on April 25, 1996, Ms. Zinoman recorded in her file notes that "[t]he Diocese wishes to avoid any negative publicity on these cases. A suit vs. a Bishop, etc. would most likely be published." (SOF, ¶ 46.) LMC agreed to the RCAB's request to forego its contractual right to this information. Had the RCAB ever intimated that annual aggregate limits should not apply to clergy sexual abuse claims – again, tantamount to an expression of limitless coverage – LMC would have insisted upon unfettered access to the RCAB's personnel records for accused priests to gain a more detailed understanding of its insured (and insofar as there was coverage) its potential exposure. (Reardon Affidavit, ¶ 6.) To the extent that the RCAB offered resistance, LMC would have sought a court order compelling the RCAB to provide the necessary access. Id. With the benefit of hindsight, the impetus for the

---

[16] Kemper is the tradename of LMC. Reardon Deposition, 5:24-6:4.

RCAB's concern is clear – such records would reveal the RCAB's own misconduct, and thereby raise the coverage and other issues that form the basis of LMC's counterclaim.[17]

LMC's forbearance from pursuing declaratory actions and from pursuing access to the RCAB's records constitute adequate consideration to support the parties' agreement to apply annual aggregate limits. As a result of such forbearances, the RCAB has received the benefit of more than $19 millions dollars in defense and indemnity payments, some or all which it might not otherwise have received. Reardon Affidavit, ¶ 2.

> **2.    The RCAB's Contention That a Modification Can Only be Effected by a Writing is Unfounded.**

The RCAB also attempts to avoid the consequences of its conduct, and the modification it evidences, by arguing that language in the policy jackets that it formed a part of the 1974 to 1983 policies, requires any modification to be in writing. However, the language relied upon by the RCAB "nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized officer or representative of the company" applies only when it is the insured that seeks to enforce a purported change in the terms of the policy against the company. (See, Diederich Aff., Ex. 67, bates no. 000065.)

Insofar as there was any writing requirement, and the writings presented in the record are not deemed sufficient to satisfy that requirement, there is a question of fact as to whether RCAB's conduct waived any such requirement. Under Massachusetts law, "[w]aiver may be manifested by acts as well as by words . . . . It is difficult to frame a contract so as to foreclose the operation in equity of the doctrine of waiver in order to prevent an injustice." Flynn v.

---

[17] Such records largely formed the basis of the Attorney General's conclusion that "the widespread abuse of children *was due to an institutional acceptance of abuse and a massive pervasive failure of the leadership*." The Sexual Abuse of Children in the Roman Catholic Archdiocese of Boston, A Report by the Attorney General (July 23, 2003) (emphasis supplied). At a minimum, had LMC not provided the RCAB with the consideration of not demanding its priests' personnel files, it would have filed a declaratory judgment action in 1995 on the "neither expected nor intended" issue.

Wallace, 359 Mass. 711, 716 (Mass. 1971) (internal cite omitted). Furthermore, "a valid waiver does not require an assent, a writing, consideration, or detrimental reliance." Federal Deposit Ins. Corp. v. Slinger, 913 F.2d 7, 13 (1st Cir. 1990), citing E.A. Farnsworth, *Contracts* § 8.5 at 562 (1982). If the record evidence does not irrefutably establish that the RCAB waived any applicable writing requirement, it presents a jury question as to whether the RCAB, by its conduct, intended to waive any requirement that a modification be in writing. Documents signed by the RCAB or its General Counsel expressly acknowledge the RCAB's agreement to the application of aggregate limits. (SOF, ¶ 31.) The RCAB, for nearly a decade, advanced its own interests through the application of annual aggregate limits and at all times knew or should have known that Coverage Part 7 included language that restricted the application of aggregate limits to completed operation and products exposure. (SOF, ¶¶ 7-15.) This course of conduct, in and of itself, is evidence from which the trier of fact – "in order to prevent injustice" – could equitably infer an intent to waive any requirement that modifications be in writing.

### 3. The RCAB Is Estopped from Enforcing Coverage Part 7's Restriction on the Application of Aggregate Limits.

The requirements for an estoppel under Massachusetts law are as follows:

(1) a representation or conduct amounting to representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and (3) detriment to such person as a consequence of the act or omission.

In Re Colarusso, 2004 U.S. App. LEXIS 18612, *22 n. 8 (1st Cir. 2004), citing Boylston Dev. Group, Inc. v. 22 Boylston Street Corp., 412 Mass. 531, 542 (Mass. 1992) (Ex. C, Tab 7.); see also, Bongaards v. Millen, 440 Mass. 10, 15 (2003) (same). Applying this standard to the record evidence, the RCAB is not entitled to the summary adjudication it seeks due to LMC's viable

defense that the RCAB, by its own conduct, is estopped from attempting to enforce the limitations upon application of aggregate limits contained within Coverage Part 7.

There is a factual basis for the trier of fact in this case to find that the RCAB engaged in conduct amounting to a representation intended to induce a course of conduct on the part of LMC. From the onset of the sexual abuse claims, the RCAB knew or should have known that Coverage Part 7 limited the application of annual aggregate limits to claim-types which did not include clergy sexual abuse claims. (SOF, ¶¶ 8-13.) Despite such knowledge, from the time of LMC's acknowledgment that it would provide coverage for such claims (under a full reservation of rights), the RCAB provided LMC with written and oral communications reflecting its acceptance and its independent accounting of the application of aggregate limits to these claims. (SOF, ¶ 31.) The RCAB's conduct in this regard constitutes a representation that it agreed that annual aggregate limits would be applied to coverage available from LMC for clergy sexual abuse claims.

As a result of this representation, LMC refrained from pursuing declaratory actions upon an array of potential coverage defenses and limitations, which it would not otherwise have done had the RCAB signaled anything but full agreement with the practice of applying annual aggregate limits to clergy sexual abuse claims. (Reardon Affidavit, ¶¶ 4-5.) Additionally, LMC refrained from insisting upon unfettered access to the RCAB's personnel files. (Id., ¶ 6.) Such insistence undoubtedly would have revealed the expected or intended nature of the harm sustained by clergy sexual abuse victims, a bar to coverage altogether. Thus, the detriment sustained by LMC as a result of such forbearances is undeniable. Namely, it paid more than

$19,000,000 in defense and indemnity payments, all or some of which it might not otherwise have paid.[18] (Id., ¶ 2.)

As there is sufficient record evidence as to each of the required elements, LMC possesses a viable estoppel defense against the RCAB's claim that aggregate limits should not be applied to LMC's indemnity payments. Moreover, based on its representations to LMC that it accepted the application of annual aggregate limits and LMC's detrimental reliance upon same, the RCAB is also estopped from attempting to enforce any requirement that modifications be in writing. See, e.g., Thomas Howard Brown, P.C. v. Smith, 1999 Mass. Super LEXIS 168, *8 (Mass.Sup.Ct. 1999) ("Even if the [contract] barred oral modifications, as a matter of law, summary judgment would be inappropriate because there are disputed material facts relating to estoppel.")[19]

## IV.    All of the RCAB's Claims of Are Time-Barred.

The RCAB is not entitled to the summary adjudications it seeks because the breach of contract, misrepresentation and G.L. c. 93A claims upon which they are necessarily predicated, are all time-barred.[20] The RCAB filed suit on March 5, 2004. Insofar as all of the RCAB's

---

[18] The RCAB's assertion that LMC can demonstrate no detrimental reliance can be summarily rejected. Its sole support for the contention is the following exchange which occurred during the 30(b)(6) deposition of LMC:

> Q.    So my question is: Did Lumbermens do anything between 1995 and today with respect to payment of claims that it would not have done had there been no applicable aggregates?
>
> A.    No I don't believe so.

The immediately discernible flaw in the RCAB's reasoning is that LMC's detriment does not flow from things it did which it would not otherwise have done had the RCAB ever suggested that aggregate limits should not apply to coverage for clergy sexual abuse claims. Rather, LMC's detriment flows from the things that it refrained from doing, and which it otherwise would have done, had the RCAB ever made such a suggestion – namely, pursuing declaratory actions, on a claim-by-claim basis, as to any and all potential coverage defenses and insisting upon (Reardon Affidavit, ¶¶4-5), and pursuing through the courts, unfettered access to the RCAB's personnel files (Id., ¶6).

[19] A copy of this decision can be found at Ex. C, Tab 8.

[20] While this Court may grant summary judgment to LMC sua sponte, in raising these issues, LMC is only seeking an order denying the relief requested by the RCAB's in its motion for summary judgment. See, Leyva v. On the

claims sounding in contract or tort are based on its contention that LMC breached the insurance policies by misrepresenting the applicability of aggregate limits, the statutes of limitations began to run on June 1, 1995 when, according to the RCAB's Complaint, LMC informed the RCAB that aggregate limits would be applied to the policies.[21]  (Complaint at ¶ 16.)

### A.    The RCAB's Claims Are Barred by the Applicable Statutes of Limitations.

Pursuant to Massachusetts law, the respective statutes of limitations for the RCAB's breach of contract, tort and G.L. c. 93A claims, are six years, three years, and four years.  G.L. c. 260, § 2; c. 260, §5A; and c. 260, §2A.  Since the record evidence suggests that all of the RCAB's predicate causes of action accrued on June 1, 1995, the RCAB must prove that it could not, through the exercise of reasonable diligence, have known that its claims against LMC arose at that time.  Key Trust Co. of Maine v. Doherty, Wallace, Pillsbury and Murphy, P.C., 811 F.Supp. 733, 737 (D. Mass. 1993), quoting Edwards v. John Hancock Mutual Life Ins. Co., 973 F.2d 1027,1029 (1st Cir. 1992) (a cause of action may be tolled until the facts that give rise to it, "either become known or should have become known to the injured party *in the exercise of reasonable diligence*") (emphasis added); Saenger Org., Inc. v. Nationwide Insurance Licensing Assoc., 119 F.3d 55, 65 (1st Cir. 1997), citing Williams v. Ely, 423 Mass. 467, 473 n.7 (1996) (claim must be inherently unknowable).

On June 1, 1995, when the LMC advised that it would be applying indemnity payments against annual aggregate limits, the RCAB knew or should have known of the accrual of its causes of action for misrepresentation and breach of contract (which form the basis for its claim

---

Beach, Inc., 171 F.3d 717, 719 (1st Cir. 1999) ("district courts possess the power to grant summary judgments on their own initiative").

[21] Insofar as a distinction may be drawn between notice that the aggregates would be applied and the actual payment of claims along with notice of their application against an aggregate limit, it is a distinction without a difference because 1996 was when the first payment was applied against an aggregate.  (SOF, ¶ 31, first letter included therein.)

for violation of c. 93A). The record evidence shows that the RCAB knew or should have known the terms and condition of the Coverage Part 7 at that time (SOF, ¶¶ 8-14) and, consequently, that LMC's position regarding application of aggregate limits varied with that position. Bearing such in mind, for the applicable limitations periods to trigger, the RCAB did not need to know every fact required to prevail on its claims. Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 48 (1st Cir. 2004), citing, Riley v. Presnell, 409 Mass. 239, 243 (1991). Instead, it is sufficient that the RCAB had enough information to simply suggest that it has suffered an injury caused by LMC's conduct. Id., citing, International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 217-18 (1990).

The RCAB's cause of action for misrepresentation must be deemed to have arisen on June 1, 1995. Sleeper v. Kidder, Peabody & Co., 480 F.Supp 1264, 1270 (D. Mass. 1979) (A cause of action for misrepresentation accrues at the time the alleged misrepresentation was made). The RCAB's claim of breach of contract also arose at that time – i.e., the time at which the RCAB advised that it was acting at odds with the written terms and condition of Coverage Part 7. Whitcomb v. Pension Dev. Co., 808 F.2d 167, 169 (1st Cir. 1986) ("A cause of action for breach of contract generally accrues at the time of breach, even if the amount of damages may be unknown or *if damages might not be sustained until later*" (emphasis added), citing Campanella & Cardi Construction Co. v. Commonwealth, 351 Mass. 184, 185 (1966). The RCAB's claim for violation of c. 93A arose at that time as well. DiGregorio v. Commonwealth, 10 Mass. App. Ct. 861, 862 (1980) (rescript)); Kozikowski v. Toll Bros., Inc., 246 F.Supp. 2d 93, 98 (D. Mass., 2003) (The accrual date of a G.L. c. 93A claim is "established by the same principles that govern the determination of the underlying actions" citing Coady v. Marvin Lumber and Cedar Co., 167 F.Supp. 2d 166, 169 (D. Mass. 2001)). At a minimum, there remain questions of fact as to

whether the RCAB's claims against LMC were inherently unknowable. See, Saenger Org., 119

F.3d at 65; see also, Wolinetz, 361 F.3d at 48 (factual disputes concerning the date the RCAB

knew or should have known of its causes of action, are best resolved by a jury); Riley, 409 Mass.

at 248 ("where . . . the plaintiff has claimed a trial by jury, any disputed issues relative to the

statute of limitations ought to be decided by the jury").

### B.    The RCAB's Claims Are Barred under the Equitable Defense of Laches.

Laches is the doctrine of stale demand and it is grounded in the equitable notion that

courts are reluctant to come to the aid of a party who has knowingly slept on its rights under

circumstances where it might have earlier asserted such rights in the exercise of due diligence.

Compass Bank for Sav. v. Billingham (In re Graves), 212 B.R. 692, 697 (Bankr.Fed.App. 1997).

Since the RCAB failed to take any action regarding the actual application of aggregate limits to

its insurance policies until the filing of its complaint in March 2004, it is estopped by the

doctrine of laches from attempting to do so now.

LMC can establish a defense of laches by demonstrating unreasonable delay on the part

of the RCAB in attempting to contest the application of aggregate limits to the policies. See,

MacDougall v. Unified Retirement Plan of the Bank of New Eng. Corp., 878 F.Supp. 4, 8

(D.Mass. 1995). The record evidence shows that at all relevant times the RCAB knew or should

have known the terms and conditions of the Coverage Part 7 (SOF, ¶¶ 8-14), and, consequently,

that LMC's position regarding the application of aggregate limits varied with what the RCAB

now contends are the facts. Despite such knowledge, it waited until March 2004, by the filing of

this litigation, to do anything about it.

The RCAB's lack of diligence has resulted in inequity to LMC, such that it would be

unfair to allow the maintenance of the claims. Compass Bank for Sav., 212 B.R. at 697.

"Prejudice in a laches defense comes in two forms: evidentiary and economic." <u>Stein v. United States</u>, 135 F.Supp.2d 265, 274 (D. Mass. 2001). In this case, LMC suffers both due to the RCAB's delay in filing suit.

LMC has suffered evidentiary, or "defense" prejudice, because the lapse of time prevents it from developing and presenting a full and fair defense on the merits. <u>Id</u>. The loss of witnesses or their memories . . . is likely to be particularly harmful to the defendant." <u>Baird v. Bellotti</u>, 724 F.2d 1032, 1034 (1st Cir. 1984). This lapse of time has caused both parties to be unable to locate the relevant records, which is prejudicial to LMC in establishing its defenses. See <u>Stein</u>, 135 F.Supp.2d 265. In addition, LMC has also suffered economic prejudice as a result of the RCAB sleeping on its rights. Had the RCAB ever challenged the application of payments of claims against the stated aggregate limits, LMC would have pursued a declaratory judgment action and would have demanded further information from the RCAB that was developed in the investigation of the claims. (Reardon Aff. ¶¶ 4-6.) As a result of such forbearances, LMC has provided defense and indemnity payments to the RCAB which total more than $19,000,000.

"Application of the defense of laches must be flexible, and depends on all of the circumstances of the particular case and the equities involved." <u>Giese v. Pierce Chem. Co.</u>, 29 F.Supp. 2d 33, 38 (D. Mass. 1998). The existence of laches is determined at the discretion of the trial court. <u>Ramos v. Continental Ins. Co.</u>, 493 F.2d 329, 332 (1st Cir. 1974). The length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability are factors to be weighed to determine the existence of laches. <u>Stein</u>, 135 F.Supp. at 270. Because the RCAB unreasonably delayed the filing of this suit causing prejudice to LMC, its claims should be barred by the doctrine of laches. At a minimum, summary adjudication of the RCAB's factual determinations is inappropriate because a district court must weigh all pertinent facts and equities in making a decision on the laches defense. See, <u>Stein</u>, 135 F.Supp. 2d 265.

## CONCLUSION

Lumbermens Mutual Casualty Company respectfully requests this court to deny the

RCAB's Motion for Partial Summary Judgment because:

1. Material issues of fact preclude a determination that LMC issued any primary policy to the RCAB for a period prior to March 31, 1964;

2. Material issues of fact also preclude any determination concerning the terms and condition of policies issued prior to March 31, 1974;

3. The December 2001 Buy Back Agreement precludes any determination concerning the existence of any excess policies in effect between 1973 and 1977;

4. A material dispute concerning the applicability of aggregate limits to the indemnity payments provided to the RCAB for sexual abuse claims precludes any summary adjudication on that issue; and

5. As a matter of law, the RCAB is not entitled to a summary adjudication that LMC is precluded from contesting coverage for the claims covered by the global settlement.

There is no dispute that:

1. LMC issued primary policies covering certain RCAB parishes for the period from September 31, 1974 to March 31, 1983 (the "parish policies");

2. LMC issued separate primary policies covering certain RCAB institutions, such as schools and hospitals, for the period from March 31, 1964 to March 31, 1983 (the "institution policies");

3. LMC issued excess liability policies to the RCAB for the period from September 23, 1977 to March 31, 1983; and

4. the primary policies issued from 1974 to 1983 include the Coverage Part 7 - Comprehensive General Liability Insurance Form.

Respectfully submitted,

LUMBERMENS MUTUAL
CASUALTY COMPANY

By its counsel,

John E. Tener, BBO No. 563791
Anthony R. Zelle, BBO No. 548141
Mary L. Cataudella, BBO No. 553350
Brian P. McDonough, BBO No. 637999
Nancy M. Cremins, BBO No. 658932
ROBINSON & COLE LLP
One Boston Place
Boston, MA 02108
(617) 557-5900

Dated:  October 1, 2004