UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE,<br><br>  Plaintiff,<br><br>  v.<br><br>LUMBERMENS MUTUAL CASUALTY COMPANY,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 04-10461-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE
## AFFIDAVIT OF MARY KAY REARDON

The Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB") submits this Memorandum in support of its Motion to Strike the Affidavit of Mary Kay Reardon (the "Reardon Affidavit"). The Reardon Affidavit falls far short of the requirements of Federal Rule of Civil Procedure 56(e) in that it consists of nothing more than rank speculation and, moreover, directly contradicts Ms. Reardon's deposition testimony.

Rule 56(e) provides that:

> Supporting and opposing affidavits shall be made on *personal knowledge*, shall set forth such facts as would be *admissible* in evidence and shall show affirmatively that the affiant is *competent* to testify to the matters stated therein.

Fed. R. Civ. P. 56(e) (emphasis added). The Rule requires that affidavits be examined on a point-by-point basis. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001). Applying such an analysis to the Reardon Affidavit demonstrates that nothing in the affidavit passes muster.

**I.    THE COURT SHOULD STRIKE STATEMENTS IN THE AFFIDAVIT NOT BASED ON MS. REARDON'S PERSONAL KNOWLEDGE.**

The "touchstone" of admissibility for affidavits supporting or opposing summary judgment is personal knowledge. *Perez*, 247 F.3d at 315–16. Importantly, "the requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." *Id.* at 316. Despite the fact that Ms. Reardon—a fact witness and not an expert—avers that the information provided in her affidavit is "upon [her] personal knowledge," (*see* Reardon Aff. ¶2 (attached hereto as Exhibit "A")) the subsequent paragraphs in the Affidavit demonstrate that it is not.

**A.    Speculation About What Lumbermens "Would Have Done" Had the RCAB Contested the Application of Aggregates.**

The Affidavit primarily is composed of Ms. Reardon's speculation about what LMC might have done had the RCAB only divined LMC's deception and contested its indefensible application of aggregate limits; specifically, had the RCAB challenged LMC's false contention that aggregates had applied, LMC would have filed a declaratory judgment action raising coverage defenses (*see* Reardon Aff. ¶¶ 4, 5 & 6) and sought a court order requiring the RCAB to provide additional information to LMC (*id.* ¶ 6.)

What unites each of Ms. Reardon's statements is that they contain nothing more than Ms. Reardon's *post hoc* speculation as to what Lumbermens would have done. Such sheer speculation is not admissible evidence and certainly does not reflect firsthand knowledge. *See, e.g.*, *Perez*, 247 F.3d at 315–16 ("surmise" is inadmissible). The Reardon Affidavit discloses no reason that she would be so omniscient as to know how Lumbermens might have reacted in various factual scenarios. The above statements are contrived and comprise, at best, an unhelpful and unsupported opinion. *See* Fed. R. Evid. 701. It should not be considered by the Court for these summary judgment proceedings.

In addition, neither Ms. Reardon nor LMC demonstrates that the hypothetical declaratory judgment action would have generated any ruling favorable to LMC; quite the contrary, such an action undoubtedly would have promoted the cause of the RCAB. LMC could not have asserted in good faith that the claims against the RCAB were not covered. For example, their contention that the claims do not constitute claims for "bodily injury" was considered and rejected by LMC's own counsel in 1995. (*See, e.g.*, Letter from Laurie J. Condos to Christine Zinoman, Mar. 16, 1995 (Attached hereto as Ex. "B").) Similarly, LMC could not have required the RCAB to interpose a charitable immunity defense against the claims, as LMC had waived its ability to assert that defense by written endorsement. (*See* Pl.'s Statement of Material Facts as to Which There is No Genuine Issue to be Tried ¶ 12.)[1]

To the extent that its so-called "coverage defenses" might have borne fruit, LMC now contends that those defenses in fact are still preserved by virtue of its reservation of rights letters. (*See* Reardon dep. 280:10–281:21[2]; *see also* Lumbermens Mut. Cas. Co.'s Opp. to Pl.'s Mot. for Partial Summ. J. at 8 (alleging that LMC reserved its rights to decline coverage at a June 1, 1995 meeting with the RCAB).) If LMC truly thought that it was abandoning any position in reliance on the RCAB's acquiescence in the non-existent aggregates, it would not have delivered the reservation of rights letters.

Finally, the record simply belies the assertion that LMC was denied access to, or refrained from requesting, RCAB records. In fact, Messrs. Maloney and Vega both testified that they had unfettered access to the RCAB's files before the Geoghan settlement of 2002. (*See*

---

[1] Because Lumbermens has failed to controvert the fact of this waiver, it is deemed admitted for summary judgment purposes. *See* L.R. 56.1.

[2] All pertinent excerpts from Ms. Reardon's deposition are attached hereto as Exhibit "C".

Maloney dep. 178:18–179:6; Vega dep. 79:2–80:24.[3]) Indeed, the Geoghan file was what prompted LMC to join in the settlement. In a memo of October 20, 1997, Mr. Meany wrote the following to Ms. Reardon:

> Liability against the insured is not favorable, particularly with the claims against Father Geoghan. The Church records indicate that this priest had numerous complaints made against him over a period of several years. The Archdiocese placed him in a treatment center for a period of twelve months, but upon his release placed him back in parish ministry. Each time a complaint was made against Father Geoghan the Archdiocese relocated him to another ministry.
>
> It appears that the knowledge the Church had about the behavior of its priest and the failure to appropriately act will be considered negligence. Back in the sixties and seventies, it was general practice to remove and relocate the offender. At the time pedophilia was a relatively unknown disease. The Catholic Church will most likely be found negligent in their treatment of the offenders and negligent in continuing to place them in situations where the behavior was allowed to continue.
>
> In 1971 the Massachusetts legislature abolished the doctrine of charitable immunity, but established a limitation of a charity's liability in the amount of $20,000. Although this statute provides the insured with a viable defense, the insurance policies provide an "immunity" endorsement which states that we will not use these defenses without the consent of the insured. Based on prior settlements entered into by the insured in excess of $20,000, it is apparent they chose not to use this as a defense.
>
> * * *
>
> These claims are all venued in Boston. Boston is known to be a predominately [*sic*] Catholic city. We do not know what a jury might do in cases of this nature. We do know that a jury returned a verdict in Dallas, TX in the amount of $124 million against the Archdiocese of Dallas for similar conduct. (Ex. "F")

The record demonstrates that LMC's contention that it has been denied access to the RCAB's files is yet another red herring. The documents produced by LMC to the RCAB in this action

---

[3] Pertinent excerpts from Messrs. Maloney's and Vega's depositions are attached hereto as Exhibits "D", and "E", respectively.

include myriad examples of confidential RCAB internal records that LMC had in its possession before this lawsuit began, and actually produced to the RCAB with its initial disclosures.

**B.    Statements About Events in Which Ms. Reardon Was Not a Participant.**

The statements speculating as to what Lumbermens might have done under different, hypothetical circumstances are all the more repugnant to the Federal Rules when considered in light of the fact that they generally pertain to a point in time at which Ms. Reardon had no involvement with the RCAB's claims. Ms. Reardon testified as Lumbermen's 30(b)(6) designee that she was not involved with the RCAB's claims until 1997. (*See* Reardon Dep. 362:24–363:4.) Consequently, her recently contrived opinion as to what Lumbermens might have done in 1995 or 1996 (*see* Reardon Aff. ¶¶ 4 & 5 (referring to "the next three years")) is well outside the scope of Ms. Reardon's personal knowledge. Indeed, virtually all of Ms. Reardon's affidavit that is not pure speculation about Lumbermens' hypothetical behavior constitutes statements about what other actors at LMC did or learned, despite the fact that Ms. Reardon lacks any firsthand knowledge to testify as to these matters. Ms. Reardon states that LMC allegedly learned "of many issues which . . . might abrogate coverage" and that LMC did not require the RCAB to provide information concerning certain accused priests because of statements made by Wilson D. Rogers. (*See* Readon Aff. ¶¶ 5 & 6.) Nowhere does Ms. Reardon's Affidavit disclose—as required by the First Circuit—how she knows (1) that LMC came to learn of the "issues" described in paragraph 5; (2) that LMC received a statement from Wilson D. Rogers; or (3) that LMC relied on that statement.

What Ms. Reardon's deposition makes clear—but is not disclosed in her Affidavit—is that all of her "personal knowledge" on these subjects is based on inadmissible hearsay. For example, Ms. Reardon testified that the conversation in which the Rogers firm allegedly asked Lumbermens not to investigate the claims because of their sensitive nature occurred in 1995 or

1996 and was between Wilson D. Rogers, Jr. (or Wilson D. Rogers III) and (probably) Christine Zinoman. (*See* Reardon Dep. 263:8–265:2.) In other words, Ms. Reardon now pretends to have personal knowledge of a conversation in which she already has testified that she did not participate. Consequently, her affidavit can only be based on the hearsay statements of other participants in the alleged conversation, which are inadmissible in Rule 56(e) affidavits. *See, e.g.*, *Chapman v. Bernard's, Inc.*, 167 F. Supp. 2d 406, 418 (D. Mass. 2001).[4]

Similar analysis requires the exclusion of Ms. Reardon's statement that "[a]s indicated in its counterclaim in this action, LMC came to learn of many issues which, for any given claim, might abrogate coverage, in whole or part . . ." (Reardon Aff. ¶ 5.) The Reardon Affidavit sets out no grounds for the conclusion that Ms. Reardon has any personal knowledge of how LMC learned of these alleged "issues". The Affidavit fails to "show affirmatively that [Ms. Reardon] is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). In fact, what Ms. Reardon did say at her deposition is that she received oral and written reports from various Lumbermens personnel regarding the RCAB. (*See* Reardon dep. 364:19–365:22.) As with her statements regarding the events in meetings in which she did not participate, Ms. Reardon's conclusory statements about what LMC learned based on the hearsay statements of others should be excluded from consideration on summary judgment.

---

[4] Ms. Reardon could testify to these issues in her capacity as a Rule 30(b)(6) witness designated to speak at deposition as to these matters. The Reardon Affidavit, however, is tendered in her personal capacity. Consequently, she should not be deemed competent to submit an affidavit in which she ascribes particular understandings or knowledge to Lumbermens. *Cf. In re Empire Refining Co.*, 1 F. Supp. 548, 549 (S.D. Cal. 1932) (affidavit on behalf of corporation must reflect that representative makes affidavit on corporation's behalf).

**II.   THE COURT SHOULD STRIKE STATEMENTS IN THE REARDON AFFIDAVIT THAT FLATLY CONTRADICT MS. REARDON'S DEPOSITION STATEMENTS.**

In order to protect the integrity of the summary judgment process, it is critical to prevent parties from offering affidavits which inexplicably contradict prior sworn testimony. *See Mahan v. Boston Water & Sewer Comm.*, 179 F.R.D. 49, 53 (D. Mass. 1998) (citing *Colantouni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1 (1st Cir. 1994)). The Court should rebuff Lumbermens's attempt to create a triable issue of fact on the basis of Ms. Reardon's statements which are obviously inconsistent with her sworn testimony at her deposition.

Lumbermens now uses the Reardon Affidavit in an effort to support its claim that the RCAB is estopped from asserting that there are no aggregate limits because, if the RCAB had only protested sooner Lumbermen's misrepresentations concerning the application of aggregates, Lumbermens would have behaved differently. Lumbermens contends that it detrimentally relied on "representations" by the RCAB in that it "refrained from pursuing declaratory actions upon an array of potential coverage defenses and limitations, which it would not otherwise have done had the RCAB signaled anything but full agreement with the practice of applying annual aggregate limits . . . ." (Lumbermens Mut. Cas. Co.'s Opp. to Pl.'s Mot. for Partial Summ. J. at 35 (citing Reardon Aff. ¶¶ 4 & 5); *see id.* (citing Reardon Aff. ¶ 6).) This argument and the underlying Affidavit are flatly at odds with Ms. Reardon's testimony at her deposition as Lumbermens's sole 30(b)(6) designee.

In fact, Ms. Reardon actually testified that, had the RCAB asserted that there were no applicable aggregates, Lumbermens merely would have "reviewed" the situation:

> Q. So what did Lumbermens do to its own detriment that it would not otherwise have done if the Archdiocese had pushed back and said no, we disagree there are no aggregates?
>
> A. If the Archdiocese had raised the issue of aggregates, it would have been reviewed.

> Q. If the Archdiocese had said we disagree, we don't have the policies, we don't know whether there are aggregates or not; if they had affirmatively said that or had gone further and said there are no aggregates, what would Lumbermens have done differently from what it did do?
>
> A. Any time an insured takes an exception with a coverage position, that issue is re-reviewed and relooked at by staff.

(Reardon Dep. 460:8–461:6. (objections omitted).)

In addition, Ms. Reardon was asked, "Did Lumbermens do anything between 1995 and today with respect to the payment of claims that it would not have done had there been no applicable aggregates." Her response: "No. I don't believe so." (Reardon dep. 462:7–12.) Ms. Reardon offers no explanation in her affidavit for her contradictory positions.[5]

What Ms. Reardon did not say in her deposition is—as Lumbermens now claims—is that a myriad of other policy defenses would have been pursued and that various declaratory judgment actions would have been filed. Had Lumbermens "reviewed" the situation then, it

---

[5] Lumbermens does attempt to explain Ms. Reardon's contradictory testimony in its opposition to the RCAB's motion for summary judgment, arguing that Ms. Reardon's testimony was only directed to the question whether Lumbermen's affirmatively did anything it would not have done absent a protest from the RCAB, as opposed to *refraining* from taking an action it would have taken. (*See* Lumbermens Mut. Cas. Co.'s Opp. to Pl.'s Mot. for Partial Summ. J. at 37 n.18.) Lumbermens's defense is nothing more than linguistic sophistry based on a misrepresentation of the record. Ms. Reardon was asked directly what Lumbermens would have done if the RCAB had objected to the wrongful imposition of the aggregates. (*See* Reardon dep. 460:18–461:6.) She did not suggest that Lumbermens would have sought a declaratory judgment or otherwise responded differently to the RCAB's claims. (*Id.*)

would recognize, as it should now, that its purported defenses are without merit.[6]  In any case, to claim now, months after her deposition and over a year after her memo, that Lumbermens would have done much, much more than merely review the situation, but would actually have filed (losing) lawsuits flies in the face of the rule that triable issues of fact cannot be created by affidavits that contradict prior testimony.

---

[6] In fact, Lumbermens' entire "estoppel" position is flawed.  Not only can Lumbermens not identify a specific "representation" upon which it supposedly relied, *see Kozikowski v. Toll Bros., Inc.*, 354 F.3d 16, 24 (1st Cir. 2003) (gathering cases for the proposition that representations must be specific to justify reliance for estoppel purposes), but estoppel cannot be predicated on representations of law.  *John W. Gosttschalk Mfg. Co. v. Springfiled Wire & Tinsel Co.*, 74 F.2d 583, 587 (1st Cir. 1935).  Here, the "representation" made by the RCAB was based on Lumbermens's own misrepresentation of the terms of the RCAB policies.  How Lumbermens can possibly claim that it was misled to its detriment by the RCAB's mistaken acceptance of Lumbermens's misrepresentation defies imagination.

**Conclusion**

For the foregoing reasons, the Court should grant the RCAB's Motion and strike the Reardon Affidavit.[7]

        Respectfully submitted,

        THE ROMAN CATHOLIC ARCHBISHOP
        OF BOSTON, A Corporation Sole

        By its attorneys,


        /s/Paul B. Galvani_____
        Paul B. Galvani (BBO # 183800)
        Thomas H. Hannigan, Jr. (BBO # 220420)
        Bryan R. Diederich (BBO # 647632)
        Kate Cimini (BBO # 654336)
        Ropes & Gray LLP
        One International Place
        Boston, MA 02110
        (617) 951-7000

Dated: October 13, 2004

---

[7] The Reardon Affidavit should be stricken in its entirety because those paragraphs remaining after removing Ms. Reardon's speculation and secondhand knowledge are irrelevant or inaccurate. As related above, Ms. Reardon's claim in paragraph 2 that she makes the affidavit upon her personal knowledge is clearly wrong. The amount that LMC paid to the RCAB (*see* Reardon Aff. ¶ 3) is irrelevant in this phase of the proceeding. Ms. Reardon's post hoc rationalization of her admission that Lumbermens ha[s] no argument" on the aggregates issue (Reardon Aff. ¶ 7) when parsed is meaningless. All she says is that the conduct of the parties reflected an understanding that aggregate limits would apply. In fact, the RCAB's conduct was the result of a "misunderstanding" that flowed from LMC's misrepresentations. Ms. Reardon's opinion in ay event is pointless in light of the unanimous testimony of all witnesses with firsthand knowledge that no such "agreement" to impose aggregates existed. (*See* Zinoman dep. 54:12–55:10 (Exhibit "G"); Bennett dep. 63:9–64:1 (Exhibit "H"); Meany dep. 39:6–11 (Exhibit "I"); Vega dep. 92:17–21 (Exhibit "E"); Rogers III dep. 118:2–24 (Exhibit "J").)