# MORRISON, MAHONEY & MILLER

### COUNSELLORS AT LAW

250 SUMMER STREET
BOSTON, MASSACHUSETTS 02210-1181
617-439-7500
FACSIMILE 617-439-7590

| MASSACHUSETTS | MICHIGAN |
| Boston | Grand Rapids |
| Raynham | Southfield |
| Springfield | |
| Worcester | CALIFORNIA |
| Yarmouth Port | San Francisco |
| RHODE ISLAND | NEW YORK |
| Providence | New York |
| CONNECTICUT | ENGLAND |
| Hartford | London |

Laurie J. Condos
617-737-8809

March 16, 1995

Christine M. Zinoman
Division Claims Office
Kemper National Insurance Companies
Kemper Insurance Building
Summit, New Jersey 07901-2154

Re:   Various Plaintiffs
Vs:   Roman Catholic Archbishop of Boston
      Your Claim No.: Various
      Our File No.: L-12963

Dear Ms. Zinoman:

Reference is made to your letter dated February 15, 1995 raising a number of coverage and liability questions concerning the above-captioned matters. We have now had the opportunity to conduct the necessary legal research and analysis and are prepared to render our written opinion, which follows.

## I. COVERAGE ANALYSIS

In your assignment letter, you have posed seven questions for our consideration which we have, in turn, addressed. Please be advised that, in addition to responding to these lines of inquiry, we have provided you with some additional coverage and liability information which we believe will prove to be of assistance in handling these matters.

Question 1:

For those cases within our confirmed policy periods, has there been an "occurrence" as defined in our policy? If so, will these cases trigger 1 or multiple "occurrences" within our policies? Please note, there is an aggregate limit for each policy period. (Under the Christi opinion, it appears that the "occurrence" date will be the date of the first alleged molestation. Is this still true with regards to these additional cases?)



EXHIBIT
B

)00007

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 2

Response 1:

As we later discuss in response to Question 5, it is our opinion that, with respect to the priests-perpetrators, there is no "occurrence" as defined in the policies because of the inherently injurious nature of their acts. However, as the priests' intent will not be imputed to the Diocese, the claims against the Diocese, even if allegedly arising out of "reckless" conduct, will likely fall within the definition of "occurrence." See Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393 (1990).

As to the question of whether the various plaintiffs' allegations constitute a single occurrence, thereby invoking a single limit of liability, or multiple occurrences, thereby invoking multiple limits of liability, this is an issue we would expect the Diocese and the claimants to raise. In this regard, we acknowledge that each policy is subject to a $300,000 aggregate. Further, we note that, for the purposes of determining the limit of the company's liability, "all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

The weight of authority in the majority of jurisdictions is that, where one proximate, uninterrupted and continuous cause results in all the injuries to or damage for which a claimant seeks coverage, there is a single accident, occurrence or claim within the meaning of the "per accident," "per occurrence" or "per claim" clauses in a liability insurance policy, limiting the insurer's liability to the designated amount for each accident, occurrence or claim.

Although the Massachusetts appellate courts have not dealt with this issue in the context of sexual molestation claims involving a religious institution, other states have done so. In most instances, the issue of single versus multiple occurrences has been addressed in the context of claims being made against the Archdiocese, rather than the perpetrator-priest. As will be seen, the distinction between the priest and alleged negligent supervisor can be crucial in determining the number of available policy limits. For example, in Interstate Fire & Cas. Co. v. Portland Archdiocese, 747 F. Supp. 618 (D. Or. 1990), the District Court ruled the continuous negligent supervision of the priest by the Archdiocese was the act which exposed the Archdiocese to liability. Therefore, because any direct liability on the Diocese's part stemmed from its alleged negligence in supervising and in failing to remove the priest from his position, the court ruled that, although this negligence was present in each of the policy years at issue, it was a continuous negligence and not a number of discrete episodes of negligence. Accordingly, "[t]his continuing negligence was the single proximate cause of resulting injury to [the plaintiff] and constitutes a single occurrence." Id. at 625.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 3


Following its conclusion that the injuries to the plaintiff were a result of a single occurrence, the court turned to the question of when the occurrence happened for purposes of establishing coverage. In this regard, the court found it must be made by referencing the time when the injurious effects of the occurrence took place. As the parties in Interstate agreed the plaintiff's personal injury happened in 1979 when he was first molested, the court concluded that coverage under the 1979 policy was thus implicated.

In Lee v. Interstate Fire & Cas. Co., 826 F. Supp. 1156 (N.D. Ill. 1993), the District Court, applying Rhode Island law, ruled claims against the Archdiocese of Rhode Island based upon a priest's sexual molestation of a minor over a period of several years constituted one occurrence and triggered coverage only in the year that the first sexual encounter took place. Accord May v. Maryland Cas. Corp., 792 F. Supp. 63 (E.D. Mo. 1992). (However, we note that the May court provided no analysis for applying what has been labelled "the first encounter doctrine.") Thus, as to the claims of negligent supervision against the Diocese, the Lee court found that, although the "exposure theory may be appropriate in cases where it is difficult or impossible to identify when an injury occurs, in child abuse cases it is clear that injury to a child occurs at the time of first encounter." Id. at 1162.[1]

We do note, however, that the "first encounter" analysis has not been universally adopted. In this regard, the United States Court of Appeals for the Fifth Circuit adopted a "one occurrence per child per year" rule. Society of Roman Catholic Diocese of Lafayette v. Interstate Fire & Cas. Co., 26 F.3d 1359 (5th Cir. 1994). In Lafayette, the court ruled allegations that pedophilic priests had abused thirty-one children over a period of several years should trigger coverage in each year the incidents took place. In doing so, the court relied upon a line of Louisiana cases dealing with multiple injuries occurring in an asbestos context. Nevertheless, the court did decline to find that each separate incident could be a new occurrence within the same policy period, thereby limiting the insurer's liability by holding that all subsequent molestations of each child during the same policy period arose out of the same occurrence.

In its decision, the Lafayette court also cited with approval the United States District Court, District of Minnesota's decision in Diocese of Winona v. Interstate Fire & Cas. Co., 841 F. Supp. 894 (1992). In Diocese of Winona, the District Court ruled that negligent supervision

---

[1] Courts who have invoked the "exposure theory" have typically done so in cases involving latent injuries such as asbestos, finding it is reasonable to conclude that, because the plaintiff inhaled asbestos fibers during a number of policy years, thereby resulting in "bodily injury," the insurer is on the risk for each policy year during which the plaintiff was so "exposed."

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 4

of priests by the Archdiocese may have constituted occurrences triggering policies issued subsequent to the date the negligent supervision of the priest initially occurred, although recognizing that such negligent supervision could constitute only one occurrence per policy period. Further, it is important to note that most of the above cases discussing the number of occurrences were between insurers seeking resolution of the allocation of settlement costs. In a different setting, courts may be less inclined to find these cases persuasive.

With respect to guidance from the Massachusetts appellate courts, although two Massachusetts cases have examined the issue of the number of occurrences for purposes of an insurance policy, neither involved a claim against a religious organization. While both found multiple occurrences, both arguably involved different policy language or different facts from those presented here. First, in Slater v. United States Fidelity & Guar. Co., 379 Mass. 801 (1980), the Supreme Judicial Court found multiple occurrences for the purposes of an inland marine "Physician's and Surgeon's Equipment Floater" policy, which insured an orthodontist's office furniture. In Slater, an orthodontist insured his office property under an inland marine policy providing insurance against "[a]ll risks of loss or damage to property insured except as hereinafter provided." The insured sought recovery under its policy for a loss incurred when an employee embezzled a total of $9,000 in funds over a two year period. The court considered whether the total loss of $9,000, resulting from the employee's theft of various amounts on several occasions, constituted more than one "occurrence" within the meaning of the policy. Although beginning its analysis by citing the general rule that where there is one uninterrupted, proximate cause which results in more than one act or event, there is one occurrence, the court concluded each act of embezzlement constituted a separate occurrence. As earlier indicated to you in our opinion in the Christi matter, the Slater decision is arguably distinguishable on several grounds. First, Slater involves substantially different policy language, that of an equipment floater policy, rather than a liability policy covering third party claims. Additionally, the limit of coverage for one occurrence was $250, clearly less than the $9,000 loss suffered. The court noted that courts are influenced by whether they are interpreting deductible amounts (with a finding of multiple occurrences decreasing an insured's recovery) rather than policy limits of liability. Consequently, since Slater did not involve a deductible amount, the court's finding resulted in a $9,000 loss being completely covered rather than only $250 of the loss being covered.

More significant, however, is the Supreme Judicial Court's later decision in Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393 (1990), wherein the court held repeated acts of sexual abuse by several operators of a child care facility against several children enrolled in that facility precluded a finding of a single, on-going cause. In reaching this decision, the court noted the facts of the cases relied upon by the insurer for the proposition that the acts of abuse

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 5

constituted a single occurrence were fundamentally different from the facts presented in Fells Acres. The court continued by distinguishing the facts of the single occurrence cases from the facts therein (i.e., there were several tort plaintiffs who allege numerous discrete acts of abuse, negligence and breach of duty by several different defendants, some individual, one corporate and these acts of abuse took place at different locations.) Id. at 416. Thus, although we believe there is a reasonably good argument that the plaintiffs' claims against the Diocese (as opposed to those claims against the priest-perpetrator) constitute a single occurrence, at the very least for each policy period, we note that both Slater and Fells Acres provide contrary authority, albeit in somewhat factually distinguishable circumstances.

Additionally, as we discussed in Christi opinion, dated July 26, 1994, a matter at the Superior Court level decided by Judge James S. McHugh may also be raised by the claimants and/or the Diocese. In that case, the court ruled that, to the extent the defendant-psychiatrist made an independent decision before each of his sexual relations, there may have been more than one occurrence. However, that claim can arguably be distinguished. As to the priest-perpetrator, a similar analysis may be raised; however, such an analysis would not seem to apply to the Diocese whose alleged negligent act is that of failure to adequately supervise and/or hire the particular priest involved.

As a practical matter, a review of the representative sampling of claims provided to us indicate that, with respect to those which have been settled by the Diocese, the occurrence issue is moot. However, we note at least two of the claims we received are pending and, in one, a demand of $270,000 has been made. Therefore, to the extent the 1974 - 1977 policy aggregate has been diminished by earlier claims paid (or which will be paid), we expect certain claimants, and/or the Diocese, to contend there were at least two occurrences, one in each policy period, in order to trigger subsequent policies, as well. As the Diocese apparently recognizes coverage is not provided for the priests-perpetrators due to the intentional nature of their acts. Therefore, because coverage is being sought solely on behalf of the Diocese for either vicarious liability claims and/or negligent hiring and supervision claims, we would expect the issue of multiple occurrences will only be raised in the context of the inability of the aggregates available to satisfy all of the claims made against the Diocese.

Further, it is our understanding from speaking with you that no excess policy pre-dated September of 1980.[2] Therefore, to the extent the acts of abuse took place during more than one

---

[2] Further, it is questionable whether an excess policy predated the 1981-1982 policy. We understand you are in the process of investigating this issue.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 6


policy period, we expect the Diocese will argue at least some of these losses fall within the September 1980 - 1983 policy, so as to have available excess coverage. To the extent losses pre-date the issuance of any excess policy, the Diocese, of course, is subject to the $300,000 aggregate in each of the policy periods.

With respect to the representative sampling received, payments have been made for claims spanning the period of time from 1967 - 1980 in the amount of $256,000. Attorneys fees for this period are approximately $10,000. Further, we note that, in your letter of February 15, 1995 (on page two) you state that, under the Christi opinion, it appears the occurrence date will be the date of the first alleged molestation. Although we would seek to make such an argument in Christi, we cannot guarantee with certainty, in light of the Supreme Judicial Court's decisions in Fells Acres and Slater, that such an argument would be accepted by the Massachusetts appellate courts.[3]

Question 2:

If it is deemed that there was an "occurrence", will the emotional distress/anxiety, etc . . . claims qualify as "bi" as defined in our policies?

Response 2:

The policies issued to the Roman Catholic Archbishop of Boston define "bodily injury" to mean "bodily injury, sickness or disease . . . ." Under Massachusetts law, the term "bodily injury" does not include purely mental pain, but rather refers to physical injuries "and the consequences thereof." Allstate Ins. Co. v. Diamant, 401 Mass. 654, 656 (1988). However, mental or emotional distress is covered if it accompanies physical injury. Sullivan v. Boston Gas Co., 414 Mass. 129 (1993). In Sullivan, the Court found headaches, insomnia, loss of appetite, muscle tension, and the like, constitute "physical harm." Id. at 138-139. Therefore, the exact type of damage alleged by each plaintiff must be evaluated. Further, the Sullivan court construed this issue in the context of a "physical harm" requirement of a valid negligent infliction of emotional distress claim. In doing so, the court claimed its analysis should not affect its prior decisions concerning the interpretation of the term "bodily injury" for purposes of insurance

---

[3] However, as the Christi case involves only vicarious liability claims against the Diocese versus any independent negligent act on its part, and where, in Christi, it appears that the sexual molestation took place during the course of counselling, and not at various locations, it may be that a "better" argument can be made in Christi that Fells Acres does not control.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 7

coverage.  <u>Sullivan</u>, 414 Mass. at 138 n. 9.  However, because the terms "bodily injury" and "physical harm" may be construed similarly, a showing of physical harm which meets the standard applied in <u>Sullivan</u> may trigger coverage under Kemper's policies.

Additionally, as we earlier noted to you, although courts nationwide appear to be split on the issue whether emotional harm constitutes bodily injury, the trend in sexual abuse and molestation coverage cases is toward including emotional injury within the definition of bodily injury, particularly where there has been some physical contact.  Therefore, we believe that most likely the claims involved would satisfy the "bodily injury" requirement under your policies.

<u>Question 3</u>:

Would any of these cases possibly fall within the "personal injury" coverage?

<u>Response 3</u>:

The materials provided to us indicate that personal injury liability coverage was afforded to the Diocese for all three policy periods (1974-1977, 1977-1980 and 1980-1983.)  In this regard, Endorsement #5 attached to the 1974 through 1977 policy provides for personal injury liability coverage with a separate aggregate of $300,000.  Furthermore, this policy is subject to the following endorsement:

> Item (c) of "Persons Insured" - Personal Injury Liability Insurance is amended to read as follows: (c) if the named insured is designated in the Declarations as other than an individual, partnership, joint venture, the organization so designated and any executive officer, employee, director or stockholder thereof while acting in the scope of his duties as such.  (Endorsement Number 13).[4]

Generally, coverage is not available under personal injury liability coverage unless an enumerated offense is pled.  See <u>Aetna Cas. & Sur. Co.</u> v. <u>First Security Bank of Bozeman</u>, 662 F. Supp. 1126 (D. Mont. 1987) (no coverage under personal injury liability provision where

---

[4] The notations on Endorsements 5 and 13 of the 1974 - 1977 policy form provided indicate that these coverages were renewed in the 1977 - 1980 form, and the 1980 - 1983 form, under the Broad Form Commercial General Liability Endorsement, G222.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 8

plaintiff to failed allege defamation). However, as the definition of personal injury typically encompasses claims for false arrest and false detention, as do the policy forms issued here, and because sexual assaults may involve a detention against the victim's will, coverage for molestation claims could be triggered under a personal injury endorsement. Consequently, because the priests are afforded insured status under this coverage part, it is potentially possible the claimants may seek to trigger coverage under this part of the policy by making such allegations.

However, two hurdles would be faced by the claimants in this regard. First, any personal injury offense alleged must be "committed in the conduct of" or "arise out of the conduct of" the named insured's business. Furthermore, in order to qualify as an insured under this policy part, the individual must have acted while in the scope of his duties as an employee. In Worcester Ins. Co. v. Fells Acres Day School, Inc., supra, the Supreme Judicial Court discussed the criteria which must be analyzed to determine whether a person's acts come within the scope of his employment. The court found that where the sexual misconduct was not motivated by a purpose to serve the employer, nor constituted acts of the kind which the employee was hired to perform, nor were assaults responding to the victim's interfering in anyway with the employees' performing their duties, the employer was not vicariously liable. Therefore, it is unlikely an appellate court would hold that the priests were in the scope of their employment when they committed the various acts of sexual abuse and molestation of the various claimants. For these same reasons, it is also unlikely this coverage part will be implicated against the Diocese.

Furthermore, such interrelated and interdependent acts of sexual abuse arguably do not constitute "personal injury" for the purposes of a general liability policy where every allegation concerning imprisonment or detention arose out of alleged acts of sexual abuse. See e.g., Commercial Union Ins. Cos. v. Sky, Inc., 810 F. Supp. 249, 255 (W.D. Ark. 1992). Such an "imaginative reading" of the "personal injury" coverage provisions may, therefore, be rejected by the Massachusetts appellate courts. See Rideout v. Crum & Forster Ins. Co., 417 Mass. 757, 764 n. 4 (wherein the Court rejected the insured's effort to obtain a duty to defend ruling involving a civil suit for employment discrimination under a liability insurer's "personal injury" coverage by describing the claims as ones for "defamation" or "invasion of privacy.")

Question 4:

Are the courts still abiding by the "manifestation", "discovery rule" with regards to the statute of limitations? It is my understanding that although we may be held to the date of the alleged 1st molestation act as the "occurrence" date - with regards to the statute of limitations in Massachusetts, the courts are going by the date the plaintiff knew or should have known of his/her alleged injury???

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 9


<u>Response 4</u>:

Our earlier analysis provided to you in our July 26, 1994 opinion in <u>Christi</u>, applies to these claims as well. Therefore, for your convenience, we have restated our opinion in this letter.

The statute of limitations for a tort claim in Massachusetts is three years and provides that a tort action "shall be commenced only within three years . . . after the cause of action occurs." G. L. c. 260, §2A. Because the Massachusetts legislature has not provided a statutory definition of when a cause of action accrues, the issue has been left to judicial interpretation. See <u>Franklin</u> v. <u>Albert</u>, 381 Mass. 611, 619 (1980). Generally, a cause of action accrues on the date of the plaintiff's injury. <u>Joseph A. Fortin Constr., Inc.</u> v. <u>Massachusetts Housing Finance Agency</u>, 392 Mass. 440, 442 (1984). However, courts have found a doctrine that would require the statute of limitations to begin to run even before the plaintiff knew or reasonably should have known of the cause of action to be unfair.

Accordingly, the Massachusetts courts have developed the "discovery rule" which provides that a cause of action will not accrue, and, therefore, the statue of limitations does not begin to run, until the plaintiff knew or reasonably should have known that he may have suffered injury because of the defendant's conduct. The plaintiff's knowledge of the injury is a question of fact to be decided by a jury. The Massachusetts Supreme Judicial Court has addressed the application of the discovery rule to a tort claim involving an action against a psychotherapist for sexual abuse.

In <u>Riley</u> v. <u>Presnell</u>, 409 Mass. 239 (1991), the Court ruled that a cause of action for psychotherapeutic malpractice involving sexual abuse did not begin to run until the plaintiff either knew or should have known that he was harmed and either knew or should have known the cause of such harm. Applying this "discovery rule," the Court then held that a patient's suit for malpractice, brought against a psychotherapist who treated and abused him from 1975 and 1979, should not have been dismissed on a motion for summary judgment, even though the plaintiff did not bring suit until 1985, several years after the three year statute of limitations in tort would normally have expired.

Following <u>Riley</u>, the United States District Court for the District of Massachusetts in <u>Hoult</u> v. <u>Hoult</u>, 792 F. Supp. 143 (D. Mass. 1992), expanded upon <u>Riley</u>, holding that the "discovery rule" could be applied to other sexual abuse cases, even in the absence of any therapist/patient relationship. Thus, the <u>Hoult</u> court denied the defendant's motion for summary judgment on statute of limitations grounds, despite the plaintiff's allegations that the defendant, her father, had

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 10

sexually abused her over fourteen years earlier. The statute of limitations, said the Court, does not begin to run against the victim of sexual abuse until she either knew or should have known she had a cause of action.

Finally, in Munsey v. Kellett, Middlesex Superior Court C.A. No. 91-5984 (Dec. 29, 1992), Judge Stephen Neel denied the defendants' motion for summary judgment in an action involving five cases of repressed sexual abuse. Judge Neel based his denial on the ground that the dates the plaintiffs should have known of the causal link between their childhood experiences and their subsequent adolescent and adult problems raised questions of fact appropriate for jury determination.

Applying the above precedent to the facts of the representative sampling provided, we note the issue of whether the statute of limitations has run will depend upon whether the claimants can show they did not know, and reasonably could not have known, they had been harmed by the priest's (and the Diocese's) conduct until some time which would be considered timely within the applicable statute of limitations. Once the statute of limitations is pled as a defense, the various claimants will bear the burden of proving facts that take the case "outside the impact of the three-year statute of limitations." Riley, supra at 243-44. In this regard, we also note that tolling agreements may have been entered into between the Diocese and various claimants. However, concerning some of the matters provided, Coon for example, it is unclear when certain claimants "discovered" their harm and whether a tolling agreement was executed.

With respect to your related inquiry as to what date constitutes the date of loss, under Massachusetts law, the insured has the burden to demonstrate that the asserted injuries were sustained during the policy period. Although at first glance when the harm occurred for purposes of the statute of limitations might seem to affect the time when the harm occurred for purposes of coverage, these two issues involve differing analytical approaches. Therefore, it is our opinion that, although the claimants' harm may not have been "discovered" until some recent time period, the harm, for "occurrence" purposes, occurred when the acts complained of took place.

Question 5:

    As a carrier, what is our obligation with respect to indemnity/defense for?

(a)    The Archdiocese of Boston (Roman Catholic Archbishop of Boston, a Corporation Sole . . . .)

(b)    the individual Priests

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 11


Response 5:

It is undisputed the Diocese and its affiliated parishes qualify as insureds under the Kemper policies issued. Furthermore, the counts and/or claims against the Diocese sound in either vicarious liability or negligent supervision and/or hiring. As to those claims and/or complaints grounded solely on a claim of vicarious liability, it is our opinion that the priest-perpetrator's intent most likely would not be imputed to the Diocese as a matter of law and, consequently, a defense should be afforded to the Diocese for their alleged vicarious liability. See Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393 (1990). As we earlier indicated to you, while the earlier decision of Bowen v. Lloyd's Underwriters, 339 Mass. 637 (1959), suggests coverage may be excluded for an insured's vicarious liability where the employees action is itself outside the scope of coverage, the case was decided over thirty years ago.[5]

In any event, putting aside for a moment the issue of a duty to defend on a vicarious liability count, Kemper's ultimate exposure in a vicarious liability case may not be significant because the priest's misconduct would likely have been outside the scope of his employment. Fells Acres, 408 Mass. at 404-405. As earlier discussed, in Fells Acres, the court found that where sexual misconduct was not motivated by a purpose to serve the employer, nor constituted acts of the kind which the employees where hired to perform, nor were assaults responding to the victim's interfering in any way with the employees' performing their duties, the employer was not vicariously liable. Therefore, in those pending cases where allegations of vicarious liability

---

[5] We did locate, however, two more recent decisions from other jurisdictions which appear to be supportive of the Bowen decision. See Commercial Union Ins. Co. v. Sky, Inc., 810 F. Supp. 249, 254-255 (W.D. Ark. 1992), insurer had no duty to defend corporate defendant where employees acts of sexual harassment could not as a matter of law be considered "accidental;" Town of South Whitley v. Cincinnati Ins. Co., 921 F.2d 104, 108 (7th Cir. 1990) (insured town denied coverage under Commercial Liability Umbrella policy to the extent the alleged acts of the tort suit assert intentional discriminatory acts committed by the Board of Trustees of the town.) In contrast, other courts favor affording coverage for vicarious liability of a master even where that liability may be premised on an uncovered, unintentional act of the servant. See e.g., Ranger Ins. Co. v. American Mut. Prot. Bur. Security, Inc., 1993 W.L. 437002 (N.D. Cal. Aug. 24, 1993). In any event, in light of Fells Acres, it is our opinion that a duty to defend is implicated.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 12


have been made, the defense should be raised that, at the time the acts complained of were committed, the priest was acting outside the scope of his employment.

We also understand the claims and/or complaints which have been made against the Diocese often encompass claims against the Diocese based upon negligent supervision and/or hiring and/or retention of the various priests. If any such claims are made, it is our opinion the duty to defend the Diocese has been implicated. However, we believe a viable statutory defense, in the form of the charitable immunity defense, exists in order to limit the Diocese's liability in these matters to $20,000. See our later discussion beginning on page 19.

As to the priests-perpetrators, even if they were to qualify as insureds under the policy, due to the inherently injurious nature of their acts, no coverage should be afforded as these injuries were "expected or intended," as a matter of law and, therefore, fail to constitute an "occurrence," as defined in the policies.[6] In contrast, we note that, if the Diocese is alleged to have known of the abusive activities of the priest but failed to protect the children from this abuse, although such conduct may be deemed "reckless," it likely will not give rise to "expected or intended injuries, and, therefore, the "occurrence" requirement is met. Fells Acres at 401-411. Such negligence claims arising from the intentional acts of a sexual abuse perpetrated by another would likely be covered by the Kemper policies.

Therefore, as to any pending claims, it would be appropriate to send a disclaimer letter to the individual priest at his last known place of residence. Such a letter should reference the lack of the insured status of the priest due to his commission of acts which fall outside the scope of his duties and/or employment. Additionally, a letter should encompass a discussion of the inherent intentional nature of the acts, thereby precluding coverage for lack of an "occurrence."

Question 6:

What do you recommend that we do regarding the pre-1994 cases where the "form letter" disclaimers were issued?

---

[6] We note that, in some of the correspondence provided to us from the Diocese to Kemper, the Diocese has acknowledged that no defense is owed to the individual priest and further, we also note that, in some instances, a contribution by the individual priest has been made in order to settle various matters.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 13

Response 6:

With respect to those "pre-1994" claims which have been settled by the Diocese, there is no legal or practical reason to amend or reissue these letters. The impact of the Syracuse Division's disclaimer stance on these claims is discussed in further detail below in our response to Question 7.

As to those matters which are pending (those in suit and those where only claims have been made), a withdrawal of the disclaimer coupled with the offer of a defense to the Diocese should be made.[7] In this regard, we are of the opinion there is little basis to rely on the definition of an "occurrence," to preclude coverage. In this regard, we refer you to our discussion on pages ten and eleven discussing the Supreme Judicial Court's decisions in Fells Acres and Bowen. Further, since all of the claims we have reviewed involve some physical contact in connection with the emotional injury alleged, it is unlikely a defense of no "bodily injury" would prevail. Consequently, the only coverage defense likely to be successful is that, because of the vast number of claims, an exhaustion of the policy aggregate of the various policies may result.

Question 7:

What course of action do you recommend with respect to the pending 1994 cases forward? Final Reservation of Rights? Disclaimer? I am speaking of those cases that fall within our confirmed policy periods. (Per my discussion with Laurie - I believe that we may need to concede that coverage existed back to 3/31/71 and 9/23/71 as the underwriting policies that I have all seem to indicate that the 74-77 policy periods were RENEWALS. Since our policies were written on 3 year terms at that time, I think that we may have to concede coverage back until 1971. your thoughts? If a declaratory were brought on this matter - would the Mass courts hold us in to coverage from 71-74, where there is no actual "physical" policy in our records? It is my thought that there is enough evidence that we would have to concede that coverage existed with us for that time frame??)[8]

---

[7] As we later discuss, although there may not be a technical basis for providing defense counsel where only a claim has been made, it is advantageous due to the sheer number and complexity of these matters.

[8] Please note we have set forth a separate discussion on the "lost policy" issues raised by these matters beginning on page 15.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 14



Response 7:

    Although it is somewhat difficult to completely respond to Question 7 in light of the fact that we only possess a representative sampling of these matters, we do have the following recommendations. With respect to those claims against the Diocese which have been settled by the Diocese, we suggest that an offer be made forthwith to reimburse the Diocese for the amounts of these settlements as well as the attorneys' fees incurred. In this regard, we rely upon the Supreme Judicial Court's recent decision in <u>Liquor Liability Joint Underwriting Association of Massachusetts</u> v. <u>Hermitage Ins. Co.</u>, 419 Mass. 316 (1995). In that case, the general liability insurer, who had earlier failed to defend a claim for negligent security against its insured, was found liable for one-half the cost of defense and the entire cost of the settlement made to the tort plaintiff by the liquor liability insurer. The court ruled that, notwithstanding the fact one of the counts against the insured was outside the scope of coverage <u>i.e.</u>, it alleged a negligent serving of alcoholic beverages, the general liability insurer had a duty to defend if <u>any</u> of the allegations in the complaint were reasonably suspectable of an interpretation that they stated a claim covered by its policy. <u>Id</u>. at 319-320. In its discussion, the court reiterated principles governing an insurer's conduct, earlier stated in <u>Polariod Corp.</u> v. <u>Travelers Indem. Co.</u>, 414 Mass. 747, 764 (1993), "that an insurer who has committed a breach of its contractual duty to defend its insured is liable 'for the natural consequences of [the] breach of contract that places its insured in a worst position," and that "an obligation to pay settlement costs could result from a breach of the duty to defend." The court further pointed out that "an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage."

    Although recognizing that, in <u>Polariod</u>, the Court was not presented with a situation where the underlying action involved covered and uncovered counts, the court determined that, where, as here, the damages were not apportioned between covered and uncovered claims, the burden fell to the general liability insurer. Consequently, because the liability insurer could not meet its burden of determining the allocation between the covered and uncovered claims, it would be held liable for the full amount of the settlement. Additionally, the court ruled the defending insurer was not only entitled to interest on the settlement monies it had paid to the underlying plaintiff, but was also entitled to interest on the attorneys' fees and costs, from the dates on which such expenses were incurred.

    Consequently, although some of the releases in the representative sampling provided indicate that both the priest-perpetrator and the Diocese were released by the claimant, under the <u>Hermitage</u> decision discussed above, to the extent these settlements were not apportioned between the priest and Diocese, we believe the Diocese is entitled to recover the entire cost of each settlement, as well as attorneys' fees and costs incurred. Additionally, it would be appropriate

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 15

to calculate the interest on these monies from the time the settlement was paid and/or attorneys fees' and costs were incurred.

As to those pending claims which are in suit, an appointment of defense counsel on behalf of the Diocese is implicated. Therefore, a letter should be formulated whereby a defense is offered to the Diocese. The Hartnett matter is an example of this type of case. With respect to other matters, such as Costello, which have not yet been placed in suit, although no "technical" duty to defend is implicated because no lawsuit has been filed, it would be advisable to appoint defense counsel to conduct investigations and to bring a sense of consistency to the handling of the defense of all of these matters. For example, issues such as the protection afforded to the Diocese because of the charitable immunity cap under G. L. c. 231, §85K, as well as any viable statute of limitations defense, should be advanced.

8. <u>Proving the Existence and Terms of an Insurance Policy</u>

The loss of a policy does not in itself defeat an insured's claim for coverage. A written policy is simply evidence of the contract between insurer and insured and, thus, the insured may enforce his rights under the contract even if the policy has been lost or destroyed. See <u>Zurich Ins. Co.</u> v. <u>Raymark Industries, Inc.</u>, 144 Ill. App.3d 943 (1986). The loss or destruction of the written policy does not extinguish the rights and obligations of the parties. 52 Am. Jur. 2d, <u>Lost and Destroyed Instruments</u> §35. All that is necessary is that the coverage agreed upon be capable of being ascertained. <u>Zurich Ins. Co.</u> v. <u>Raymark Industries, Inc.</u>, <u>supra</u>.

As a general rule, it is the insured's burden to establish the existence of an insurance policy. See <u>Golden</u> v. <u>Equitable Life Assur. Soc'y</u>, 293 Mass. 286, 288 (1936); <u>Boston Forwarding & Transfer Co.</u> v. <u>Contractors Mut. Liab. Ins. Co.</u>, 226 Mass. 372, 373 (1917). This includes proving the essential terms of the policy. See <u>Emons Industries, Inc.</u> v. <u>Liberty Mut. Ins. Co.</u>, 545 F. Supp. 185, 188 (S.D.N.Y. 1982); <u>Executive Aviation, Inc.</u> v. <u>National Ins. Underwriters</u>, 16 Cal. App. 3d 799, 806 (1971); 44 Am. Jur. 2d Insurance §1924. The insured also has the burden to show that he sustained a loss within the policy's coverage. <u>Markline Co.</u> v. <u>Travelers Ins. Co.</u>, 384 Mass. 139, 140 (1981). The insurer, on the other hand, has the burden of showing any limitation on or exclusion of coverage. <u>Zurich Ins. Co.</u> v. <u>Raymond Industries, Inc.</u>, 144 Ill. App. 3d 949 (1986); <u>Executive Aviation, Inc.</u> v. <u>National Ins. Underwriters</u>, 16 Cal. App.3d at 806; Couch on Insurance 2d §79:417.

The next issue is what standard of proof an insured must meet in order to prove its claim. When the proponent can demonstrate that he has made a diligent search for the policy, a court will permit secondary evidence of the terms of the policy. See <u>Burroughs Wellcome Co.</u> v.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 16


Commercial Union Ins. Co., 632 F. Supp. 1213, 1223 (S.D.N.Y. 1986). However, a standard of proof higher than that ordinarily accepted may be required. See, e.g., Keene Corp. v. Insurance Co. of N. America, 1981 Fire & Casualty Cases 712, 714 (D.D.C. 1981) (under Pennsylvania law, "clear, satisfactory and convincing evidence"). See also Sylvania Elec. Products, Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965) (more strictness in proof with respect to lost contract where the document whose existence is in dispute is at the very foundation of the claim); Combined American Ins. Co. v. Gilmore, 428 S.W.2d 857 (Tex. App. 1968) (life insurance policy).

A wide range of evidence has been accepted to establish the existence and terms of lost or destroyed policies. See e.g., Burroughs Wellcome Co. v. Commercial Union Ins. Co., 642 F. Supp. 1020 (S.D.N.Y. 1986) (by affidavit and portions of policies, insured established a chain of continuous coverage for over 25 years); Keene Corp. v. Insurance Co. of N. America, 1981 Fire & Casualty Cases 712, 714 (D.D.C. 1981) (insured used index cards to establish coverage); Phoenix Ins. Co. v. Nationwide Mutual Ins. Co., 335 F. Supp. 671 (D. Mont. 1972) (photograph of general agent's "daily," including carbons of face sheets, and premiums which reflected charge for purported endorsement); Clendenin v. Benson, 177 Cal. App. 674, 4 P.2d 616 (1931) (insured submitted testimony of employees of the insurer and business records to prove existence and contents of missing policy); Underwriters Life Ins. Co. v. Bornemann, 141 S.W.2d 1005 (Tex. Civ. App. 1940) (letters written by insurer to insured used to establish existence of policy).

Even admitting evidence, however, is not necessarily persuasive in establishing that the alleged coverage existed. See e.g., C.F.W. Construction Co. v. Travelers Ins. Co., 363 F.2d 557 (6th Cir. 1966). There, the insured sought to establish coverage by proving that an exclusionary endorsement had been removed from the policy. The insured's evidence in this regard consisted of (1) evidence of a "course of dealing" between insured and insurer, (2) a certificate of insurance to the effect that the insurer was providing an unspecified type of coverage, and (3) an affidavit of belief, but not personal knowledge, that the endorsement would have been removed. Despite this evidence, summary judgment for the insurer was allowed.

Reviewing Massachusetts appellate caselaw, we have not located any case in which the court clearly defined the respective burdens of proof when a policy has been lost or destroyed. However, the Massachusetts cases discussed below suggest how these issues might be decided.

In Joyce v. London & Lancashire Indem. Co., 312 Mass. 354 (1942), the plaintiff brought a bill to reach and apply against the insurer of an automobile in which he had been a passenger at the time of his injury. The issue was whether the plaintiff, who had obtained a judgment against the insured for negligent operation, could recover as a guest occupant. "The policy of

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 17

insurance was not in evidence at the trial . . ., and its contents did not appear." Id. at 356. Thus, the court assumed the automobile's owner, a Massachusetts resident, had registered the automobile in compliance with Massachusetts law. From that fact it followed that a motor vehicle liability insurance policy had been issued, and the court "presumed that the policy conformed to the mandates" of the motor vehicle responsibility law, Mass. Gen. L. c. 90, §34A. However, the Joyce court then ruled that, because compulsory motor vehicle insurance does not include guest occupant coverage, the plaintiff could not recover against the insurer. "Where, as here, the policy of insurance was not in evidence, the trial judge could not go beyond the assumption that the policy in question conformed to the mandates of the statute." Id. at 358. The court reached this result because "[i]t was at least for the plaintiff to show that there was a policy of insurance, and that the judgment recovered in his original action was ostensibly within its terms." Id. at 358-359.

Shapiro v. State Farm Mut. Ins. Co., 355 Mass. 54 (1962) also purportedly involved a motor vehicle liability policy and similar facts: the plaintiff had obtained a judgment against an automobile operator and then sought to satisfy the judgment under the operator's insurance policy. The plaintiff did not put the policy into evidence at trial. Unlike the situation in Joyce, however, there was no evidence that the owner/operator had been a Massachusetts resident at the time of the accident, and thus the court did not presume the existence of a motor vehicle liability policy conforming to Massachusetts law. Therefore, the plaintiff, who had "the burden of proving that the policy of insurance obligated the insurer to pay the judgment," could not recover. Shapiro, 355 Mass. at 56.

Both of the above cases support the general proposition that it is the insured who has the burden of showing that a policy exists and that the policy contains provisions which afford coverage for his loss.[9] Furthermore, even when the insurer has admitted the existence of a policy, as it did in Joyce, the burden still rests on the insured to show provisions entitling him to coverage. However, reliance upon these cases would need to be qualified because neither was a "lost policy" case. Although the court did not so state in either opinion, it seems likely the plaintiff simply failed, by oversight or otherwise, to put the policy in evidence, and the insurer was silent as to what the policy terms were. In a true "lost policy" case, evidence of the insured's and insurer's records and testimony concerning the existence of coverage would likely determine the outcome of the issue.

---

[9]  The plaintiff in a reach and apply action "stands in the shoes" of the insured.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 18

     There have also been a few cases at the Superior Court (trial) level which have addressed the "lost policy" issues in the context of environmental claims.[10] First, in Rubenstein v. Liberty Mutual Ins. Co., Suffolk County Superior Court No. 90-1687 (Mass. October 8, 1991), certified question dismissed, No. 92-P-771 (Mass. App. April 15, 1993), the former owners of polluted property sought coverage for a suit against them by the current owners for costs which they had incurred in cleaning up oil that had leaked from underground tanks over a period of years. On cross-motions for summary judgment, Judge Botsford deferred any ruling with respect to earlier carriers with missing policies, however, finding that disputed issues of fact remained as to the existence and scope of said policies.

     Second, in Cooley, Inc. v. Aetna Cas. & Sur. Co., Bristol County Superior Court C.A. No. 90-00060 (Mass. February 17, 1993), the plaintiff, Cooley, had shipped waste solvents and other materials to the Re-solve site in North Dartmouth, Massachusetts from March 1967 until July 1976. In this action, Judge Tierney declined to rule on the existence of coverage under policies issued between 1967 and 1978, which Cooley had been unable to fully document. While acknowledging Cooley had the burden of proving the existence of these policies, the Court found that the insured had submitted sufficient secondary evidence of coverage to preclude summary judgment for the insurers.

     Next, in Roche Brothers Barrel & Drum Co. v. American Employers Ins. Co., Middlesex No. 91-6120 (Mass. Super. January 13, 1994), the insured sought coverage for third party claims brought against it arising out of its shipment of wastes to the Charles George Superfund site in 1976. Commercial Union disclaimed any obligation to defend since it could not locate its policies. In an ensuing declaratory judgment action, the Superior Court (O'Toole) ruled that secondary evidence submitted by the insured met its burden of establishing the existence and terms of the claimed coverage. However, the Superior Court found that any policies that existed would have contained a pollution exclusion. Because of the more detailed discussion in this case, we have attached a copy for your review. You will note some similarities between the Diocesan matters and the Roche Brothers matter, as, for example, the discussion of a renewal policy.

     Further, in SCA Disposal Services of New England, Inc. v. Central National Insurance Company of Omaha, Suffolk No. 90-0393 (Mass. Super. April 12, 1994), Judge Cratsley dismissed the claims against all insurers but CNA, holding that its 1975-78 policy contained an

---

[10] Our resources at the Superior Court level do not reveal any lost policy cases arising in the context of sexual abuse claims. However, the treatment by the Superior Court of this type of issue, albeit in the environmental context, any prove to be of assistance.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 19


endorsement deleting the pollution exclusion. Although a complete copy of this policy was unavailable, the Court ruled that WMNA had met its burden of proving the existence and terms of the policy according to a standard of clear and convincing evidence.

Most recent is the federal district court decision of <u>State Mut. Life Assur. Co. of America</u> v. <u>Lumbermens Mut. Cas. Co.</u>, No. 90-12505 (D. Mass. January 11, 1995). There, the unsecured lender of a paint manufacturer sought coverage under various missing policies issued during the 1960's for environmental clean up claims involving the manufacturing facility. The Court ruled the insured had the burden of proof, but had met its burden with respect to these policies. The court did not address the question of what standard of proof should be applied.

What all of the above cases demonstrate is that, at a minimum, the insured has the burden of proof to demonstrate the existence of the policy, its terms, conditions and liability limits. It appears as if the Massachusetts courts, at least at the trial court level, would be receptive to imposing a clear and convincing standard with respect to the burdens of proof involving both the existence and terms of the policy at issue.[11]  As to your specific question concerning the 1971-1974 policy, we note Kemper's own records appear to confirm the existence of this policy. As in the <u>Roche Brothers</u> matter, a copy of which is enclosed, the 1974-1977 policy was apparently a "renewal" of a policy identified by policy number 1YL 64 706 [the pre-1971-1974 policy]. We understand you agree that the sequencing code employed to reference the prior policy comports with the sequencing utilized by Kemper during that time period.

However, other than a general reference to the policy as being "renewed" by the 1974-1977 policy, nothing is known about the kinds or amounts of coverage provided under the pre-1974 policy. In this case, the court would likely consider documentary and testimonial evidence of what policy conditions and/or endorsements were typically issued by Kemper during the relevant time frame. This could involve deposition testimony from various Kemper employees

---

[11]  Although involving a loan guarantee document, the Appeals Court's decision in <u>Capital Bank & Trust Co.</u> v. <u>Richman</u>, 19 Mass. App. Ct. 515, 520 n. 5 (1985), may provide some guidance. In this action to establish the existence of a loan guarantee agreement, the trial court applied the preponderance of the evidence standard. On appeal, the defendant attempted to argue a standard of clear and convincing proof should apply, but the Appeals Court refused to consider the issue because the defendant had not raised the issue at trial. Consequently, although the court found that the defendant waived this issue, it does not preclude the argument in future cases that a higher standard should apply.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 20

and/or Kemper agents.  Additionally, the Insurance Law Library here in Boston often is able to provide assistance with respect to providing specimen policy forms utilized by various companies during various time frames.  Another issue presented is that of the limits of the "1971-1974 policy."  As the three policy periods following that policy period had a $300,000 "per person" $300,000 "aggregate," we would expect a court would find that, at a minimum, the limits would not exceed that of $300,000.

It is our understanding that Kemper is likely to acknowledge the existence of the policy with a period of 9/23/71 through 9/23/74.  Nonetheless, we raise the above issues, as we understand the Diocese is also seeking to demonstrate that policies may have preceded the issuance of a 1971 - 1974 policy.

9.  Charitable Immunity

For your convenience, we restate our discussion of this issue from the Christi opinion. The common law doctrine of charitable immunity was first recognized in Massachusetts in McDonald v. Massachusetts General Hospital, 120 Mass. 432 (1876), which held charitable institutions are immune from liability for their torts when engaged in activities related to the charitable purpose of an organization.  In 1971, the Massachusetts legislature enacted G.L. c. 231, sec. 85K which abolishes the defense of charitable immunity, but establishes a limitation of a charity's liability in the amount of $20,000.

The statute provides, in pertinent part, that:

It shall not constitute a defense to any cause of action based on tort brought against a corporation, trustees of a trust, or members of an association that said corporation, trust or association is or at the time the cause of action arose was a charity; provided that if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation, trust, or association, liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive or interests and costs. Notwithstanding any other provision of this section, the liability of charitable corporations, the trustees of charitable trusts, and the members of charitable associations shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.

MORRISON, MAHONEY & MILLER

Christine M. Zinoman
March 16, 1995
Page 21


The rationale in support of charitable immunity is that funds donated for charitable purposes should be applied in furtherance of an organization's charitable purposes and should not be diverted for other purposes. The statute reflects a legislative balancing of the interests in protecting charitable organizations against the interest of a person injured as a result of a tort for which the charitable organization is responsible.

In order to qualify for the statutory cap, the company's insured must prove both that it is a charitable organization, and that the tort complained of "was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation." G.L. c. 231, §85K; English v. New England Medical Center, Inc., 405 Mass. 423, 425 (1989), cert. denied, 493 U.S. 1056 (1990); Harlow v. Chin, 405 Mass. 697, 715 (1989). In general, any charitable organization may take advantage of the liability cap. The charter of an organization is sufficient as *prima facie* evidence of an organization's status as a charitable institution. Barrett v. Brooks Hospital, Inc., 338 Mass. 754, 759 (1959). While we do not have in the materials provided to us a copy of the charter of organization of the Diocese, we believe that it would be found to be a charitable organization.

Once it is determined an organization is a charitable organization, the next inquiry must be whether "the tort was committed in the course of any activity carried on to accomplish directly the charitable purpose of such corporation, trust or association...." Although the majority of the cases where charitable immunity is invoked concern allegations of negligence, the doctrine has been invoked in cases involving "reckless, willful or wanton misconduct," Boxer v. Boston Symphony Orchestra, 342 Mass. 537, 538 (1961) and even intentional misconduct. St. Clair v. Trustees of Boston University, 25 Mass. App. Ct. 662, 666-67 (1988) (intentional interference with advantageous relations and slander.) Here, the claimants allege that incidents of sexual abuse occurred in connection with various church-related activities i.e., altar boys, church sponsored basketball. If, by providing such activities, the Diocese was acting to accomplish directly the charitable purpose for which it was created, it will have met its "burden of showing that the tort was committed in the course of its charitable purpose," Harlow v. Chin, 405 Mass. at 716, and be afforded the protection of the statute.

Our research reveals one Massachusetts case involving the charitable immunity statute and a sexual assault, the rape of a student, which occurred on a college campus. Mullins v. Pine Manor College, 389 Mass. 47 (1983). There, the plaintiff brought an action against the college and its vice-president for operations to recover damages for injuries suffered as a result of a rape. The jury returned verdicts in the amount of $175,000. Pursuant to G.L. c. 231, §85K, the trial judge reduced the amount of the judgment against the college, a charitable organization, to $20,000. The Massachusetts Supreme Judicial Court affirmed the judgment. Based upon this

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 22


decision, it is our opinion that, if a verdict is returned against the Diocese, any damages awarded may well be subject to the statutory cap.

That the claimants have alleged numerous instances of sexual abuse should not alter or effect the operation of the statute, if it is found to be applicable. "Under the substantive law of torts of this Commonwealth, charitable organizations are not liable for personal injuries in excess of $20,000, and, therefore, the plaintiffs have no right to a jury determination of damages in excess of that amount." English, supra, at 426. We have found no case law which states that the separate alleged incidents should not be treated, for the purposes of the statute, as one claim against the defendant. However, individuals, officers or employees of the charitable organization are not covered by the defense. "The general rule . . . is that an agent is not entitled to the protection of his principal's immunity even if the agent is acting on behalf of his principal." Mullins, at 63.

Nevertheless, notwithstanding the viability of this defense, we note all three policies issued are subject to the following "immunity" endorsement which provides:

(1)    The company agrees that it will not use, either in the adjustment of claims or in the defense of suits against the Insured, any limitation of liability by statute, or the immunity of the Insured from tort liability (unless requested by the Insured to interpose such defense).

(2)    The Insured agrees that the waiver of defense of immunity shall not subject the company to liability for any portion of a claim, verdict, or judgment in excess of the applicable limit of liability stated in the policy.

Consequently, the defense of charitable immunity, although a viable one, cannot be asserted without the Diocese's assent. Our review of the representative sampling provided reveals that, in at least some instances, the defense has been raised. However, as some of the individual settlements exceed $20,000.00, we are uncertain to what extent this defense was relied upon by the Diocese. Of course, as we earlier indicated, as to those matters which have been settled, Kemper is bound to reimburse the Diocese, irrespective of the assertion of this defense. However, as to the pending claims, and in light of the $300,000 aggregate found in all three policies, it would be in the Diocese's interest to assert this defense in connection with any and all pending claims.

**MORRISON, MAHONEY & MILLER**

Christine M. Zinoman
March 16, 1995
Page 23

## CONCLUSIONS AND RECOMMENDATIONS

As set forth above, numerous coverage and liability issues are raised by the claims made against the Diocese and the various priests. Accordingly, we have set forth our specific suggestions for future handling of these matters in response to your questions nos. 5, 6 and 7.

Very briefly, however, from the representative sampling of claims we have reviewed, we believe a duty to defend the Diocese has been implicated. As to those claims which have been settled, reimbursement of settlement monies, attorneys' fees and costs is required. As to those claims which are pending, a defense under a reservation of rights should be offered consistent with this coverage opinion. In contrast, we believe there is no duty to defend any of the priests-perpetrators named by the claimants. Consequently, disclaimer letters should be sent to the respective priests, again, consistent with this coverage opinion. We understand that, at this juncture, you will be reviewing the remaining claims in light of the information we have now provided. Should you have any questions concerning the content of this letter and its application to the representative sampling of claims provided to us, or the remaining claims, please do not hesitate to contact us, at your convenience.

Very truly yours,

Stephen J. Andrick

Laurie J. Condos

LJC/ddd

900030