

7/26/2004  Mary Kay Reardon (Vol. 1)

1              UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
2

    THE ROMAN CATHOLIC ARCHBISHOP
3   OF BOSTON, A Corporation Sole,
4            Plaintiff,
5       -vs-                C.A. No. 04-10461-DPW
6   LUMBERMENS MUTUAL CASUALTY
    COMPANY,
7
             Defendant.
8   _____

9            VOLUME I - Pages 1 - 314
10
11          The deposition of MARY KAY REARDON,
12  called by the Plaintiff for examination,
13  pursuant to notice and pursuant to the
14  Federal Rules of Civil Procedure for the
15  United States District Courts pertaining to
16  the taking of depositions, taken before
17  DIANE L. STODULSKI, Certified Shorthand
18  Reporter, Registered Professional Reporter,
19  and Notary Public within and for the County
20  of Cook and State of Illinois at 200 South
21  Wacker Drive, Suite 3000, Chicago, Illinois,
22  commencing at the hour of 9:00 o'clock AM on
23  the 26th day of July, A.D. 2004.

```
 1    could have been more than one office.  We
 2    had a number of offices in Massachusetts.  I
 3    couldn't name them but generally the losses
 4    would be handled as to where the loss
 5    occurred, as to where the insured was
 6    principally located.
 7         Q.   Did there come a time, Ms. Reardon,
 8    where you personally had any involvement
 9    with respect to claims against the
10    Archidiocese of Boston -- when I say the
11    Archdiocese for Boston, that's the shorthand
12    of the Archbishop of Boston?
13         A.   When I was personally involved in
14    the claims?
15         Q.   Yes.
16         A.   Yes, there was.
17         Q.   When did that happen?
18         A.   I believe in early '97.
19         Q.   So prior to '97 it is your
20    recollection you had no contact with respect
21    to claims handling related to the
22    Archdiocese of Boston?
23         A.   No, I knew that there were claims
24    involving the Archdiocese of Boston, but I
```

1   was not personally involved in any of those

2   claims up until late '96 or early '97.

3       Q.   Do you recall if you were copied on

4   any documents before that?

5       A.   I don't recall being copied on

6   anything.

7       Q.   Where were you located at the time

8   that it first came to your attention?

9       A.   I was located in the home office.

10      Q.   So by that point you had left Grand

11  Rapids, and I will ask you where you went in

12  between, but you were in Long Grove?

13      A.   Yes.

14      Q.   And why did it come to your

15  attention at that point?

16      A.   Because Kemper was undergoing some

17  restructuring at the time, and we were

18  closing the division offices, but we were

19  still maintaining a structure in the home

20  office, in other words, authority levels, et

21  cetera, were still coming to the home

22  office. We were just going to skip the

23  division level and eliminate that, and the

24  branch claim offices would go directly to

1   as to whether the insured had copies of the
2   policies and whether they had them
3   available, there was nothing in the files
4   that indicate that.
5       Q.   So in 19 -- when did you first
6   become involved?
7       A.   In 1996 or early 1997.
8       Q.   So in '96 or '97 when you became
9   involved, it was your understanding that the
10  Archdiocese, in fact, had copies of the
11  policies that Lumbermens had written?
12      A.   I didn't know whether they had it
13  at that point in time or not.
14      Q.   Nobody told you that they said that
15  they didn't have copies?
16      A.   No, nobody told me that.
17      Q.   You didn't see any correspondence
18  back and forth as to whether there was any
19  coverage?
20      A.   I saw the older correspondence and
21  I saw that the issue had been resolved for
22  the 1964 and going forward to 1971 policy
23  years where Kemper had acknowledged that
24  there were policies in existence for those

```
 1    BY MR. GALVANI:
 2        Q.    What I am looking at is a two-page
 3    letter dated July 30, 1996 from Christine
 4    Zinoman to Dunn & Rogers bearing Bates
 5    number RCA 7001786 and 7.  Have you even
 6    this document before?
 7        A.    Yes.
 8        Q.    When for the first time did you see
 9    this document?
10        A.    I can't tell you when the first
11    time was that I saw this document, but I did
12    see it in the last two weeks.
13        Q.    Did you see it at the time it was
14    written?
15        A.    I couldn't tell you.  I don't know.
16        Q.    Ms. Zinoman was reporting to you at
17    that time, correct?
18        A.    No, she was not.  She never
19    reported directly to me.  She was never my
20    direct report.  She reported to Mr. Meany.
21    Mr. Meany reported directly to me.
22        Q.    And was Mr. Meany reporting to you
23    in July '96?
24        A.    I believe it wasn't until the end
```

```
 1   of 1996 that he was reporting to me.  If my
 2   memory serves me correctly, at this point in
 3   time, Ms. Zinoman would have been reporting
 4   to Mr. Meany.  Mr. Meany was a division
 5   employee at the time.
 6        Q.   Now, in any event, this letter
 7   written in July of 1996 reflects, does it
 8   not, that there was insurance written by
 9   Lumbermens for the Archdiocese of Boston all
10   the way back to March of '64?
11        A.   Yes.
12        Q.   And, in fact, it specifically lists
13   the policy years '64 to '65, 5 to 6, 6 to 7,
14   and 7 to 8, correct?
15        A.   Yes.
16        Q.   Have you found any of those
17   policies yet?
18        A.   No, we never found actual policies.
19        Q.   Now, these policies reference the
20   aggregate balance; do you see that?
21        A.   Yes.
22        Q.   And for the year 1967 to '68, the
23   aggregate balance on this document reads
24   $279,045?
```