UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE,<br>  Plaintiff,<br><br>v.<br><br>LUMBERMENS MUTUAL CASUALTY COMPANY,<br>  Defendant. | C.A.04-10461-DPW |

**LUMBERMENS MUTUAL CASUALTY COMPANY'S SUPPLEMENTAL BRIEF IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

On November 8, 2004, pursuant to the Court's recent order, Lumbermens Mutual Casualty Company ("LMC") conducted a further deposition of Joseph McEnness ("Mr. McEnness") in his capacity as Rule 30(b)(6) designee of the Roman Catholic Archbishop of Boston, A Corporation Sole (the "RCAB"). This continued deposition was necessitated by the RCAB's late production of 619 pages of policy-related materials obtained from its constituent parishes and institutions. The new McEnness testimony further confirms (i) that the RCAB did not conduct a diligent search for such policies and, consequently, cannot make use of secondary evidence to prove the limits of liability for any policy issued pre-1974; (ii) that the RCAB's core claims of breach of contract and misrepresentation are time-barred and the RCAB cannot utilize the declaratory judgment process to circumvent this claim preclusion; and (iii) that the knowledge which must be imputed to the RCAB as a matter of law regarding the aggregate limits precludes the RCAB's present effort to negate its prior agreement to limit the annual coverage to $300,000.

## SUPPLEMENTAL ARGUMENT

I. **THE RCAB DID NOT MAKE A DILIGENT SEARCH FOR POLICIES AND THUS CANNOT RELY UPON SECONDARY EVIDENCE TO PROVE LIMITS OF LIABILITY OF PRE-1974 POLICIES.**

The RCAB cannot rely upon secondary evidence to prove the terms of any policy unless it first proves that it conducted a diligent but unsuccessful search for same. Harrington v. United States, 504 F.2d 1306, 1313 (1st Cir. 1974). Diligence cannot be established without proof that all reasonable means were employed. Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965) ("He who seeks to introduce secondary evidence must show that he has used all reasonable means to obtain the original.") (emphasis supplied) (internal cite omitted). The recently continued deposition of its 30(b)(6) designee, Mr. McEnness, emphatically demonstrates that the RCAB failed to employ all reasonable means to locate missing policies.

Although the RCAB has admitted that there is no distinction between the RCAB and its constituent parishes (SOF, ¶ 11),[1] it failed to meaningfully search the parishes for policies or policy related materials prior to July, 2004. Mr. McEnness testified that prior to 2004, no written request to search records for LMC policy materials was ever made to any parish. (McEnness Transcript, Exhibit 1 hereto (hereafter, "McEnness"), 35:14-35:17.) Similarly, despite acknowledging that certain RCAB institutions were part of its insurance program (McEnness, 43:18-43:20), Mr. McEnness also confirmed that prior to 2004, no written request to search records for LMC policies was ever made to any institution. (McEnness, 35:14-35:17.) Instead, Mr. McEnness testified that the RCAB's efforts in this regard comprised a smattering of telephone calls by Arthur Powers and Paul Fallon to parishes that the RCAB cannot identify. (McEnness, 35:3-35:9; 37:1-37:7.) Not surprisingly, this methodology—which engendered no

---

[1] Citations herein to "SOF" are to LMC's Rule 56.1 Statement of Material Facts, which can be found within its original opposition brief.

2

accountability for lack of any record of the request having been made—proved wholly ineffective, and resulted in recovery of no policy-related materials, at all. (McEnness, 36:17-36:24; 37:1-37:7.)

Further evidencing the RCAB's lack of diligence, and undermining its claim to undo its eight-year acceptance of the application of aggregate limits, is the fact that the RCAB simply stopped looking for policy materials on June 1, 1995, when LMC stated that it would begin to reimburse the RCAB for settlement and defense costs. Despite LMC's express instruction that such payments were being made pursuant to a full reservation of rights, as well as the facts that no policy documents evidencing the terms of any pre-1974 policy had been recovered yet, there was an ongoing dispute regarding the application of the terms of the post-1974 policies, and there was an ongoing dispute regarding the existence and terms of excess policies allegedly issued, the RCAB simply gave up on its effort to locate LMC policies:

> Q. Mr. Powers and Mr. Fallon, when was it that they made their effort to locate insurance policy information?
>
> MR. GALVANI: Objection.
>
> A. They couldn't give the exact date. They spoke in general terms of the early nineties to mid-nineties.
>
> Q. What was your understanding of that time frame?
>
> A. My understanding of that time frame was that time frame that pertained to the period that Lumbermen's was refusing to acknowledge coverage and refusing to pay claims, and it predated that time frame when they began paying the claims, basically. *Once the claims were being paid, they didn't see the -- any dispute that would warrant continued pursuit for policies.*

(McEnness, 39:23-40:15.) (Emphasis supplied.)

Finally, and conclusively, Mr. McEnness confirmed that in 2004, some 12 years after the point at which a diligent search should have been conducted, he prepared and sent a letter to each of the RCAB's 361 parishes and 111 institutions, requesting that each search its records for

3

material relating to LMC policies. (McEnness, 42:24-43:11.) The requests, dated mid-July, 2004, included variations of the following admonition:

> The search must be completed, and any documents forwarded, as soon as possible but no later than Friday, July 23, 2004. If your search for records is not productive, you must return a signed copy of this letter via facsimile to 617-746-5421, stating the date of your search and the fact that it was not productive. The parishes that have not returned the acknowledgment form will begin receiving follow-up telephone calls from our office on Monday, July 26.

(*See* Exhibit 2 (hereto), p.2; Exhibit 3 (hereto), p. 2.)

As a result of these requests, within two weeks the RCAB had recovered 392 pages of documents relating to policies issued by LMC, including twelve (12) separate copies of the document entitled "COVERAGE PART 7—COMPREHENSIVE GENERAL LIABILITY INSURANCE" ("Coverage Part 7"). (SOF, ¶ 8; Affidavit of John Tener, ¶¶ 3-7.) Within six weeks of the requests, the RCAB had recovered an additional 225 pages of documents relating to LMC policies, including seven (7) more separate copies of Coverage Part 7. (Id.) The Court, no doubt, will recall that Coverage Part 7 is the very document which the RCAB alleges was wrongfully withheld from it, and from which it purports to have "suddenly" discovered in 2003 that aggregate limits should not have been applied to clergy sexual abuse claims.

Despite his Rule 30(b)(6) obligation to appear prepared to provide testimony concerning the contents of these late-produced documents, Mr. McEnness could not even answer the fundamental question of where these various copies of Coverage Part 7 had been recovered from. (McEnness, 12:5-12:20; 40:16-40-21.) Consequently, he also could offer no explanation in response to the key question: Why were these documents not located pursuant to the RCAB's earlier "searches" of parish and institution records? (McEnness, 42:5-42:20.) Furthermore, it is impossible to say whether these documents comprise the universe of documents relating to LMC policies which were residing in parish or institution records as of July 2004. Although the RCAB relies upon Mr. McEnness' search requests as evidence of its "diligence" in searching for

4

policy materials (*see* RCAB's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, p. 20), it has yet to produce a single acknowledgement form from any parish or institution confirming that the requested search was undertaken but unproductive, as specifically required by the procedures set forth in Mr. McEnness' requests. (*See* Exhibit 2 (hereto), p.2; Exhibit 3 (hereto), p.2.) Indeed, despite Mr. McEnness' testimony that his request was sent to all parishes and institutions, without explanation, the RCAB has produced documents confirming only that requests were sent to St. Frances Xavier Cabrini Parish and the Fernald School. (Id.)

Bearing all of the foregoing in mind, the diligence of the RCAB's search for policies in the 1990s must be evaluated by comparison to the methods utilized, and results obtained, in 2004. In 2004, simply by writing a letter requesting that searches be undertaken, the RCAB was able to recover substantial materials relating to policies issued by LMC. By its failure to employ this most reasonable of means twelve years earlier, the RCAB cannot be deemed to have conducted a diligent search at that time. Consequently, the RCAB, through lack of diligence (and thus by its own fault), increased the likelihood that critical information would be lost in the interim. It stands to reason that older materials relating to the earlier issued policies (i.e., pre-1974), were at greatest risk of being lost or discarded during that twelve year interim.

In sum, the RCAB's attitude concerning its obligation to undertake a diligent search for lost polices is crystallized by the following exchange:

> Q. Can you tell me why those documents, the Coverage Part 7 general liability coverage, weren't located by the RCAB prior to 2004?
>
> MR. GALVANI: Asked and answered. Objection.
>
> Q. Can you answer that question?
>
> A. I already answered.
>
> Q. Give me your explanation again, if you think you already answered.

5

MR. GALVANI: Objection.

A. The RCAB had every expectation that the information that they were being provided by Lumbermen's was full and accurate, *and that there was no reason for them to conduct an exhaustive search for documents that may or may not have given them information.* There was no dispute.

(McEnness, 28:1-28:16.) As a result of this willful blindness, the RCAB cannot carry its burden of proving that it made a diligent search for pre-1974 policies. As such, the Court should not consider any secondary evidence proffered as proof that pre-1974 policies included terms limiting the application of stated aggregate limits.

## II.   THE RCAB CANNOT CIRCUMVENT APPLICABLE STATUTES OF LIMITATIONS BY DECLARATORY ACTION.

It is well settled that "declaratory relief cannot be used to circumvent a period prescribed by statute for obtaining judicial review." Bd. of Appeals of Rockport v. DeCarolis, 32 Mass. App. Ct. 348, 352 (1992); Second Church of Dorchester v. City of Boston, 348 Mass. 477, 479 n.1 (1962) (declaratory procedure cannot be employed to circumvent statutes of limitations). Through this declaratory action, the RCAB is attempting to circumvent the preclusive effect of applicable statutes of limitations.

The RCAB seeks declarations, *inter alia*, that no aggregate limits on recovery are applicable to clergy sexual abuse claims under any policy allegedly issued by LMC, that all primary policies allegedly issued by LMC remain in full effect and have not been exhausted, and that LMC improperly concluded that primary policies issued pre-1977 have been exhausted. (*See* RCAB's Motion for Partial Summary Judgment, p. 2, requested declarations (7), (8), and (9).) However, at core, each of these declarations is merely a recasting of claims that LMC either breached its contractual obligations by applying aggregate limits, or that the RCAB acquiesced to the application of aggregate limits due to misrepresentations by LMC.

As confirmed by Mr. McEnness' recent testimony, both claims are time barred. Indeed, while the "discovery rule" will toll the accrual date of the statutory period for claims arising from

6

an "inherently unknowable" wrong, Mr. McEnness' testimony makes plain that no basis exists for invoking the rule. *See* International Mobiles Corp. v. Cannon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 222 (1990) ("The inherently unknowable wrong must be incapable of detection by the wronged party through the exercise of reasonable diligence.")

On June 1, 1995, LMC advised the RCAB that it would be applying indemnity payments for clergy sexual abuse claims against stated aggregate limits. (SOF, ¶ 27.) Furthermore, the RCAB knew as early as February 1994, that LMC's coverage assessments were premised upon its interpretation of Coverage Part 7. (SOF, ¶ 12.) Bearing these record facts in mind, if the RCAB had exercised even a modicum of diligence in 1995, it could easily have retrieved a copy of Coverage Part 7, and ascertained for itself the propriety of LMC's decision to apply payments against aggregate limits. The indisputable nature of this assertion is evidenced by the fact that in 2004, simply by writing a letter, Mr. McEnness successfully recovered 19 copies of the document in a matter of weeks. (SOF, ¶ 8; Affidavit of John Tener, ¶¶ 3-7.)

In fact, the RCAB's failure in 1995 to determine for itself the propriety of applying aggregate limits resulted not because the terms of Coverage Part 7 were inherently unknowable to it, but because the RCAB simply chose not to review them. Indeed, as revealed by Mr. McEnness' Rule 30(b)(6) testimony, the RCAB was simply operating under the misguided belief that it was not obligated to read its policies:

> Q. Do you have any explanation, Mr. McEnness, why these documents that are a part of Rogers Exhibit 3 and McEnness Exhibit 1 were not located by the RCAB prior to 2004?
>
> A. I think there's probably a number of reasons why that was the case.
>
> Q. Why don't you explain the reasons.
>
> A. Well, I think that historically there was certainly the impression that Lumbermen's was cooperating with them. To the degree that the claims were being processed and paid, they had stepped up to the plate in the mid-nineties and began paying these claims, *and the RCAB didn't have any reason to believe that there was any need to review the policy and its detail or pursue this.* [ ]

7

(McEnness, 15:22-16:13.) (Emphasis supplied.) Bearing this in mind, it is well settled that a party shall be charged with knowledge of the terms of a contract whether he chooses to read them or not. Lerra v. Monsanto, 521 F.Supp. 1257, 1262 (D. Mass. 1981) ("In Massachusetts, one who signs an agreement is presumed to have read and understood its contents."); Spritz v. Lishner, 355 Mass. 162,164 (1969) ("one who signs a written agreement is bound by its terms whether he reads and understands it or not or whether he can read or not") (internal cite omitted).

As such, the RCAB's claim of breach of contract must be deemed to have arisen on June 1, 1995—i.e., the time at which the RCAB advised that it was acting at odds with the written terms and condition of Coverage Part 7. Whitcomb v. Pension Dev. Co., 808 F.2d 167, 169 (1st Cir. 1986) ("A cause of action for breach of contract generally accrues at the time of breach, even if the amount of damages may be unknown or *if damages might not be sustained until later*" (emphasis added), citing Campanella & Cardi Construction Co. v. Commonwealth, 351 Mass. 184, 185 (1966).[2] Similarly, the RCAB's cause of action for misrepresentation also must be deemed to have arisen at that time. Sleeper v. Kidder, Peabody & Co., 480 F.Supp. 1264, 1270 (D. Mass. 1979) (A cause of action for misrepresentation accrues at the time the alleged misrepresentation was made).

At a minimum, there remain questions of fact as to whether the RCAB's claims against LMC were inherently unknowable in 1995. *See*, Saenger Org. v. Nationwide Ins. Licensing Assocs., 119 F.3d 55, 65 (1st Cir. 1997); *see also*, Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 48 (1st Cir. 2004) (factual disputes concerning the date one knew or should have known of its causes of action are best resolved by a jury); Riley v. Presnell, 409 Mass. 239, 248 (1991) ("where . . . the plaintiff has claimed a trial by jury, any disputed issues relative to the statute of

---

[2] Insofar as a distinction may be drawn between notice that the aggregates would be applied and the actual payment of claims along with notice of their application against an aggregate limit, it is a distinction without a difference because 1996 was when the first payment was applied against an aggregate. (SOF, ¶ 31, first letter included therein.)

8

limitations ought to be decided by the jury"). As such, the RCAB is not entitled to receive the pivotal declarations it seeks (i.e., declarations (7), (8), and (9)) by summary adjudication.

### III. THE RCAB IS ESTOPPED FROM ENFORCING COVERAGE PART 7'S RESTRICTION UPON THE APPLICATION OF AGGREGATE LIMITS.

As confirmed by Mr. McEnness' testimony, knowledge of Coverage Part 7's terms must be imputed to the RCAB due to its availability at all relevant times, and thus the RCAB is estopped from contesting, after the fact, the parties' actual application of aggregate limits. The requirements for an estoppel under Massachusetts law are as follows:

> (1) a representation or conduct amounting to representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and (3) detriment to such person as a consequence of the act or omission.

In Re Colarusso, 2004 U.S. App. LEXIS 18612, *22 n. 8 (1st Cir. 2004), citing Boylston Dev. Group, Inc. v. 22 Boylston Street Corp., 412 Mass. 531, 542 (Mass. 1992)[3]; *see also*, Bongaards v. Millen, 440 Mass. 10, 15 (2003) (same). As confirmed by Mr. McEnness' recent testimony, had it deigned to do so, at all relevant times the RCAB easily could have obtained a copy of Coverage Part 7. In fact, as late as 2004, Mr. McEnness, himself, succeeded in obtaining twelve (12) copies of the document in two week's time, and seven (7) more copies of the document in six week's time. (SOF, ¶ 8; Affidavit of John Tener, ¶¶3-7.) Due to its availability, as a matter of law, the RCAB is charged with knowledge of its contents, whether it chose to read them or not. Lerra, 521 F.Supp. at 1262; Spritz, 355 Mass. at 164.

Thus from the onset of the sexual abuse claims, the RCAB knew or should have known that Coverage Part 7 limited the application of annual aggregate limits to claim-types which did not include clergy sexual abuse claims. (SOF, ¶¶ 8-13.) However, despite such knowledge, from the time of LMC's acknowledgment that it would provide coverage for such claims (under

---

[3] A copy of this LEXIS-published decision was previously provided to the Court as Tab 7 of Exhibit C to Transmittal Affidavit of Brian P. McDonough.

9

a full reservation of rights), the RCAB provided LMC with written and oral communications reflecting its acceptance and its independent tracking of the application of aggregate limits to these claims. (SOF, ¶ 31.) From LMC's perspective, the RCAB's conduct in this regard could only be interpreted as a representation that it agreed that annual aggregate limits would be applied to coverage available from LMC for clergy sexual abuse claims.

As a result of this representation, as confirmed by its Director of Claims, Mary Kay Reardon, LMC refrained from pursuing declaratory actions upon an array of potential coverage defenses and limitations (many of which it is currently pursuing), which it would not otherwise have done had the RCAB signaled anything but full agreement with the practice of applying annual aggregate limits to clergy sexual abuse claims. (Reardon Affidavit, ¶¶ 4-5.) As the supervisor of claims-handling for clergy sexual abuse claims from late 1996 onward, the decision of whether to initiate declaratory actions in connection with such claims rested solely with her during that timeframe. (Supplemental Reardon Affidavit, ¶¶3-4.) Furthermore, that LMC sustained detriment as a result of such forbearances is undeniable. In short, it paid more than $19,000,000 in defense and indemnity payments, all or some of which it might not otherwise have paid. (Reardon Affidavit, ¶ 2.)

As there is sufficient record evidence as to each of the required elements (at least for summary judgment purposes), LMC possesses a viable estoppel defense against the RCAB's claim that aggregate limits should not be applied to LMC's indemnity payments.

## CONCLUSION

Wherefore, for the foregoing reasons, in conjunction with those set forth in its original opposition, Lumbermens Mutual Casualty Company respectfully requests this court to deny the RCAB's Motion for Partial Summary Judgment because:

1. Material issues of fact preclude a determination that LMC issued any primary policy to the RCAB for a period prior to March 31, 1964;

2. Material issues of fact also preclude any determination concerning the terms and condition of policies issued prior to March 31, 1974;

3. The December 2001 Buy Back Agreement precludes any determination concerning the existence of any excess policies in effect between 1973 and 1977;

4. A material dispute concerning the applicability of aggregate limits to the indemnity payments provided to the RCAB for sexual abuse claims precludes any summary adjudication on that issue; and

5. As a matter of law, the RCAB is not entitled to a summary adjudication that LMC is precluded from contesting coverage for the claims covered by the global settlement.

There is no dispute that:

1. LMC issued primary policies covering certain RCAB parishes for the period from September 31, 1974 to March 31, 1983 (the "parish policies");

2. LMC issued separate primary policies covering certain RCAB institutions, such as schools and hospitals, for the period from March 31, 1964 to March 31, 1983 (the "institution policies");

3. LMC issued excess liability policies to the RCAB for the period from September 23, 1977 to March 31, 1983; and

4. The primary policies issued from 1974 to 1983 include the Coverage Part 7 - Comprehensive General Liability Insurance Form.

Respectfully submitted,

LUMBERMENS MUTUAL
CASUALTY COMPANY

By its counsel,

*/s/ Anthony R. Zelle*

John E. Tener, BBO No. 563791
Anthony R. Zelle, BBO No. 548141
Mary L. Cataudella, BBO No. 553350
Brian P. McDonough, BBO No. 637999
Nancy M. Cremins, BBO No. 658932
ROBINSON & COLE LLP
One Boston Place
Boston, MA 02108
(617) 557-5900

Dated: November 12, 2004

11