# EXHIBIT 1

**11/8/2004  Joseph F. McEnness**

1                          PAGES 1 - 47

2              IN THE UNITED STATES DISTRICT COURT

3                FOR THE DISTRICT OF MASSACHUSETTS

4                        C.A. No. 04-10461-DPW

5      THE ROMAN CATHOLIC ARCHDIOCESE OF BOSTON,

6      a Corporation sole,

7                          Plaintiff

8                  Vs.

9      LUMBERMEN'S MUTUAL CASUALTY COMPANY

10                         Defendant

11

12          30(b)(6) Notice to Lumbermen's Mutual

13     Casualty Company, Deposition of Joseph F. McEnness,

14     Jr., taken pursuant to Notice under the applicable

15     provisions of the Federal Rules of Civil Procedure on

16     behalf of the Defendant, before Deborah Roth, R.P.R.

17     and a Notary Public in and for the Commonwealth of

18     Massachusetts, at the offices of Robinson & Cole,

19     LLP, One Boston Place, Boston, Massachusetts,

20     commencing on Monday, November 8th, 2004 at 1:08 p.m.

21

22            NEAL A. SALLOWAY - COURT REPORTERS

23                   FIVE CARDIGAN ROAD

24                 WEST PEABODY, MA   01960

### 11/8/2004 Joseph F. McEnness

1    been marked as McEnness 1 and Rogers Exhibit 3 are

2    documents that came from the parishes, correct, or

3    the institutions?

4        A.  Yes.

5        Q.  Do you know who at the individual parishes

6    and institutions conducted the searches for these

7    documents?

8        A.  No.

9        Q.  Is there anyone at the RCAB who can testify

10   on the subject of the identity of persons at the

11   institutions and the parishes who looked for

12   materials in response to your letter?

13       A.  No.

14       Q.  Do you know where these documents were

15   located at the specific individual institutions and

16   parishes?

17       A.  No.

18       Q.  Do you know how they were initially received

19   by the individual parishes or institutions?

20               MR. GALVANI:  Objection.

21       A.  No.

22       Q.  Do you know when they were received by the

23   individual parishes or institutions?

24               MR. GALVANI:  Objection.

12

11/8/2004 Joseph F. McEnness

1           MR. GALVANI:  -- to see the dates on the

2       letter.

3           MR. ZELLE:  You don't need to coach him.

4           MR. GALVANI:  I am not coaching him.

5           MR. ZELLE:  You want him to look on the

6       document?

7           MR. GALVANI:  It's on your time.

8           MR. ZELLE:  Yes, it is, Big Shot.

9           MR. GALVANI:  Just a moment, Mr. Zelle.

10          MR. ZELLE:  We are on your time.

11          MR. GALVANI:  We are on your time.  We

12      are going to leave at 2:08 whether you like it or

13      not.

14          MR. ZELLE:  We'll see.

15          MR. GALVANI:  And I resent that remark.

16          MR. ZELLE:  All right.  That's on your

17      time.

18          MR. GALVANI:  Are you pressing that

19      question?

20          MR. ZELLE:  I am going to ask a new

21      question.

22      Q.  Do you have any explanation, Mr. McEnness,

23      why these documents that are a part of Rogers Exhibit

24      3 and McEnness Exhibit 1 were not located by the RCAB

15

### 11/8/2004  Joseph F. McEnness

1   prior to 2004?

2       A.  I think there's probably a number of reasons

3   why that was the case.

4       Q.  Why don't you explain the reasons.

5       A.  Well, I think that historically there was

6   certainly the impression that Lumbermen's was

7   cooperating with them.

8           To the degree that the claims were being

9   processed and paid, they had stepped up to the plate

10  in the mid-nineties and began paying these claims,

11  and the RCAB didn't have any reason to believe that

12  there was any need to review the policy and its

13  detail or pursue this.

14          There was no expectation that they would

15  have in the parishes any information that would have

16  been meaningful in terms of their analysis of

17  coverage or the policies.

18          Everything was in the RCAB name.  The

19  documents and the policies were kept at the RCAB.

20  There wasn't any policy or procedure that allowed for

21  distribution of that information to the parish level.

22      Q.  Okay.  When you say that there was no reason

23  to seek the information or the documents that are a

24  part of Exhibit 1 McEnness and Exhibit 3 Rogers,

11/8/2004 Joseph F. McEnness

1      Q.  Can you tell me why those documents, the

2  Coverage Part 7 general liability coverage, weren't

3  located by the RCAB prior to 2004?

4              MR. GALVANI:  Asked and answered.

5  Objection.

6      Q.  Can you answer that question?

7      A.  I already answered.

8      Q.  Give me your explanation again, if you think

9  you already answered.

10             MR. GALVANI:  Objection.

11     A.  The RCAB had every expectation that the

12  information that they were being provided by

13  Lumbermen's was full and accurate, and that there was

14  no reason for them to conduct an exhaustive search

15  for documents that may or may not have given them

16  information.  There was no dispute.

17     Q.  Essentially what you are saying is you relied

18  blindly on the representations?

19             MR. GALVANI:  Objection.  Argumentative.

20     A.  That's not what I said, no.

21     Q.  Isn't that essentially what you are telling

22  me?

23             MR. GALVANI:  Objection.

24     A.  Essentially I am telling you the expectation

28

**11/8/2004 Joseph F. McEnness**

1            MR. GALVANI:  Objection.  This is

2    Mr. McEnness.

3        Q.  I'm sorry, Mr. Powers, when he made these

4    telephone calls, do you know whom he called?

5        A.  Locations?

6        Q.  Locations or individuals.

7        A.  No.  He spoke in general terms.  He hadn't --

8    he didn't have a recollection of a specific list of

9    parishes that he contacted.

10       Q.  Do you know specifically what Mr. Powers

11   asked?

12       A.  Only in general terms.  I'm sure he was

13   speaking in general terms from memory.

14       Q.   Prior to 2004, did the RCAB ever send any

15   written request to the parishes or institutions

16   seeking information relating to Lumbermen's policies?

17       A.  Not that I'm aware of.

18       Q.  Do you know whether Mr. Powers ever followed

19   up on the telephone calls that he made to the

20   institutions and parishes, or just the parishes, or

21   whomever it was that he called?

22       A.  You mean repeated the same call?

23       Q.  I understood your testimony to be that

24   Mr. Powers made telephone calls to either

1    institutions or parishes, but made some telephone

2    calls to people he thought might have policy

3    information?

4        A.   That's correct.

5        Q.   My question is, do you know whether he ever

6    followed up after making the initial call?

7        A.   Once he had been told they didn't have

8    anything?

9        Q.   Do you know whether he got any call back from

10   anyone saying they didn't have anything?

11       A.   I don't know if that informing was conveyed

12   in the same phone call or in later phone calls.  What

13   he advised me is that they didn't have anything.

14            How many phone calls were involved in

15   ascertaining that, I can't answer.  I don't know.  I

16   am not sure.

17       Q.   Can you tell me whether Mr. Powers

18   ascertained that the people he requested information

19   from didn't have anything, by virtue of their

20   explicitly telling him they didn't have anything, or

21   by virtue of the fact that they simply didn't respond

22   to his request?

23       A.   He advised me that they told him they didn't

24   have anything.

1      Q.  Now, do you know whether Mr. Fallon made

2    similar requests?

3      A.  Yes.

4      Q.  When did he tell you about his efforts?

5      A.  That he made a number of phone calls

6    requesting information and had the same result as

7    Mr. Powers.

8      Q.  Did he ever put anything in writing

9    requesting information?

10     A.  Not that I'm aware of.

11     Q.  Do you know whether prior to 2004 the

12   Chancery -- not the parishes or institutions -- prior

13   to 2004, whether the Chancery every had in its

14   possession Coverage Part 7?

15          MR. GALVANI:  Objection.  From all time?

16   From the beginning of time?

17          MR. ZELLE:  Good point.

18     Q.  After 1993.

19   · A.  Whether at any time after 1993 until these

20   documents were produced did the Archdiocese -- the

21   Chancery -- not to my knowledge, but I have no way of

22   knowing that.

23          There could have been a document that was

24   there, and it is gone.  How do I answer that

1    possession in 1993 and 2004?

2              MR. GALVANI:  That calls for privileged

3    communication, and you are not entitled to probe

4    that.  I will instruct --

5         Q.  Let me ask you this:  Did the RCAB ever

6    ascertain whether between 1993 and 2004 Mr. Rogers

7    had copies of Coverage Part 7 in his possession?

8              MR. GALVANI:  2004?

9         Q.  Between 1993 and 2003 -- let me back that up

10   to February 2003.

11             MR. GALVANI:  Objection.

12        A.  I know that Mr. Rogers was in possession of a

13   deposition transcript and documents produced in that

14   deposition of 2000.

15        Q.  That included Coverage Part 7?

16        A.  I would have to review the exhibits to answer

17   that.

18        Q.  Do you know when Mr. Rogers and Mr. Fallon

19   sought information by telephone relating to

20   Lumbermen's policies?

21             MR. GALVANI:  Objection.

22        A.  Mr. Rogers?

23        Q.  Mr. Powers and Mr. Fallon, when was it that

24   they made their effort to locate insurance policy

**11/8/2004 Joseph F. McEnness**

1    information?

2                    MR. GALVANI:  Objection.

3         A.   They couldn't give the exact date.  They

4    spoke in general terms of the early nineties to mid-

5    nineties.

6         Q.   What was your understanding of that time

7    frame?

8         A.   My understanding of that time frame was that

9    time frame that pertained to the period that

10   Lumbermen's was refusing to acknowledge coverage and

11   refusing to pay claims, and it predated that time

12   frame when they began paying the claims, basically.

13                    Once the claims were being paid, they

14   didn't see the -- any dispute that would warrant

15   continued pursuit.

16        Q.   Can you tell me with respect to the Coverage

17   Part 7, copies of Coverage Part 7 which are included

18   within McEnness Exhibit 1 and Rogers Exhibit 3, which

19   parishes they came from or which institutions they

20   came from?

21        A.   No, I can't.

22        Q.   Why not?

23        A.   The information was routed directly to

24   counsel.

### 11/8/2004 Joseph F. McEnness

1   is the extent of it.

2          If you are asking, do I recall

3   specifically which parish produced that specific

4   document, I can't recall, no.

5      Q.  Did you ever follow up after receiving the

6   documents which you received or which your counsel

7   received from the parishes and institutions to

8   determine how the documents were maintained, or where

9   they came from, or why they hadn't been previously

10  located in response to Mr. Powers' or Mr. Fallon's

11  requests?

12          MR. GALVANI:  Objection.

13     A.  Could you repeat that?

14     Q.  Sure.  After receiving the response to your

15  letter to the parishes and institutions, did the RCAB

16  ever follow up to determine why these documents

17  hadn't been located in response to the prior requests

18  by Mr. Powers and Mr. Fallon?

19          MR. GALVANI:  Objection.

20     A.  No.

21          MR. ZELLE:  That's all I have got.

22          CROSS-EXAMINATION

23  BY MR. GALVANI:

24     Q.  Do you know how many parishes were contacted?

1      A.  361.

2                  MR. ZELLE:  Was this in 1992 or the

3   early nineties or 2004?

4                  MR. GALVANI:  Wait a minute.  I am

5   asking the questions.

6                  MR. ZELLE:  Clarify your question.

7      Q.  Mr. McEnness, do you know how many

8   institutions were contacted?

9      A.  Institutions?

10     Q.  Institutions.

11     A.  110 -- 111, excuse me.

12     Q.  Parishes you said were organizationally part

13  of the Archdiocese?

14     A.  Yes.

15     Q.  The institutions, are they organizationally

16  part of the Archdiocese?

17     A.  No.

18     Q.  Some of the institutions were included within

19  the Archdiocese's insurance program?

20     A.  Yes.

21     Q.  So we are clear, there were 365 parishes that

22  were solicited this year?

23     A.  365.

24     Q.  Now, is the Boston School for the Deaf a