# EXHIBIT A

11/9/2004  Dennis R. Connolly

1       actions?
2   A.  Sometimes they -- they, yes.  Sorry.
3   Q.  Did any of those cases involve lost or
4       missing policies?
5   A.  Oh, wow.  I don't remember.
6   Q.  All right.
7   A.  There was a long period of time and lots
8       and lots of cases.
9   Q.  Did any of them involve issues of
10      aggregate limits?
11  A.  Again I -- I don't remember.
12  Q.  All right.  Have you ever been employed by
13      the Kemper Insurance Company --
14  A.  No, sir.
15  Q.  -- or Companies?
16  A.  No, sir.
17  Q.  Have you ever been a consultant to Kemper
18      or any of its subsidiaries?
19  A.  Well, I worked with Kemper during the time
20      that I was at the American Insurance
21      Association.  I was a spokesperson on
22      liability and insurance issues.  Kemper
23      was not a member of the American Insurance
24      Association, but we were the preeminent

11

11/9/2004 Dennis R. Connolly

1   those actual terms for that time period?
2   A. No. But as I have indicated, there would
3      be no rational reason to not use it. It
4      would be as if some video company suddenly
5      decided that they would have videos of a
6      different size or lightbulbs with a
7      different screw pattern.
8   Q. You, of course, have not seen the
9      declaration page for any policies issued
10     by the LMC for the period '61 to '64?
11  A. That is correct.
12  Q. And you have not seen any information
13     regarding limits on policies for that
14     period of time, '61 to '64?
15         MR. GALVANI: Objection.
16  A. I think in Exhibit H to my -- I am sorry
17     -- yes, Exhibit H to my affidavit, there
18     is reference to the fact that there --
19     yes.
20         (Pause.)
21         (The witness viewing documents.)
22  A. This is the letter from Mansfield,
23     Connolly -- no relation that I know of --
24     and Gartland to Lumbermens from John J.

40

11/9/2004  Dennis R. Connolly

1  Gartland, which says, "Inasmuch as the ad
2  damnum in the writ exceeds the coverage of
3  your policy, I will be glad to enter my
4  appearance as co-counsel for the defendant
5  when and if you desire me to do so."
6      My -- the subsequent letter that
7  refers to an ad damnum of $150,000 makes
8  me feel based on my experience at that
9  time that this was probably a $100,000
10 policy.
11 Q. Meaning what?
12 A. Meaning that the limits would have been
13    $100,000.
14 Q. Per occurrence?
15 A. Per occurrence, although there is a
16    possibility that they may have been in
17    some instances policies referred to per
18    claimant or per person and per occurrence,
19    but for an insured of this nature, I would
20    suspect that it was per occurrence.
21 Q. But again that is your opinion based upon
22    what standard practice was at the time?
23 A. That's correct.
24 Q. You have no personal knowledge as to what

11/9/2004  Dennis R. Connolly

1    LMC's practices were vis-a-vis the RCAB --

2         MR. GALVANI: Objection.

3  Q. -- at that time?

4         MR. GALVANI: Objection.

5  A. That is correct.

6         MR. TENER: I am sorry?

7         THE WITNESS: I was reminding

8    myself to wait when there are objections.

9  Q. Do you have any knowledge, personal

10    knowledge, as to whether there are any

11    aggregate limits stated in the policy that

12    you believe existed from '61 to '64?

13 A. Well, I know that there were no aggregate

14    limits for exposures other than product

15    liability and completed operations in the

16    policies that exist, and I find it

17    implausible that a policy in a time of

18    liability expansion would go from, that is

19    to say when the tort liability system is

20    expanding, would go from a restricted

21    coverage, that is to say one with an

22    aggregate applicable, to one that didn't

23    have an aggregate applicable.

24         I also know that the reason for

1       addressee on Exhibit F, is or was?

2   A.  I believe they were counsel for -- no.  I

3       don't know, but I believe they were

4       counsel for the Archdiocese -- Archbishop.

5   Q.  You will see this was made attention to

6       Wilson D. Rogers, III?

7   A.  Yes.

8   Q.  Have you ever talked to Wilson D. Rogers,

9       III?

10  A.  No, I have not.

11  Q.  Do you know who that is?

12  A.  I believe he is a attorney with Dunn &

13      Rogers.

14  Q.  So you have no personal knowledge as to

15      what understanding, if any, there was

16      between the LMC and RCAB with respect to

17      aggregate balances at this time period in

18      1996?

19          MR. GALVANI:  Objection.

20  A.  I do know that at this time period that

21      Lumbermens had misrepresented the policies

22      as having an aggregate.

23  Q.  Now it is true at this time period for the

24      period '64-'65 you have never seen any

54

11/9/2004  Dennis R. Connolly

1   actual policies from -- issued by
2   Lumbermens to RCAB?
3       MR. GALVANI: Objection.
4  A.  That is correct.
5  Q.  And you have not seen any declaration
6   pages that may have been attached to any
7   policies issued from '64 to '65 or
8   thereafter?
9       MR. GALVANI: Well, objection.
10  "Or thereafter"? Right through '83?
11      MR. TENER: No. Right through
12  1973.
13 A.  I have not seen declaration pages, but as
14  I have noted, the way an insurance policy
15  works is that it is a sort of a
16  comprehensive instrument, and in this
17  particular case, declaration pages which
18  state that there might be an aggregate, as
19  is the case in the policies after '74,
20  state there is an aggregate, but they also
21  state that you must refer to the entire
22  policy, and the policy itself states that
23  the aggregate is applicable only to
24  product liability and completed

55