UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>LUMBERMENS MUTUAL CASUALTY COMPANY,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 04-10461-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**RCAB'S MEMORANDUM IN RESPONSE TO LMC'S SUPPLMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

　　　　The Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB") submits this Memorandum in response to Lumbermens Mutual Casualty Company's ("LMC") supplemental brief in opposition to the Motion for Partial Summary Judgment currently pending before the Court.  Having been given time to conduct more discovery, LMC has failed to adduce any evidence that refutes the RCAB's entitlement to summary judgment.  Quite the contrary, the evidence adduced by LMC demonstrates beyond peradventure that the RCAB has conducted a diligent but unsuccessful search for original insurance policies.  The RCAB's search was especially reasonable in light of its assumption that LMC would live up to its duty -- statutory and otherwise -- to represent correctly the terms of its policies.  It is only because LMC violated those obligations that the RCAB was misled into believing that there were aggregate annual limits applicable to its claims.  Having discovered LMC's deception, the RCAB is entitled now to enforce the terms of those contracts.

**I.    THE RCAB HAS CONDUCTED A DILIGENT SEARCH FOR COPIES OF ITS INSURANCE POLICIES; HAVING FOUND NONE, THE RCAB IS ENTITLED TO RELY ON SECONDARY EVIDENCE OF THEIR EXISTENCE AND TERMS.**

The RCAB's burden, for purposes of using secondary evidence to establish the terms and conditions of its policies, is to show that, as of the present date, a diligent search has been conducted and no original policies have been located. *See* FED. R. EVID. 1004; *Burt Rigid Box Inc. v. Travelers Prop. Cas. Corp.*, 126 F. Supp. 2d 596, 614 (S.D.N.Y. 2001, *aff'd in part, rev'd in part* 302 F.2d 83 (2d Cir. 2002); *see also Continental Ins. Co. v. The Roman Catholic Bishop of Fall River*, No. 92-12016-MA, slip op. 8–9 (D. Mass. Aug. 12, 1993) (Ex. A). LMC attempts to insert into the standard a requirement that the search have been undertaken at a particular point in time, but there is no legal support for this requirement. As of September, it can be said without doubt that there is simply no extant original policy or copy thereof for any year prior to 1974 in either the RCAB's or LMC's possession.

In a perhaps telling omission, LMC opens its supplemental argument regarding the RCAB's search with a misleading parenthetical half-quotation from the *Sylvania* case. (*See* LMC's Supplemental Br. in Opp. to Pl's Mot. for Partial Summ. J. at 2 (citing *Sylvania* for the proposition that "[h]e who seeks to introduce secondary evidence must show that he has used *all* reasonable means to obtain the original.") In fact, immediately before that sentence, the *Sylvania* court wrote that "[t]here is no universal or fixed rule that determines the sufficiency of the proof required to show that a reasonable or diligent search has been made. *Each case is governed in large measure by its own particular facts and circumstances*." *Sylvania Elec. Prods., Inc. v. Flanagan*, 352 F.2d 1005, 1007 (1st Cir. 1964) (emphasis added). Here, measured against the facts and circumstances that LMC ignores, the RCAB's searches beginning in the early 1990s have been more than sufficiently diligent.

Having asked the Court for the opportunity to conduct additional discovery with respect to RCAB's search for its missing policies, LMC has learned only that which was already known and could have been explored in previous discovery:

- In the early- to mid-1990s, Arthur Powers and Paul Fallon attempted to locate the RCAB's insurance policies (or copies thereof) and, as part of their efforts, made phone calls to both parishes and institutions. (*See* 11/8/04 McEnnes Dep. 33:6–23; 39:23–40:4.)[1] The institutions contacted indicated that they did not have insurance policy information. (*Id.* 33:17–23.)

- Subsequent to the initiation of this litigation, the RCAB undertook a survey of the 365 parishes that are organizationally part of the RCAB and the 110 institutions that, while not organizationally part of the RCAB, participate in its insurance program. (*Id.* 43:7–23.) No original policies and no copies of the original policies were recovered in this search either, although additional secondary evidence of both the primary and excess policies was recovered.

In light of this extensive search, the RCAB may rely on secondary evidence, including evidence from LMC's own files.[2]

Of course, this new evidence is merely cumulative of the evidence already submitted as part of the summary judgment record establishing that the RCAB -- like LMC -- has searched for its insurance policies and has not found them from the period prior to 1974.

- The RCAB searched its own files in the mid-1990s for policies and policy information, including a search of the RCAB archives that involved sifting through "boxes upon boxes of folders." (Fallon Dep. 47:1–8 (Ex. D); *see* The RCAB's Corrected Mem. of L. in Supp. of its Mot. for Partial Summ. J. at 20.)

- The RCAB interviewed its former brokers in a search for policies or policy information. (*Id.*)

- The RCAB recently subpoenaed the successor to its former broker in an effort to locate additional information. (*See* The RCAB's Corrected Mem. of L. in Supp. of its Mot. for Partial Summ. J. at 21.)

---

[1] All cited portions of Mr. McEnness's deposition are attached hereto as Exhibit B.
[2] *See, e.g.*, Ex. C (LMC line card reflecting that the 1964 policy was a renewal policy).

Like all of the other efforts undertaken by the RCAB, these efforts failed to produce the original insurance policies, or copies thereof.

There is simply no reason to suspect that the parishes would ever have had the original insurance policies or copies thereof for any insurance policies that are in dispute in this case. LMC *concedes* that it provided coverage for the parishes from 1974 to 1983and that those policies are governed by the terms of Coverage Part 7. (*See* LMC's Supplemental Br. in Opp. to Pl's Mot. for Partial Summ. J. at 11.) While the RCAB contends that the policies covering the parishes extend back to 1971 (and that there is compelling secondary evidence that this is so) [3], there is no reason to believe that originals of the disputed policies would reside in parish files. As Mr. McEnness explained in his recent deposition:

> There was no expectation that they would have in the parishes any information that would have been meaningful in terms of their analysis of coverage or the policies.
>
> Everything was in the RCAB name. The documents and the policies were kept at the RCAB. There wasn't any policy or procedure that allowed for distribution of that information to the parish level.

(11/8/04 McEnness Dep. 16:14–21.)

All 19 of the forms about which LMC rants were substantially identical and comprised simply the policy jacket for 1974, and not the actual policy. While the best evidence rules requires the proponent of secondary evidence to have searched for the missing document, it does not require the RCAB to search in places that are not likely to have the original policies, or even copies thereof. Consistent with the RCAB's conclusion that it was unlikely to find the policies

---

[3] In fact, Paul Meany's schedule of insurance accurately reflects that the parish policies extended back to 1971 (*see* Ex. E), a fact confirmed by a letter from Monsignor Finnegan to the parishes indicating that the RCAB was obtaining coverage for the parishes in 1971 (*see* Ex. F.) and the fact that the 1974 policies in LMC's possession are clearly marked as renewals (*see* Diederich Aff. Ex. 4). The institutions were covered from at least 1961, and probably from 1955.

in the parish files, the recent search (undertaken in an effort to locate all relevant information for purposes of its initial disclosures ) has revealed no original policies and no copies of original policies.

Even if LMC were able to import into the evidentiary standard a requirement that a search be conducted at a particular time, the facts and circumstances of the relationship of the RCAB and the LMC were such that the RCAB had no reason to conduct a further search after 1995. As Mr. McEnness testified, LMC, after its initial denials of coverage, began to cooperate with the RCAB and pay *in full* its pending claims:

> . . . I think that historically there was certainly the impression that Lumbermen's [*sic*] was cooperating with them.
>
> To the degree that the claims were being processed and paid, they had stepped up to the plate in the mid-nineties and began paying these claims, and the RCAB didn't have any reason to believe that there was any need to review the policy and its detail or pursue this.

(11/8/04 McEnness dep. 16:5–13.)

While it is true that LMC was falsely claiming that there were applicable aggregate limits on the policies it had sold to the RCAB, it did not reach those fictitious limits to reject claims until the latter half of 1998 at the earliest. (*See* Pl.'s Corrected Stmt. of Facts as to Which There is no Genuine Issue to be Tried ¶ 87.)

> . . . it was a situation where the RCAB relied upon Lumbermen's [*sic*] to provide them with the information relative to the policy, relative to the coverage.
>
> Since they were providing -- they were providing the coverage, they were paying the claims, there was no reason to suspect that they were being given false information.

(*Id.* 17:9–16.)

## II.  THE RCAB IS NOT TIME-BARRED FROM RECOVERING ON ITS CONTRACT WITH LMC.

The same operative facts demonstrate the inherent lack of logic to LMC's suggestion that the statute of limitations began to run in 1995 and that the RCAB is now time-barred from recovering on its contracts.[4]  It is undisputed that it was not until the latter half of 1998 (at the earliest) that LMC began to refuse to pay new claims on the basis of the "exhaustion" of the non-existent aggregates.. (*See* Pl.'s Corrected Statement of Material Facts as to Which There is No Genuine Issue to be Tried ¶¶ 86–88; Diederich Aff. Ex. 50.)  The fact that LMC claimed that there were aggregate limits or that it was applying payments to aggregate limits in 1995 or 1996 is irrelevant, because contract actions accrue at the time the contract is breached.  *See Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 146 (1st Cir. 2004).  In the case of an insurer's obligation to indemnify, a cause of action for breach does not accrue until the insurer becomes legally obligated to indemnify, which is when judgment is entered against the insured or a claim is settled.  *See John Beaudette, Inc. v. Sentry Ins. Mut. Co.*, 94 F. Supp. 2d 77, 104–05 (D. Mass. 1999).[5]  The RCAB has settled many claims since 1998—including over 500 claims as part of the 2003 global settlement—some of which implicated each and every period of LMC's coverage.  Consequently, the RCAB's request for a declaration of the terms of the policies implicated by those claims is not time barred, nor is its request that the Court order LMC to cure its breaches by making the RCAB whole.

Finally, even were it true that any of the RCAB's causes of action initially accrued in 1995, the statute of limitations would still not have expired, because LMC concealed the cause of

---

[4] While LMC repeatedly argues about the RCAB's cause of action for misrepresentation, the RCAB has not moved for summary judgment on its misrepresentation claims.  LMC's arguments with regard to the proper application of the statute of limitations to RCAB's misrepresentation claims are irrelevant at this stage of the proceedings.

action. *See* MASS. GEN. L. ch. 260, § 12. Indeed, as late as 2003, LMC contended that there were aggregate limits in the insurance policies it had issued to the RCAB. For purposes of the RCAB's pending motion, LMC has failed utterly to carry the burden of proving that the RCAB's claims are time-barred.

### III. THE RCAB IS NOT ESTOPPED FROM ENFORCING THE TERMS OF ITS INSURANCE POLICIES.

The additional evidence adduced at LMC's request also underscores the untenable nature of its argument that the RCAB is estopped from enforcing the terms of its insurance policies because it foolishly accepted LMC's misrepresentation of their terms as true. As Mr. McEnness testified, the RCAB had no copies of the insurance policies in its chancery offices (*see* 11/8/04 McEnness dep. 38:11–19), did not expect to find policy information in the parish files (*id.* 16:14–17), and had "every expectation that the information that they were being provided by Lumbermen's [*sic*] was full and accurate . . . ." (*Id.* 28:11–13.) Indeed, in that sense the RCAB's reliance on LMC was eminently reasonable inasmuch as LMC is under a statutory obligation to avoid "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue." MASS. GEN LAWS. ANN. ch. 176D, § 3(9)(a).

The RCAB's reasonable reliance is in direct contrast to LMC's behavior. Its alleged reliance on the RCAB's non-statements, *cf. Moore v. Marty Gilman, Inc.*, 965 F. Supp. 203, 219 (D. Mass. 1997) (calling "very doubtful" the premise that a promissory estoppel—as opposed to equitable estoppel—claim could be based on a party's silence), is patently unreasonable. Not only did the relevant claims-handlers at LMC have copies of the coverage terms as early as 1994 (*see See* Pl's Corrected Statement of Material Facts as to Which There is No Genuine Issue to be

---

[5] In this sense, the LMC policies are like installment contracts. When a party breaches an installment contract, an independent cause of action accrues at the date of each missed payment. *See Flannery v. Flannery*, 429 Mass. 55, 58–59 (1999).

Tried ¶ 18; LMC's Opp. to Pl's Mot for Partial Summ. J. at 2), but LMC's claims adjusters often used standard policy forms widely available in their offices to adjust claims (*see* Pl's Corrected Statement of Material Facts as to Which There is No Genuine Issue to be Tried ¶¶ 38–41) and even shared those forms with coverage attorneys from whom LMC sought advice (*id.* ¶¶ 39, 47, 53). LMC did not have to look for those forms in order to determine that the RCAB was laboring under a misimpression; it merely had to look *at* them.

Worse, the source of the RCAB's misimpression was LMC itself, which makes its claim of estoppel all the more curious. Estoppel is not available as a defense where both parties have equal access to information that would show the inaccuracy of the representation in question. *See* RESTATEMENT (SECOND) OF TORTS § 894, cmt. d. Here, LMC's access to information was not just equal to the RCAB's, it was *superior*. The Court should not permit LMC the option to misrepresent the terms of its insurance policies and then suggest that the RCAB cannot enforce the real terms of those policies because it was duped by LMC's misrepresentations.

## CONCLUSION

For the foregoing reasons, along with those expressed in its original Memorandum in support of its Motion for Summary Judgment, the RCAB is entitled to judgment as a matter of law on the claims described in its Motion.

                    Respectfully submitted,

                    THE ROMAN CATHOLIC ARCHBISHOP
                    OF BOSTON, A Corporation Sole

                    By its attorneys,

                    /s/Paul B. Galvani
                    Paul B. Galvani (BBO # 183800)
                    Thomas H. Hannigan, Jr. (BBO # 220420)
                    Bryan R. Diederich (BBO # 647632)
                    Kate Cimini (BBO # 654336)
                    Ropes & Gray LLP
                    One International Place
                    Boston, MA 02110

Dated: November 16, 2004        (617) 951-7000

-10-