UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

THE CONTINENTAL INSURANCE
COMPANY,
    Plaintiff,

v.

THE ROMAN CATHOLIC BISHOP
OF FALL RIVER, THE DIOCESE
OF FALL RIVER, and JAMES R.
PORTER,
    Defendants.

CIVIL ACTION NO. 92-12016-MA

---

MEMORANDUM AND ORDER

Mazzone, D.J.                                    August 12, 1993

This is an action filed by Continental Insurance Company
("Continental") pursuant to the Federal Declaratory Judgment Act,
28 U.S.C. § 2201 (1988).  Continental seeks a declaration of the
rights and obligations of the parties under insurance policies
allegedly issued to the Diocese of Fall River.  Continental
argues that it has no duty either to defend or to indemnify the
defendants, the Roman Catholic Bishop of Fall River, the Diocese
of Fall River, and James R. Porter, in connection with claims
that while serving as a priest, Porter sexually molested numerous
children in parishes across the country.  The matter is presently
before the court on the motion for partial summary judgment of
the Bishop and the Diocese of Fall River (collectively, "the
Diocese"), who seek a decision that Continental has breached its
duty to defend.

EXHIBIT
A

BACKGROUND

A.  Porter History

Defendant James R. Porter was admitted to St. Mary's
Seminary in Baltimore in 1956 to prepare for service as a priest.
In 1960 he was ordained a priest of the Diocese of Fall River and
appointed associate pastor at St. Mary's Parish in North
Attleboro, Massachusetts, where he remained until 1963.[1]
Continental alleges that during Porter's three years at North
Attleboro, various church priests caught Porter in the act of
molesting children on church premises, yet took no action to stop
the attacks.  Continental further alleges that church officials
Bishop James L. Connolly and Humberto Cardinal Medeiros (then the
Fall River Chancellor) received reports from parishioners of
additional attacks.

In 1963, after sending Porter home to his family for a short
period, Connolly and Medeiros transferred him to the Sacred Heart
Parish in New Bedford without revealing his history of pedophilia
to his new parishioners.  Porter's molestation of children
allegedly continued.  In 1964-65 Porter was committed to a
private hospital in Wellesley, Massachusetts for six to nine

---

[1] Parts of this factual background are disputed by the
Diocese.  For example, the Diocese has denied that Porter's
position at St. Mary's was associate pastor and that his duties
included supervising and providing recreational outings for alter
boys.  These disputes are irrelevant to the question immediately
at hand, which concerns only the contractual obligations arising
from the alleged insurance policy.  Much of the account of
Porter's life and activities is taken from his May 17, 1973
petition to the Vatican requesting laicization, which is included
in the record as Exhibit R (SP 000197-214) to the Affidavit of
Joseph F. Wayland.

2

months of shock therapy. He was then treated as an outpatient for about six months, during which time he lived with his parents. In 1966, Connolly and Medeiros assigned Porter to St. James Parish in New Bedford, again without alerting parishioners to his history. Church officials received renewed reports of molestations. In 1967, Connolly removed Porter's faculties to perform priestly ministry in the Diocese, and after a brief stay with his parents, Porter was transferred to a treatment facility operated by the Servants of the Paraclete in Jemez Springs, New Mexico.[2]

Porter resided with and received treatment from the Servants of the Paraclete from 1967 through 1969. During that time he served, with the knowledge of the Diocese, as a supply priest at various parishes throughout the Southwest. He allegedly molested children at several locations.

In August, 1969, Porter was transferred to a Servants of the Paraclete facility in Nevis, Minnesota. He began serving as an extern priest in the Diocese of Crookston, filling in at various parishes. He was soon appointed associate pastor of St. Philip's Parish in Bemidji, Minnesota, where he remained until approximately September, 1970, when it became known that he was again molesting young boys. Porter was removed from St. Philip's and sent to another Servants of the Paraclete facility, St. Michael's Institute in Sunset Hills, Missouri, where he remained

---

[2]The Servants of the Paraclete is an organization which offers counseling and rehabilitation to Roman Catholic priests.

about a month before Bishop Connolly placed him on a one year
leave of absence.  Porter petitioned for laicization in 1973 and
the Vatican granted his petition in January, 1974.

B.  The Underlying Claims

Since July, 1992, twenty-two plaintiffs have commenced
individual actions in Washington County, Minnesota, alleging that
they were sexually molested by Porter in Minnesota during the
period from approximately August, 1969 through September, 1970.
The complaints name Porter, the Bishop of Fall River, the Diocese
of Crookston, Minnesota, and the Servants of the Paraclete, Inc.
as defendants.  The plaintiffs seek to impose liability upon the
Diocese of Fall River on theories, inter alia, of negligent and
reckless supervision and failure to protect the public.[3]

While Porter's alleged victims have asserted claims against
the Diocese in Massachusetts and New Mexico as well as in
Minnesota, the Diocese has limited its motion for partial summary
judgment to the Minnesota claims.  At present, the Diocese seeks
a declaration that Continental has breached its obligation to
defend with respect to the Minnesota claims only.[4]

---

[3]Continental characterizes the underlying claims as alleging
that the Diocese "recklessly, knowingly and/or intentionally
failed to properly supervise and discipline Porter."  (Compl. ¶
74.)  However, Count IV, labeled "Negligence," clearly asserts
negligent and reckless conduct by the Diocese, whatever else may
be asserted or implied.

[4]The defense and indemnification of the New Mexico and
Massachusetts claims are not presently at issue because Travelers
Insurance Company rather than Continental insured the Diocese
during the period when most of the abuse in New Mexico is alleged
to have occurred and because the Diocese has resolved the bulk of
the Massachusetts claims.

4

C.    Insurance History

The parties agree that from March 1, 1967 to April 1, 1969, the Diocese was insured by Travelers Insurance Company. They also agree that Continental insured the Diocese from April 1, 1972 to April 1, 1975 under Policy No. 6997440, from April 1, 1975 to April 1, 1976 under Policy No. 3794905, and from April 1, 1976 to April 1, 1977 under Policy No. 3795085. However, the parties disagree as to the state of the Diocese's insurance coverage from April 1, 1969 to April 1, 1972, the period of the Minnesota claims. The Diocese alleges that Continental provided coverage during that period under Policy No. 8103060. Continental maintains that the Diocese has produced no competent evidence of such a policy. Neither party is able to locate the policy.

Continental originally agreed to defend the claims asserted against the Diocese in Minnesota and Massachusetts. In response to notice of the Minnesota claims in July, 1992, Continental assigned the sixteen initial lawsuits to the Minneapolis law firm of Stitch, Angell, Kneider & Muth. However, Continental reserved its rights, and on August 14, 1992, Continental notified the Diocese that it had decided to withdraw from the defense of all claims, including those in Minnesota.

LEGAL STANDARD

As a preliminary matter, Continental and the Diocese disagree as to the weight of the Diocese's burden in proving the existence and terms of the missing policy. Continental agitates

for a "clear and convincing evidence" standard of proof, while
the Diocese holds out for the more traditional "preponderance of
the evidence."  The court is not directed to and has not found
any Massachusetts case which explicitly resolves this matter.[5]

Rather than counting cases from other jurisdictions, which
admittedly differ as to the better standard, the court adopts the
thorough and well-considered decision in Remington Arms Co. v.
Liberty Mut. Ins. Co., 810 F. Supp. 1420 (D. Del. 1992).  After
an extensive discussion which need not be reiterated here, the
Remington court disagreed with the line of cases relied upon by
Continental and rejected the clear and convincing standard of
proof in lost policy cases.  This outcome accords with more
general pronouncements of the Massachusetts Supreme Judicial
Court, which disfavors heightened civil burdens except in quasi-
criminal circumstances.  See Medical Malpractice Joint
Underwriting Ass'n v. Commissioner of Ins., 395 Mass. 43, 46
(1985) (holding that higher standard of proof required only where
particularly important individual interests or rights at stake);
In re Guardianship of Roe, 383 Mass. 415, 422-23 (1981) (holding
that higher standard of proof required in civil cases only when
individual may suffer stigma comparable to criminal conviction
and faces loss of liberty).

---

[5]As the Diocese notes, Sylvania Elec. Prods., Inc. v.
Flanagan, 352 F.2d 1005 (1st Cir. 1965), does not address the
question of the state burden of proof for proving the contents of
a missing document but rather the strictness of proof required in
proving that an adequate search has been undertaken.  See 352
F.2d at 1008.

This court therefore holds that under Massachusetts law, the Diocese need only prove the existence and terms of the missing policy by a preponderance of the evidence. At the summary judgment stage, however, a preponderance of the evidence is not enough; the Diocese must prove the material terms of the policy beyond factual dispute (or else demonstrate the absence of any dispute). <u>See</u> Fed. R. Civ. P. 56(c). In order to grant summary judgment, this court would have to decide "not that the evidence as presented was sufficient to support one conclusion or another, but rather that, as a matter of law, the evidence presented could only support one conclusion." <u>Remington</u>, 810 F. Supp. at 1423.

Summary judgment may be granted only when the movant is entitled to judgment as a matter of law and the record evinces no genuine dispute as to any material fact. <u>See</u> Fed. R. Civ. P. 56(c). "A factual dispute is material if it affects the outcome of the litigation, and genuine if manifested by substantial evidence going beyond the allegations of the complaint." <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d 812, 815 (1st Cir. 1987) (internal quotations and citations omitted). While a court need not "give credence to 'mere allegations' or draw inferences where they are implausible or not supported by 'specific facts,'" <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262 (1st Cir. 1991) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)), the court must "take the record in the light most hospitable to the party opposing summary judgment and indulge all reasonable inferences favorable to him." <u>Buenrostro</u>

7

v. Collazo, 973 F.2d 39, 41 (1st Cir. 1992).

DISCUSSION

By its motion for partial summary judgment, the Diocese
seeks a determination that Continental has a duty to defend the
Diocese against the claims asserted by the Minnesota plaintiffs.
The major question presented is whether the Diocese's inability
to produce the insurance policy under which it claims this
benefit precludes that determination. The Diocese argues, based
upon secondary evidence, that the policy was in effect during the
time frame of the incidents giving rise to the Minnesota claims,
that it contained a standard defense clause, and that its
provisions were such that the underlying claims fall within its
coverage. Continental does not now directly deny that it issued
the policy for the years 1969 to 1972; rather, it argues that the
Diocese has failed to produce any competent evidence as to its
existence or terms.

Both the Diocese and Continental have undertaken extensive
searches for the missing policy. The Diocese, which has no
formal document retention policy, has searched the Diocesan
insurance office, the Diocesan Chancery Office, and the Diocesan
archives. It has also directed searches of the files of each
parish within the Diocese. (Third Affidavit of Monsignor John J.
Oliveira ¶¶ 2-3.)

Continental's document retention schedule indicates that its

8

copy of the policy should have been destroyed in the early 1980s.[6] Nevertheless, Continental has searched records held by the Stoneham, Massachusetts branch of Continental Loss Adjusting Services, Inc., its Nashua, New Hampshire underwriting office, and its home office in Cranbury, New Jersey. (Affidavit of Mary Rowe ¶ 3.) Both the Diocese and Continental have instructed Kaler, Carney, Liffler & Co., the insurance broker used by the Diocese, to search its files. (Third Oliveira Aff. ¶ 3; Affidavit of Joseph F. Wayland ¶ 19.) All of these efforts were unsuccessful.

However, the Diocese's search did unearth a vast amount of secondary evidence relating to the policy. Most importantly, the Diocese located a three-year Continental policy, No. 6997440, for 1972-75. Both the 1972-75 policy and an accompanying transmittal letter from Kaler, Carney refer to the 1972-75 policy as a renewal of Policy No. 8103060 for the 1969-72 period. The Diocese also found personal injury claims files, property damage claims files, checks issued by Continental to the Diocese under Policy No. 8103060, Continental fire inspection reports, subrogation reports, Diocesan insurance invoices, change endorsements, certificates of insurance, and various correspondence from Kaler, Carney, all tending to show that

---

[6]According to Continental's document retention schedule for policies which expired in 1972, policies were retained at the branch office that issued them for one year after expiration. They were then transferred to an off-site warehouse where they were retained for eight years before being destroyed. (Affidavit of Mary Rowe ¶¶ 7-8.)

Continental indemnified the Diocese under Policy No. 8103060 from April 1, 1969 to April 1, 1972. In view of this overwhelming documentation, there can be no genuine dispute that Continental issued the Diocese some sort of insurance policy for the years 1969 to 1972.

In order to establish that Continental has a duty to defend under the policy, the Diocese must prove two things: first, that the policy contained a defense obligation clause;[7] and second, that there is "a possibility that the liability claim falls within the insurance coverage." Sterilite Corp. v. Continental Casualty Co., 17 Mass. App. Ct. 316, 319 (1983) (internal quotation and citation omitted), rev. denied, 391 Mass. 1102 (1984). Massachusetts uses a comparison test to determine whether liability claims may be covered:

> It is settled in this jurisdiction, and generally
> elsewhere, that the question of the initial duty of a
> liability insurer to defend third-party actions against
> the insured is decided by matching the third-party
> complaint with the policy provisions: if the
> allegations of the complaint are 'reasonably
> susceptible' of an interpretation that they state or
> adumbrate a claim covered by the policy terms, the
> insurer must undertake the defense.

Continental Casualty Co. v. Gilbane Building Co., 391 Mass. 143, 146 (1984) (internal quotations and citations omitted). Thus, establishing that Continental has a duty to defend requires the Diocese to prove, in broad outlines at least, the contents of the

---

[7]Not all liability insurance policies contain defense obligations. See, e.g., Jones v. Southern Marine & Aviation Underwriters, Inc., 888 F.2d 358, 362 (5th Cir. 1989); Gon v. First State Ins. Co., 871 F.2d 863, 868 (9th Cir. 1989).

missing policy.

Because the Diocese is unable to produce the 1969-72 policy, it seeks to use its voluminous secondary evidence to prove the policy's terms and conditions. Under the best evidence rule, secondary evidence is not admissible to prove the contents of a writing, Fed. R. Evid. 1002, unless its proponent first shows that it did not lose or destroy the original fraudulently or in bad faith, Fed. R. Evid. 1004(1), and that a reasonable and diligent search has been made for it. Sylvania Elec. Prods., Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965). Despite Continental's assertions to the contrary, the court is confident that the Diocese meets these criteria.

Continental insinuates that the Diocese has been less than candid in explaining the loss of the policy. However, the circumstances relied upon by Continental--that the Diocese has no formal document retention policy and that it has produced other insurance-related documents from periods both prior and subsequent to 1969-72--do not begin to rise to the level necessary to call into question the Diocese's good faith.

Continental also contends that there is a genuine issue of material fact as to the nature and extent of the Diocese's search. Given that "the missing original writing[] in dispute [is] the very foundation of the claim, . . . more strictness in proof [of a diligent search] is required than where the writing[] [is] only involved collaterally." Sylvania, 352 F.2d at 1008. However, the third Oliveira affidavit, the second Shepard

11

affidavit, and the reams of relevant insurance materials produced
by the Diocese convince the court that even under the Sylvania
standard there is no genuine dispute that the Diocese has
conducted a thorough and comprehensive search.  Therefore, the
secondary evidence produced by the Diocese is competent and may
properly be proffered in an attempt to establish the terms of the
policy.

The secondary evidence establishes certain basic terms
beyond dispute.  Change endorsements and accompanying
correspondence from Kaler, Carney show the policy number to be
8103060, specify the period of the policy as April 1, 1969 to
April 1, 1972, identify the insured as the Roman Catholic Bishop
of Fall River, and describe the policy as "Special Multi-Peril
Coverage." (Second Oliveira Aff., Ex. 18.)  These documents also
indicate that as of July 27, 1971, the Diocese's bodily injury
liability coverage was increased to $100,000 each person,
$300,000 each occurrence, and $300,000 aggregate, while property
damage liability coverage was increased to $50,000 each
occurrence and $50,000 aggregate.[8]  (Id.)  A December 11, 1969
letter from Kaler, Carney detailing loss statistics for the
period from April 1, 1969 to September 30, 1969 indicates that
the Diocese was covered for at least the following types of
losses:  burglary, fire and lightning, windstorm, and public
liability.  (Second Oliveira Aff., Ex. 22.)  The cover letter

---

[8]Oddly, while it relies on these documents, "[t]he Diocese
does not concede there was any aggregate under the policy . . .
. " (Reply Mem. at 9 n.6.)

accompanying the 1972 renewal policy confirms that the 1969-72 policy included comprehensive general liability coverage. (Second Oliveira Aff., Ex. 2.)[9]

However, although it is a very close question, the court finds that genuine issues of material fact arise as to the more specific terms of the policy which must be established in order to determine the existence of a duty to defend. As noted, in order to prove the duty, the Diocese must establish both that the missing policy contained a defense obligation and that there is a possibility that the underlying claims fall within the terms of the coverage. The Diocese's main attempt to prove these specifics focuses on the fact that three other policies, a 1966 Continental specimen policy, the 1967 Travelers policy, and the 1972 Continental renewal policy, were all comprehensive general liability policies with defense obligations. The Diocese argues that these three policies contained very similar terms and conditions and asks the court to infer that the terms of the 1969-72 policy must have been the same. The Diocese's only other evidence of the policy's terms consists of the affidavit of its former broker and a purported admission by Continental.

The three policies relied upon by the Diocese are certainly similar.[10] In addition, there is some evidence which might tend

---

[9]The Diocese cites internal Continental memoranda dating from 1992 which appear to confirm these basic facts. (See Reply Mem. at 7-8.)

[10]Apparently because portions of the actual Travelers policy were illegible, the Diocese used a "form policy used in the preparation of the Travelers Policy" in making its comparison.

to show that Continental undertook the defense of a disputed

claim which arose during the policy period.[11]  However, to

conclude that the missing policy was identical in all relevant

respects to the policies proffered by the Diocese would require

an inference of large proportions.  The drawing of such

inferences against the non-movant is properly the province of the

trier of fact.  See Remington, 810 F. Supp. at 1422-23 (stating

that "the question of whether or not a party has offered

sufficient evidence to prove the contents of a lost writing is a

matter for the trier of fact to decide," and that where

conclusions must be drawn from secondary evidence, "this drawing

of conclusions . . . creates a triable issue of fact").

Moreover, Continental has offered cogent reasons why the

court should not simply assume that the 1969-72 policy was

identical to the others.  First, on September 16, 1971, the

Massachusetts legislature abolished the common law doctrine of

absolute charitable immunity.  See Mass. Gen. Laws Ann. ch. 231,

§ 85K (West 1985).  As of that date, there was a momentous change

in the Diocese's insurance needs; therefore, we should hesitate

───────────────────

(Second Affidavit of Alana Shepard ¶¶ 5-6.)  It does not seem
particularly probative that the Travelers specimen policy closely
resembles the 1966 Continental specimen policy.  The Diocese
itself speculates that the 1966 specimen was an industry-wide
form followed by both Continental and Travelers.  (See Reply Mem.
at 13.)

[11]The Diocese has produced a Continental check to William J.
Fenton, Esq. in the amount of $1,068.00 for legal fees incurred
in representing the Diocese in a slip-and-fall suit brought by
Rosa and Henry Cordeiro against one of the Diocese's churches.
(Second Oliveira Aff., Ex. 7.)

to rely blindly on post-1971 policies to establish the terms of
pre-1971 policies.

Second, Continental points out that the existing policies
issued to the Diocese do differ among themselves, at least in
terms of coverage limits and broad form excess coverage. (See
Opp. Mem. at 20-21.) While the Diocese is correct that the
precise policy limits are irrelevant to the existence of a duty
to defend, they may well determine the extent of that duty. The
1966 specimen policy and the 1972 renewal policy relied upon by
the Diocese both include the following language:

> [T]he [insurer] shall not be obligated to pay any claim
> or judgment or to defend any suit after the applicable
> limit of the [insurer's] liability has been exhausted
> by payment of judgments or settlements.

(Second Shepard Aff., Ex. A at CIC 000028, Ex. B at GL-2.) Thus,
as a practical matter, the liability limits are highly relevant--
at least if the missing policy included this clause.

Finally, Continental challenges the presumption, relied upon
by the Diocese, that "[a]n insurance contract is not a negotiated
agreement; rather its conditions are by and large dictated by the
insurance company to the insured." Johnson Controls, Inc. v.
Bowes, 381 Mass. 278, 281 (1980). Continental notes both that
the Diocese shopped around among carriers to find the best terms,
as illustrated by its switch from Travelers to Continental, and
that a March 28, 1972 letter from Kaler, Carney to the Diocese
indicates that the terms of the renewal policy were open to
discussion. (See Second Oliveira Aff., Ex. 2.) The presumption
that insurance companies dictate their terms may well hold in the

15

case of individual insureds (like the solo practitioner whose legal malpractice insurance was at issue in <u>Bowes</u>), but this court declines to apply it in the case of large institutional insureds such as the Diocese. Therefore, the missing policy cannot be assumed to be identical either to the 1966 specimen policy or to the 1972-75 renewal policy. For these reasons, the court hesitates to assume that the missing policy is indistinguishable from the exemplars offered by the Diocese.

The Diocese attempts to bolster its inference that the missing policy is a carbon copy of the others by the affidavit of its former broker, James Reardon. Reardon worked for Kaler, Carney from 1967 until he retired in 1985. Soon after starting at Kaler, Carney, he began handling the Diocese account. Reardon states:

> The basic insurance agreement for comprehensive general liability coverage contained in the 1969 Continental policy <u>would have been</u> the same as that contained in the 1972 Continental policy, with the possible exception of adjustments in limits of liability or excess coverage. The provisions with respect to the scope of the duty to defend and indemnify <u>would have been</u> the same.

(Reardon Aff. ¶ 8, emphasis added.)

The court, without impugning Reardon's honesty in the least, is concerned about the precision of his recollections concerning individual provisions of an insurance policy issued almost twenty-five years ago. Reardon handled many different kinds of insurance for the Diocese, including "workmen's compensation insurance, property insurance, comprehensive general liability insurance, automobile insurance, and boiler insurance." (Reardon

16

Aff. ¶ 2.)  He presumably handled insurance policies for other
Kaler, Carney clients as well.  The court also notes the
subjunctive mood of the verb in the crucial statements.  Although
these circumstances may give rise to some question, the court
must leave the assessment of the weight to be given Reardon's
testimony to the trier of fact.  See Yerardi's Moody St. Rest. &
Lounge, Inc. v. Board of Selectmen, 878 F.2d 16, 17 (1st Cir.
1989) ("'[C]redibility determinations, the weighing of the
evidence, and the drawing of legitimate inferences from the facts
are jury functions, not those of a judge, whether he is ruling on
a motion for summary judgment or for a directed verdict.'")
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986)).

      In attempting to prove the existence of a defense
obligation, the Diocese also relies upon what it characterizes as
a binding judicial admission by Continental in its complaint.
The complaint states:

> Upon information and belief, any insurance policy
> issued by Continental to the RCB of Fall River during
> the period in question would have obligated Continental
> to defend and pay only those claims of bodily injury
> which were caused by either an "accident" or an
> "occurrence".

(Compl. ¶ 54.)  The court declines to accept this as an admission
that the missing policy contained a defense clause.

      In the first place, the phrase "upon information and
belief," not quoted by the Diocese in its argument, obviates
whatever force this statement might have had.  As the Diocese
itself notes, in its Memorandum in Support of Motion to Strike

17

the Affidavit of Christine Flanagan, presently before the court,
"statements of information and belief '[amount] to nothing more
[than] a mere allegation, not entitled to credence or weight in
the summary judgment calculus.'" (Mem. in Supp. of Mot. to
Strike Flanagan Aff. at 3 n.1, quoting Sheinkopf v. Stone, 927
F.2d 1259, 1271 (1st Cir. 1991).) The Diocese insists upon the
incompetence and unreliability of the statements made "upon
information and belief" in the Flanagan affidavit and asks that
they be stricken, while at the same time asking the court to deem
a statement contained in an unverified complaint and also made
"upon information and belief" to be a binding judicial admission.
Even the Diocese cannot have its cake and eat it, too.[12]

In the second place, the main import of Continental's
statement is not that the policy contained a defense clause, but
rather that coverage existed for bodily injuries caused by
accidents or occurrences only, as defined in the following
paragraph. (See Compl. ¶ 55.) This does not amount to the
clear, express, and unambiguous statement required by the First
Circuit. See Schott Motorcycle Supply, Inc. v. American Honda
Motor Co., 976 F.2d 58 (1st Cir. 1992). The Diocese's valiant
but failing effort to establish the terms of the missing policy
cannot be resuscitated by Continental's statement.

In conclusion, there is no genuine dispute that Continental
insured the Diocese under Policy No. 8103060 for the period April

---

[12]The disputed portions of the Flanagan Affidavit are
stricken and the court has not considered them in deciding the
motion for summary judgment.

1, 1969 to April 1, 1972. On the other hand, the court finds
that there are genuine issues of material fact as to the terms
and conditions, as distinct from the existence, of the missing
policy. While there is every indication that the Diocese will be
able to prove the terms of the policy at trial by the usual
preponderance standard, that endeavor will involve a weighing of
evidence which is not appropriate on summary judgment. Hence,
the Diocese's motion for partial summary judgment must be
denied.[13]

The pending motion is thus resolved, but one further note is
in order. At the hearing on this motion, I expressed my concern
that any resolution of this motion would not advance the fair,
effective and efficient resolution of the case. As much as I
believe my ruling is compelled by the law and the present record,
the core issues have yet to be addressed. Those issues were set
out by Continental in its memorandum opposing this motion.
Continental argued that alleged late notice and misrepresentation
by the Diocese absolved Continental of any duty to defend while
"these threshold coverage issues" are litigated. (Opp. Mem. at
25.) The merits of the notice and misrepresentation defenses are
not presently properly before me and so are not addressed.
However, it is my opinion that, were it now clear that
Continental had a duty to defend, it could not escape that duty

---

[13]Because the Diocese's motion for summary judgment is
denied on the grounds that there are genuine issues as to
material facts, the court need not reach Continental's argument
that the motion was premature, occurring as it did while
discovery was ongoing.

while litigating notice or misrepresentation defenses.

The law in Massachusetts is somewhat unclear on this issue. Of all the cases from all the jurisdictions cited by both parties on this question, only one is directly on point. With the exception of the missing policy problem, the circumstances in Vermont Gas Systems, Inc. v. United States Fidelity & Guaranty Co., 805 F. Supp. 227 (D. Vt. 1992), were similar to ours. The insured under a comprehensive general liability policy sought a declaration as to its insurer's duty to defend environmental cleanup claims. At issue was "whether an insurer has an initial duty to defend claims against the insured even though the insurer contends it did not receive timely notice of the claims for which the insured seeks coverage, as required by the governing policy." Id. at 228. The Vermont Gas court held that the insurer had "a present duty to defend and must reimburse costs of defense already incurred" by the insured, even though the merits of the notice defense were not yet before the court. Id. at 233.

The decision in Vermont Gas comports with the spirit of Sterilite Corp. v. Continental Casualty Co., 17 Mass. App. Ct. 316 (1983), rev. denied, 391 Mass. 1102 (1984). Because Sterilite discusses a situation entirely different from ours--one involving the common disagreement as to whether the allegations of the underlying claims fall within the policy, thus triggering the duty to defend--it is not the touchstone the Diocese

argues.[14]  Nevertheless, the principle expressed by the
Sterilite court would seem to apply to our situation, where the
insurer and the insured have disagreements over notice and
misrepresentation.   The Sterilite court stated:

> What is not permitted is that an insurer shall escape
> its duty to defend the insured against a liability
> arising on the face of the complaint and policy, by
> dint of its own assertion that there is no coverage in
> fact . . . .

Id. at 324.

However, our case does not yet appear in the Vermont Gas
posture.  Continental does not merely assert notice and
misrepresentation defenses.  Continental's first argument, in its
starkest form, is that there is no policy.  The more nuanced
argument behind which Continental concentrates its weight is that
the Diocese has not met its burden to prove the relevant terms of
the policy, such as a defense obligation.  This situation is not
covered by Sterilite, which presupposes the existence of a policy
with known terms.  In our circumstances, where the policy is
missing and the initial existence of a duty to defend is in
question, it would be extreme (as well as unprecedented, to the
court's knowledge) to impose a present duty to defend on the

---

[14]The issue "discussed so thoughtfully in the Sterilite
Corp. opinion" is "whether, in light of the allegations in a
particular complaint, the insurer has a duty to defend."
Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 407 Mass.
675, 685-86 (1990) (explaining that a declaratory judgment action
is appropriate to resolve that type of dispute and that the
underlying claimant in that type of dispute should be "bound by
any judicial declaration concerning the insurer's duty to defend
because, until there is an unalterable determination as to the
nature of the underlying claim, any declaration of rights
concerning the insurer's duty to defend cannot be conclusive").

insurer.  Later will be soon enough for Continental to reimburse the Diocese for defense costs should the Diocese clear its initial hurdle of proving the relevant terms of the missing policy.

     SO ORDERED.

                                    United States District Judge