Vol. 1 - 1

```
                          Pages:    1 - 111
                          Volume:   1
                          Exhibits: 1 - 3
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 04-10461-DPW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
THE ROMAN CATHOLIC ARCHBISHOP       \*
OF BOSTON, A CORPORATION SOLE,      \*
                         Plaintiff, \*
v.                                   \*
LUMBERMENS MUTUAL CASUALTY          \*
COMPANY,                            \*
                         Defendant. \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JOSEPH M. McENNESS, JR., a 30(b)(6) DESIGNATED WITNESS of THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, taken pursuant to Notice under the applicable provisions of the Federal Rules of Civil Procedure on behalf of the Defendant, before Donna C. St-Aubin, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Robinson & Cole, One Boston Place, Boston, Massachusetts, 02108, commencing on Monday, August 2, 2004, at 10:00 a.m.

**NEAL A. SALLOWAY - COURT REPORTERS**
FIVE CARDIGAN ROAD
WEST PEABODY, MASSACHUSETTS 01960
(781)581-3993 - (978) 535-0313 - FAX:(978)

EXHIBIT
B

```
 1    A.   I believe it was K-A-H-L-E-R.
 2              MR. GALVANI:  I don't think there's
 3         an H.  I think it's K-A-L-E-R.
 4    Q.   They were involved prior to 1955?
 5    A.   That's correct.
 6    Q.   Can you tell me the names of any brokers that
 7         were involved subsequent to 1955?
 8    A.   Subsequent to 1955, it appeared that they went
 9         with Associated Mutuals and then the James S.
10         Kemper Agency.
11    Q.   When did the switch occur to J.S. Kemper, if
12         you know?
13    A.   I don't know that.  I can't ascertain that
14         from the documents I looked at.
15    Q.   And was the J.S. Kemper Company at some point
16         replaced by another broker?
17    A.   I believe they were purchased by another
18         broker.
19    Q.   Who was that?
20    A.   They became Rollins and Burdick,
21         B-U-R-D-I-C-K.
22    Q.   When did that purchase occur?
23    A.   I believe it was the early '80s.
```

1  A.  It appeared to be in the form of minutes.

2  Q.  Minutes of what?

3  A.  It appeared to be in the form of minutes of a
4      discussion or a meeting in which the coverage
5      and proposal for coverage were being outlined,
6      so it's difficult to -- I can't tell.  Not
7      difficult.  I can't tell who actually drafted
8      it.

9  Q.  Was Lumbermens mentioned as one of the
10     providers of insurance in the summary?

11 A.  They were mentioned as the only insurer that
12     was offering a proposal for public liability.

13 Q.  This was in the context of a proposal, not a
14     summary of existing policies?

15 A.  That's correct.

16 Q.  Now, you made reference to a similar proposal
17     that covered some period in the '60s; is that
18     right?

19 A.  Relative to your last question, there was an
20     accompanying document that referenced the
21     binding of liability insurance.  It didn't
22     specify.

23 Q.  It didn't specify what?

```
 1              We -- I questioned the people that were in
 2              charge of the insurance department in the
 3              office prior to my arrival.
 4      Q.      Who was that?
 5      A.      Arthur Power and Paul Fallon.
 6      Q.      Anyone else?
 7      A.      The people that work for me now, yes, that
 8              were present at the time in the '90s prior to
 9              my arrival.
10      Q.      Who would that be?
11      A.      The operations manager, the manager of risk
12              analysis and reporting.
13      Q.      And what are their names?
14      A.      Joan Marie Considine --
15      Q.      I'm sorry.  Joe Marie?
16      A.      Joan Marie Considine and David Huskins
17              (phonetic).  They were in the office for a few
18              years prior to me.  I also sent an inquiry
19              out -- we recently sent an inquiry out to
20              parishes and institutions under my name,
21              requesting a search of all documents that they
22              would have in their possession on a local
23              level and requesting that they forward any
```

1      pertinent documents to Ropes & Gray.
2   Q. Have you received any responses to the parish
3      or institution inquiries?
4   A. Yes, we have.
5   Q. And what were those responses?
6   A. The responses to my office --
7   Q. (Nodded head up and down.)
8   A. -- were that they did conduct a search and
9      that some documents were secured.
10         MR. GALVANI: Those documents, if I
11     may interject, Mr. Tener, have been dribbling
12     in over the last several days. I'll be making
13     a supplemental production to you today of what
14     has been found so far.
15  Q. Mr. McEnness, do you know what has been found
16     thus far from the parishes and institutions?
17  A. Only in general terms.
18  Q. What do you understand has been found?
19  A. There have been a variety of documents
20     including invoices from the Archdiocese of
21     Boston, the insurance department, dating back
22     to the '60s and early '70s, along with
23     letters, a variety of documents, all of which

1         were sent to Ropes & Gray.
2    Q.   Do you know if any actual policies were found
3         in any of the parishes or institutions?
4    A.   No actual policies -- excuse me.  There was
5         one policy that was found, yes.  I believe --
6         I don't recall if it was a parish or an
7         institution that found a policy.  Yes.
8    Q.   Can you tell me what that policy included?
9    A.   I haven't viewed it myself.  It's my
10        understanding that it's a copy of a policy you
11        already have, so it isn't a new document.
12        It's just --
13   Q.   What were the dates, or what are the dates of
14        those policies that have been turned up from
15        the parishes?
16              MR. GALVANI:  That misstates the
17        testimony.  I object.
18   Q.   Oh, I thought I understood you to say one
19        policy had been --
20   A.   Right.
21   Q.   What are the dates of that policy?
22   A.   I don't recall a specific date.  I believe it
23        was the late '70s.

1   Q.   Was any effort made to contact the successors
2        to the James S. Kemper Agency?
3   A.   Yes.
4   Q.   And who were the successors?
5   A.   The Rollins Burdick Group had gone to Aon; it
6        was eventually picked up by Aon or became Aon.
7        They were contacted.  In addition, there were
8        personnel that apparently with the Kemper
9        Agency that Mr. Powers had contacted and
10       counsel had contacted in the '90s, and they
11       pursued that information as well.
12  Q.   Who were the individuals that were contacted?
13  A.   Tony Iarrerati (phonetic).
14  Q.   Anyone else?
15  A.   There was another gentleman.  I believe his
16       name was -- I can't remember the name off the
17       top of my head.  There were statements secured
18       that I saw.
19  Q.   Those have been produced?
20  A.   Yes.
21  Q.   Anyone else contacted that you know?
22  A.   Not that I know of, no.
23  Q.   Was anyone at Aon itself contacted?