11/9/2004  Dennis R. Connolly

```
 1              P R O C E E D I N G S
 2                     - - -
 3              DENNIS R. CONNOLLY, first having
 4    affirmed to tell the truth, the whole
 5    truth, and nothing but the truth,
 6    testified as follows in answer to direct
 7    examination by MR. TENER:
 8                     - - -
 9    Q.   Would you state your name, please?
10    A.   Dennis R. Connolly.
11    Q.   And, Mr. Connolly, you are here on behalf
12         of The Roman Catholic Archbishop of
13         Boston, is that right, as an expert
14         witness?
15    A.   I believe the correct title is the
16         Archbishop.  Yes.
17    Q.   Okay.  Okay.  Why don't we -- at this
18         point when I -- to shorten the deposition
19         and make the dialogue a little more
20         understandable, when I refer to the RCAB,
21         would you agree with me that stands for
22         The Roman Catholic Archbishop of Boston, a
23         corporation?
24    A.   I would.  And if I refer to the Archbishop
```



```
 1        in 1986, and Marsh acquired Johnson &
 2        Higgins in 1997, and I retired from Marsh
 3        this year in May, although I was engaged
 4        for about a year before that on a very
 5        limited circumstance at Marsh.
 6   Q.   The policies that you were familiar with
 7        at Kemper, what time periods were those
 8        policies, if you remember?
 9   A.   Well, I was familiar with insurance
10        policies running from the time that I
11        started working at Liberty Mutual.
12        Liberty Mutual was a -- being a mutual
13        company, being a large worker's comp.
14        insurer in that period of time, trying to
15        become a large casualty insurer -- was
16        more or less in comparable competition
17        with Kemper, and so we were familiar with
18        what Kemper was doing, and we were doing
19        the same thing.
20             So really from 19' -- the answer
21        to your question, I am sorry, is from 1965
22        to more or less the present.
23   Q.   In preparation for today's deposition,
24        what documents did you review, if any?
```

```
 1           the way it worked.  That was the way of
 2           the insurance industry developing this
 3           sort of standardized product.
 4    Q.     Now looking at paragraph 17, you state,
 5           "Based upon my knowledge and experience,
 6           an insured like the RCAB was issued
 7           standard form policies," et cetera.
 8                    What do you mean by "like the
 9           RCAB"?
10    A.     I mean that a company -- well, let's call
11           it a company -- or an entity such as the
12           RCAB would have been treated as, one, in
13           general a desirable insured.  It is the
14           kind of insured that insurance companies
15           would like to have.  In addition, it was a
16           company that had a relatively known set of
17           risks.  That it had some significant
18           worker's comp exposure; it had some
19           significant property exposure; it wasn't a
20           terribly difficult risk.
21                    And so it would have a pretty
22           much standard treatment as far as policy
23           form would be concerned and would be the
24           kind of company that people would compete
```

```
 1        those actual terms for that time period?
 2   A.   No.  But as I have indicated, there would
 3        be no rational reason to not use it.  It
 4        would be as if some video company suddenly
 5        decided that they would have videos of a
 6        different size or lightbulbs with a
 7        different screw pattern.
 8   Q.   You, of course, have not seen the
 9        declaration page for any policies issued
10        by the LMC for the period '61 to '64?
11   A.   That is correct.
12   Q.   And you have not seen any information
13        regarding limits on policies for that
14        period of time, '61 to '64?
15             MR. GALVANI:  Objection.
16   A.   I think in Exhibit H to my -- I am sorry
17        -- yes, Exhibit H to my affidavit, there
18        is reference to the fact that there --
19        yes.
20             (Pause.)
21             (The witness viewing documents.)
22   A.   This is the letter from Mansfield,
23        Connolly -- no relation that I know of --
24        and Gartland to Lumbermens from John J.
```

```
 1    A.    Yes.
 2    Q.    Are you prepared to say that more than
 3          "it would have been"?  For example, are
 4          you prepared to say that it was issued on
 5          a standard 1955 form?
 6    A.    I think it was.  I think for reasons that
 7          I think I have just explained, it is just
 8          improbable that, to use the analogy of the
 9          screw-in lightbulb, that some company
10          would suddenly change the direction in
11          which the screws went.  These were
12          standardized policies, so that you and I
13          and insurance -- and policyholders would
14          not have to read more than once, where
15          each and every time, or for each and every
16          insurer competing for business, you
17          wouldn't have to go through the policy.
18                What you could do is to the
19          extent that there were changes in the
20          policy those would be done by way of
21          endorsement, as, for example, the
22          endorsement waiving the eleemosynary
23          defense, statutory limit.
24    Q.    Again you have no personal knowledge of
```

```
 1    not familiar.  Those would be why we would
 2    turn to IAG, because we didn't have that
 3    expertise.
 4              MR. TENER:  If I could just have
 5    a minute.
 6              (Pause.)
 7              MR. TENER:  I have no further
 8    questions.
 9              MR. GALVANI:  I have a few
10    questions.
11                   CROSS EXAMINATION
12    BY MR. GALVANI:
13 Q. I just had a few questions, Mr. Connolly,
14    to clarify a few things.  You explained
15    that you started work for Liberty Mutual,
16    I believe, in 1965; is that correct?
17 A. That's correct.
18 Q. Now at that time did you become familiar
19    with the extant standard insurance
20    policies -- general liability policies?
21 A. Yes, I did, but I should just reiterate,
22    as I said before, insurance policies
23    respond to claims made years later, so
24    that the -- what is called the tail means
```

```
 1           that when I started defending cases for
 2           Liberty Mutual, most of the policies had
 3           been issued five or ten years before.  So
 4           I was familiar with policies going back
 5           and working with policies going back to
 6           '55, or as I mentioned in that case with
 7           the infant claims, we had policies going
 8           back to the '40s.
 9    Q.     And is it fair to say that the standard
10           form in use in 1965 was that that had been
11           promulgated in 1955?
12    A.     That is correct.  There were a series of
13           what were called major changes, and so
14           policy forms were commonly referred to as
15           the '55 form and the '73 form or the 1986
16           pollution exclusion.
17    Q.     And there was a standard form in 1966?
18           True?  Is that correct?
19    A.     Yes.
20    Q.     And in fact, that is the standard form
21           that is attached to Ms. Zinoman's
22           handwritten memorandum to Morrison,
23           Mahoney & Miller which is attached to your
24           affidavit as Exhibit E?  Is that correct?
```