

**TRESSLER, SODERSTROM, MALONEY & PRIESS**
ATTORNEYS AT LAW

Sears Tower, 22nd Floor
233 S. Wacker Drive
Chicago, Illinois 60606-6308
312/627-4000
Fax 312/627-1717
www.tsmp.com

Patrick E. Maloney
(312) 627-4004
pmaloney@mail.tsmp.com

February 3, 2003

Mr. Augie Vega
Executive Liability Specialist
Kemper Insurance Companies
1 Kemper Drive
Long Grove, IL 60049-0001

    Re:    RCAB Lawsuits
           Your File No: 180 LU 014775
           Our File No: 33-2311-3

Dear Mr. Vega:

    Lawsuits against the RCAB continue to be filed in large numbers. As reported in newspapers, the RCAB is exploring the potential of bankruptcy court protection. For that reason, attorneys from the law firm of Goodwin & Proctor in Boston have been retained to analyze potential assets available to the RCAB. As part of that search, Goodwin & Proctor has raised questions regarding the insurance policies issued to the RCAB by Kemper. Specifically, they question whether any of the Kemper policies have aggregate limits applicable to these claims.

**ISSUES:**

    a.    Do any of the primary policies issued by Kemper have applicable aggregate limits;

    b.    Do any of the umbrella policies issued by Kemper have applicable aggregate limits?

**THE POLICIES:**

I.    <u>Policy Information</u>

---

LINCOLNSHIRE, ILLINOIS      WHEATON, ILLINOIS
COSTA MESA, CALIFORNIA      LOS ANGELES, CALIFORNIA      NEWARK, NEW JERSEY



EXHIBIT E

LM 0000408

Mr. Augie Vega
Page 2
February 3, 2003

    A.    <u>Lines of Coverage</u>

        1.    <u>Primary Policies</u>

Lumbermens Mutual Casualty Company ("LMC") issued two separate and concurrent lines of coverage to the RCAB: the "Parish" policies and the "Institution" policies. The Parish policies had a larger premium than the Institution policies and were written to cover the RCAB, all the parishes and other parish buildings, including schools. The Institution policies were written to cover all remaining exposures and entities of the RCAB. The named insured under both policies was "Roman Catholic Archbishop of Boston, a Corporation Sole, and all Subsidiary, Affiliated, Associated, Allied Companies, Corporation, Firms or Organizations as now or hereinafter constituted for which the Named Insured has the responsibility of placing coverage and for which coverage is not otherwise specifically afforded." The policies under both lines of coverage also contain numerous additional insured endorsements.

        (a)    <u>Primary Policies Alleged to Exist</u>

The coverage file information indicates that LMC and the RCAB have been operating under the assumption that LMC issued primary coverage under the Institution policies from 1964 to 1983 and under the Parish policies from 1971 to 1983.

        (b)    <u>Primary Policies Located to Date</u>

To date, the following primary policies have been located:[1]

**INSTITUTION POLICIES**

| POLICY NUMBER | POLICY PERIOD |
|---|---|
| 4 YL 757 500 | 3-31-74 to 3-31-77 |
| 7 YL 757 500 | 3-31-77 to 3-31-80 |
| 0 YL 757 500 | 3-31-80 to 3-31-83 |

---

[1]    It should be noted that the jackets used for these policies were not contained in the available information.

Mr. Augie Vega
Page 3
February 3, 2003

## PARISH POLICIES

| POLICY NUMBER | POLICY PERIOD |
|---|---|
| 4 YL 64 706 | 9-23-74 to 9-23-77 |
| 7 YL 64 706 | 9-23-77 to 9-23-80 |
| 0 YL 64 706 | 9-23-80 to 3-31-83 |

Copies of the Declarations Pages for the above policies are under Tab 1.[2]

    2.    <u>Umbrella Coverage</u>

It is also alleged that LMC issued umbrella coverage to the RCAB from 9-23-77 to 3-31-83, and the parties have been operating under that assumption. However, no complete umbrella policy has been located. The *only* umbrella policy information found to date is a marked up Declarations Page for policy 1 SX 002 269, effective 9-23-81 to 9-23-82.

For purposes of this evaluation, the jacket deemed most likely to have been issued with the policy has been analyzed. However, it has not been conclusively determined that this is the correct jacket. A copy of the Declarations Page and the assumed jacket for this umbrella policy are under Tab 2.

    B.    <u>Aggregate Issue</u>

All of the located primary policies indicate that they have a $300,000 per occurrence limit with a $300,000 aggregate with regard to bodily injury. The located Declarations Page of the umbrella policy indicates that the policy has a $10,000,000 per occurrence limit with a $10,000,000 aggregate.

The primary policies all contain the following provisions regarding limits of liability:

> The total liability of the company for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limits of bodily injury liability

---

[2]    Although not noted on the Declarations Page, Parish policy number 0 YL 64 706 was cancelled 3-31-83.

Mr. Augie Vega
Page 4
February 3, 2003

> stated in the declarations as applicable to "each occurrence." Subject to the above provisions respecting "each occurrence," the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate."

The jacket which is believed to have been utilized with the umbrella policy contains the following provisions regarding limits of liability:

> Regardless of the number of persons or organizations who are insureds under the policy and regardless of the nature and number of claims made or suits brought against any or all insureds, the total limit of the company's liability for any one occurrence shall be the ultimate net loss resulting therefrom in excess of the underlying limit; provided, however, the company's liability is further limited to the amount stated in the declarations as the aggregate limit with respect to all ultimate net loss resulting from one or more occurrences during each annual period while this policy is in force commencing from its effective date and arising out of (1) products-completed operations liability, or (2) occupational diseases of employees of insureds, such aggregate limit applying separately to (1) and (2).

    C.    <u>Definition of "Occurrence"</u>

        1.    <u>Primary Policies</u>

As noted above, applicable jackets for the primary policies have not been located. However, Kemper policy jackets utilized during that time-frame generally define "occurrence" as "an accident, including injurious exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." These policies also state that "this insurance applies only to bodily injury or property damage which occurs during the policy period."

        2.    <u>Umbrella Policy</u>

The jacket which is believed to have been used with the umbrella policy defines "occurrence" as:

LM 0000411

Mr. Augie Vega
Page 5
February 3, 2003

> An accident including continuous or repeated exposure to conditions, which results during the policy period, in a personal injury, property or advertising liability neither expected nor intended from the standpoint of the insured.....

It should be noted that the umbrella policy jacket states that the "occurrence" must take place during policy period in order for there to be potential coverage.

### D. Miscellaneous Provisions

#### 1. Severability of Interests Provisions

The Institutional primary policies all contain a severability of interests endorsement that states:

> It is agreed that the limits of the company's liability applies separately with respect to each insured against whom claim is made or suit brought and the definition of the insured and the limits of liability provisions are amended accordingly.

The purported umbrella policy jacket states as follows:

> The insurance afforded applies separately to each insured against whom claim is made or suit is brought, but the inclusion herein of more than one insured shall not operate to increase the limits of the company's liability.

Pursuant to this language, regardless of the number of insured in a lawsuit, the limits of the umbrella policy will remain the same.

## HISTORICAL HANDLING:

### The Primary Policies:

Our records show Kemper first received claims alleging sexual abuse submitted by the RCAB in 1993. The RCAB claimed Kemper provided coverage from 1954 through 1983. Kemper's initial search for policies reflected evidence of coverage from September 1971 to September of 1983, but coverage was disclaimed in twenty-one lawsuits on the basis of no bodily injury, no property damage and no occurrence.

LM 0000412

Mr. Augie Vega
Page 6
February 3, 2003

In early 1995, Ms. Zinoman of the Summit, New Jersey office "unearthed" a box of policy information and identified "2 distinct sets of policy information going from 1971-March of 1983 including a $10,000,000 umbrella policy in the early 80's". (See Tab A).

Legal opinions were obtained from the law firm of Morrison, Mahoney & Miller in Boston recommending a defense of the claims under a reservation of rights, and also recommending that Kemper reimburse the RCAB for claims previously denied but settled by the Archdiocese. An internal memorandum of March 30, 1995 attaches a detailed history and excellent summary of these matters. (See Tab B). The memorandum states that there was a $300,000 aggregate for each policy year.

Kemper met with attorneys for RCAB on June 1, 1995 to discuss and resolve outstanding issues. A summary of that meeting is contained in a July 7, 1995 letter from Attorney Rogers. (See Tab C). At that time, the RCAB still alleged it had primary coverage with Kemper as early as 1955. Next, our file contains a memorandum of Ms. Zinoman stating that stats actuarial has come up with policy numbers and information back to 1964, but no policies. (See Tab D).

Attorney Rogers then sent a letter to Kemper dated April 22, 1996 stating that Kemper has acknowledged primary coverage from March 31, 1964 to March 31, 1983. On July 30, 1996, Ms. Zinoman sent a letter to Mr. Rogers listing aggregate limits of $300,000 for the years 1964-1968. (See Tab E).

There are numerous references in correspondence between Kemper and the RCAB to the existence and balance of aggregate limits and matters that Kemper agreed to. For example, in a letter dated 6/23/97, attorney Rogers states: "…it has been our understanding that Kemper Insurance had agreed to indemnify the Roman Catholic Archbishop of Boston, a Corporation Sole, by assigning claims to policy years in which there was sufficient aggregate available, so long as a portion of the alleged abuse occurred in those policy years." (See Tab F). On July 14, 1998, Paul Meany of Kemper wrote to Mr. Rogers stating that the aggregates on all primary policies from 1964-1977 had been exhausted. (See Tab G). In response to a request for issuance of coverage information from a plaintiff attorney, the Rogers law firm drafted a letter dated March 9, 2000 stating that the limits of all primary policies have been exhausted. (See Tab H). Finally, on May 16, 2000 Attorney Rogers sent a letter to the RCAB Manager of Insurance Claims regarding: "…the agreement which was reached with respect to outstanding indemnity owed to RCAB by Kemper Insurance. As you are aware, all primary policies which RCAB had in place with Kemper Insurance have now been exhausted." (See Tab I).

LM 0000413

Mr. Augie Vega
Page 7
February 3, 2003

Clearly, concessions and compromises were made throughout the years Kemper handled these claims. Kemper and the RCAB always treated every primary policy as having a $300,000 aggregate. Kemper agreed to many settlements on that basis and the RCAB kept detailed records.

<u>The Umbrella Policies</u>:

Many of the memoranda referenced above address the existence or non-existence of umbrella policies. Several memoranda and letters reference "complete" copies of umbrella policies from September 1977-March 1983. However, a complete search of all documents provided by Kemper does <u>not</u> reveal the existence of any umbrella policies. All we have is a simple declaration page regarding a 1981-1982 policy.

The RCAB maintained for years that we issued umbrella policies for the years 1973-1977 as well. We negotiated a written buy back agreement as to that dispute. (See Tab J).

Because we have no umbrella policies, there is now a question as to the existence of the policies and/or aggregate limits under the policies. Under the coverage part 7 in effect for 1977-1983 the aggregate limits only apply to Products Liability/Completed Operations claims and occupational disease claims.

## CLAIMS and LAWSUITS:

The Rogers law firm sends periodic updates regarding the number of claims and lawsuits pending against the RCAB and individual defendants. Up to this point, we have been tracking those lawsuits which allege any abuse as taking place between 1977 and 1983. The exact number changes based upon settlements, dismissals and receipt of new claims. At the present, our records show 134 open claims or lawsuits alleging abuse between 1977 and 1983. Those 130 plaintiffs allege sexual abuse by 40 different priests.

If we would expand the focus of the cases we are tracking to include the years 1974 to 1983, we would be looking at 186 plaintiffs alleging sexual abuse by 46 different priests. If we would further expand the focus of the cases we are tracking to include all claims prior to and including 1983, we would be looking at 313 plaintiffs alleging sexual abuse by 69 different priests.

Mr. Augie Vega
Page 8
February 3, 2003

## CURRENT METHOD OF HANDLING:

At the present, the RCAB lawsuits are being handled on the basis that: 1) all primary policy limits have been exhausted; 2) umbrella coverage exists from September, 1977 to March of 1983; 3) the umbrella policies have aggregate limits; 4) defense costs are included in the definition of ultimate net loss and thus erode limits; and 5) the cases are being defended under a general reservation of rights.

Over the last nine months or so, monthly defense costs have increased dramatically. The Rogers firm has doubled their billing rates, additional attorneys have been retained to defend Cardinal Law and the RCAB, and even the Goodwin & Proctor firm (bankruptcy counsel) is submitting their bills to Kemper. There is a dispute as to which bills are payable under our policies and how much. It should be noted, however, that under Massachusetts law, Kemper forfeits the right to control the defense when the defense is provided pursuant to a reservation of rights.

### Trigger of Coverage:

As currently being handled by carriers, a policy is considered to be triggered (for defense cost sharing) if there is any allegation of abuse of a child during that policy period. If there are allegations of abuse taking place prior to 1977 or after 1983 only, Kemper does not participate in the defense. If all allegations of abuse take place during the Kemper coverage years (1977-1983), then Kemper pays the entire defense. If the allegations of abuse span the Kemper coverage years and the Travelers years (post 1983), the defense is shared with Travelers.

### "OCCURRENCE"

The issues of what is the "occurrence" and the number of "occurrences" are key considerations in these issues. In a typical case, where a child is abused by a priest, the offending priest is <u>not</u> named as a defendant in the lawsuit. (Of course, there would be no insurance coverage for the abuser since his conduct would be intentional.) Rather, the typical defendants in these cases are the RCAB and various Cardinals, Bishops, and other so-called supervisory priests, and the significant allegations center around the failure to properly supervise or control the activities of the priest-abusers. Hence, we maintain that the alleged failure to supervise constitutes the "occurrence" as far as insurance coverage is determined. Further, we maintain that the totality of the alleged conduct of failure to supervise or control the activities of a priest abuser constitutes one occurrence. To the extent, or at the point when evidence shows that the

LM 0000415

Mr. Augie Vega
Page 9
February 3, 2003

supervisory defendants knew of the conduct of a priest-abuser and intentionally allowed him the opportunity to continue, then we maintain there is no occurrence.

**RECOMMENDATIONS and ALTERNATIVES:**

    a. Agreement on Aggregates:

The RCAB and KEMPER have handled these cases over the course of ten years by resolving all disputes on an agreed basis. Kemper conceded on years of coverage for which it has no policies and aggregates were agreed upon. The RCAB has been given tremendous leeway and freedom to handle and settle these cases independently all with the understanding that all policies had aggregate limits. No one has ever questioned the existence of aggregate limits until now. We suggest that Kemper and RCAB meet and reduce to writing an agreement as to aggregate limits on all policies: primary and umbrella. There are compelling reasons for both Kemper and RCAB to do so. Most important, it is the surest route to early resolution of all these cases.

The plaintiffs, RCAB, and all insurance carriers have agreed to global mediation of all outstanding lawsuits. In fact, discovery is basically stayed in all of these cases for 90 days pending mediation efforts. Kemper's willingness to participate in the mediation in a meaningful way may be a major factor in reaching a written agreement on aggregate limits.

    b. Mediation and/or Lump Sum Settlement:

Assuming Kemper has aggregate limits on the umbrella policies, Kemper should consider now a lump sum settlement with RCAB, or, in the alternative, be prepared to offer a lump sum to settle all current matters in the pending mediation. Because of the dispute as to aggregates and/or their level of exhaustion, such lump sum may have to exceed the amount we show as remaining aggregates.

    c. Failure to Agree on Aggregates and Declaratory Judgment:

If agreement cannot be reached on aggregate limits, then the RCAB will basically be taking the position that Kemper has unlimited coverage. A declaratory judgment would be required to determine the respective rights of the parties. The pivotal issue beyond aggregate limits, would be "occurrence" and "number of occurrences". The stakes in such litigation would be quite high for Kemper and the RCAB.

LM 0000416

Mr. Augie Vega
Page 10
February 3, 2003

### CONCLUSION:

We strongly recommend that an effort be made to reach a final and written agreement with the RCAB regarding aggregate limits. I look forward to discussing the approach you would like to follow.

Very truly yours,

Patrick E. Maloney

PEM/kjs/292960

LM 0000417