# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A Corporation Sole, <br><br> Plaintiff, <br><br> v. <br><br> LUMBERMENS MUTUAL CASUALTY COMPANY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)  Civil Action No. 04-10461-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FOR THE IMPOSITION OF SANCTIONS

### Introduction

The RCAB has improperly withheld documents from production, and as a result, has severely impaired LMC's ability to defend this case and to prosecute its counterclaims. Specifically, the RCAB has obstructed LMC's efforts to obtain documents provided by the RCAB to the Attorney General's Office, which led that office to conclude that "for at least six decades, three successive Archbishops, their Bishops and others in positions of authority within the Archdiocese . . . chose to protect the image and reputation of their institution rather than the safety and well-being of the children entrusted to their care." *The Sexual Abuse of Children in the Roman Catholic Archdiocese of Boston,* p.73 ("AG's Report"). A copy of the AG's Report is attached as Exhibit A to the Affidavit of Anthony R. Zelle, which is submitted in support of this motion ("Zelle Aff."). The documents that led the Office of the Attorney General to reach this

conclusion are relevant to the RCAB's insurance coverage claims, because there is no coverage for bodily injury that results from institutionalized policies and practices which establish that the ensuing harm was not fortuitous.

In addition to its refusal to produce the documents provided to the Attorney General's Office and its obstruction of efforts by LMC's counsel to obtain them through the Attorney General's Office, the RCAB has concealed the existence of relevant documents, and withheld others on the basis of untenable privileges. The existence and authenticity of these documents, which were obtained by LMC through independent investigation, was confirmed by recent deposition testimony of Gilbert S. Phinn, the RCAB's former Director of Clergy Personnel.

Because RCAB has flouted its discovery obligations and thereby severely prejudiced LMC's efforts to develop evidence through depositions, LMC respectfully requests this Court to sanction the RCAB by ordering the RCAB to: (1) produce all of the documents that it provided to the Attorney General; (2) produce all documents within its possession, custody, or control which relate to "information from the [RCAB]'s files that touch upon prior notice of [abuse]," pursuant to its automatic disclosure obligations as required by the Court's Scheduling Order of June 3, 2004; (3) produce all documents within its possession, custody, or control which are responsive to LMC's October 15, 2004 Request for Production of Documents; and (4) pay LMC $50,000 to compensate LMC for a portion of the attorneys fees and costs incurred to determine that the RCAB had consciously disregarded its discovery obligations. Furthermore, LMC respectfully requests this Court to **stay** all pending discovery deadlines in this matter until such time as the RCAB has satisfied its foregoing production obligations.

## ARGUMENT

### I.     The RCAB Has Improperly Withheld from LMC the Documents that Were Provided to the Attorney General's Office.

LMC's counterclaims and defenses are based largely upon the independently-reached conclusions detailed in AG's Report.  From January 2002 to July 2003, the Attorney General's office conducted an extensive investigation of the RCAB's policies, practices, and procedures regarding allegations of clergy sexual abuse of children.  Based on the documents provided to the Attorney General's office by the RCAB during this investigation, the Attorney General concluded that "[f]or more than fifty years there has been an institutional acceptance within the Archdiocese of clergy sexual abuse of children."[1] AG's Report, p. 16.  This determination was founded, in part, upon the following explicit "Findings & Conclusions":

- Top RCAB officials knew the extent of the RCAB's clergy sexual abuse problem for many years before it became known to the public;

- The RCAB's response to reports of sexual abuse of children, including maintaining secrecy of reports, placed children at risk;

- The RCAB did not notify law enforcement authorities of clergy sexual abuse allegations;

- The RCAB did not provide all relevant information to law enforcement authorities during criminal investigations;

- The RCAB failed to conduct thorough investigations of clergy sexual abuse allegations;

- The RCAB placed children at risk by transferring abusive priests to other parishes;

- The RCAB placed children at risk by accepting abusive priests from other parishes;

- The RCAB placed children at risk by transferring abusive priests to other Dioceses in the United States and abroad.

AG's Report, pp. 25, 30, 52, 54, 57, 59, 63, and 65.

---

[1] Contrary to the assertions made by the RCAB at past hearings before this Court, the Attorney General's investigation was not limited to the period of time after which Cardinal Law became the Archbishop.

The AG's report makes clear that its findings and conclusions are based, in no small part, upon its review of thousands of documents obtained from the RCAB's own files.[2]  Between April 7, 2002 and July 3, 2002, the Attorney General made twelve document requests to the RCAB, asking the RCAB to voluntarily produce records pertaining to the general issue of sexual abuse of children, as well as all records detailing allegations of sexual abuse of any child since 1960.[3]  However, based on the slow pace at which the RCAB was producing records, and its refusal to voluntarily produce certain categories of important documents, including medical and psychological records of priests evaluated or treated for pedophilia or ephebophilia, and correspondence with the Vatican and the Papal Nuncio, the AG's Office was forced to initiate a grand jury investigation. AG's Report, Appendix 1, p. 1-3.  Thereafter, the Attorney General's Office issued fifty-three *subpoenas duces tecum*, and compelled the RCAB to produce documents relating to allegations of sexual abuse of children by priests and other RCAB workers; clergy sexual abuse investigations conducted by the RCAB; policies, procedures, memoranda and other documents dealing with the sexual abuse of children; and personnel records, including review board and disciplinary records, as well as records of psychiatric and psychological evaluations, counseling, and treatment of priests and other RCAB workers alleged to have sexually abused children.  AG's Report, Appendix 1, p. 1-4.

In the present case, the availability of insurance coverage for the RCAB's claims depends, in part, on the RCAB's notice and knowledge of the acts of sexual abuse that were committed by its priests.  While the RCAB has failed to produce to LMC the documents it

---

[2] The AG's report quotes a figure of "more than 30,000 pages of documents."  *See* AG's Report at Appendix 1: Scope of the Attorney General's Investigation (Appendix 1"), p. 1-1.  In a December 7, 2004 conversation with Attorney Zelle, Kurt Schwartz, Chief of the Criminal Bureau of Office of the Attorney General, stated that there were approximately 100 boxes of documents that were obtained from the RCAB.  *See* Zelle Affidavit at ¶ 6.

[3] Again, this refutes the RCAB's assertion that the Attorney general's investigation was limited to the period of Cardinal Law's tenure as Archbishop.

provided to the Attorney General's Office, the AG's Report suggests that the documents reflect that the RCAB was aware of sexual abuse by priests and that the frequency of this abuse was so alarming that it is difficult to comprehend.   As such, the documents provided by the RCAB to the Attorney General's office are not merely "reasonably likely to lead to the discovery" of evidence supporting LMC's defenses and counterclaims, but are, clearly, highly probative of them.   In short, the documents provided by the RCAB to the Attorney General's Office and withheld from its production to LMC will show that based on the terms and conditions of the insurance policies issued by LMC, and the public policy which supports the reallocation of risk through liability insurance, there can be no coverage because the harm for which coverage is sought resulted from an "an institutional acceptance . . . of clergy sexual abuse of children." AG's Report, p. 73.

To date, despite LMC's express request for production of all documents produced to the AG's Office, the RCAB continues to withhold the documents.   Indeed, as evidenced by the following exchange during the hearing held on November 23, 2004, RCAB's counsel made clear that the RCAB could not even determine the documents that had been produced:

> THE COURT:  So, what's the problem with turning over what you have given to the Attorney General?
>
> Mr. GALVANI:  Well, see, a lot of it has no bearing.
>
> THE COURT:  Okay.  So that having been said, what's the practical problem?
>
> MR. GALVANI:  Well. One practical problem, frankly, Your Honor, is that we're not sure we can even identify what was turned over to the Attorney General.  []
>
> THE COURT:  Well, but the stuff that you turned over, you don't think you can identify?

> MR. GALVANI:  Well, I'm told that that is not as easy as one might think.  []

Zelle Aff., Ex. B, 5:17-6:10.

Following the Scheduling Conference, one of the attorneys representing LMC, Anthony Zelle, contacted Kurt Schwartz, the Chief of the Criminal Bureau of the Office of the Attorney General, in connection with LMC's efforts to obtain documents provided by the RCAB to the Attorney General's Office.  Zelle Aff., ¶ 5.  Attorney Schwartz informed Attorney Zelle that if the RCAB requested a copy of the documents the RCAB provided to the Attorney General's Office, the Office of the Attorney General would make the documents available for copying, provided that the expense of the copying and any attendant financial burden incurred by the Office of the Attorney General would be covered.  Zelle Aff., ¶ 6.  Attorney Schwartz estimated that there were 100 boxes of documents.  *Id*.  By letter of December 7, 2004, Attorney Zelle wrote to one of the attorneys for the RCAB, Paul Galvani, and in pertinent part the letter states:

> You suggested at the last scheduling conference, the RCAB did not maintain a complete set of the documents provided to the Attorney General by the Law Offices of Wilson D. Rogers and others.  If this is the case (and we have been informed by the Attorney General's Office that original documents were produced and may not have been copied), I would like to know the RCAB's plan for producing all of these documents.  We have spoken with the Attorney General's Office and in response to a request from the RCAB, they will work with us and with you to ensure that a full and complete disclosure is accomplished.  However, this will require time, which is of the essence, and consequently, I will appreciate your immediate response to these matters.

Zelle Aff., ¶ 7 and Exhibit E attached thereto. Attorney Galvani has not responded to Attorney Zelle's request to work with him and Attorney Schwartz in connection with the production of the materials provided by the RCAB to the Attorney General's Office. Zelle Aff., ¶ 8.

6

While there is no legally cognizable basis for the RCAB to withhold them, the RCAB continues to frivolously refuse to produce the documents it provided to the AG's Office. For example, the RCAB's objection to producing documents relating to periods for which LMC did not provide insurance coverage, on relevance grounds, is patently meritless.[4]    Documents reflecting the manner in which the RCAB handled complaints of sexual abuse and the priests whose conduct gave rise to the complaints, before and after the LMC policy period, are reasonably likely to lead to the discovery of admissible evidence of the policies, practices, and procedures that were in effect during the time LMC insured the RCAB. Insofar as the documents led the Attorney General's Office to conclude that "for at least six decades, three successive Archbishops, their Bishops and others in positions of authority within the Archdiocese . . . chose to protect the image and reputation of their institution rather than the safety and well-being of the children entrusted to their care," they likewise support the conclusion that there is no coverage for bodily injury that results from these deliberate, institutionalized practices. Equally frivolous is the RCAB's objection that LMC's request for the documents provided to the Attorney General exceeds the scope of discovery as delineated by the Court, and is a blatant mischaracterization of the Court's Scheduling Order of June 3, 2003. A copy of the June 3, 2003 Scheduling Order is attached to the Affidavit of Brian P. McDonough ("McDonough Aff.") filed in support of this motion, at Ex. C. That order only spoke to the RCAB's automatic disclosure obligations in Phase I, and was in no way intended to prohibit LMC from requesting documents material to it defenses and counterclaims during Phase II.[5]

---

[4] *See*, The RCAB's Response to Defendant's First Request for the Production of Documents ("RCAB's Document Responses"), at Response No. 1, a copy of which is attached to the Zelle Affidavit as Ex. C.

[5] The documents provided by the RCAB should have been disclosed in July as part of the RCAB's initial disclosure; however, for the purpose of the present motion for sanctions, the RCAB's continued failure to produce them, and its reliance upon frivolous objections to LMC Requests for Production, is sufficient to support an order compelling their production and awarding the sanctions requested by LMC.

Most troubling, however, is the RCAB's contention that it need only produce "non-privileged" documents that it provided to the AG's Office. *See,* Zelle Aff., Ex. C, Response to Request No. 1. As a matter of law, in producing documents to the AG's Office, the RCAB waived any privileges or protections which may have attached. *See,* <u>United States v. Massachusetts Institute of Technology</u>, 129 F.3d 681, 685-86 (1st Cir. 1997) (MIT's disclosure of privileged documents to a government agency (the Defense Contract Audit Agency), a potential adversary, constituted a waiver of privilege requiring production of the same documents in subsequent investigation by the IRS); <u>In Re: Lupron® Marketing and Sales Practice Litigation</u>, 313 F.Supp.2d 8, 11 (D. Mass. 2004) ("that the disclosure in <u>MIT</u> was to a second government agency rather than a private party is of no consequence"). Indeed, as the RCAB has strenuously argued previously in this case, in producing documents to the AG's Office, the RCAB also has waived any attorney-client privilege or work product protection for all documents relating to the subject matters addressed in those documents.[6]

As there can be no legitimate dispute that the RCAB waived any privilege that may have applied to the documents it turned over to the Attorney General's Office, it is clear that the RCAB's privilege logs in this case were prepared with a conscious disregard of the privilege waivers that resulted from this production. Moreover, based on Mr. Galvani's representations to the Court at the hearing of November 23, 2004, that the RCAB had not, and could not, determine which documents were produced to the AG's Office, he violated Rule 11 by asserting privilege over documents without determining whether they were turned over to the Attorney General's Office. The RCAB's discovery abuse is compounded by the fact that the RCAB and its counsel have actively obstructed LMC's efforts to facilitate the production of the documents provided to

---

[6] *See* arguments and citations set forth in RCAB's Motion to Compel the Production of Documents, filed on September 3, 2004.

the Attorney General's Office. Attorney Zelle informed Attorney Galvani that upon a request by the RCAB, the Attorney General's Criminal Bureau Chief would to provide a complete copy of all of the documents provided to the Attorney General's Office by the RCAB and asked Attorney Galvani to make the request.   Attorney Galvani ignored Mr. Zelle's letter and the RCAB maintains its untenable position concerning the documents provided to the Attorney General's Office, despite Attorney Galvani's admission that "we're not sure we can even identify what was turned over to the Attorney General."

## II.    Deposition Testimony of the Reverend Gilbert S. Phinn Confirms That the RCAB Has Improperly Withheld Documents Concerning the RCAB's Notice and Knowledge of Sexual Abuse by Priests.

On January 7, 2005, LMC conducted the deposition of the Rev. Gilbert S. Phinn. A complete copy of the deposition of Father Phinn ("Phinn Dep.") and the 27 exhibits marked thereat, are attached as Exhibit A to the McDonough Affidavit.  Fr. Phinn served as Assistant-Director of the RCAB's Clergy Personnel Office from 1973 to 1979, and as Director of that office from 1979 to 1983.  In his deposition, Fr. Phinn testified at length as to his personal involvement in the transfer and assignment of a priest whom he knew had sexually molested children, the former Reverend Robert M. Burns (since incarcerated and defrocked, in that order). He also testified about a complaint he received in October of 1980 regarding the molestation of two children by Reverend Paul Finegan.  Through this testimony, he identified and authenticated documents that were maintained by the RCAB that have been concealed from LMC in this litigation.  LMC obtained them through its independent investigation.  These documents should have been produced as part of the RCAB's automatic disclosure obligations, and were specifically requested in LMC's Request for Production of Documents.

A.    **The RCAB has Concealed and Withheld Documents Concerning the RCAB's Notice of Sexual Molestation of Children by Father Burns.**

Fr. Burns was twice assigned by the RCAB to serve as an Associate Pastor in parishes in Boston.  Prior to the first assignment, the RCAB had a medical report from the House of Affirmation, a psychiatric treatment center in which Fr. Burns was treated for molesting children while working as a pastor in Ohio.  The medical report "clearly stated that Father Burns ought not receive an assignment that placed him in a position to minister to minors." *See* Phinn Dep., 88:3-90:2; Exs. 16, 17, and 17A.  The RCAB seeks insurance coverage under the LMC policies for sums paid to settle claims by six victims of Fr. Burns, who were abused while Fr. Burns was assigned to the RCAB parishes.  The RCAB has not produced the medical report, nor has it identified it on its privilege log.

On March 4, 1999, the Most Reverend James W. Malone, retired Bishop of the Diocese of Youngstown, Ohio ("Bishop Malone"), gave a sworn affidavit concerning the facts and circumstances surrounding the 1982 transfer of Father Burns from his diocese to the RCAB. ("Malone Affidavit").  Phinn Dep., Ex. 6.  Bishop Malone swore, *inter alia*, that he agreed to transfer Father Burns, who had previously sexually abused children in the Diocese of Youngstown, to the RCAB, only after:

> Bishop Hughes and Father Phinn both assured me that they were fully aware of Father Burns' history, that he had been receiving treatment, and that any assignment he would be given would be subject to the recommendation of his counselors and would not allow him to be in a position where he would have contact with young boys.

Phinn Dep., Ex. 6, ¶ 11.  Despite the fact that the RCAB's attorneys were served with a copy of this affidavit as recently as July 21, 2003, the RCAB has withheld it from production in this

case.[7]  Clearly the document relates to the RCAB's prior notice of abuse, and thus reflects the RCAB's conscious disregard of this Court's Order concerning the documents the RCAB was required to produce in its initial disclosure.

Fr. Phinn also identified and authenticated documents, which have not been produced by the RCAB, and that he testified were created and maintained by himself and the assistant directors of the Office of Clergy Personnel. These included pages of notes from a document that Fr. Phinn described as a "journal."  Phinn Dep., 44:17-45:19 and Exs. 2, 3 and 4.  One page from the journal, marked as Exhibit 2 during his deposition, reflects the RCAB's knowledge of Fr. Burns sexual abuse of children prior to his assignment within the RCAB.  Phinn Dep., 43:22-44:7.  The notes state:

> Robert Burns
>
> > From Youngstown Ohio – comes on recommenda-
> > tion of Bp. [Bishop] Al Hughes
> > has been at H of A [House of Affirmation] for 1 year.
> > Problem:  little children.

When questioned about the source of these notes, Fr. Phinn indicated that they came from a daily journal kept by him throughout his ten years in the Personnel Office.  Phinn Dep., 44:17-45:19. He further testified that such journals were kept as a matter of office policy and procedure by each of the Assistant-Directors, as well as the Director, himself, and that the journals were intended to track all activity in which each such person was engaged throughout the day.  *Id.*

Two other journal notes prepared by Fr. Phinn, which have been concealed by the RCAB, also relate to the RCAB's notice and knowledge of prior abuse by Father Burns.  Notes dated October 19, 1982, indicate that Bishop Thomas V. Daily had "reservations" about assigning

---

[7] Through independent investigation, LMC discovered that this affidavit was served on the RCAB as an exhibit to *Plaintiffs' Memorandum of Law in Support of their Motion in Limine to Admit Evidence of Practices and Policies of the RCAB Concerning Sexually Abusive Priests*, which was filed in an action entitled Ford, et al. v. Bernard Cardinal Law, et al., Suffolk Superior Court No. 02-04551-T1.

Father Burns in the RCAB.  Phinn Dep., Ex. 3.  Notes dated October 27, 1982, indicate that Cardinal Humberto S. Medeiros similarly had "reservations" about assigning Father Burns in the RCAB, that Fr. Phinn felt "that [Father. Burns] should not be placed where there is a school," and that Fr. Phinn had asked for a placement recommendation from the House of Affirmation. Phinn Dep., Ex. 4.

Father Phinn's journal notes are not the only documents relating to the RCAB's notice and knowledge of prior abuse by Father Burns that the RCAB has failed to produce.  Exhibits 16 and 17 to Fr. Phinn's deposition refer to "The October 27, 1982 report from the House of Affirmation to Reverend Gilbert Phinn, Director of the Office of Clergy Personnel (copy enclosed), [which] clearly stated that Father Burns ought not receive an assignment that placed him in a position to minister to minors."  Father Phinn testified that this medical report, as well as any document relating to a priest within the RCAB that was received by the Clergy Personnel Office, would be placed in the priest's personnel file that was physically maintained in that office.  Phinn Dep. 124:9-124-20.  This medical report has not been produced.  Moreover, Fr. Phinn testified that the Clergy Personnel Office, where he worked from 1973-1983, was not located in the Chancery Building.  Phinn Dep., 45:2–45:8.  Since the RCAB's Answer to Interrogatory No. 10, states "that for the period 1955-1983, priest personnel files were maintained by the RCAB at the Chancery Building," there may have been multiple personnel files, which is consistent with Fr. Phinn's testimony, but which controverts the RCAB's false and misleading interrogatory answer stating that the only personnel files were kept in the Chancery Building.  The RCAB's Answers to LMC's Interrogatories are attached to the McDonough Affidavit at Ex. L.  Even more duplicitous is the RCAB's statement in its Answer to Interrogatory No. 10 that "Contained in these [personnel] files would be all information relative

to priest assignments . . . but excluding information of a confidential nature such as medical reports . . . the RCAB is unaware of any circumstances under which documents have been removed from personnel files for maintenance elsewhere." *Id.*   According to Fr. Phinn, the House of Affirmation report concerning Fr. Burns sent to him at the Office of Clergy Personnel was filed in the personnel file of Fr. Burns that was maintained in the Office of Clergy Personnel.  Phinn Dep., 124:9-124:20.  Withholding this medical report not only constitutes another violation of the RCAB's obligation to automatically disclose documents relating to its prior notice of abuse, but clearly indicates that the RCAB has not produced complete copies of all of the priests' personnel files.  In its Requests for Production, LMC specifically sought "[t]he personnel files and 'confidential files' of all priests whose alleged conduct gave rise to claims for which the RCAB has claimed or is claiming coverage."  Zelle Aff., Ex. C, Request No. 7.

There is nothing among the documents provided by the RCAB in its initial disclosure that even resembles a personnel file, which, according to Fr. Phinn, would include, among other things,  the assignment card, biographical data, medical records or notations concerning medical care, letters of praise or complaint, notes made by the Office of Clergy Personnel concerning the priest's assignment or transfer, copies of correspondence with the Archbishop and other RCAB officials, and seminary records.[8]  There were no personnel files provided by the RCAB in its initial disclosure and it has not produced any documents in response to LMC's October 15, 2004 Requests for Production seeking, *inter alia*, "[t]he personnel files and 'confidential files' of all priests whose alleged conduct gave rise to claims for which the RCAB has claimed or is claiming coverage."  Zelle Aff., Ex. C, Request No. 7.

---

[8] The only documents produced by the RCAB in response to LMC's October 15, 2004 Requests for Production, 184 priest assignment cards, were provided on January 7, 2005, *after* the deposition of Fr. Phinn.  These documents should have been produced six months earlier in the RCAB's initial disclosure.  The RCAB has provided no explanation for their late production.

On December 17, 2004, counsel for LMC wrote to the RCAB's counsel requesting that it provide the range of Bates numbers where the priest personnel files could be located. McDonough Aff., Ex. D. In an e-mail response on December 22, 2004, the RCAB's counsel represented "[o]n August 13, 2004, the RCAB produced the relevant portions of the priest files, as required by the Court in its order dated June 3, 2004. Those documents were produced in electronic format, and fall within the bates-range RCA 1500001 - RCA 1501879. In addition to the documents, we produced a separate privilege log titled "RCAB PRIVILEGE LOG (PRIEST PERSONNEL FILES)" on August 13, 2004." McDonough Aff., Ex. E.

Counsel for LMC has examined all 1,879 documents in the Bates range provided by the RCAB's counsel. McDonough Aff., ¶3. The documents do not include copies of documents which would otherwise be in a priest's personnel file including, but not limited to, assignment cards, or other documents identified by Fr. Phinn. *Id.*, ¶4. The documents within the specified Bates range consist mostly of pleadings and motions made in the underlying cases, and demand letters from plaintiffs' counsel. *Id.*, ¶5. Whatever the source(s) of these documents, as undeniably confirmed by the absence of any assignment cards therein, they most assuredly do not represent the complete personnel files that have been requested.

In addition to the personnel files maintained by the Clergy Personnel Office, Father Phinn testified that personnel files were also maintained by other offices within the RCAB. The existence of other such personnel files is evidenced by yet another document withheld by the RCAB, namely, a "Personal and Confidential" memorandum dated March 21, 1996, from Rev. Brian M. Flatley, Assistant to the Secretary for Ministerial Personnel, to the "File." Phinn Dep., Ex. 15. This memorandum, which details Reverend Flatley's telephone conversation of that date with an anonymous victim of Father Burns, states:

14

> I responded that we knew that [Father Burns] had been involved in sexual
> misconduct in his past but we were told that there was very little chance that he
> would act out again.  We thought he was cured.  The young man expressed
> disbelief at this.  He asked if we told anyone at Saint Thomas Aquinas about
> Father Burns' past.  I said no, that Father Thomas knew nothing.  He asked how
> we could have done that.  I told him that there is no good explanation.

In withholding this document, once again the RCAB has violated its obligation to automatically

disclose documents relating to prior knowledge of abuse, as well as its obligation to produce

"[t]he personnel files and 'confidential files' of all priests whose alleged conduct gave rise to

claims for which the RCAB has claimed or is claiming coverage," pursuant to LMC's express

request for production of same.

### B.    The RCAB Has Concealed and Withheld Documents Concerning the RCAB's Notice and Knowledge of Sexual Molestation of Children by Father Finegan.

Fr. Phinn's testimony concerning his personal handling of allegations of sexual abuse by

Fr. Paul Finegan demonstrates additional improper withholding of documents by the RCAB.  Fr.

Phinn testified about his receipt of a letter in October 1980 in which a woman alleged that her

younger sister, and her younger sister's friend, were both being routinely molested by Fr.

Finegan.  Phinn Dep., 214:12-224:12 and Exs. 20, 21.  This letter clearly relates to the RCAB's

notice of abuse by Fr. Finegan.  Similarly, as it was received by Fr. Phinn at the Office of Clergy

Personnel, it should have been within the personnel file for Fr. Finegan maintained by that office.

Not only has the RCAB withheld this initial letter alleging the abuse, but it has also withheld Fr.

Phinn's written response to that letter,  Phinn Dep., Ex. 22; a subsequent letter from the older

sister dated October 18, 1980, Phinn Dep., Ex. 23;  Fr. Phinn's response to that second letter,

dated November 5, 1980, Phinn Dep., Ex. 24; and Fr. Phinn's file notation "that the matter had

been resolved."  Phinn Dep., Ex. 26.

The RCAB's failure to produce the documents concerning its notice, in 1980, of sexual molestation by Fr. Finegan, along with previously discussed discovery abuses, support an award of the sanctions requested by LMC.

## III.    RCAB Has Improperly Withheld Other Relevant Documents That LMC Has Obtained through Independent Investigation.

The scope and breadth of RCAB's flagrant disregard of its discovery obligations is further revealed by a cache of documents that LMC has obtained through independent investigation. These documents were found by LMC on an internet website.[9]  They provide numerous examples demonstrating that the RCAB has improperly cloaked documents with privilege, despite its knowledge that such documents have <u>not</u> been maintained in a confidential manner.  They include:

- A letter dated January 17, 1970, from Reverend Patrick J. Kelly to Reverend "John J." at the Archdiocesan Personnel Office. This letter appears on the RCAB privilege log as RCAPRIV25003-25004.  It chronicles in detailed manner various "rumors of homosexuality" concerning Father Joseph E. Birmingham, including the fact that the rumor "was knowledgeable among the youngsters (boys and girls) at St. James' School, and among some of the parents."  McDonough Aff., Ex. F-1.

- File notes from "TJF" dated November 4, 1964.  These notes appear on the RCAB privilege log as RCAPRIV25005-25007.  The notes detail a meeting at the Chancery Office attended by Msgr. Sexton, Msgr. Finnigen, Fr. Hurley, Fr. Birmingham, and two boys and their fathers.  The notes indicate that during this meeting the boys made accusation that Birmingham had repeatedly put his hands down their pants. The notes indicate that knowledge of such conduct by Birmingham is "widespread."  The notes indicate that Msgr. Sexton assured the fathers that Birmingham "would be transferred immediately."  The notes indicate that "the people were to be told that [Birmingham] had been 'working too hard' and 'needed a rest.'  McDonough Aff., Ex. F-2.

- A letter dated November 1, 1983 from Most Reverend John M. D'Arcy to Most Reverend Thomas V. Daily.  This letter appears on the RCAB privilege log as RCAPRIV25048-25049.  The letter details various allegations against Reverend Richard Buntel, including that "[i]t is said that at his previous parish he was called "pothead" by some in the parish – probably by

---

[9]  The website from which these documents were downloaded is http://www.bishopaccountability.org ("Bishop Accountability").

young people.  I am told that the drug involved was cocaine . . . [t]here is talk at his previous parish of homosexual activity."  McDonough Aff., Ex. F-3.

- File notes dated February 9, 1980. These notes appear on the RCAB privilege log at RCAPRIV25145-25147. The notes indicate that "a woman from Blessed Sacrament Parish, Jamaica Plain called . . . to report homosexual activity by Fr. John Geoghan with her sons (ages 6-14) and her nephews who were living in her home at that time.  The time period approximately is for 1 year." McDonough Aff., Ex. F-4.

- File Notes dated July 24, 1982, from "+TVD."  These notes appear on the RCAB privilege log as RCAPRIV25157.  The notes detail a meeting in which parents of children previously abused by Father Geoghan were shocked to learn that he had been reassigned "to a post where he has contact with young boys." McDonough Aff., Ex. F-5.

- A "Personal and Confidential" memorandum dated July 11, 1996, from Rev. Brian M. Flatley, Assistant to the Secretary of Ministerial Personnel, to the "File." This memorandum appears in the RCAB's privilege log twice, at RCAPRIV25160-25162, and also at RCAPRIV25163-25165.  This memorandum  provides a chronology of abuse allegations and reassignments of Father Geoghan between 1980 and 1994. McDonough Aff., Ex. F-6.

- File notes dated August 29, 1977.  These notes appear on the RCAB privilege log at RCAPRIV25184-25185.  They relate to a meeting between Bishop Thomas V. Daily and Father Kelley concerning a police report that was strongly indicative of improper activities between Father Kelly and a teenager that occurred while Father Kelley was drunk at a camp in New Hampshire.  McDonough Aff., Ex. F-7.

- "Personal and Confidential" file notes dated July 31, 1993, prepared by Sister Catherine Mulkerrin.  These notes appear on the RCAB privilege log at RCAPRIV25233-25236. The notes detail allegations of abuse by Father Bernard Lane at the Alpha-Omega House nineteen years earlier.  McDonough Aff., Ex. F-8.

- Letter dated April 29, 1980, from the Reverend Thomas C. Hudgins to the Most Reverend Thomas V. Daily.  The letter appears on the RCAB's privilege log as RCAPRIV25237-25238.  The letter concerns Father Bernard Lane and states that "[s]ince Father's transfer from the Alpha Omega House, I have heard from Protestants as well as Catholics some very disturbing stories concerning the reason for his removal."  McDonough Aff., Ex. F-9.

- Letter Dated April 16, 1980, from Most Reverend Thomas V. Daily to the Reverend Thomas C. Hudgins.  The letter appears on the RCAB's privilege log at RCAPRIV25239-25241.  The letter notes that Daily has "serious misgivings with Father Lane's association with a project of this kind, however good it may seem to be.  Your counsel would be deeply appreciated, on a very personal, confidential basis."  McDonough Aff., Ex. F-10.

- "Personal and Confidential" file notes from the Review Board, dated June 6, 1994.  The file notes appear on the RCAB's privilege log at RCAPRIV25249-25252.  The notes relate to an unnamed priest.  They indicate that "[i]n 1978 the priest resigned as Director of the

residential program and participated in an outpatient assessment. The results of that are not available to us now. Subsequently, he was assigned to parish ministry." Thereafter, the notes indicate that "the data is strongly suggestive of an ephebophilia problem in the mid '70s." McDonough Aff., Ex. F-11.

- Letter dated December 26, 1974, from Rev. Thomas v. Daily to John J. Gartland, Esq. The letter appears on the RCAB's privilege log as RCAPRIV25289. The letter relates to allegations of telephone calls being placed Father David Murphy to women in the South Shore area during which "questions were asked of a personal nature and requests made that were not proper." McDonough Aff., Ex. F-12.

- Letter dated November 10, 1984 from Reverend Robert J. Banks to Reverend Michael R. Peterson, M.D. The letter appears on the RCAB privilege log as RCAPRIV25291. The letter states that Bank's is "writing in regard to our most recent case which we have been discussing by telephone. It seems that there were incidents with several altar boys at an assignment a couple of years after ordination. He was transferred and within a few months there were reports of incidents with a couple of altar boys." McDonough Aff., Ex. F-13.

- Notes dated July 16, 1993 relating to the "O'Sullivan case." The notes appear on the RCAB privilege log as RCAPRIV25292-25294. They indicate that "[i]n 1985 Father O'Sullivan came to me to report allegations and to acknowledge the substance of them." Thereafter, they indicate that in 1992, "Father O'Sullivan was again placed on administrative leave." McDonough Aff., Ex. F-14.

- An undated letter from an unnamed priest to Monsignor Sexton. This letter appears on the RCAB privilege log as RCAPRIV25457-25460. The unnamed priest states that "if the boy would release me from the seal you would quickly conclude that the accusation has no foundation. On the other hand . . . the boy is not likely to do this." Later, making the accusation plain, the priest states "I did not masturbate this boy . . . ." McDonough Aff., Ex. F-15.

- A "Confidential Memorandum" to the "file of Rev. Dozia Wilson," dated September 3, 1997, from the Reverend William F. Murphy. This memorandum appears in the RCAB privilege log as RCAPRIV2552-2554. The memorandum indicates that in 1978 a number of boys were living with Father Wilson at a rectory in Albany, and that the Albany police had told the bishop there to remove Father Wilson from the area "because of homosexual activity." McDonough Aff., Ex. F-16.

The RCAB's failure to produce these documents, which clearly relate to the RCAB's prior notice and knowledge of abuse, reveal a blatant disregard of this Court's order directing the RCAB to include in its initial disclosure, documents reflecting its notice of claims of sexual abuse by priests. In addition, these documents are of the type that Fr. Phinn testified would be

maintained in personnel files kept by the Office of Clergy Personnel or, in personnel files maintained elsewhere if the complaint was reported to an office other than the Office of Clergy Personnel and, therefore, should have been produced in response to LMC's Requests for Production. Instead, and despite the fact that the RCAB knew that they had not been maintained in a confidential manner, the RCAB chose to conceal them by improperly designating them as privileged. In many cases, the privilege log does not even identify the author or recipient of the document, reflecting the deficiency of the privilege log, itself.

In addition to demonstrating the RCAB's improper utilization of privilege logs to conceal discoverable documents, these documents also demonstrate that the RCAB has affirmatively misrepresented to the Court the level of its compliance with its document production obligations. At the November 23, 2004 hearing, the RCAB's counsel affirmatively represented that the RCAB had produced all discovery in the underlying cases:

> MR. GALVANI: Well, they also have what I would submit is anything that bears on this case. We have produced all of the claimant files. *We have produced all of the discovery from the underlying cases.* (Emphasis supplied.)

*See* Zelle Aff., Ex. B, Transcript of Hearing of November 23, 2004, p. 4, lines 11-14.

As each of the documents identified above were submitted as exhibits to *Plaintiffs' Memorandum of Law in Support of their Motion in Limine to Admit Evidence of Practices and Policies of the RCAB Concerning Sexually Abusive Priests Other Than Paul Shanley*, which was filed in an action entitled Ford, et al. v. Bernard Cardinal Law, et al., Suffolk Superior Court No. 02-04551-T1, it is evident that RCAB has **not** produced all discovery in the underlying cases. Despite the fact that this brief is replete with references to documents demonstrating the RCAB's prior knowledge of abuse, the RCAB nevertheless has withheld all of these exhibits. They should have been produced as they were maintained by the RCAB after the Motion in Limine

was received in 2003, as well as in the manner in which they were maintained within the RCAB's files before the were apparently produced in the underlying cases.

In addition to the documents identified above which demonstrate the RCAB's improper use of its privilege log to withhold documents, the information available on the Bishop Accountability website also shows that the RCAB has relevant documents that it has attempted to conceal. These documents, which include those marked during the deposition of Fr. Phinn, were not even listed on the RCAB's privilege log. As documents in the public domain, asserting privilege to withhold them is conduct which warrants sanctions. However, attempting to hide them from LMC, which is what the RCAB has done by failing to produce them or list them on its privilege log, warrants even more severe sanctions.[10]

One document that the RCAB has attempted to conceal involves claims against Fr. David Murphy. A letter dated November 13, 1967 from Rev. Francis J. Sexton to Reverend Herbert A. Phinney encloses a letter which the Cardinal received concerning Father Murphy. McDonough

---

[10] The Supreme Court has recognized that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive . . . . The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.'" Taylor v. Illinois, 484 U.S. 400, 408-09 (1988). To that end, Fed. R. Civ. P. 26, 37 and 41, as well as a trial court's inherent power, authorize entering a sanction of dismissal for the type of egregious discovery misconduct which has occurred in this case. See, e.g. Chambers v. NASCO, 501 U.S. 32, 45 (1991). The Supreme Court has stated that "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976) (reversing court of appeals and reinstating trial court's order of dismissal). It is well-established that "[t]he imposition of sanctions under Rule 37 lies within the discretion of the district court, and a decision to dismiss an action for failure to comply with discovery orders will be reversed only if the decision constituted an abuse of that discretion." Valentine v. Museum of Modern Art, 29 F.3d 47, 49 (2d Cir. 1994). The Second Circuit has observed that "in this day of burgeoning, costly and protracted litigation courts should not shrink from imposing harsh sanctions where . . . they are clearly warranted." Jones v. Niagara Frontier Transp. Auth., 836 F.2d 731, 735 (2d Cir. 1987) (affirming dismissal). Accord Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 71-73 (2d Cir. 1988) (affirming dismissal and stating that "although preclusion of evidence and dismissal of the action are harsh remedies and should be imposed only in rare situations, they are necessary to achieve the purpose of Rule 37 as a credible deterrent 'rather than a 'paper tiger'….[C]ompliance [with discovery orders] is necessary to the integrity of our judicial process" and "[a] party who flouts such orders does so at his peril." Id.

Aff., Ex. G.[11] Sexton's letter cryptically states, "if this is a typical crank letter, you can ignore it. If you think the matter should be called to Father Murphy's attention, I will leave it to your judgment. There is no need for any answer." Similarly, the RCAB has attempted to conceal a letter dated October 13, 1982, from Bishop Daily to Rev. David Murphy, in which Bishop Daily states, "I would like very much…to talk to you…about the use of the rectory space by young people." McDonough Aff., Ex. H. Bishop's Daily's handwritten notes at the bottom of the letter reflect that Bishop Daily "spoke with Fr. M. as scheduled & asked about 'Murphy's whore house.' Fr. M. explained that this was unfortunate . . . that nothing untoward happened there.'" *Id*. Another attempt by the RCAB to conceal relevant documents is evidenced by the RCAB's failure to produce, or even identify on its privilege log, a memorandum dated January 16, 1986 to Bishop Banks from Fr. Wright, in which Fr. Wright relates a call he received from a homeless man who was solicited by Fr. Murphy to perform sadomasochistic activity, and that Fr. Murphy paid him $200 to engage in this activity. McDonough Aff., Ex. I.

With regard to Fr. Eugene O'Sullivan, the RCAB has withheld a letter dated January 12, 1985, in which a mother relates to Archbishop Law "the anguish pain and suffering resulting from E. O'Sullivan's actions toward my son . . . ." McDonough Aff., Ex. J. On page three of the letter, the woman writes that "the hardest thing for me to believe is that this has gone on for so many years . . . all the church did was transfer [Fr. O'Sullivan]." This letter was not produced by the RCAB, nor is it listed in the RCAB's privilege log. Concerning Fr. Richard Coughlin, the RCAB has withheld a memo dated November 30, 1984, which chronicles a meeting with a man who alleged that Fr. Coughlin fondled him on several occasions between the ages of nine and

---

[11] The enclosed letter sent to the Cardinal was apparently not produced in the underlying litigation, but more significant in terms of the present motion, it was not even identified by the RCAB on its privilege log.

eleven.  McDonough Aff., Ex. K.   This letter was not produced by the RCAB, nor is it listed in the RCAB's privilege log.

The foregoing documents represent but a sampling of the documents which the RCAB has improperly withheld -- those relating to only a handful of priests.  The universe of documents withheld is unquestionably larger.  What is certain at this point, however, is that had LMC not undertaken an independent investigation and instead relied on the RCAB counsel's representations – *i.e.*, "we have fully complied with our obligations for discovery in this case.  We complied with the judge's order, and we have complied with the discovery rules" – it never would have discovered what is likely just the "tip of the iceberg" of highly probative documents improperly withheld by the RCAB.  *See* statements of Kate Cimini, Phinn Dep. 55:6-9, 214:3-10.

The RCAB's conduct in this regard is clearly willful and knowing.  It reflects bad faith and has been extremely prejudicial to LMC.  It is an affront to this Court and the rules of civil procedure, and warrants the imposition of severe sanctions.

## CONCLUSION

The imposition of sanctions under Rule 37 lies within the discretion of the district court and the court has substantial breadth to award sanctions that will preserve integrity of the court's rules, discourage abusive conduct in the future, and  punish the party which has engaged in the abusive conduct.  Against this backdrop, LMC respectfully submits that the RCAB's conduct in the present case justifies an Order requiring that: (1) the RCAB produce all of the documents that it provided to the Attorney General and bear the full cost of that production; (2) the RCAB produce all documents within its possession, custody, or control which relate to "information from the [RCAB]'s files that touch upon prior notice of [abuse]," pursuant to its automatic disclosure obligations as required by the Court's Scheduling Order of June 3, 2004; (3) the

RCAB produce all documents within its possession, custody, or control which are responsive to LMC's October 15, 2004 Request for Production of Documents; and (4) the RCAB pay LMC $50,000 to compensate LMC for a portion of the attorneys fees and costs incurred to determine that the RCAB had consciously disregarded its discovery obligations.   Furthermore, LMC respectfully requests this Court to **stay** all pending discovery deadlines in this matter until such time as the RCAB has satisfied its foregoing production obligations.

Respectfully submitted,

LUMBERMENS MUTUAL CASUALTY COMPANY,

By its attorneys,
ROBINSON & COLE LLP

John E. Tener, BBO No. 563791
Mary L. Cataudella, BBO No. 553350
Anthony R. Zelle, BBO No. 548141
Brian P. McDonough, BBO No. 637999
Nancy M. Cremins, BBO No. 658932
Robinson & Cole LLP
One Boston Place
Boston, Massachusetts 02108
(617) 557-5900