UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 04-10461-DPW |
| Plaintiff, | | |
| v. | | |
| LUMBERMENS MUTUAL CASUALTY COMPANY, | | |
| Defendant. | | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.    Introduction**

The Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB") submits this Memorandum in Opposition to the Motion of Defendant, Lumbermens Mutual Casualty Company ("LMC"), for Partial Summary Judgment on statute of limitations grounds. Not only is LMC not entitled to partial summary judgment, but, in fact, the RCAB is entitled to an order of the Court that its claims are not time barred. At the very least, there are genuine issues of material fact that preclude entry of summary judgment for LMC.[1]

In its Motion for Partial Summary Judgment, LMC makes the striking acknowledgement that its assertion of aggregate annual limits applicable to claims submitted by the RCAB "was clearly at odds with the policies' terms and conditions."

---
[1] The RCAB submits with this Opposition a Rule 56.1 Statement, and related Exhibits, attached to the Affidavit of Timothy J. Casey.

(Memorandum of Law in Support of LMC's Motion for Partial Summary Judgment[2] at 1.)  LMC's argument is essentially that its repeated statements and conduct regarding the existence of aggregate limits were so blatantly wrong that the RCAB *must* have known from the outset that they were false, and in violation of LMC's contractual and statutory obligations, and that the RCAB should have sued within six years of LMC's initial false statement.  (*See id.* at 1, 10, 11 n.4, 12.)

LMC misconstrues several documents upon which it relies in support of its contention that the RCAB's complaint is barred by the applicable statutes of limitations, and draws inapposite analogies to cases in which an insured failed to bring a timely action against an insurer.  None of these efforts satisfies LMC's burden of establishing, as a matter of undisputed fact, its affirmative defense that the RCAB's claims for coverage under the primary policies issued by LMC are barred by the applicable statutes of limitations.[3]  In fact, the undisputed evidence demonstrates that the RCAB brought the present lawsuit within the time prescribed by the applicable statutes of limitations for actions for breach of contract, misrepresentation, and Chapter 93A.  The RCAB, therefore, requests not only that the Court deny LMC's motion for summary judgment, but that the Court declare that the RCAB's causes of action articulated in the complaint are timely.

## II.     Discussion

A defendant asserting that a claim is barred by the applicable statute of limitations bears the initial burden of establishing, as an affirmative defense, that the plaintiff's claim falls outside of the applicable limitations period.  *Fay v. Aetna Life Ins. & Annuity Co.*,

---

[2] Cited herein as (LMC's Summ. J. Mem. at __).
[3] LMC's motion is limited to the primary policies issued by LMC, and has no bearing on the excess policies issued by LMC.

-2-

307 F. Supp. 2d 284, 290 (D. Mass. 2004); *Williams v. Ely*, 423 Mass. 467, 474 (1996). Only once LMC meets this burden must the RCAB present facts which demonstrate that its claim falls within the statutory period. *Fay*, 307 F. Supp. 2d at 290. Because LMC has failed to show, as a matter of undisputed fact, that the RCAB's claims were brought outside of the applicable statutes of limitations, it has failed to meet its burden on this affirmative defense. Instead, the undisputed evidence demonstrates that all of the RCAB's claims fall within the statutes of limitations.

LMC's theory is that the RCAB's cause of action accrued on June 1, 1995, when it supposedly informed the RCAB (falsely) that its general liability policies contained annual aggregate limits that applied to the claims then being submitted by the RCAB. (LMC's Summ. J. Mem. at 1, 3, 8, 10.) LMC's theory is belied by the facts, the applicable law, and basic principles of public policy, which should preclude an insurer from profiting by violating its statutory duty not to misrepresent its coverage to an insured.

    A.    <u>The RCAB's Claim for Breach of Contract Is Timely.</u>

In Massachusetts, the statute of limitations for a breach of contract claim is six years. G.L. c. 260, § 2. Thus, if the cause of action accrued on or after March 5, 1998 – six years before the date the RCAB filed its complaint – the claim is timely. A breach of contract claim accrues at the time of breach, *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 64 (1st Cir. 1997) (citing *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 221 (1990)), although the amount of damages resulting from the breach need not be ascertainable in order for the cause of action to accrue. *Int'l Mobiles Corp.*, 29 Mass. App. Ct. at 221.

None of the evidence presented by LMC in its Motion for Partial Summary Judgment establishes that the RCAB's breach of contract claim accrued before March 5, 1998.  LMC's argument that the breach took place in June 1995 either misperceives or mischaracterizes the breaches of which the RCAB complains in this lawsuit, as well as the governing law.  The relevant breaches of contract are LMC's refusal to pay defense costs for claims falling within the scope of coverage, and LMC's refusal to indemnify the RCAB for loss or damage for which the RCAB had become legally obligated to pay. (Compl. ¶ 57 (defining the LMC's breaches of contract as its refusal or failure "to perform its duty to defend and indemnify the RCAB with respect to claims by individuals alleging sexual molestation by priests, and negligent supervision by the Individual Insureds").)  None of the evidence presented by LMC establishes that these breaches took place before March 5, 1998.  In fact, the undisputed evidence demonstrates that LMC breached an obligation under the contracts, *at the earliest*, on July 14, 1998, when Paul D. Meany of LMC wrote to Wilson D. Rogers, III, to inform him that claims submitted by the RCAB for reimbursement exceeded the remaining available aggregate limit.  (*See* Affidavit of Timothy J. Casey[4] Ex. 20.)  In the letter, Mr. Meany stated that the "total settlements on those claims [submitted by the RCAB] were $2,310,000.  Since the balance remaining on the aggregates for the years 1964 to 1977 was $1,031,649 that leaves $1,278,351 as uncovered." (*Id.*)  It was not until several months later, in October 1998, that LMC issued checks representing only partial payment for these claims. (Casey Aff. Ex. 22.)  Indeed, that breach by LMC pertained only to claims then asserted, and did not extend to claims subsequently asserted, including the hundreds of claims not even filed until 2002.

---

[4] Cited herein as (Casey Aff. Ex. __).

The RCAB's breach of contract claim comprises two distinct duties owed by LMC to the RCAB - the duty to pay defense costs, and the duty to indemnify. These two duties arise at different points in time. As Magistrate Judge Bowler explained in *John Beaudette, Inc. v. Sentry Insurance Mutual Co.*, 94 F. Supp. 2d 77 (D. Mass. 1999), the duty to pay defense costs arises when a lawsuit is filed that contains claims reasonably susceptible of an interpretation that places them within the scope of coverage. *Id.* at 102-03; *see also Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co., Inc.*, 46 Mass. App. Ct. 209, 214 (1999) (dictum). In contrast, the duty to indemnify arises on the date of the "judgment, settlement or final resolution wherein the insured becomes legally obligated to pay damages." *John Beaudette, Inc.*, 94 F. Supp. 2d at 103. *See generally Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099-1100 (1st Cir. 1989) (distinguishing between the insurer's duty to defend and the duty to indemnify); *Sterilite Corp. v. Continental Cas. Co.*, 17 Mass App. Ct. 316, 318 n.4 (1983) (same).

Indeed, in a letter from Thomas H. Thompson of LMC to Wilson D. Rogers, Jr., dated February 25, 1994, cited by LMC in the Affidavit of Nancy M. Cremins,[5] LMC acknowledges that these contractual obligations do not arise until a lawsuit has been filed (duty to defend) and the RCAB has become legally obligated to pay damages (duty to indemnify). In the letter, Mr. Thompson states that "[a]s there has been no suit filed, Lumbermens' defense obligation, if any, has not been triggered." (Cremins Aff. Ex. 4.) Mr. Thompson goes on to state that "[a]s the duty to defend has not been triggered, and as the Archdiocese is not yet legally obligated to pay damages . . . , it is our position that *Lumbermens' obligations under the insurance contract have not been breached.*" (*Id.* (emphasis added).)

---

[5] Cited herein as (Cremins Aff. Ex. __).

Even though the dates on which these contractual duties arise may be different, the date on which these duties were breached by LMC as to any particular claim is the date on which it failed to pay the claim submitted by the RCAB, in whole or in part, on the basis of the putative aggregates. In letters from LMC to the RCAB from December 1996 through June 1997, cited by LMC, LMC notifies the RCAB of remaining aggregate balances for particular policy years. (*See* Cremins Aff. Ex. 13.) In a letter dated January 14, 1998, LMC extended $1.9 million in settlement authority to counsel for the RCAB to use to settle open claims, which was the remaining balance of the purported aggregate limits on the primary policies. LMC informed the RCAB that it would let the RCAB counsel distribute the money "as you felt the need" and that payment of those claims would eliminate any claims with a 9/23/77 loss date. However, LMC did not actually fail to pay any claims at that time on the basis of any putative exhaustion. (*See* Cremins Aff. Ex. 16.) By those dates, therefore, LMC had not yet failed to pay any claims submitted by the RCAB, in whole or in part, on its fallacious "aggregates" or "exhaustion" theory. It was not until October 22, 1998, when LMC issued checks as partial reimbursement for claims the RCAB had settled (Casey Aff. Ex. 22), or at the earliest on July 14, 1998, when LMC informed the RCAB that the settled claims exceeded the remaining aggregate balance (Casey Aff. Ex. 20), that LMC stopped paying claims under certain policy years on the basis of exhaustion of aggregates.[6] Because July 14, 1998 and October 22, 1998

---

[6] As to defense costs, it was not until some three years later that LMC declined to pay defense costs. Casey Aff. Ex 24. It is also worth noting that in the summer and fall of 1998, there continued a discussion between LMC and counsel for the RCAB concerning the RCAB's claim that LMC had issued an excess policy for the years 1973-1977, a policy which would have provided additional coverage for the claims then pending. Casey Aff. Exs. 20, 21. That dispute was not resolved until the "buyback" agreement signed in 2002 pursuant to which LMC paid the RCAB $2.5 million. See Casey Aff. Ex. 34.

are both less that six years prior to the filing of the complaint in this action, the RCAB's breach of contract claim is not barred by the applicable statute of limitations.

Moreover, the initial declinations to pay by LMC related only to claims then being settled. In fact, most of the claims for sexual misconduct were not even lodged until sometime after March 5, 1998. *See* Casey Aff. Ex. 34. Consequently, there are many claims with respect to which LMC did not breach its obligations until much later, because its duties to advance defense costs or indemnity had not yet arisen due to the fact that no lawsuit or claim had been presented to the RCAB. For example, the so-called "Geoghan 86" claims were not settled until 2002, and the so-called "global settlement" was not reached until 2003. *See* Casey Aff. Ex. 32; *id.* Ex. 34. LMC could not have breached its duties with respect to these claims before they arose; therefore, the claims for coverage of these settlements did not accrue until some time after the settlements were reached, well within the six-year statute of limitations for breach of contract. Even if LMC could establish that it actually failed to pay one or more claims prior to March 5, 1998, only those claims arguably would be barred.

In this regard, LMC's refusal to pay defense costs and indemnity must be considered multiple breaches of its insurance contracts, which became actionable every time the RCAB presented LMC with a complaint alleging facts bringing it within the scope of coverage (duty to defend), or with a judgment or settlement involving a covered claim (duty to indemnify), and LMC thereafter declined to pay defense costs or indemnity on the basis of exhaustion of aggregates. The case of *Commercial Union Assurance Co. v. Porter Hayden Co.*, 698 A.2d 1167 (Md. Ct. Spec. App. 1997) is instructive on this point. In *Commercial Union*, the insurer argued that because the

-7-

earliest claims submitted by the insured for defense costs and/or indemnity in connection with asbestos exposure were barred by the applicable three-year statute of limitations, all of the claims submitted by the insured, including five submitted within the three-year period, were barred. The court disagreed, stating that the insured undertook

> to defend and potentially to indemnify Porter Hayden for an unlimited number of third-party claims that might be filed against Porter Hayden. Where the duty to defend and indemnify might attach, the failure to perform that duty with respect to *each separate claim* would constitute a separate breach.

*Id.* at 1192 (emphasis added). Similarly here, LMC obligated itself, by the terms of the policies, to indemnify the RCAB for a potentially unlimited number of third-party claims. By definition, "occurrence" based policies, which LMC's policies were, are triggered whenever a claim is filed, even if decades after the policy was issued. Each time the RCAB submitted a claim for defense costs and/or indemnity, and the claim was denied, another cause of action for breach of the insurance contract accrued.[7]

The evidence relied upon by LMC to establish that the RCAB's breach of contract claim accrued prior to March 5, 1998 fails to satisfy LMC's burden of establishing that the relevant breaches accrued more than six years prior to the date the RCAB filed suit. For example, LMC states that it informed the RCAB on June 1, 1995, that it would apply annual aggregate limits to the RCAB's policies. (LMC's Summ. J. Mem. at 3, ¶ 7.) As an initial matter, there is a disputed issue of fact in that regard, because the testimony

---

[7] Although no Massachusetts court appears to have addressed this precise issue in the insurance context, the Massachusetts Appeals Court stated in *Chambers v. Lemule Shattuck Hospital*, 41 Mass. App. Ct. 211 (1996), "we consider each alleged violation of the continuing weekly payment obligation a new claim for statute of limitation purposes, as with any contract calling for continuous separate performances over a period of time." *Id.* at 213 (internal quotation marks omitted). In this regard, the insurance contract may be likened to an installment contract, which would create a new and independent cause of action for breach of contract accruing each time a payment was missed. *See, e.g.*, *Flannery v. Flannery*, 429 Mass. 55, 58-59 (1999). The Court need not rely on this concept to resolve this issue in this case, however, as all of the relevant breaches took place after March 5, 1998, within the six-year limitations period.

concerning whether the concept of aggregates was discussed at that meeting is conflicting. (*Compare* Casey Aff. Ex. 8 (Zinoman dep. at 81:13/81:21) (no recollection of aggregate limits being discussed at the meeting) and Casey Aff. Ex. 9 Bennett dep. at 63:5-63:13 (same), *with* Casey Aff. Ex. 3 (Rogers, Jr. dep. at 57:21-58:13 (recollection of discussion of aggregate limits in "mid-1995").) Even if such a discussion took place at that time, however, it would not have constituted a breach of the insurance contracts, because it did not yet result in LMC's declining to pay defense costs or indemnity, the two obligations owed by LMC to the RCAB under the contracts. As noted above, it was not until LMC actually failed to pay defense costs or indemnity, in whole or in part, on the basis of the putative aggregates, that it breached its contractual obligations to the RCAB, and the RCAB's cause of action as to the claims then denied first accrued. That happened in October 1998, or at the earliest in July 1998. LMC has not presented any evidence which would show that it failed to pay defense or indemnity costs on the basis of exhaustion of the aggregate limits prior to March 5, 1998.

The closest LMC comes to proffering such evidence is a letter from Wilson D. Rogers, III, to Paul Meany of LMC, dated June 23, 1997, in which Mr. Rogers appears to protest LMC's application of an aggregate limit to deny payment of a claim settled by the RCAB with a victim. (*See* Cremins Aff. Ex. 12.) What is clear from the letter, however, is that Mr. Rogers is protesting LMC's assertion that one of its policies had been exhausted. He points out that two settlement claimants for which LMC had already agreed to indemnify the RCAB had rescinded their agreements to settle, which, therefore, freed up insurance money available for that policy year to reimburse the RCAB for another settlement. (*Id.*) Indeed, shortly after this letter, on July 9, 1997, LMC wrote the

-9-

RCAB a check to indemnify the RCAB for the latter claim. (Casey Aff. Ex. 14.) Therefore, by June 1997, LMC had not yet declined to pay any claims on the basis of exhaustion of aggregate limits.

LMC also contends that other letters from Wilson D. Rogers, Jr. to LMC establish that the RCAB protested LMC's assertion of aggregate limits prior to March 5, 1998. (LMC's Summ. J. Mem. at 4-5, ¶¶ 10-11; Cremins Aff. Exs. 10-11.) In these letters, however, Mr. Rogers does not protest the existence or application of annual aggregate limits, but rather LMC's position that some portion of the aggregate limits for certain years had been used up. In a letter from Wilson D. Rogers, Jr., to Christine M. Zinoman, dated April 22, 1996, Mr. Rogers states that "we are still awaiting your determination of the aggregate balances for the period September 23, 1980 through March 31, 1983 for Policy B. . . . We would also request that you please identify the claims Kemper made payments on in order that we may compare this information with our records." (Cremins Aff. Ex. 10.) In a letter from Wilson D. Rogers, Jr., to Paul D. Meany, dated May 5, 1997, Mr. Rogers states that "a number of these [policies] did not have a beginning aggregate of $300,000 as Kemper Insurance represented that it had previously made payments. Any information you would be able to provide us, which may prove helpful in identifying the claims which were previously paid out of these aggregates would be greatly appreciated." (*Id.* Ex. 11.) In any event, even if the RCAB had protested LMC's false representations concerning aggregates, no cause of action for breach of contract would have arisen until LMC in fact failed to pay as required. Moreover, the RCAB did not challenge the existence of aggregate limits until it met with LMC representatives in Chicago in January 2003. (Casey Aff. Ex. 7 (Rogers, III, dep. at 79:4-83:6).) More

important, in the letters relied upon by LMC, Mr. Rogers did not protest LMC's refusal to pay defense costs or indemnity on the basis of aggregate limits, because LMC had not yet invoked the aggregates as a basis upon which to deny coverage.

The other letters contained in the Cremins Affidavit merely establish that LMC notified the RCAB that it was approaching exhaustion of some of its annual aggregate limits, or that the aggregates had been tapped out. (Cremins Aff. Exs. 13-16.) In none of these letters does LMC deny payment of defense costs or indemnity on the basis of exhaustion of aggregates. As stated earlier, LMC has failed to present any evidence that it actually began denying payment of claims on the basis of exhaustion of aggregates more than six years before the RCAB brought the instant lawsuit.

The caselaw relied upon by LMC to argue that the breach of contract took place on June 1, 1995, does not support its position. In *International Mobiles Corp. v. Corron & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215 (1990), the essence of the contract was the broker-defendant's agreement to place coverage for the insured-plaintiff's vehicles in (among other places) Rhode Island. The court concluded that the breach took place when the broker failed to place coverage in Rhode Island, rather than the (later) date when the insured was required to pay damages to a third party for harm caused by one of its vehicles in Rhode Island. *Id.* at 221-22. LMC cites this case for the proposition that the amount of damages suffered from a breach of contract need not be ascertainable in order for the cause of action to accrue. (LMC's Summ. J. Mem. at 10.) This proposition does not change the fact, however, that LMC did not commit a breach of its contractual obligations merely by declaring that annual aggregate limits applied to the

policies (whenever that took place), contrary to the express language of the policies.[8] Instead, it was not until much later, when LMC actually refused to pay defense costs or indemnify the RCAB on the basis of the aggregates, that it breached its obligations under the policies.[9]

LMC also relies upon *Nortek, Inc. v. Liberty Mut. Ins. Co.*, 2004 WL 1431056 (Mass. Super. Ct. May 28, 2004), a case in which the insured complained about the insurer's improper allocation of a settlement across multiple policy years, which allowed the insurer to bill the insured larger retrospective premiums than would otherwise have been possible. *Id.* at *5, *7 (looking to plaintiff's complaint to define the relevant breach and stating that "[t]he essence of the plaintiffs' [breach of contract] claims is the impropriety of Liberty's allocation of the Mississippi Hearing Loss Claims settlement over more than just the 1988 policy year."). The court concluded that the insured was aware of the relevant breach more than six years before the insured filed suit, when the insured's risk manager wrote to the insurer to complain about the improper allocations. *Id.* at * 6. LMC uses this case, in conjunction with the letters from Wilson D. Rogers, Jr.

---

[8] At best for LMC, its statements regarding the applicability of aggregate limits constituted an anticipatory repudiation of the terms of the contracts. Massachusetts, however, generally does not recognize the doctrine of anticipatory repudiation. *John Beaudette, Inc.*, 94 F. Supp. 2d at 104 (citing *Cavanagh v. Cavanagh*, 33 Mass. App. Ct. 240, 243-44 (1992)). Even in situations in which Massachusetts recognizes anticipatory breach, "the period of limitations runs, not from the time of such [anticipatory] breach, but from the time fixed by the contract for performance by the defaulting party." *Id.* at 104 (citing 51 Am. Jur. 2d *Limitations of Actions* § 132 (1970). As explained above, LMC's performance under the contracts was not due until the RCAB submitted defense costs (duty to defend), and settlements or judgments were reached (duty to indemnify). (*See, e.g.*, Cremins Aff. Ex. 4.)

[9] LMC states (at footnote 3 of its Summary Judgment Memorandum) that RCAB incurred "out-of-pocket" costs in August 1992 and August 1994 to settle two claims involving Fr. Burns. LMC says these facts are not "material", LMC does not address them in its Rule 56.1 Statement, and it is not clear what point LMC is trying to make, if any. In fact, the two claims settled, as LMC should well know, did not involve alleged abuse in LMC's policy period, but rather abuse during the subsequent policy period covered by Travelers. The "facts" are therefore neither material nor relevant to this case.

to LMC cited in the Cremins Affidavit, to argue that the RCAB "'knew full well' that LMC was applying aggregate limits." (LMC's Summ. J. Mem. at 12.)[10]

As stated earlier, in these letters, Mr. Rogers does not contest LMC's application of aggregate limits. Instead, he merely challenges LMC's calculations of the amounts supposedly remaining under the aggregate caps asserted (falsely) by LMC for particular years. (*See* Cremins Aff. Exs. 10-12.) More important, whether and when the RCAB knew about LMC's applying annual aggregate limits to the policies is totally irrelevant to the question when the relevant breaches took place.[11] As LMC itself acknowledged in 1994, it could not have breached its obligation to pay defense costs until a complaint was filed that brought a claim within the scope of coverage, and it could not have breached its obligation to indemnify the RCAB until the RCAB became legally obligated to pay a claim by reason of a settlement or judgment. (Cremins Aff. Ex. 4.) *See also John Beaudette, Inc.*, 94 F. Supp. 2d at 102-03. It was not until LMC failed to pay the RCAB for defense costs or indemnity on particular claims that LMC actually breached its contractual obligations. As demonstrated above, the undisputed evidence is that this did not take place on particular claims until some time after July 1998.

B.  The RCAB's Misrepresentation Claims Are Timely.

As with the RCAB's breach of contract claim, LMC asserts that the clock began to run on the RCAB's misrepresentation claims on June 1, 1995. The point of accrual for

---

[10] The *Nortek* case is simply not analogous to the situation presented here involving hundreds of separate claims asserted over a multi-year period under "occurrence" policies. LMC has not cited any case that deals with this situation.

[11] For this reason, LMC's mention of the fact that the RCAB produced to it multiple copies of Coverage Part 7 as part of this litigation (LMC's Summ. J. Mem. at 2-3, ¶ 5), suggesting that the RCAB had copies of this portion of the policies before March 5, 1998, is a complete red herring. Even if this is true, for the reasons outlined above, it is utterly irrelevant to the question when the RCAB's claim for breach of contract accrued. Instead, the relevant question is when did LMC fail to live up to its obligations under the contract to pay defense costs and indemnity for covered claims.

the RCAB's misrepresentation claims, however, is distinct from the accrual of its breach of contract claims. Applying the undisputed evidence to the appropriate rules of accrual for misrepresentation claims demonstrates that the RCAB's misrepresentation claims are timely.

The statute of limitations for misrepresentation and fraud claims in Massachusetts is three years. G.L. c. 260, § 2A. The cause of action does not accrue until the plaintiff "knew or should have known of the misrepresentation." *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 763 (1st Cir. 1996) (citing *Friedman v. Jablonski*, 371 Mass. 482 (1976)). A key element of a claim for intentional or negligent misrepresentation is that the statement made by the defendant be false. *Macoviak v. Chase Home Mortgage Corp.*, 40 Mass. App. Ct. 755, 760 (1996) (fraud); *Gianocostas v. Riu Hotels, S.A.*, 59 Mass. App. Ct. 753, 758 n.9 (2003) (negligent misrepresentation). While LMC now acknowledges that its coverage position "was clearly at odds with the policies' terms and conditions," that astonishing concession reflects an undeniable violation of its statutory and other duties owed to the RCAB. In fact, the RCAB was perfectly free to rely on its insurer's description of its policies, and it was not until the RCAB knew or had reason to know that statements made by LMC regarding the existence of aggregates limits in the policies were false that the RCAB's causes of action for fraud and negligent misrepresentation first accrued.

The undisputed evidence establishes that the RCAB did not learn that LMC's statements regarding the existence of aggregate limits in the policies were false until February 2003, at a meeting between representatives of LMC and the RCAB, in which LMC finally admitted, for the first time, what it says was clear (presumably to it) all

-14-

along, namely, that the policies themselves did not contain aggregate limits. (Casey Aff. Ex. 3 (Rogers, Jr. dep. at 180:17-181:15); Casey Aff. Ex. 35.) Shortly before this meeting, Nancer Ballard, an attorney advising the RCAB regarding possible bankruptcy, completed a review of portions of the insurance policies and discovered that the policies did not contain aggregate limits applicable to sexual abuse claims. (Casey Aff. Ex. 3 (Rogers, Jr. dep. at 136:17-137:24, 180:17-181:15); Casey Aff. Ex. 7 (Rogers, III dep. 81:4-82:17).) Until then, the RCAB did not know that LMC's statements regarding the existence of aggregates were false. Indeed, it was not until 2000 that counsel for the RCAB received copies of the policies at issue, and even then counsel received only portions of certain policies, and only as a result of a deposition of Paul Meany of LMC by an attorney for one of the abuse victims. (Casey Aff. Ex. 7 (Rogers, III dep. at 56:6-56:17).) This was despite the fact that counsel for the RCAB had asked LMC in the past for copies of its policies, and had been informed that LMC could not find the policies. (Casey Aff. Ex. 3 (Rogers, Jr. dep at 43:10-43:20).)

To be sure, the RCAB may have had copies of portions of the policies, including Coverage Part 7, at various parishes scattered throughout the Archdiocese, prior to the deposition of Paul Meany. Neither counsel for the RCAB nor the insurance office of the RCAB knew of the existence of these portions of the policies, however. (Casey Aff. Ex. 4 (Fallon dep. at 46:21-46:23); Casey Aff. Ex. 3 (Rogers, Jr. dep. at 30:21-31:14).) These portions of policies were not discovered until 2004, incident to the present litigation. (Cremins Aff. Exs. 5, 6). Prior to Nancer Ballard's review, the RCAB had no reason to question LMC's assertions regarding the existence of aggregates. (*See* Casey Aff. Ex. 7 (Rogers, III dep. at 83:1-83:11).) LMC maintained its position regarding aggregates

consistently during this time, and did not change its position at all, even though it now relies, ironically, on the assertion that its coverage position was clearly wrong. *See John Beaudette, Inc.*, 94 F. Supp. 2d at 109 (suggesting that a "sharp reversal" of an insurer's coverage position should cause a reasonably prudent insured to research the terms of its policies). The RCAB was entitled to rely on LMC's assertions regarding the existence of aggregates, because LMC had a legal obligation not to "misrepresent[] pertinent facts or insurance policy provisions relating to coverages at issue" incident to settlement of claims. G.L. c. 176D, § 3(9)(a).

In Massachusetts "if a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." G.L. c. 260, § 12. This tolling provision generally requires "active fraud" by the tortfeasor in order to toll the limitations period. *Geo. Knight & Co., Inc. v. Watson & Wyatt Co.*, 170 F.3d 210, 215 (1st Cir. 1999) (citing *Stetson v. French*, 321 Mass. 195 (1947)). Such was certainly the case here, as LMC actively persisted in misleading the RCAB about the existence of aggregates, until the RCAB confronted LMC with copies of the policies in early 2003. Even if LMC's conduct could be construed as something less than active concealment, "mere failure to reveal information can be fraudulent concealment by a person, such as a fiduciary, who has a duty to disclose." *Id.* LMC had a legal duty to represent the terms and conditions of coverage accurately to its insured. G.L. c. 176D, § 3(9)(a). Its failure to do so, in derogation of its legal obligation to be truthful, should toll the statute of limitations until the RCAB actually discovered that the policies did not contain aggregate

limits. This did not take place until late 2002 or early 2003, when the RCAB faced an avalanche of abuse claims that forced it to consider the drastic measure of seeking bankruptcy protection, which caused it to go back and review the portions of policies it had in order to determine if additional coverage could be sought from its insurer. (Casey Aff. Ex. 7 (Rogers, III dep. at 79:18-80:4)).

### C. The RCAB's Chapter 93A Claim is Timely.

LMC devotes one sentence of its Motion for Partial Summary Judgment to an argument that the RCAB's claim based on Chapter 93A of the Massachusetts General Laws is time-barred. (LMC's Summ. J. Mem. at 8.) Once again, however, LMC fails to meet its burden of establishing that the RCAB has brought its 93A claim outside the time permitted by the applicable statute of limitations.

The statute of limitations for a Chapter 93A claim is four years. G.L. c. 260, § 5A. "[T]he accrual date for a c. 93A cause of action is determined by the same principles dispositive of the accrual date of general tort actions." *John Beaudette, Inc.*, 94 F. Supp. 2d at 109-10 (citing *Int'l Mobiles Corp.*, 29 Mass. App. Ct. at 221). It is the plaintiff's burden "to identify allegations of misconduct which provide the basis for the chapter 93A claim and the corresponding facts which make the alleged chapter 93A violation timely." *Id.* at 111 n.40. In its complaint, the RCAB identified a number of actions taken by LMC that violated Chapter 93A. (Compl. ¶ 74.) These actions are discussed below.

The first unfair and deceptive practice by LMC consisted of "misrepresenting pertinent facts or insurance policy provisions relating to the coverages at issue (especially with regard to the aggregate limits)." (Compl. ¶ 74(a).) As discussed above, the RCAB did not actually know about this misrepresentation until approximately February 2003.

-17-

In light of LMC's active concealment – now implicitly acknowledged by LMC in its moving papers – of the terms and conditions of coverage until that time, the Court should conclude that the RCAB's 93A claim is timely insofar as it is predicated on this conduct. *See Int'l Mobiles Corp.*, 29 Mass. App. Ct. at 220-21 (applying discovery rule to Chapter 93A claim and finding claim against insurer to be timely).

The next unfair and deceptive trade practice identified by the RCAB consisted of LMC's "failing to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear." (Compl. ¶ 74(b).)  LMC committed unfair trade practices, in violation of the policies it had written and sold to the RCAB and of Chapter 176D, by failing to effectuate settlements in the cases, and in particular by relying on the non-existent aggregates to do so, and the RCAB's Chapter 93A claim predicated on those practices is timely.

The RCAB also complains of LMC's "refusing to pay claims without conducting a reasonable investigation based on all available information." (Compl. ¶ 74(d).)  LMC simply denied payment, for defense costs and indemnity, on the basis of exhaustion of aggregates, starting sometime after October 1998.  None of these denials was based on a reasonable investigation, but, instead, all were based on a misrepresentation of the terms of coverage.

Another unfair trade practice consisted of LMC's "refusing to timely pay defense costs to the RCAB." (Compl. ¶ 74(e).)  Again, LMC refused to pay defense costs on multiple occasions on the basis of exhaustion of aggregates, starting sometime after October 1998.  Indeed, it appears LMC did not refuse to pay defense costs until the fall of 2001.  Casey Aff. Ex. 24.

LMC also violated Chapter 93A by "asserting that the RCAB entered into an 'agreement' to modify the insurance policies at issue to impose aggregate limits where none exist." (Compl. ¶ 74(f).)  LMC first suggested that the RCAB and LMC had entered into an agreement to impose aggregate limits on the policies at the February 2003 meeting between representatives of LMC and the RCAB. (Casey Aff. Ex. 7 (Rogers, III dep. at 84:8-85:11); Casey Aff. Ex. 27 (Maloney dep. at 33:4-34:15).)  Therefore, the RCAB's 93A claim is timely insofar as it is based on this conduct by LMC.

Additionally, LMC "assert[ed] that the [global] settlement constitutes a 'voluntary payment and assumption of liability on the part of the RCAB.'" (Compl. ¶ 74(g).)  LMC did not make such an assertion until September 12, 2003, when counsel for LMC sent a letter to counsel for the RCAB stating that the global settlement offer constitutes a "voluntary payment and assumption of liability on the part of the RCAB," and that LMC was therefore not required to respond to the request for indemnity. (Casey Aff. Ex. 32 (RCA 7007021) (letter from Patrick E. Maloney to Thomas H. Hannigan, Jr., dated Sept. 12, 2004).)  Therefore, the RCAB's 93A claim based on this conduct is timely.

Accordingly, insofar as the RCAB's Chapter 93A claim is predicated on the conduct described above, the claim is timely.

**III.     Conclusion**

For the foregoing reasons, the Court should deny LMC's Motion for Partial Summary Judgment, and instead should declare that the claims asserted by the RCAB in its complaint are all timely.

                                       Respectfully submitted,

                                       THE ROMAN CATHOLIC ARCHBISHOP
                                       OF BOSTON, A Corporation Sole

                                       By its attorneys,

                                       /s/Paul B. Galvani_____
                                       Paul B. Galvani (BBO # 183800)
                                       Thomas H. Hannigan, Jr.
                                         (BBO # 220420)
                                       Bryan R. Diederich (BBO # 647632)
                                       Kate Cimini (BBO # 654336)
                                       Timothy J. Casey (BBO 650913)
                                       Ropes & Gray LLP
                                       One International Place
                                       Boston, MA 02110
                                     (617) 951-7000

Dated:  January 25, 2005