UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE,<br><br>    Plaintiff,<br><br>    v.<br><br>LUMBERMENS MUTUAL CASUALTY COMPANY,<br><br>    Defendant. | Civil Action No. 04-10461-DPW |

**PLAINTIFF'S RULE 56.1 STATEMENT**

Pursuant to Local Rule 56.1, The Roman Catholic Archbishop of Boston, a Corporation Sole ("the RCAB"), submits this statement of facts in opposition to Lumbermens Mutual Casualty Company's ("LMC") Statement of Facts contained is its Memorandum of Law in Support of LMC's Motion for Partial Summary Judgment.[1] *See* LMC's Summ. J. Mem. at 2–7.[2]

    1.    As LMC now acknowledges, it provided primary general liability insurance policies to the RCAB from at least March 1962 to March 1983 (the "institution policies"), and additional general liability insurance policies dating from September 1971 to March 1983 (the "parish policies"). [LMC's Statement of Facts ¶¶ 1-2.][3]

---

[1] Cited herein as "LMC's Summ. J. Mem."
[2] References in the text to LMC's Statement of Material Facts will be cited as [LMC's Statement of Facts ¶ __]
[3] There remains for trial a factual dispute on the question whether, as the RCAB contends, LMC issued it liability insurance dating back to 1955.

2. The RCAB does not dispute that in 1992 or 1993, the RCAB began submitting claims to LMC arising out of allegations relating to sexual abuse by priests. [LMC's Statement of Facts ¶ 3.]

3. The RCAB does not dispute that on February 25, 1994, Thomas H. Thompson wrote a letter to Wilson D. Rogers, Jr., counsel for the RCAB, containing the quotation, "I direct your attention to the 'Insuring Agreement' section under Coverage Part 7 of the Combination Automobile General Liability Policy." [LMC's Statement of Facts ¶ 4; Affidavit of Nancy M. Cremins[4] Ex. 4.] That letter, however, went on to quote from the referenced Coverage Part 7 "Insuring Agreement" section, but made no reference to the policy language relating to aggregate limits. *See* Affidavit of Timothy J. Casey[5] Ex. 1. Additionally, in the letter, Mr. Thompson expressed LMC's position that its decision not to participate in a non-binding mediation to settle a sexual abuse claim "is not a breach of our insurance contract." Casey Aff. Ex. 1  LMC's position was that its obligations to pay defense costs and indemnify the RCAB had "not yet been triggered," due to the fact that no lawsuit had yet been filed and the RCAB had not yet become legally obligated to pay damages. *Id.*

4. The RCAB does not dispute that it has produced several copies of Coverage Part 7 in this litigation. [LMC's Statement of Facts ¶ 5.] These copies of Coverage Part 7 were discovered in 2004 incident to this litigation, when a questionnaire was sent to parishes and institutions participating in the RCAB program, asking them to

---

[4] Cited herein as "Cremins Aff."
[5] Cited herein as "Casey Aff."

search their records for copies of any insurance policies or related documents they may have. Casey Aff. Ex. 2 (McEnness dep. at 4:24–5:4, 6:6–8:9). [6]

5.      The RCAB does not dispute that Coverage Part 7 contains the language regarding limits of liability quoted by LMC in its Statement of Materials Facts. [LMC's Statement of Facts ¶ 6.]

6.      Beginning in 1992 or 1993, the RCAB searched for, but did not find, copies of the insurance policies that had been issued to the RCAB by LMC. Casey Aff. Ex. 3 (Rogers, Jr. dep. at 30:6–31:1); *id.* Ex. 4 (Fallon dep. at 45:9–46:23). The RCAB asked LMC to provide copies of the RCAB's insurance policies, but LMC did not do so. Casey Aff. Ex. 3 (Rogers, Jr. dep. 43:10–21).

7.      LMC had located copies of some of the RCAB policies as early as 1994, although LMC did not provide copies to the RCAB. Casey Aff. Ex. 5 (Memorandum from Ewing to Zinoman with box of documents, LM 0019252); Casey Aff. Ex. 3 (Rogers, Jr., dep. at 43:10–21); Casey Aff. Ex. 6 (Meany dep. at 59:19–21; 60:24–61:3.[7]

8.      In its initial disputes with LMC regarding the interpretation of the RCAB's insurance policies, counsel for the RCAB relied on policy language quoted in LMC's denial letters. Casey Aff. Ex. 3 (Rogers, Jr. dep. at 37:19–39:15). The RCAB had no reason to suspect that LMC would materially misstate the terms of the insurance policies that LMC had sold to the RCAB. Casey Aff. Ex.2 (McEnness dep. at 28:8–28:16); Casey Aff. Ex. 7 (Rogers, III dep. at 83:1–83:11). LMC bore a statutory duty not to misstate to the RCAB the terms of its insurance policies. M,G.L. c. 176D, § 3(9)(a).

---

[6] All deposition testimony will be cited as "[Deponent] dep. at [page number]."
[7] Indeed, it was not until the deposition of Paul Meany in 2000 that the RCAB received from LMC partial copies of some of its insurance policies. *See* Casey Aff. Ex. 7 (Rogers, III dep. at 56:6–56:17).

9. LMC's assertion that it informed the RCAB at a meeting on June 1, 1995, that all indemnity payments for sexual abuse claims would be applied against annual aggregate limits [LMC's Statement of Facts ¶ 7] is the subject of conflicting testimony. Christine Zinoman and Frank Bennett of LMC have testified that they do not recall the concept of aggregate limits being discussed at that meeting. Casey Aff. Ex. 8 (Zinoman dep. at 81:13–81:21); Casey Aff. Ex. 9 (Bennett dep. at 63:5–63:13). Wilson D. Rogers, Jr., however, testified that it was his recollection that LMC discussed aggregate limits with the RCAB in "mid-1995." Casey Aff. Ex. 3 (Rogers, Jr. dep. at 57:21–58:13).

10. The RCAB does not dispute LMC's acknowledgement that the Court has determined that LMC's policies do not contain annual aggregate limits applicable to the sexual abuse claims presented by the RCAB. [LMC's Statement of Facts ¶ 8].

11. The RCAB also does not dispute that by April 1996, LMC began to issue reimbursement checks for settled claims, and indicated the policy period where an aggregate balance was eroded by payment of particular claims submitted by the RCAB. [LMC's Statement of Facts ¶ 9; Cremins Aff. Ex. 9]. In none of the letters cited by LMC, did LMC refuse payment of a claim or defense costs, in whole or in part, on the basis of exhaustion of an annual aggregate limit. *See* Casey Aff. Ex. 10.

12. The RCAB does not dispute that on April 22, 1996, the RCAB's general counsel, Wilson D. Rogers, Jr., wrote to Christine Zinoman of LMC to discuss the reimbursement of claims submitted by the RCAB. [LMC's Statement of Facts ¶ 10; Cremins Aff. Ex. 10]. The RCAB does dispute, however, the suggestion by LMC that Mr. Rogers contested LMC's representation regarding the existence of annual aggregate limits in this letter. *See* LMC's Summ. J. Mem. at 12. Instead, Mr. Rogers, in the letter,

acknowledges Ms. Zinoman's assertion of the existence of aggregate limits, but questions Ms. Zinoman about her contention that a portion of some of the annual aggregate limits had already been paid to the RCAB. Mr. Rogers stated:

> We are still waiting your determination of the aggregate balances for the period September 23, 1980 through March 31, 1983 for Policy B. . . . We would also request that you please identify the claims Kemper made payments on in order that we may compare this information with our records.

Casey Aff. Ex. 11. Far from contesting the existence of aggregates, the letter demonstrates Mr. Rogers' reliance on Ms. Zinoman's assertion that the policies contained aggregates, as he seeks to discern how Ms. Zinoman had arrived at particular numbers for remaining balances on certain policy years. *See id.*

13. Similarly, the RCAB disputes the suggestion by LMC that Mr. Rogers' letter to Paul Meany of LMC, dated May 5, 1997, "referred to the dispute between the RCAB and LMC concerning aggregate limits." [LMC's Statement of Facts ¶ 11; *see* LMC's Summ. J. Mem. at 12]. In the letter, Mr. Rogers stated:

> [A] number of these [policies] did not have a beginning aggregate of $300,000 as Kemper Insurance represented that it had previously made payments. Any information you would be able to provide to us, which may prove helpful in identifying the claims which were previously paid out of the aggregates would be greatly appreciated.

Casey Aff. Ex. 12. As with the previous letter, Mr. Rogers is not disputing the existence of aggregates. He accepted LMC's representations (which we now know were false) concerning aggregates. Rather, he is merely attempting to calculate the balances purportedly remaining on certain policy years, and seeks LMC's assistance in determining how much coverage remains for certain years, in the mistaken belief that aggregates were applicable.

14. In another letter cited by LMC [LMC's Statement of Facts ¶ 12; Cremins Aff. Ex. 12], Mr. Rogers wrote to Paul Meany of LMC on June 23, 1997 to discuss coverage issues. The RCAB does not dispute that Mr. Rogers stated that he was informed by LMC that a claim settled by the RCAB with an abuse victim had been denied by LMC because "there was insufficient aggregate remaining from the applicable policy years." Casey Aff. Ex. 13. In the letter, however, Mr. Rogers informed Mr. Meany that, because two settlement agreements previously reached that impacted the same policy years had been rescinded by the settlement claimants, money previously allocated to fund those two settlements could be re-applied to the claim that was previously denied by LMC. *See id.* Once again, this letter demonstrates the RCAB's reliance upon, and not rejection of, LMC's assertion of aggregate limits.

15. Indeed, several days later, on July 9, 1997, LMC responded to Mr. Rogers' letter by issuing a check to reimburse the RCAB for the settlement of the claim at issue. Casey Aff. Ex. 14. Therefore, by that date, LMC had not yet failed to pay claims, in whole or in part, on the basis of exhaustion of aggregate limits.

16. The RCAB acknowledges that in letters from LMC to the RCAB from December 1996 through June 1997, cited by LMC [LMC's Statement of Facts ¶ 13; Cremins Aff. Ex. 13], LMC notified the RCAB of remaining aggregate balances that it calculated for particular policy years. Nowhere in these letters, however, does LMC fail to pay a claim for defense costs or indemnity, in whole or in part, on the basis of exhaustion of aggregate limits. Instead, in the

letters, LMC referred to purported remaining balances that are available to satisfy LMC's obligations under the contracts.  Casey Aff. Ex. 15.

17.    The RCAB does not dispute that in a letter to the RCAB dated June 16, 1997, LMC informed the RCAB that a payment of $240,000 will consume the remaining aggregate balance available under one of the policies (3/31/64 – 3/31/65).  [LMC's Statement of Facts ¶ 14; Cremins Aff. Ex. 14.] Nowhere in the letter, however, does LMC say that the payment "breached its applied aggregate cap" [LMC's Statement of Facts ¶ 14], nor does LMC fail to pay a claim for defense costs or indemnity, in whole or in part, on the basis of exhaustion of aggregate limits.  *See* Casey Aff. Ex. 16.

18.    The RCAB does not dispute that on December 12, 1997, LMC discussed, in an internal memorandum, extending additional settlement authority to the RCAB, and possible exhaustion of the some of the putative aggregate limits for certain policy years.  [Statement of Facts ¶ 15; Cremins Aff. Ex. 15]. Nowhere in the memorandum, however, does LMC state that it will fail to pay any particular defense costs or indemnity on the basis of exhaustion of aggregate limits.  *See* Casey Aff. Ex. 17.  (The internal memo otherwise does not support the assertions made by LMC in its Statement of Facts ¶ 15, and is therefore disputed.)

19.    On Decmeber 29, 1997, Wilson Rogers, Jr. wrote to Paul Meany of LMC to advise LMC of several settlements that had been reached, and that offers of settlement had been extended to other claimants.  *See* Casey Aff. Ex. 33.

20. The RCAB acknowledges that on January 14, 1998, Paul Meany wrote to Wilson D. Rogers, III. In his letter, Mr. Meany provided a preliminary accounting of the status of the purported aggregate limits and confirms his extension of settlement authority to the RCAB of $3,601,370. Of this amount, $1,901,370 comprised the "remaining balance" on the primary policies, and the remainder was allocated to the post-1977 policy years for which LMC had acknowledged excess coverage. [LMC's Statement of Facts ¶ 16; Cremins Aff. Ex. 16]. Mr. Meany did not extend authority "on specific claimants but rather let you distribute it as you felt the need." *Id.* In the letter, Mr. Meany informed Mr. Rogers that "payments of these claims will eliminate any claims with a pre 9/23/77 loss date." Casey Aff. Ex. 18. Nowhere in the letter, however, does Mr. Meany fail to pay a claim for defense costs or indemnity, in whole or in part, on the basis of exhaustion of aggregate limits. *See id.*

21. The RCAB disputes LMC's characterization of the January 14, 1998 letter. [*See* LMC's Statement of Facts ¶ 16] First, the letter does not confirm the "tender" of the remaining balance on the primary policies, but merely confirms the extension of settlement authority. *See* Casey Aff. Ex. 18. Second, rather than stating that it "exhausted" the primary limits, it explains that those limits will be exhausted in the future upon payment of $1,901,370 in claims arising wholly prior to September 23, 1977. *Id.* Third, the RCAB disputes LMC's characterization of the charts attached to the January 14, 1998 letter. The first chart, entitled "Archdiocese of Boston Open Claims", contains a list of claims currently pending against the RCAB. Not all of those claims with "300K"

in the status column, however, had been resolved as of January 14, 1998. In fact, Mr. Rogers' April 14, 1998 letter indicates that one of them had just been settled for a higher amount. *See infra* ¶ 22. Finally, while the second chart attached to the January 14, 1998 letter indicates that there was no aggregate balance purportedly remaining for several primary policies, the RCAB disputes that, prior to October, 1998 or, at earliest, July 14, 1998, LMC had denied or refused to pay any claims submitted by the RCAB on the basis of the exhaustion of aggregate limits. *See* Casey Aff. Ex. 18. In addition, LMC and the RCAB at this point were disputing existence of excess coverage for the RCAB pre-dating 1977. *See* Casey Aff. Ex. 20; *id.* Ex. 21; *id.* Ex. 34. The RCAB asserted that LMC had issued excess policies from 1973 to 1977, which would have provided additional coverage. That dispute was not resolved until the "buy-back" agreement with LMC in 2002, wherein LMC paid the RCAB $2.5 Million. *See* Casey Aff. Ex. 34.

     22.    On April 14, 1998, Wilson D. Rogers, Jr. wrote to Paul Meany to report that the RCAB had settled additional claims and to seek indemnification from LMC for those settlements. Casey Aff. Ex. 19. One of the claims was one contained in the list appended to Mr. Meany's January 14, 1998 letter; Rogers reported in April that it had been settled for $400,000. *Id.* The letter also set forth a list of claims still pending against the RCAB, and stated that "[i]f and when any of these claims are settled, [the RCAB] will seek to be indemnified by [LMC]." *Id.* The letter does not refer to the denial of any claims by LMC on the basis of

exhaustion; to the contrary, it seeks indemnification for claims arising prior to 1977.

23. On July 14, 1998, Paul Meany of LMC wrote to Wilson D. Rogers, III. By his letter, Mr. Meany informed Mr. Rogers that it was LMC's position that nine claims settled by the RCAB and submitted to LMC for indemnification arose prior to September 1977, and that, since the total value of those settlements was $2,310,000, and the aggregate limit purportedly remaining on the pre-1977 policies was $1,031,649, that a total of $1,278,351 would not be reimbursed by LMC. *See* Casey Aff. Ex. 20. Mr. Meany went on to say that "[y]ou should be advised that any pending claims with a loss date prior to September 23, 1977 would not be honored due to the exhaustion of the aggregate, and requested that Mr. Rogers "[p]lease advise Paul Fallon that because the aggregates have been exhausted he doesn't need to send me any new claims with a loss date prior to September 23, 1977." *Id.* In the letter, Mr. Meany indicated that he would send checks reimbursing the RCAB for those claims at a later date. *Id.*

24. On September 16, 1998, Mr. Meany wrote to the RCAB's counsel and stated:

> We would also like to take this opportunity to reiterate our position with regard to the policy limits which *remain available* to satisfy the claims which have been submitted and may be submitted in the future. As you are aware the primary policies issued to the [RCAB] contain aggregate limits for bodily injury claims. The remaining bodily injury aggregate limits available under all the primary policies issued between 1964 and 1977 totals $1,031,649. The [RCAB] settled the [nine claims referenced in the July 14, 1998 letter] for $2,310,000. [LMC] will contribute to these claims up to the amount of the remaining aggregate limits, $1,031,649. *Upon [LMC's] payment of this amount,*

> *the policy limits of the [LMC] primary policies covering the period 1964 to 1977 will have exhausted.* Accordingly, [LMC] will no longer have any indemnity obligation with regard to those claims submitted where the last act of alleged abuse took place prior to September 23, 1977.

(emphasis added). Casey Aff. Ex. 21. According to this letter from LMC, on September 16, 1998, the primary policies were not yet exhausted. The letter went on to deny specific claims that arose prior to September 23, 1977, and stated that, if the RCAB did not desire LMC to issue individual declination letters, that LMC would understand the instant letter to have "sufficiently acted as [LMC's] declination of these referenced claims. *Id.*

25.   In fact, at least some of the claims denied by LMC in its July 14, 1998 and September 16, 1998 letter were eventually paid by LMC under the RCAB's excess policy. *See* Casey Aff. Ex. 36.

26.   On October 22, 1998, LMC issued checks to the RCAB to reimburse it for various settlements reached with claimants alleging sexual abuse. Casey Aff. Ex. 22. Each of the checks bore the legend "exhaust aggregate for policy period." *See id.* That same day, Mr. Meany wrote to Mary Kay Reardon of LMC that "this will exhaust all of the primary aggregates." Casey Aff. Ex. 23.

27.   The earliest date on which LMC declined to pay claims submitted by the RCAB on the basis of "exhaustion" was in October 1998, or, alternately, July 14, 1998. This action was commenced on March 5, 2004, within six years of that date.

28.   On November 19, 2001, Wilson D. Rogers, Jr. wrote to Augie Vega of LMC confirming a conversation between Mr. Vega and Wilson D.

Rogers, III, wherein Mr. Vega asserted that, upon exhaustion of the primary policies, LMC has no further responsibility for defense costs under that policy. Casey Aff. Ex. 24. The letter states that, as of October 22, 2001, any bills for cases that do not fall within the remaining excess coverage will not be billed to LMC, and that this is "contingent upon the written representation of [LMC] that with respect to the primary policies at issue, upon exhaustion of a primary policy, there is no further responsibility by [LMC] for the costs of defense." *Id.*

29. On December 17, 2001, Mr. Vega responded to Mr. Rogers' November 19, 2001 letter and stated that "the primary policies have been exhausted and therefore [LMC] no longer has any responsibility for any costs of defense for any claim that would have been covered under those policies." Casey Aff. Ex. 25.

30. The RCAB first challenged LMC's assertion of aggregate limits in the RCAB's insurance policies in January 2003. *See* Casey Aff. Ex. 7 (Rogers, III dep. at 79:14–83:6.) Shortly before meeting with LMC's attorney in Chicago, Nancer Ballard, an attorney advising the RCAB regarding a potential bankruptcy, discovered that the RCAB's policies did not provide for aggregate limits applicable to the RCAB's sexual misconduct claims. *See* Casey Aff Ex. 3 (Rogers, Jr. dep. at 136:17–137:24; 180:17–181:15); *id.* Ex. 7 (Rogers, III dep. at 81:4–82:17) Prior to this meeting, LMC was consistent in its assertion that the policies themselves contained applicable annual aggregate limits. In February 2003, after being questioned by the RCAB about the basis for LMC's asserting the existence of aggregates at a meeting in Chicago in January 2003, counsel for

LMC admitted that there was no such language contained in the policies. *See* Casey Aff. Ex. 3 (Rogers, Jr. dep. 179:6–180:5); *id*. Ex. 7 (Rogers, III dep. 83:17–85:12); Ex. 26; Ex. 35.  It was not until February 2003, then, that the RCAB actually knew that LMC had misrepresented the terms of coverage.  *Id.*[8]

31.     In February 2003, when LMC acknowledged, for the first time, that the policies themselves did not contain aggregate limits applicable to sexual abuse claims, it proposed that the parties enter into a written agreement imposing aggregate limits.  The RCAB refused to do so.  *See* Casey Aff. Ex. 27 (Maloney dep. 33:15–34:15); *id.* Ex. 28; Ex. 35.

32.     From sometime after October or July 1998 to the present, therefore, LMC has declined to pay indemnity for claims arising prior to 1977 on the basis of the exhaustion of aggregate limits.

33.     From November 2001 to the present, therefore, LMC has declined to pay defense costs for claims arising prior to 1977 on the basis of exhaustion of the aggregate limits.

34.     LMC continued to pay claims submitted for "unexhausted" policy years, however, including a contribution of $2,160,000 to the $10 million settlement entered into by the RCAB to resolve the so-called "Geoghan 86" claims in 2002.  Casey Aff. Ex. 29 (Vega dep. at 129:10–129:13).  LMC's claims adjuster admitted that LMC had enough information to conclude that this settlement was reasonable and willingly participated with full knowledge of the

---

[8] The parties discussed LMC's assertions regarding the existence of aggregates, and the RCAB's reliance upon LMC's assertions, in detail in the papers submitted in connection with the RCAB's Motion for Partial Summary Judgment.  The RCAB incorporates by reference that discussion, and the documentary evidence presented therein, into the present motion.

facts regarding acts of abuse of Father Geoghan.  *See* Casey Aff. Ex. 29 (Vega dep. at 79:2–80:17); *id.* Ex. 30; *id.* Ex. 31.

36. Since June 2001, the RCAB received hundreds of new claims for sexual misconduct and related alleged negligent supervision arising out of conduct during the years 1961 to 1983, the majority of which were settled in 2002 or 2003.  LMC reflects this fact in its own internal notes indicating that after the Geoghan settlement, new plaintiffs' attorneys have become involved in these matters and have brought "hundreds" of new claims.  *See* Casey Aff. Ex. 34.

36. In 2003, after the RCAB reached a "global" settlement with over 500 victims of clergy abuse, the LMC informed the RCAB that the settlement constituted a voluntary payment and assumption of liability on the part the RCAB, and that LMC was thereby relieved of any obligation it may have had to contribute to the settlement.  Casey Aff. Ex. 32.

        Respectfully submitted,

        THE ROMAN CATHOLIC ARCHBISHOP
        OF BOSTON, a Corporation Sole

        By its attorneys,

        /s/Paul B. Galvani\_\_
        Paul B. Galvani (BBO No. 183800)
        Thomas H. Hannigan, Jr. (BBO No.220420)
        Bryan R. Diederich (BBO No. 647632)
        Timothy J. Casey (BBO # 650913))
        Kate Cimini (BBO No. 654336)
        Ropes & Gray LLP
        One International Place
January 25, 2005        Boston, MA 02110
        (617) 951-7000