## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| Roman Catholic Archbishop of Boston, a Corporation Sole, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04-10461-DPW |
| Lumbermens Mutual Casualty Company, | ) ) | |
| Defendant. | ) ) ) | |

## OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FOR THE IMPOSITION OF SANCTIONS

The Roman Catholic Archbishop of Boston, a Corporation Sole (the "RCAB"), submits this Memorandum in Opposition to Lumbermens Mutual Casualty Company's ("LMC") Motion to Compel the Production of Documents and for the Imposition of Sanctions.   In its motion, LMC has complained about: (1) the fact that the RCAB had not produced to it  documents produced to the Office of the Attorney General; (2) the fact that portions of the Finegan and Burns files were not included in the RCAB's production of certain documents from priest personnel files on August 13, 2004; (3) that the RCAB did not produce the exhibits to a Motion in Limine submitted in *Ford v. Law*; (4) that the RCAB withheld documents as privileged despite the fact certain such documents were publicly available on a website; and (5) that the RCAB did not produce certain other miscellaneous documents in its production of August 13, 2004.

In a now-familiar pattern, LMC filed this motion on January 12, one day before the Status Conference.  LMC chose not to confer with the RCAB about asserted errors in its

production of documents, resorting instead to inflammatory rhetoric and ambush.  The RCAB
denies that it intentionally violated any discovery obligation, as explained below.

**RELEVANT FACTS**

**1.     Initial Disclosures**

In order to respond to the Motion, it is necessary to review the history of discovery
proceedings in this action.  On June 3, 2004, at the initial Rule 16.1 Conference, LMC argued
that it was entitled to all of the priest personnel files maintained by the RCAB.  (*See* 6/3/04 Hr'g
Tr. 40:13-20, attached as Exhibit 1.)  The RCAB objected on the ground that such discovery was
both overly burdensome and irrelevant.  The Court responded by analogizing this case to those
alleging that municipalities are responsible for police misconduct, and stating "invariably at the
outset of such cases, there's a demand for the personnel file.  And invariably, I say 'no, you can't
have the personnel file.'  But if there is information concerning similar misconduct by the
alleged supervised individual prior to the incident that is the subject of the claim, then I will turn
it over or order it to be turned over subject to some form of protective order until we've got some
idea of where it leads."  (6/3/04 Hr'g Tr. 50:1-17, attached as Exhibit 1.)

When the Court asked what it would take to "cull the files to see whether or not there
were prior complaints with respect to these priests of the type that were alleged in the claim,"
counsel for the RCAB responded that "[i]t would be a large amount of work …. To go through
and to do it right, to be careful about it, it would be a large amount of work …." (6/3/04 Hr'g Tr.
51:25-52:25, attached as Exhibit 1.)  The Court responded that, "while one always wants to limit
discovery to no more than is necessary to resolve the case, you make judgment early on at the
outset about things that might be involved that the parties can do and should do in evaluating ….
And I think my view is with respect to the individual priests involved, that there should be

provided to the insurer defendant here materials that – any materials in the personnel file that touch upon prior notice of similar misconduct."  (6/3/04 Hr'g Tr. 56:3-24, attached as Exhibit 1.) The Court also stated that it would "not order the personnel files as such to be turned over. However, with respect to the individual priests as to whom claims have been made, the defendants shall be provided with the information from the plaintiffs' files that touch upon prior notice of similar conduct on a rolling basis by no later than August 15, 2004."  (6/3/04 Hr'g Transcript at 61:19-25, attached as Exhibit 1.)

     The Court had preceded this analysis by stating that it did not want to phase document production (unlike other discovery), but, rather, that the parties were to produce all paper in the case as part of their initial production.  (6/3/04 Hr'g Tr. 21:25-22:3, 29:15-24, attached as Exhibit 1.)  The Court stated "[i]nitial discovery is everything", (6/3/04 Hr'g Tr. 19:11-14, attached as Exhibit 1), and that "paper discovery on this is going to be entire … for both parties." (6/3/04 Hr'g Tr. 29:23-24, attached as Exhibit 1.)  The Court also indicated that it would "take up questions of privilege as those assertions are made. And I think we'll just – you're going to give us a privilege list. And if it's asserted, then we'll take that up at some appropriate time." (6/3/04 Hr'g Tr. 62:1-5, attached as Exhibit 1.)  The Court's written order is attached as Exhibit 4.  The RCAB understood the Court's ruling to apply to the entire case, and not merely to Phase I of the proceedings, in light of its directive that the parties were to produce all paper in the case as part of their initial production.  Accordingly, the RCAB proceeded with the belief, and governed itself accordingly, that the only documents that would ever be produced from the priests' personnel files were those that might have put the RCAB on notice of similar misconduct.[1]  Of course, the RCAB also understood that it was to produce the entire set of claim

---

[1] The RCAB understood that the Court might revisit what LMC was entitled to at some later date, upon some showing by LMC, but understood that LMC would have to make a specific showing of need at that later point.

files (alleging abuse, in whole or in part, within the LMC coverage period), and it did. Those claim files were produced including any information about the perpetrators contained therein.

The Court also required the RCAB to produce to LMC an index of the specific claims impacting the LMC coverage, setting forth the name of the claimant, the name of the priest involved, the time period of the abuse, and the final settlement value. (6/3/04 Hr'g Tr. 65:9-22, attached as Exhibit 1.) The RCAB prepared the index, which included information on all of the claims impacting the LMC coverage period, including those for which the RCAB is currently seeking coverage and those that had already been paid by LMC[2], and produced it to LMC on July 1, 2004 (the "RCAB's Index"). The list named approximately 720 individual claimants and approximately 150 named perpetrators.

In July 2004, LMC and the RCAB each produced approximately 165,000 pages of documents to the other, and then began deposition discovery. In the course of producing its initial disclosures, the RCAB gathered and reviewed files from the Rogers Law Firm (which had represented the RCAB with respect to the abuse claims until July 2003), Ropes & Gray LLP, and the RCAB.[3] The RCAB produced all of the claim files of the individual claimants on the RCAB's index, *i.e.,* those individuals whose claims impacted the LMC coverage period for which it is currently seeking coverage, as well as all of the claim files of the individuals whose claims had previously been settled by the RCAB and indemnified by LMC. The RCAB produced, for each of these individuals, the claim file maintained at the Office of Risk Management and Insurance, as well as the claim file maintained by RCAB's counsel. As

---

[2] The RCAB included these claims on the index, and in its production of the claim files, with the understanding that all documents were to be turned over with its initial disclosures, including those documents relating solely to LMC's counterclaims.

[3] The team that managed this document production consisted of five attorneys and several paralegals from Ropes & Gray, but the RCAB, in order to meet the deadline, had to bring in an additional group consisting of up to twelve additional attorneys and paralegals to help at various stages.

reflected in LMC's simultaneous initial production to the RCAB, most of these documents already were in the possession of LMC, having been delivered to it over the years as the claims were being analyzed and handled.

After the documents were gathered and reviewed for privilege, the RCAB sent them out to various vendors to be bates-stamped, scanned, and converted into both the format preferred by counsel for LMC and the one preferred by counsel for the RCAB. The initial production occurred in early July, as directed by the Court. Phase I depositions then commenced on July 26, 2004. Unlike the document production, the subject matter of the depositions was limited during Phase I. (*See* 6/3/04 Order, attached as Exhibit 4.)

While simultaneously preparing for depositions, counsel for the RCAB requested all of the priest personnel files of the individuals named as perpetrators in the claims at issue from the RCAB, and undertook to have those files copied and reviewed for production by August 15, 2004, at the latest, pursuant to the Court's June 3, 2004 order. Over one hundred files were so reviewed. The RCAB produced 1,879 pages of documents from the priest personnel files, including all documents referring, in any way, to prior notice. In this regard, the RCAB took a very broad view of what constituted "notice" under the Court's June 3, 2004 order. The RCAB did not limit production to documents created prior to March 31, 1983 when LMC's coverage ended; to the contrary, any document that referenced receipt of prior notice by the RCAB was identified in the production. For example, a document constituting prior notice created in 1977 was included, as well as any later documents (even generated after March 1983) referring either specifically to that 1977 document or to the fact that the RCAB had received notice of the claim

in the 1970s.[4]  (Affidavit of Kate Cimini ("Cimini Aff.") at ¶7.)  On August 13, 2004, and in

compliance with the Court's ruling, the RCAB produced electronically those documents

comprising the relevant portions of the priest personnel files,[5] along with a privilege log listing

documents which were being withheld.[6]  LMC makes no mention of the documents it received

from the RCAB pursuant to the Court's June 3, 2004 Order, except to note that those files do not

appear to constitute entire priest personnel files; however, the RCAB never suggested that it

produced entire personnel files on August 13, 2004.[7]  Nor was it required so to produce.  As

explained herein, only those portions of the priest files were those that "touched upon prior

notice" were called for.

---

[4] The protocol also established the grounds on which documents were to be withheld as privileged.  It established that documents were withheld on the basis of: the attorney-client privilege; work product protection; the religious comfort and guidance privilege; the psychotherapist-patient privilege; and the First Amendment privilege.

[5] As a result of the deposition of Father Gilbert Phinn on January 7, 2005, the RCAB has discovered that, in the course of gathering, copying, and reviewing the files of all priests accused of abuse for which the RCAB seeks (or sought) coverage from LMC, the files of three priests were not copied, and, accordingly, were subsequently neither reviewed nor produced last summer.  Those were the files of Robert Burns, Paul Tivnan, and Paul Finegan.  The RCAB has since corrected this mistake, and explains the course of events that led to it in Section II of this Opposition, and in the Cimini Affidavit attached hereto.  In any event, a search of LMC's initial production to the RCAB in July 2004 reveals that all but two of the twenty-seven "missing documents" regarding Fathers Burns and Finegan that were identified during the Phinn deposition in fact were in LMC's possession before the lawsuit was filed, having been produced to LMC in the normal course of handling the underlying claims.  (*See* Chart indicating bates-ranges of documents attached to the Affidavit of Brian McDonough, attached as Exhibit 5. )

[6] As explained elsewhere in this Opposition, prior to the involvement of the RCAB's current counsel, documents were produced in multiple settings, and there was no ready record of what had been so produced.  Moreover, most documents produced were not bates-stamped prior to production, making it even more difficult to ascertain which documents had previously been produced.  Copies of documents contained in the claim files reviewed by the RCAB's counsel that counsel could ascertain had been produced were, of course, produced to LMC in this litigation, without regard to possible privilege issues.  (Cimini Aff. at ¶8.)

[7] Also found in LMC's production are numerous examples of correspondence between the Rogers Law Firm and Patrick Maloney, counsel for LMC, concerning the priest files.  For example, on May 20, 2003, Mr. Maloney wrote to Mr. Rogers, and stated that, on a recent visit to Mr. Rogers's office, he was provided with a list of all the pending sexual misconduct claims, which listed 104 perpetrators.  It goes on to state that "I have compared the materials that my office has against that list of perpetrators and that comparison reveals that we do not have any files on the following perpetrators and ask that you provide us with copies of those files as soon as possible."  (Exhibit 6.)  The letter goes on to list twenty-nine priests of the one hundred and four listed on the prior list (Neither Father Burns nor Father Finegan was on that list.)  *Id.*  On June 2, 2003, Mr. Rogers replied to Mr. Maloney, and, referring to Maloney's May 20, 2003 letter, states "[e]nclosed please find the materials which you requested.  Please note we are providing you the entire file with respect to these priests".  (Exhibit 7. )  Further, in focus file notes produced by LMC, claims handler Augie Vega writes, on January 30, 2002, "Pat Maloney has met with the Rogers Firm and reviewed a lot of their records."  (Exhibit 8.)  On May 7, 2003, Mr. Vega writes that Kathy Warren and Patrick Maloney are going to review "all of the records in Rogers' office".  *Id.*  The bates-range of the documents identified

2.       **Attorney General Documents**

On November 23, 2004, the morning of a scheduled hearing in this case, LMC filed a

Motion to Compel the RCAB to produce written responses and documents pursuant to a request

it had served on October 15, 2004 ("LMC's first Motion to Compel").  The RCAB served its

written response to LMC's document request and opposed LMC's motion on December 2, 2004,

as ordered by the Court at the November 23, 2004 hearing.  (*See* 11/23/04 Hr'g Transcript at 7:1-

5, attached as Exhibit 2.)  By its opposition and response, the RCAB objected to LMC's requests

on the ground that the scope of discovery concerning the priests' personnel files had been

resolved by the Court in connection with its initial scheduling order, dated June 3, 2004,

wherein, as noted above, the RCAB was ordered to produce those portions of the personnel files

that involved prior notice of conduct similar to that for which the RCAB is seeking coverage.

*See* the RCAB's Opposition to LMC's Motion to Compel, dated December 2, 2004 (the

"RCAB's first Opposition").  In its opposition, the RCAB also contended that LMC had received

all materials relevant to its claims or defenses last summer.  *Id.*  Counsel for the RCAB also

explained at that hearing that it was unable to reconstruct the exact materials that had been

produced to the Attorney General's office in connection with its report, issued July 23, 2003 (the

"AG's Report").

While its first Motion to Compel was pending, on December 1, 2004, Ms. Marks of

Robinson & Cole sent an email to counsel for the RCAB, with a copy to Kurt Schwartz of the

Attorney General's office, suggesting that, because the RCAB had indicated that it could not

reconstruct the productions that had been made to the Attorney General's office, the RCAB

---

by LMC as "Documentation Regarding Accused RCAB Employees" in its initial production contains over 30,000
pages of documents.  (*See* Exhibit 9).

should simply authorize the Attorney General to produce those materials to LMC.  (*See* Exhibit 10.)

On December 2, 2004, Mr. Schwartz responded by email stating:

> Hi -- perhaps a phone discussion before sending me a waiver might make sense.  The position that I have taken that the grand jury materials possessed by this office cannot be disclosed is grounded in both a statute and the Rules of Criminal Procedure.  Accordingly, a waiver by the RCAB probably does not change the equation -- *this office still will be precluded from disclosing grand jury materials.*

(emphasis added.)  (*See* Exhibit 11.)

On December 7, 2004, Mr. Zelle, counsel for LMC, sent a letter to the RCAB stating, in relevant part, that:

> I have spoken with the Attorney General's Office and in response to a request from the RCAB, they will work with us and with you to ensure that a full and complete disclosure is accomplished.

(*See* Exhibit 12.)  Mr. Zelle made no reference to the earlier email exchange or to Mr. Schwartz's statement that he was prohibited from disclosing the documents requested by LMC, even with a waiver from the RCAB.  *Id.*   At this time, the RCAB's opposition, which explained the basis for the RCAB's objections to producing the documents, was still before the Court.

On December 10, 2004, despite the pendency of its first Motion to Compel, LMC filed a second Motion to Compel, seeking the production of the same documents sought by its first Motion to Compel.  *See* LMC's Motion to Compel the Production of Documents, dated December 10, 2004 ("LMC's second Motion to Compel").  This motion, like Mr. Zelle's December 7th letter, completely ignored the email exchange between the Attorney General's office and counsel for the RCAB and LMC.  *See id.*  In LMC's second Motion, it states that "[a]s was detailed in the December 7, 2004 letter, LMC's counsel was also informed that upon request

and authorization from the RCAB, it would make all of the documents produced available for inspection and copying." *See id.* The actual letter is attached as Exhibit 12. No reference was made to Mr. Schwartz's message.

On December 14, 2004, the RCAB responded to LMC's second Motion to Compel. In its opposition, the RCAB pointed out the inconsistencies between LMC's Second Motion and Mr. Zelle's December 7, 2004 letter, and the fact that the motion, like the letter, completely ignored Mr. Schwartz's email of December 2, 2004, which said that his office was precluded from disclosing grand jury materials. *See* RCAB's Opposition to LMC's Motion to Compel, dated December 14, 2004 (the "RCAB's second Opposition").

On December 15, 2004, one day *after* the RCAB filed its opposition to LMC's second Motion to Compel, Mr. Zelle sent an email to Mr. Schwartz purporting to confirm their conversation of December 7, 2004. (*See* Exhibit D to the Affidavit of Anthony R. Zelle in Support of Defendant's Motion to Compel and for Sanctions.) Counsel for LMC had not informed counsel for the RCAB of the conversation purportedly memorialized in Mr. Zelle's December 15th email. The first time the RCAB's counsel saw the email was on January 12, 2005, when it arrived attached to LMC's Pending Motion. Upon receipt of the email, the RCAB's counsel called Mr. Schwartz to learn his position directly. He was not available until after the hearing on January 13, 2005. At the hearing, of course, the Court ordered the RCAB to request the Attorney General's office to turn over all the material at issue to the RCAB. The RCAB hopes to have all of the documents by next week, both from the Attorney General and from the files of the Rogers Law Firm.

3.      The Deposition of Father Phinn

On December 17, 2004, counsel for LMC sent a letter to the RCAB's counsel requesting the "bates-range" of the priest personnel files produced by the RCAB pursuant to the Court's June 3, 2004 order. (*See* Exhibit 13.) RCAB's counsel responded that, "[o]n August 13, 2004, the RCAB produced the relevant portions of the priest files, as required by the Court in its order dated June 3, 2004." (*See* Exhibit 14.) The email went on to provide the bates-range of the documents – RCA1500001-RCA1501879 – and to refer LMC's counsel to the supplemental privilege log which was produced concurrently with the documents. (*See id.*)

There was no further discussion of the RCAB's August 13th production until the deposition of Father Gilbert Phinn, on January 7, 2005. During that deposition, counsel for LMC marked multiple documents that bore neither the bates number of LMC nor that of the RCAB, and which he asserted had not been produced in this litigation. Counsel for LMC did not inform counsel for the RCAB of the source of those documents, despite requests, but represented – multiple times – that the documents had not been produced in this litigation.[8] (Deposition of Father Gilbert Phinn ("Phinn dep.") at 22:7-13; 45:21-46:15; 251:14-20, attached as Exhibit 3.)

After the deposition, counsel for the RCAB immediately began a search for the documents marked as exhibits in Father Phinn's deposition. (*See* Cimini Affidavit at ¶12.) The details surrounding this search are explained in greater detail in section II, infra. Upon investigation, but prior to the filing of LMC's pending motion, counsel for the RCAB ascertained that the files of three priests had not been copied along with the other priest files reviewed by the RCAB for production in July and August of 2004, and, therefore, were neither reviewed nor produced at that time. (*Id.* at ¶13.) While this inquiry was ongoing, and one day prior to yet

---

[8] In its motion, LMC says that the documents came from a website – www.bishop-accountability.org – which purports to document the sexual abuse crisis in the Catholic church.

another previously scheduled hearing in this action, LMC filed the Pending Motion to Compel, and it did so without conducting any kind of Local Rule 7.1 conference with counsel for the RCAB.[9]

**I.    The Documents Sought by LMC's October 15, 2004 Document Request**

In its current motion, LMC again moved to compel the production of documents produced by the RCAB to the Attorney General's office in the course of its investigation of the RCAB. These documents were the subject of LMC's two motions to compel, both of which were opposed by the RCAB and were still pending before the Court when this most recent motion was filed. To the extent this motion seeks those documents, it is moot in light of the Court's order of January 13, 2005. The RCAB is currently engaged in the effort of producing those records to LMC, and attempting to do so with the utmost haste.[10]

As it explained in its responses to the two earlier motions to compel the same documents, the RCAB understood the Court's June 3, 2004 order as defining document discovery for the entire case, and not, as LMC contends, merely for Phase I. As explained in greater detail above, this is not a "blatant mischaracterization" of the Court's order, as LMC asserts at page 7 of its pending Motion to Compel.

The RCAB understood the Court to be framing its June order as one providing to both parties what might be "necessary for ultimate preparation for trial." (6/3/04 Hr'g Tr. 41:2-8, attached as Exhibit 1.) The RCAB completed the time and labor intensive document review with that understanding. The argument that the RCAB was required to cull its files relating to named perpetrators for those documents of special interest to LMC only to allow LMC to demand the

---

[9] Counsel for the RCAB vigorously disputes Mr. Zelle's assertions contained in LMC's Certification Pursuant to 7.1(A) and Fed.R.Civ.P. 37(A)(2), both concerning the substance or sufficiency of his purported consultation.

[10] Contrary to LMC's assertion, and as counsel for the RCAB stated at the hearing on January 13th, the RCAB has no intention of withholding documents that were produced to the Attorney General's office.

entire file four months later runs counter to the basic principles underlying the discovery process, especially in light of the Court's stated desire to prevent the parties from seeking overly burdensome discovery and the higher standard of relevance generally applied to requests for personnel files.  *See In re One Bancorp Secs. Litig.*, 134 F.R.D. 4, 12 (D.Me. 1991)(holding that employment records are deemed confidential and courts grant access to them only upon a particularized showing); *see also Whittingham v. Amherst Coll.*, 164 F.R.D. 124, 127-8 (D.Mass. 1995).

LMC also alleges that, since the RCAB did not know what had been turned over to the Attorney General's office, it prepared its privilege logs with a "conscious disregard" of any privilege waivers that may have resulted from that production.  The RCAB vehemently denies that it consciously disregarded any of its obligations.  The RCAB simply did not realize that the privileged documents it was withholding in fact had been produced to others.  While current counsel for the RCAB knew that its predecessor counsel had made multiple document productions to numerous parties, including the Attorney General, it also knew that, because of the volume and speed of the earlier litigation, prior counsel was not in the practice of bates-stamping documents or maintaining copy sets of the documents that were produced in the form that they were produced.

To the extent that privileged documents have been turned over to others, the RCAB obviously will produce them.  In fact, in its earlier review of documents, a protocol was established that, when it appeared that a document had been produced to another, the RCAB would produce that document to LMC in this litigation.  However, counsel for the RCAB is constrained to protect privileges that it otherwise believes to exist.

LMC's counsel never attempted to confer with counsel for the RCAB about this issue. While LMC's failure to confer is addressed in greater detail in Part IV of this Opposition, LMC never so much as raised the issue of a possible deficiency with the RCAB's privilege log prior to the filing of this motion (except its blanket challenges to the privilege log produced by the RCAB with its initial disclosures, which the Court rejected on October 28, 2004). Thus, LMC failed to comply with either Local Rule 7.1(A) or Fed.R.Civ.P. 37(A)(2), choosing, instead of seriously attempting to resolve the problem, to go directly to Court. In any event, LMC will soon receive all documents produced to the Attorney General's office, and will receive separately from the RCAB any documents included on the RCAB's privilege log that have been produced elsewhere.

## II.     Documents Marked at Father Phinn's Deposition

In July 2004, counsel for the RCAB sought to obtain any files that existed concerning the perpetrators listed on the RCAB's index from the RCAB in order to comply with the Court's order of June 3, 2004. The RCAB gathered the files currently in its possession and sent the originals to Ropes & Gray LLP for copying, but indicated that Ropes & Gray LLP already had certain other files. (*See* Cimini Aff. at ¶¶4-5.) Counsel for the RCAB also sought to gather all of the files already in its possession, and send those for copying as well, but inadvertently failed to include the files of three priests – Robert Burns, Paul Tivnan, and Paul Finegan, as those three files had been temporarily set apart from the others for reasons related to another action. (*See* Cimini Aff. at ¶5.) As a result, those three files were simply overlooked and were not reviewed for responsiveness and privilege, although a team consisting of several attorneys reviewed the documents to determine both their potential responsiveness and the applicability of privileges. (*See* Cimini Aff. at ¶¶5-6.)

As explained above, the first notice the RCAB received that there may have been something missing from its production came at the deposition of Father Gilbert Phinn, on January 7, 2005. (*See* Cimini Aff. at ¶10.) On several occasions during the deposition, Mr. Zelle asked why certain documents had not been produced. Unaware of any possible problem with the production regarding Father Burns or Father Finegan, counsel for the RCAB replied that the RCAB had fully complied with its discovery obligations in this case. (*See* Cimini Aff. ¶11.) Mr. Zelle did not elaborate, instead asserting that he had to go "find" the documents, and that they had not been produced in this litigation. At one point during the deposition, Mr. Zelle even represented that a particular exhibit had not been produced in the litigation, and stated that "[w]e just got this very very recently." (Phinn dep. at 45:21-46:15, attached as Exhibit 3.)

Upon conclusion of the deposition, counsel for the RCAB immediately began reviewing the documents that were marked at the deposition. (*See* Cimini Aff. at ¶12.) Of the twenty-seven documents marked as exhibits at the deposition, twenty-five in fact had been produced *to* the RCAB *by* LMC in July 2004 in this litigation, demonstrating that the RCAB had given the allegedly missing documents to LMC well before that date. (*See* Chart indicating bates-range of each document attached to the Affidavit of Brian P. McDonough, attached as Exhibit 5.) In fact, at least two copies of the document that Mr. Zelle contended LMC received only "very very recently" had been produced in this litigation *by LMC*. *See id.* These documents were readily found in the LMC database of documents produced by it to the RCAB by searching, alternately, in the "to", "from", "date" and "summary" fields provided to the RCAB by LMC with its production. The documents were also easily found by performing a "full text" search of LMC's documents using optical character recognition technology.[11] Thus, simply inserting the names

---

[11] LMC has the ability to search these documents using optical character recognition technology. *See* Affidavit of John E. Tener, attached as Exhibit 15.)

"Burns" or "Finegan" would have turned up most, if not all, of the supposedly missing documents. Several of these documents were also produced in July as part of claim files by the RCAB to LMC, although none was contained in the documents comprising the RCAB's August 13th production from the priest personnel files.

The ease with which counsel for the RCAB ascertained the extent that these documents were contained in LMC's own production – and in the RCAB's original production to LMC – belies LMC's repeated assertions that it had to obtain these documents through "independent investigation". Moreover, it is in express contradiction to Mr. Zelle's assertions at the deposition that these various documents "[were] not produced in this litigation." (*See e.g.*, Phinn dep. at 22:7-17, attached as Exhibit 3.)   In fact, of the twenty-seven documents marked as exhibits at that deposition, six bear bates-stamps indicating that Mr. Zelle in fact used the very copies produced by LMC in this litigation. Of those six documents, five are not even contained on the website – www.bishop-accountability.org – said by LMC to be the source of the documents. (*See* index of documents contained on www.bishop-accountability.org pertaining to Robert Burns, attached as Exhibit 16.) While the sixth document bates-stamped from LMC's production is contained on www.bishop-accountability.org, the posted copy has handwriting on it, while that marked at the deposition does not. Those six documents bear bates-stamps ranging from LM0048902 – LM0049324, demonstrating that they came out of the segment of the LMC database of documents it produced in July 2004 described by LMC as "Documentation Regarding Accused RCAB Employees". [12]   (*See* Exhibit 9.)

---

[12] Upon a review of LMC's production, documents bates-stamped LM0048822-LM0049394 as well as documents bates-stamped LM0122036-LM0122302 (containing approximately 740 pages of documents) are comprised of documents from Father Burns's personnel file.

Because LMC apparently did not even review its own database for documents with which to examine Fr. Phinn at his deposition[13] – or consciously chose not to use such documents and to seek such documents from other sources to promote its histrionics – it is clear that the goal of that deposition was simply to lay the groundwork for the Pending Motion, and not to learn anything of substance from Fr. Phinn. LMC, obviously, is more interested in pursuing diversionary tactics than the merits. In fact, the Phinn deposition is the only one it has taken since November 23, 2004, when LMC claimed it needed 75 depositions solely for fact witnesses. (*See* The Parties' Joint Statement Regarding Phase II Scheduling, filed November 22, 2004.)

## III.    Documents on the RCAB's Privilege Log

LMC notes that documents that the RCAB placed on its privilege log are available on an internet website, and alleges that the RCAB "improperly cloaked documents with privilege, *despite its knowledge that such documents have not been maintained in a confidential manner*." (LMC's Pending Motion, at 16.) (italics added.) While the RCAB agrees that documents should not be withheld if public, it vehemently challenges the assertion by LMC that it *knew* the documents were not maintained in a confidential manner. Nor does LMC allege that it ever broached the subject in a "meet and confer" with the RCAB of any possible prior disclosure of any documents contained on the RCAB's privilege log. It did not. The RCAB is currently engaged in attempting to produce all documents withheld on its privilege log that it can ascertain have been previously disclosed.[14]

---

[13] This is demonstrated by the fact that a few of the documents marked as exhibits came not only from LMC's database, but the same section of the database as the documents LMC purportedly had to obtain through "independent investigation", which indicates LMC knew of the existence of these documents in its database and it is merely seeking to divert the Court's attention from the merits of this case.

[14] In reviewing the documents identified by LMC at pp.16-18 of its Memorandum, the RCAB believes that, apart from waiver, at least some were mistakenly deemed protected from disclosure. As a result, we shall undertake a review of all documents withheld by the RCAB and placed on a privilege log. In any event, all of the documents identified by LMC were in its possession, as has been demonstrated, so it cannot claim prejudice.

The RCAB produced the privilege log at issue along with the relevant portions of the priest personnel files on August 13, 2004.  Moreover, counsel for the RCAB did not realize that the privileged documents had been previously produced.  As explained above, during the course of the underlying litigation, the RCAB's predecessor counsel was deluged with document requests, and did not maintain clear records of what was produced to whom.  When counsel for the RCAB came upon documents in the underlying claim files that it had reason to believe had been previously produced, it had a protocol of producing them to LMC.  (Cimini Aff. at ¶9.)  Any failure to do so in relation to the priest personnel privilege log was inadvertent, and all documents withheld were withheld in good faith.  Moreover, any errors would have been promptly corrected by the RCAB during a meet and confer.  *Id.*

Like most of the documents that were the subject of the Phinn deposition, all of the documents referenced in Section III of LMC's current Motion to Compel which it claims it had to obtain through "independent investigation" in fact were produced *by LMC to the RCAB* in this litigation last July.  (*See* Exhibit 5.)  The reason LMC had these documents prior to the commencement of this litigation was that the RCAB had produced them to it.  *(See* footnote 8, supra.)  Moreover, several of the documents were produced a second time by the RCAB because they were also found among the claim files that were a part of the  initial July production.  *See id.* LMC was not prejudiced by the failure to have received additional copies of documents it already had from the RCAB.

## IV.    LMC's Additional, Unsubstantiated, Claims of the Wrongful Withholding of Documents

LMC makes several other allegations of wrongdoing on the part of the RCAB in its brief.  First, it asserts that the RCAB wrongfully withheld a copy of the exhibits to a motion in limine filed in *Ford, et al. v. Bernard Cardinal Law, et al.*, and misrepresented to the Court that it had

produced the files in that litigation. Certain of these exhibits are attached as Exhibit G through K
to the McDonough Affidavit. First, as stated earlier, each of the documents referred to by LMC
in this section, exhibits G through K, was produced to LMC prior to this litigation, as evidenced
by the fact that LMC produced each one back to the RCAB with its initial disclosures. (*See*
Exhibit 5.) Several of the exhibits were also produced by the RCAB to LMC in the claim files in
its initial July production.

Second, the plaintiff in the *Ford* litigation alleged abuse occurring wholly after the LMC
coverage period. It is not a claim for which the RCAB seeks coverage from LMC, nor is it a
claim listed on the comprehensive index that the RCAB produced to LMC on July 1, 2004,
pursuant to the Court's order of June 3, 2004. No objection was received from LMC about the
omission of Ford from that index (nor was LMC paying defense costs or attending mediation
sessions for that case). Accordingly, and consistently with its understanding of its discovery
obligations, the claim file for the Ford case was not produced to LMC. In any event, the
documents in question are all on file in the Superior Court, are all publicly available, and, in fact,
were, in large part, in LMC's possession and initial production here.

Third, to the extent these documents were responsive to the Court's June 3, 2004 order –
*i.e.,* that they were contained in priest personnel files, that they referred to priests named in
claims for which the RCAB is seeking coverage from LMC, and that they touch upon prior
notice[15] – those documents in fact were produced by the RCAB, or placed on its privilege log.
None of the documents cited at pages 20 through 22 of LMC's Pending Motion (Exhibits G – K)
was responsive to the Court's June 3, 2004 order *i.e.*, they are not documents constituting or

---

[15] Excluding, for the reasons stated, those documents that originated in the files of either Robert Burns, Paul
Finegan, or Paul Tivnan.

referring to "prior notice". However, every single one of those documents were produced to the

RCAB by LMC in this action, demonstrating that the RCAB had earlier produced them to LMC.

Furthermore, the RCAB produced all two hundred-twenty one pages of the Motion in

Limine itself on August 13, 2004, as it was contained within one of the priest personnel files, and

it touched upon prior notice. The exhibits, however, were not in the priest file. Finally, LMC

never made so much as a single request for the exhibits to that motion until January 19, 2005,

when it demanded production "today" of those exhibits. (emphasis in original) (*See* Exhibit 17.)

The RCAB complied, and produced all four volumes of the exhibits on January 19th, although it

disagreed with LMC's contentions that (a) those exhibits should have been produced last

summer, and (b) they had the right to demand their immediate production. (*See* Exhibit 18.)

### V. The Conduct Alleged by LMC Does not Merit the Imposition of Discovery Sanctions

Neither the RCAB nor its counsel intended to violate any order of the Court or any

discovery obligation. They apologize for any mistakes they may have made during the

complexities of pre-trial proceedings. It is also apparent that LMC and its counsel have adopted

a strategy of attacking their opponents rather than tackling the merits. Diversion of attention

from LMC's conduct – conceded to be in violation of LMC's policy terms and of obligations that

it tell the truth to its insureds – is paramount for LMC and its counsel. The story of this case is

LMC's misrepresentation of its coverage and its intransigent refusal to pay claims it owes[16], and

not its failure to receive duplicates of documents long since in its files. The RCAB and its

counsel have done nothing to merit the imposition of the $50,000 penalty requested by LMC.

Moreover, LMC's failure to comply with its obligation to confer in good faith with the

RCAB to narrow the issues in the pending motion or to obtain the discovery without court action

---

[16] Consider, for example, the Geoghan settlement, which LMC approved and contributed 21.6% with full knowledge
of all facts, but where it has failed to pay its requisite share as a result of its discredited exhaustion theory.

precludes the imposition of certain sanctions.  LMC has not complied with its obligations under

either Local Rule 7.1(a) or Federal Rule of Civil Procedure 37(a)(4)(A).  When LMC filed the

present motion, there were two opposed motions pending seeking the production of those

documents produced by the RCAB to the Attorney General.  LMC refers to its letter of

December 7, 2004 as constituting its conference with counsel for the RCAB; however, that letter

preceded its second Motion to Compel, and had no bearing on this Motion.  Moreover, that letter

did not indicate that counsel for LMC had had a conversation subsequent to Mr. Schwartz's

email dated December 2, 2004, nor did it address all the other aspects of this Motion.  Of course,

it should be noted that LMC does not acknowledge in its Motion that it long since has had

virtually all of the documents of which it now complains, and that it got them from the RCAB.[17]

　　　Furthermore, LMC made no effort to obtain any of the other documents sought by its

motion prior to its filing.  Even more notably, LMC did not mention its intention to file the

pending motion, even though LMC's counsel called counsel for the RCAB on the evening of

January 12, 2005 to confer about the filing of LMC's motion for partial summary judgment, filed

on January 12, 2004.  Mr. Zelle's contention that his conversation with counsel *during* the

deposition of Father Phinn constituted such a conference is patently insufficient.  In that

conversation, Mr. Zelle did not explain the basis for any of his assertions that certain documents

should have been produced or were not produced.   LMC's failure to confer is indicative of the

fact the primary purpose of the pending motion is to delay the resolution of the issues in this

case, as evidenced by its request for a stay of all discovery.

---

[17] References by the RCAB to LMC's possession of the documents at issue is not intended as an attempt to justify the RCAB's withholding; rather, it merely serves to support the RCAB's contention that LMC's repeated assertions about having to engage in an "independent investigation" are without merit, that this is an ambush, and that LMC was not prejudiced by the withholdings.

## CONCLUSION

For the foregoing reasons, LMC's Motion to Compel the Production of Documents and for the Imposition of Sanctions should be denied in its entirety.

Roman Catholic Archbishop of Boston, a
Corporation Sole
By its attorneys,

/s/ Paul B. Galvani
Paul B. Galvani (BBO No. 183800)
Thomas H. Hannigan, Jr. (BBO No. 220420)
Bryan R. Diederich (BBO No. 647632)
Kate Cimini (BBO No. 654336)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated:  January 26, 2005